IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE,
WESTERN DIVISION

---

RAYMOND JAMES & ASSOCIATES, INC.,

    Plaintiff,

v.                                                                                          CASE NO. 2:18-cv-02104

50 NORTH FRONT ST. TN, LLC,

    Defendant.

---

RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION TO OBTAIN INSPECTION

---

COMES NOW Defendant 50 North Front St. TN, LLC ("Landlord"), and responds in opposition to Raymond James & Associates, Inc.'s ("Raymond James") Motion for Preliminary Injunction to Obtain Inspection (the "Motion"):

## INTRODUCTION

Raymond James seeks the extraordinary remedy of a preliminary injunction to further its commercial aim of compelling Landlord to modernize the elevators at 50 North Front Street. Raymond James relies on emotionally-charged, but factually unsupported claims, of danger for what it calls the "simple and limited purpose of obtaining a preliminary injunction." The Court should deny the Motion for the following reasons.

- The elevators are **safe** for the riding public and for Raymond James' employees.

- There is no such thing as a simple and limited mandatory preliminary injunction. The power to grant such relief is among the most extraordinary powers wielded by this Court.

- Landlord has allowed the exact injunctive relief Raymond James demanded in the Complaint and in the Motion – to permit Lerch Bates, Inc. access to the elevator systems. On March 14, 2018, Raymond James materially changed its demand, sought to enlarge the parties' agreement, and compelled this hearing.

Raymond James seeks to change the terms of the June 26, 2014 Commercial Lease it entered into for a 10-year term knowing full well that the building and its systems are not going to become younger. (the "Lease" at **Ex. 1**). Raymond James accepted the building and its elevators as they were on June 26, 2014 with Landlord responsible for repairs and maintenance as set forth in the Lease, but without any commitment to provide any base building capital improvements. The Lease terms were bargained for and agreed to, including a period of several years during which Raymond James pays no rent, a savings to Raymond James of close to nine million dollars. Raymond James now demands that Landlord provide brand-new elevators without respect to the Lease and without regard to financial realities. This is analogous to buying an extended warranty on a three-year old vehicle. You are covered under its terms for repairs and maintenance, but instead you demand a brand-new car.

This litigation is crafted to achieve Raymond James' commercial goals through injunctive relief in two (2) parts. First, Raymond James "seeks an injunction prohibiting Landlord from denying its Consultant access to the elevator system and the associated maintenance and repair records and personnel for that system." (See Complaint for Injunctive Relief, Declaratory Relief, and Damages [D.E. 1-1] (the "Complaint") ¶ 26(a)). It is important to note that Raymond James does not have such a right per the Lease. Second, "[f]ollowing completion of its Consultant's inspection, Raymond James will thereafter petition the Court for a further preliminary injunction to require landlord to, among other things, take immediate steps to protect the safety and health of Raymond James' employees and to assure Raymond James' right to a reliable elevator system." (See Complaint ¶ 26(b)). The end goal is forcing Landlord to "start modernizing the elevators immediately" requiring the "upgrade, overhaul or replace[ment of] the elevator system in whole or in part." (See Complaint ¶¶ 10 & 14).

In an effort to avoid conflict, Landlord has allowed the exact injunctive relief Raymond James demanded in the Complaint and in the Motion – to permit Lerch Bates, Inc. access to the elevator systems.  Raymond James now literally rejects the relief it demanded.  Instead, Raymond James seeks through a mandatory preliminary injunction to have a forensic litigation consulting company (as opposed to an elevator company) inspect the building in support of its imminent demand for the "further preliminary injunction" that Landlord modernize the elevators. Raymond James has no such right under the Lease, under the substantive law, or under the Federal Rules of Civil Procedure.  The elevators are safe and do not pose a hazard.  The Court should not permit Raymond James to rewrite its Lease under the guise of safety.

## LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Texas v. Camenisch, 101 S. Ct. 1830, 1834 (U.S. 1981).  "First, the court must determine 'whether the plaintiff has established a substantial likelihood or probability of success on the merits' of his claim.  Second, the court will determine 'whether the [plaintiff] would suffer irreparable injury' if a preliminary injunction did not issue.  Third, the court determines 'whether the injunction would cause substantial harm to others.'  And finally, a court must consider 'whether the public interest would be served" if the court were to grant the requested injunction." Liberty Coins, LLC v. Goodman, 748 F.3d 682, 689-90 (6th Circ. 2014) (internal citations omitted).

"[A]n injunction generally should not issue if there is an adequate remedy at law." CSX Transp., Inc. v. Tennessee State Bd. of Educ., 964 F.2d 548, 552 (6th Cir. 1992).  "A preliminary injunction may be issued to protect plaintiffs from irreparable harm and to preserve the Court's ability to effectuate its decision after a trial on the merits." Riverside Park Realty Co. v. Federal

Deposits Ins. Corp., 465 F. Supp. 305, 309 (M.D. Tenn. 1978). "The most prominent reason for granting a preliminary injunction is that without such judicial intervention into the affairs of the parties prior to a full trial on the merits of the case, the applicant for such relief is likely to suffer irreparable injury." Id. at 315. "Absent a showing of irreparable harm, a preliminary injunction is not warranted." Carpet Tech v. National Contract Flooring, LLC, No. 14-2045-JF/dkv, 2014 WL 12531120 *6 (W.D. Tenn. 2014) at **Ex. 2**. Finally, an "indicator of the need for immediate injunctive relief is the speed with which relief is sought." Id. at 7 (Judge John T. Fowlkes ruled that a nine (9) month delay between discovery of the alleged issue and the filing of an action for injunctive relief weighed against a finding of irreparable harm).

## ARGUMENT

The Lease does not require Landlord to modernize the subject elevators, nor does it permit the type of inspection demanded by Raymond James. Raymond James' claims do not meet the high legal standard required for issuance of a preliminary mandatory injunction because it does not have a substantial likelihood of success on the merits; there is no irreparable harm; and the relief requested would harm Landlord while providing no benefit to the public.

*The elevators are safe.*

Contrary to the claim[1] that the elevators "have become dangerous and unreliable," the elevators are safe for the public, including for employees of Raymond James. Thyssenkrupp Elevator Corporation[2] – one of the world's largest and most-respected elevator manufacture and maintenance companies – provides service for the elevators at 50 North Front Street. (See Sofer

---

[1]   (See Memorandum in Support of Plaintiff's Motion for Preliminary Injunction to Obtain Inspection ("Plaintiff's Injunction Memo.") at p. 1).

[2]   See https://www.thyssenkruppelevator.com.

4

Declaration (**Ex. 3**) at ¶¶ 2 & 3). On February 12, 2018, Chip Morris, Thyssenkrupp's Modernization Specialist, opined concerning the safety of the elevator services:

> As your elevator service provider, I am writing to let you know that your elevators, when operational, <u>are safe for the riding public</u>. Per our company guidelines, should any equipment be deemed unsafe, we would have a licensed elevator technician Lock Out / Tag Out the unit. We would then send our licensed elevator technicians to repair the elevator and return it to operation after confirming that it was safe for the riding public. <u>No repairs that have been completed or are in process of being completed are due to safety issues</u>, rather wear and tear of the aging equipment.
>
> <u>Entrapments are inevitable with vertical transportation, and the age of the equipment has no bearing on when one might occur.</u> Our licensed elevator technicians are trained in safely removing trapped passengers. In the event an entrapment occurs at your building located at 50 North Front Street in Memphis, TN, we have six licensed elevator technicians located within 15 minutes of your building, so a passenger who is trapped during normal business hours can reasonably expect to be released from the elevator within 60 minutes.

(See Sofer Declaration at ¶ 4, and see **Ex. 4** (emphasis added).

*Landlord has previously agreed to allow Lerch Bates, Inc. to inspect the elevators.*

Landlord rejects the notion that Raymond James has any *right* to preliminary injunction. That said, Landlord has previously agreed to Raymond James' specific demands to permit Lerch Bates, Inc. access to the elevator systems. In the Complaint, Raymond James alleged that it:

> has sought to get the elevator system thoroughly inspected by a qualified expert ("Consultant"). This Consultant, Lerch Bates, Inc., is a well-known international, elevator consulting firm specializing in the maintenance, modernization, and design of elevator systems.

(See Complaint ¶ 15). Raymond James alleged that it "seeks an injunction prohibiting Landlord from denying its Consultant access to the elevator system and the associated maintenance and repair records and personnel for that system." (See Complaint ¶ 26(a)). Finally, the Complaint demanded "[a] Preliminary Injunction that allows Raymond James and its Consultant full and complete access to the elevator system and its associated maintenance and repair records and

5

personnel." (See Complaint, Prayer for Relief A, p. 16). Throughout the Complaint, Raymond James specifically identified the *Consultant* as Lerch Bates, Inc.

In its Motion, Raymond James repeats that it "seeks an order allowing its consultant access to conduct an immediate elevator inspection …." (See Plaintiff's Injunction Memo. at p. 1). The Motion continues that Raymond James:

> has decided to get the elevator system thoroughly inspected by a qualified expert (the "Consultant"). This Consultant, Lerch Bates Inc., is a well-known international elevator consulting firm that specializes in the maintenance, modernization and design of elevator systems.

(See Plaintiff's Injunction Memo. at p. 4). As in the Compliant, at all times the Motion identifies the *Consultant* as Lerch Bates, Inc. and cites reasons supporting this choice.

The Motion hearing was originally scheduled on February 21, 2018. [D.E. 7]. However, to avoid conflict Landlord has allowed the exact injunctive relief demanded in the Complaint and in the Motion to permit Lerch Bates, Inc. access to inspect the elevator systems. David Wade wrote on February 19, 2018 that "I confirm my client has agreed that your elevator company may inspect the elevators at the 50 North Front Street address at a time when Joel Friedman [Landlord's Asset Manager] can be present." In the wake of the agreement, the February 21, 2018 preliminary injunction hearing was cancelled. [D.E. 9].

Counsel exchanged a list of possible dates on which to set the Lerch Bates, Inc. inspection. Among several other possible dates, counsel discussed March 19 and March 20. On February 23, 2018, David Wade notified Niel Prosser that "I just disconnected with Joel Friedman who reports he has a family conflict with March 19, but offers on your proposed alternate date of March 20 to begin at the noon hour." Also on February 23, 2018, Niel Prosser rejected this proposed accommodation citing the length of the inspection and the family spring

6

break schedule of Derek Recer, Raymond James' Vice President of Corporate Real Estate. Counsel had little or no discussion regarding the inspection for several weeks.

On March 8, 2018, David Wade wrote "Mr. Friedman can be available as I reported to you on February 20 on either March 13 or 14 (next week). Other than that, he is not available on March 19, but can be available on the afternoon of March 20 beginning at noon until March 21, until 4 p.m." On March 13, 2018, Niel Prosser responded that his client could shift the inspection from March 19 to March 20, but would "need to go later than 4:00 pm." David Wade confirmed that Lerch Bates, Inc.'s inspection would begin "on March 20 at noon with Joel Friedman present …. That work can go as late as required to complete the work."

On March 14, 2018, at 5:04 p.m., Niel Prosser affirmed the March 20, 2018 inspection schedule, while unilaterally seeking to change the agreement between the parties. He wrote to David Wade "we will be at the building on March 20 by noon. Tim Murphy [of Lerch Bates, Inc.] could not do the inspection on 3/20 and we will instead be using Dennis Olsen of Robson Forensic." This last-minute ultimatum exceeds the specific demands made in the Complaint and in the Motion, i.e. that Lerch Bates, Inc. conduct the elevator inspection.

Raymond James seeks to transform an agreement to have Lerch Bates, Inc. inspect the elevators, into a forced inspection by a Fed. R. Civ. P. 26(a)(2)(B) expert witness firm. Lerch Bates, Inc. is in the business of elevators.[3] In contrast, Robson Forensic is in the business of

---

[3] Lerch Bates, Inc. is an elevator consulting firm, which advertises itself as bringing "together expertise in consulting, engineering and technology for the design and management of vertical and horizontal transportation systems, including high rise elevators, commercial elevators, freight elevators, escalators and moving walkways. Our qualified consultants provide clear analysis, cost effective recommendations and attention to detail – ranging from code compliance to aesthetic considerations."

(https://www.lerchbates.com/en-US/Disciplines/Elevator-Consulting).

litigation support, billing itself as "a national leader in expert witness consulting" having been experts in "more than 50,000 cases since 1987." (See **Ex. 5**).

*Raymond James is not entitled to preliminary injunctive relief as a matter of law.*

Seeking to achieve its commercial ends, Raymond James includes in its Motion emotionally-fraught anecdotes of its employees being briefly stuck on elevators. (See Complaint ¶ 9(A)). Raymond James claims that over the course of 2017 and 2018, a total of approximately thirty (30) of its employees in five (5) separate incidents were stuck in an elevator. The total combined duration of these incidents was about three (3) hours.[4] Id.

Raymond James relies on the Declaration of Walter Gunn. Gunn admits there have been no "medical emergencies" involved with any of the brief stoppages. (See Decl. of Walter Gunn ¶ 7). He relates that, in virtually every instance, elevator technicians arrived soon after the elevator stopped. (See e.g., Decl. of Walter Gunn ¶ 7). In the memoranda and emails attached to the Gunn Declaration, Gunn and others relate that when the rare incidents have occurred, elevator technicians have arrived: (1) "in less than five minutes" and "prior to the fire fighters making the scene;[5]" (2) within five to ten (5-10) minutes of the incident[6]; (3) within forty (40) minutes of the incident[7]; and (4) within sixteen (16) minutes of the incident.

These limited incidents are inconveniences and not safety issues. Thyssenkrupp confirms that entrapments are inevitable without regard to the age of the elevators. Thyssenkrupp also

---

[4] A single incident involved fifteen (15) people stuck for about twenty (20) minutes. (See Complaint ¶ 9(A)(iii)). The longest incident lasted for about one (1) hour, involving six (6) people. (See Complaint ¶ 9(A)(ii)).

[5] See Memo. of Walter A. Gunn, at Ex. A to the Decl. of Walter Gunn.

[6] See email from Jacob Bulls to Mason Wellborn, at Ex. A to the Decl. of Walter Gunn.

[7] See email from Jacob Bulls to Mason Wellborn, at Ex. A to the Decl. of Walter Gunn.

certifies that the elevators "are safe for the riding public." (See Sofer Declaration at ¶ 3 & 4; and see **Ex. 4**). Raymond James' claims do not support preliminary injunction.

> *i. Raymond James does not have a substantial likelihood of success on the merits.*

The Lease dictates the starting date by which to measure any complaints Raymond James has with the elevators, setting the "Effective Date" as June 26, 2014. Raymond James' allegations must be weighed against its June 26, 2014 acceptance of the building – not by the rhetorical assertion that the elevators "were installed over thirty (30) years ago." The elevators are safe and are currently maintained by a professional company in materially the same condition in which they were on June 26, 2014 when they were accepted by Raymond James. (See Sofer Declaration at ¶¶ 3, 4 & 5; and see Lease at ¶ 1(w)). Nothing has changed since the date the elevators were accepted.

The Lease requires that "Landlord shall maintain and operate the Building: (1) in at least the form, manner and quality as exists at the Building on the Effective Date [June 26, 2014] (the 'Current Standard') as it relates to Building maintenance, and operation, and (ii) substantially in accordance with the manner and quality of the maintenance and operation of Comparable Buildings at the time a comparison between the Building and Comparable Buildings is made hereunder." (See Lease ¶ 10). "Landlord shall make such improvements, repairs or replacements as may be necessary to maintain[8] the Building Systems[9] serving the Premises …." (See Lease ¶ 10) (emphasis added).

---

[8]    Black's Law Dictionary defines *maintain* as "To Continue (something). … To care for (property) for purposes of operation productivity or appearance; to engage in general repair and upkeep. …" Black's Law Dictionary 126 (7th ed. 1999) at 965).

[9]    *Building Systems* are defined to include the elevators. (See Lease ¶ 1(v)).

9

The allegations of elevator interruptions, do not constitute an Interruption of Essential Service as that term is defined under the Lease. (See Lease ¶¶ 11(e) and 11 (f)). The Essential Services obligation is met if Landlord maintains "at least one (1) passenger or freight elevator providing access to the floors of the Building on which Premises are located." (See Lease ¶ 11(e)). Neither is it a Critical Failure[10], Raymond James' access to its space has not been materially or adversely impacted.

---

[10] Critical Failure. If (i) Landlord shall fail to provide any service or perform any maintenance or repair to the Building or Building Systems that Landlord is expressly required to provide or perform under the terms of this Lease, other than a repair involving any structural portion of the Building (repairs to structural portions of the Building being expressly excluded from the provisions of this paragraph); (ii) Landlord fails to commence to restore such service or perform such maintenance or repair within two (2) business days after the effective date of written notice from Tenant of the existence of such failure, forwarded to Landlord in accordance with the notices provision of this Lease (as such two (2) business day period is extended to the extent Landlord is unable to commence due to a Force Majeure Event), and thereafter diligently pursues such cure ("commence" to restore a service or to perform maintenance or a repair means performance of the first step towards such restoration or performance of such maintenance or repair as is reasonable under the circumstances, such as inspecting the area where the problem is located, assessing the nature of the problem, and which could include, for example, contacting experts to assess the nature of the problem and suggest necessary action, and contacting contractors after Landlord has determined the nature of the problem and the appropriate contractors to be contacted); (iv)as a result of such failure, Tenant's use of a material portion of the Premises is materially and adversely impaired (such failure deemed a "Critical Failure"); (v) Tenant at its election may provide Landlord with written notice pursuant to the notices provision of this Lease (the "Critical Failure Notice") that Tenant intends to cure such Critical Failure (a "Critical Repair"), and seek reimbursement from Landlord for the actual reasonable cost of effecting such Critical Repair in accordance with the terms of this paragraph; and (vi) Landlord fails to commence (as defined above) to cure such Critical Failure within four (4) consecutive calendar days after the effective date of the Critical Failure Notice, then Tenant may proceed to perform the Critical Repair and recover reimbursement from Landlord for the actual reasonable cost thereof in accordance with the terms of this paragraph. Landlord shall endeavor to address any Critical Failure as quickly as possible, and in any event, within the time frame set forth above. Landlord shall promptly and in good faith respond to inquiries by Tenant's Representative, defined below, regarding Landlord's plan for assessing the Critical Failure and the

Having accepted the Building on June 26, 2014, and as long as the elevators provide access to the floors occupied by Raymond James, there is no contractual requirement to modernize the elevators. By way of example only, Landlord submits the May 2017 Report of its managing agent, Colliers International (the "Colliers Report"), given in response to a letter from James Wachter, an attorney for Raymond James.[11] (See Sofer Declaration at ¶ 6, and see **Ex. 6**). The Colliers Report confirmed that, as of May 2017, the "building elevators were in their current condition at the time the Lease was signed." (See **Ex. 6**). The Colliers Report concluded "we feel very comfortable in saying that Raymond James Tower is in good order and continues to operate in a manner consistent with downtown Class A office space in Memphis." (See **Ex. 6**).

The elevators are safe for the public and are in the condition that than they were on June 26, 2014 and in May 2017; the building remains in a condition equal to other Comparable Buildings as defined by the Lease; and the Building continues to operate in a manner consistent with downtown Class A office space. (See Sofer Declaration at ¶¶ 2, 3, 4, 5 & 6; and see **Exs. 4 & 6**). There is no breach of the Lease; therefore, Raymond James is exceedingly unlikely to succeed on the merits. The Court should deny the Motion for Preliminary Injunction.

---

anticipated timing for curing such Critical Failure, provided such communication does not materially interfere with or compromise Landlord's cure efforts; impose unreasonable timeframes on Landlord's time for response; or otherwise impose unreasonable demands upon Landlord; such communication shall be limited to information Tenant needs to know for Tenant's legitimate business reasons; and in no event shall Landlord be required to include any proprietary or confidential information of Landlord or any third party.

(See Lease ¶ 11(f)).

[11] The Wachter Letter will be addressed in more detail below.

11

*ii. Raymond James has suffered no irreparable harm.*

There is no irreparable harm.  The elevators are safe for the public, including Raymond James' employees.  As set out in detail above, Thyssenkrupp, one of the largest and most-respected elevator maintenance companies in the world, provides service for the elevators at 50 North Front Street.  (See Sofer Declaration at ¶¶ 2 & 3).  Thyssenkrupp confirmed in writing on February 12, 2018 that the elevators at 50 North Front Street "are safe for the riding public," that "[n]o repairs that have been completed or are in process of being completed are due to safety issues," and that "the age of the equipment has no bearing on when [an entrapment] might occur."  (See **Ex. 4**).  Thyssenkrupp also confirmed its commitment that "a passenger who is trapped during normal business hours can reasonably expect to be released from the elevator within 60 minutes."  (See **Ex. 4**).  This commitment to a fast response is even evident in the otherwise critical Gunn Declaration.

Essential to this Motion, and dispositive of the claim of irreparable harm, Raymond James delayed from May 5, 2017 until February 2, 2018 to file its Complaint and its Motion.  On May 5, 2017, attorney Charles Wachter, wrote a letter on behalf of Raymond James, entitled Notice of Breach, Default, and Critical Failure.  This May 5, 2017 letter expressed many of the allegations that make up the Complaint.  (See Recer Declaration at Ex. B thereto).  The letter mentions the building's elevators in a single sentence – last on the list of eight (8) concerns raised.[12]  Having raised the elevator issue on May 2, 2017 that "[t]he buildings infrastructure is original and well beyond the useful life," Raymond James waited nine (9) months before filing the February 2, 2018 Complaint.  This wait is fatal to its demand for preliminary injunction.

---

[12]     Landlord's response (via the Colliers Report) is addressed in more detail above.

In <u>Carpet Tech v. National Contract Flooring, LLC</u>, this Court reviewed the timeliness of an action in the context of preliminary injunction motions. In that non-compete case, the Court considered the nine (9) month gap between a March 18, 2013 Cease and Desist letter and the March 14, 2013 Complaint initiating the lawsuit. <u>Carpet Tech</u>, 2014 WL 12531120, * 1. In its irreparable harm analysis, the Court reasoned that "[a]nother indicator of the need for immediate injunctive relief is the speed with which relief is sought." <u>Id.</u> at *7. The Court concluded that "[i]t appears to this Court that the delay in seeking injunctive relief is significant enough to weigh against a finding of irreparable harm" and denied the motion for preliminary injunction. <u>Id.</u> The Court should find that Raymond James' nine (9) month delay weighs against a finding of irreparable harm and should deny the Motion.

In addition to the original nine (9) month delay in taking action, Raymond James literally rejects the exact relief it demanded. Without more, this refusal to accept the exact injunctive relief it demanded in the Complaint and in the Motion is dispositive of the issue of irreparable harm. The Court should find that Raymond James' last-minute rejection of an agreement to its express demands weighs against a finding of irreparable harm and should deny the Motion.

*iii. Balancing the harms favors Landlord.*

Raymond James does not seek injunctive relief to enhance the safety of its employees or the public; rather it looks for a tactical advantage in pressing its commercial demands for capital improvements. Landlord does not disagree with the anticipated argument that the parties are allowed to select their own expert witnesses in keeping with the Federal Rules of Civil Procedure and Federal Rules of Evidence. Choosing an expert witness is, however, not the issue here. Both in the Complaint and Motion, Raymond James demanded the very specific injunctive relief of having Lerch Bates, Inc. inspect the elevators at 50 North Front Street. Landlord agreed to

13

that demand. Now at the eleventh-hour, without amending its pleadings, Raymond James seeks to compel a pre-discovery inspection by a forensic litigation expert witness firm without adhering to any of the controlling discovery rules. This tactic is not allowed by the Federal Rules of Civil Procedure. To allow it by preliminary injunction, would harm Landlord. The Court should deny the Motion.

*iv. A preliminary injunction does not serve the public interest.*

Without repeating the arguments, there is no public interest in granting preliminary injunctive relief. (1) There is no public safety benefit. The elevators are safe. (2) There is no public interest in preventing irreparable harm. Before expanding the scope of its demands, Raymond James already had an agreement in place for the Lerch Bates, Inc. inspection it sought to compel through litigation. (3) There is no public benefit in expanding the Federal Rules of Civil Procedure to allow expert discovery to proceed out-of-order, prior even to the Rule the 26(f) conference and the Court's scheduling order. The Court should deny the Motion.

WHEREFORE, PREMISES CONSIDERED, Defendant 50 North Front St. TN, LLC respectfully submits that a mandatory preliminary injunction would not be proper under the circumstances, and requests that this Honorable Court deny the Motion for Preliminary Injunction to Obtain Inspection, and grant Defendant such other and further relief to which the Court deems it is entitled.

Respectfully submitted by,

s/ J. Lewis Wardlaw
David Wade (Tenn. Bar No. 4106)
J. Lewis Wardlaw (Tenn. Bar No. 23078)
Rebecca K. Hinds (Tenn. Bar No. 31368)
MARTIN, TATE, MORROW & MARSTON, P.C.
6410 Poplar Ave., Tower II, Suite 1000
Memphis, TN 38119-4839
(901) 522-9000
(901) 527-3746 (Fax)
*dwade@martintate.com*
*lwardlaw@martintate.com*
*rhinds@martintate.com*

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon the below-listed counsel this 18th day of March, 2018, through the Court's ECF system:

Niel Prosser
The Prosser Law Firm, PLC
5865 Ridgeway Center Parkway, Suite 300
Memphis, Tennessee 38120

s/ J. Lewis Wardlaw

15