IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE,
WESTERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC.,

    Plaintiff,

v.                                          CASE NO. 2:18-cv-02104

50 NORTH FRONT ST. TN, LLC,

    Defendant.

## DECLARATION (SECOND) OF JACOB SOFER

I give this Declaration, pursuant to 28 U.S.C. Section 1746, in support of Defendant 50 North Front St. TN, LLC's Response in Opposition to Plaintiff's Motion for Preliminary Injunction.

1.    My name is Jacob Sofer. I am over 18 years of age and am competent to testify to the following.

2.    Thyssenkrupp Elevator Corporation is one of the world's largest and most-respected elevator maintenance companies.

3.    Thyssenkrupp Elevator Corporation provides service for the elevators at 50 North Front Street.

4.    On February 12, 2018, Chip Morris, Thyssenkrupp Elevator Corporation's Modernization Specialist, provided the letter attached hereto at Exhibit A, writing that:

> As your elevator service provider, I am writing to let you know that your elevators, when operational, are safe for the riding public. Per our company guidelines, should any equipment be deemed unsafe, we would have a licensed elevator technician Lock Out / Tag Out the unit. We would then send our licensed elevator technicians to repair the elevator and return it to operation after

confirming that it was safe for the riding public. No repairs that have been completed or are in process of being completed are due to safety issues, rather wear and tear of the aging equipment.

Entrapments are inevitable with vertical transportation, and the age of the equipment has no bearing on when one might occur. Our licensed elevator technicians are trained in safely removing trapped passengers. In the event an entrapment occurs at your building located at 50 North Front Street in Memphis, TN, we have six licensed elevator technicians located within 15 minutes of your building, so a passenger who is trapped during normal business hours can reasonably expect to be released from the elevator within 60 minutes.

5.    The elevators at 50 North Front Street are currently maintained in materially the

same condition in which they were maintained on June 26, 2014.

6.    Our property manager, Colliers International, provided the May 2017 Raymond

James Tower Report attached hereto at Exhibit B in response to a May 5, 2017 letter from

attorney Charles Wachter, written on behalf of Raymond James.


**FURTHER DECLARANT SAITH NOT.**


I declare under penalty of perjury that the foregoing is true and correct.


Executed on this 18th day of March 2018.

_____
Jacob Sofer

# EXHIBIT A



thyssenkrupp Elevator Corporation, 1650 Shelby Oaks Dr. Suite 6, Memphis, TN 38134

Madison Realties
5000 Buchan, Suite 2005
Montreal, QC. H4P IT2

Elevator Technology

02/12/2018
Page 1/1

**Raymond James Building – 50 North Front Street**

Mr. Friedman,

As your elevator service provider, I am writing to let you know that your elevators, when operational, are safe for the riding public. Per our company guidelines, should any equipment be deemed unsafe, we would have a licenced elevator technician Lock Out / Tag Out the unit. We would then send our licensed elevator technicians to repair the elevator and return it to operation after confirming that it was safe for the riding public. No repairs that have been completed or are in process of being completed are due to safety issues, rather wear and tear of the aging equipment.

Entrapments are inevitable with vertical transportation, and the age of the equipment has no bearing on when one might occur. Our licensed elevator technicians are trained in safely removing trapped passengers. In the event an entrapment occurs at your building located at 50 North Front Street in Memphis, TN, we have six licensed elevator technicians located within 15 minutes of your building, so a passenger who is trapped during normal business hours can reasonably expect to be released from the elevator within 60 minutes.

Best regards,

*Chip Morris*

Chip Morris
Modernization Specialist

thyssenkrupp Elevator Corporation 1650 Shelby Oaks Dr. N., Ste 6, Memphis, TN 38134
P: +1 901-379-3213, www.thyssenkruppelevator.com

**EXHIBIT B**



Raymond James Tower

May 2017

Accelerating success.





Presented by:
Colliers Management Services – Memphis, LLC

Contact:

Shellie Moses, Property Manager
+19013125752
shellie.moses@colliers.com

Accelerating success.

Colliers International
Memphis Region
ASSET SERVICES

6363 Poplar Avenue | Suite 400
Memphis, TN 38119
www.colliers.com

MAIN +1 901 375 4800
FAX +1 901 312 5750



Mr. Jacob Sofer
Madison Realties LLC
48 Bakertown Rd, – Suite 500
Monroe N.Y. 10950

Re:     Colliers International – Memphis Response to Letter Date May 5, 2017

Dear Mr. Sofer

We are in receipt and have reviewed the Exhibit attached to the letter dated May 5, 2017
sent by Holland & Knight to Landlord.  We have reviewed the history of complaints by
Raymond James, their current lease, toured/inspected the building, and met with
professional contractors for specific opinions relating to building systems.

While we understand the frustration of having water infiltration in the building, it is important
to note that once the work currently underway is fully completed, we will have the entire
roofing system (the main roof, 16th, 18th, 20th floor deck and planters) fully replaced, with
high quality products and extended warranties.

In our professional opinion the Landlord is not in Default under the Lease, and is providing
the lease requirements of services, maintenance and repairs in accordance with similar
class A buildings in Memphis, as well as at least having maintained the conditions of the
building at lease execution, both of which are requirements in the lease.

The above Exhibit that uses phrases such as "Critical Failure", does not reflect the facts on
the ground.  Moreover, none of the items listed are "Critical Failure" as defined in the Lease
(see Paragraph 11, Section F, Critical Failure, which references Paragraph 11, Section A,
Services Provided by Landlord and Paragraph 10, Maintenance and Repair.  See attached
Exhibit A).

Although the Landlord is not in default under the Lease, it is Colliers' primary objective to
have Raymond James as a satisfied Tenant and to provide Landlord with
recommendations on achieving such.  Although Colliers has recently taken over this
assignment (6 months ago), it is our opinion that the Landlord has been proactive in
maintaining the Raymond James Tower as a true Class A office building, and has been
open to recommendations on possible improvements.  We have spent our time working to
resolve the most important issues (water infiltration on upper floors), elevators, cleaning
and security while still handling the day to day operations of the tower.  Several successes
that we would like to point out are:

- Escalator/Elevator - Worked with Thyssen Krupp to get the escalator in the lobby
  working properly, as well as getting all elevator cabs up and operational.





- Cleaning - Worked with Cleaners of America and initiated an inspection program to help improve the building cleaning, to include stripping/waxing tile floors and interior window cleaning.
- Parking Garage - Worked with the neighboring parking garage to improve garage lighting, safety and appearance.
- Roof - Initiated contract for a new building roof with an above standard roof (80 mil TPO) and an exceptional (30 year) double warranty.
- 16th Floor Planter and Deck – Initiated a contract to completely refurbish the planters and deck on the 16th floor.
- HVAC - Refurbished a chiller motor (while the chiller itself has been entirely rebuilt just prior).
- Reviewed all building mechanical systems.
- Fire/Life Safety - Conducted a building wide fire drill.

With the above in mind, please see the following responses to their letter, and our recommendations. We are hopeful that Landlord reviews and considers these specific recommendations in an effort to go the extra mile in trying to achieve tenant satisfaction with Raymond James.

Please note we have responded to issues in the same order as the May 5, 2017 referenced Exhibit.

1. **Water Leaks**

    A contract with Structural Waterproofing & Restoration was executed on March 7, 2017 with work substantially completed as of May 19, 2017. Contract scope is a complete tear off and replacement of the building's roof system with an 80 mil, 30 year warrantied product. The reported roof leaks on 20 (and possibly some on 19) are the result of the previous roof conditions. See Exhibit B for photos of roof replacement. It is worth noting that we have had several significant rains since May 19, 2017 with no water infiltration observed or reported on the 20th floor since the roof work was completed.

    Additionally, Structural Waterproofing & Restoration has begun the work on the 16th floor deck. Scope of work is identical to upper floor deck and planter work that occurred previously on the 18th and 20th floors, -this process includes the reworking of the planter itself as well as a complete recoating of the patio deck and we anticipate a completion date by June 25, 2017, weather permitting. Several leaks that were noted on the 15th floor are a result of the previous deck condition. See Exhibit C for photos of planter refurbishment work.

    A visual inspection of the other floors mentioned did not show any other leaks and the Angus work order system (utilized by Raymond James Tower tenants to report building issues) was not indicative of other leak concerns. Raymond James facilities indicated that all active leaks are in Angus. Following the completion of the above work we recommend Landlord to replace all stained ceiling tiles.



**20th Floor Conference Room**

According to our contractors, the conference room issue is a direct result of the present roof conditions. Now that roof replacement has been completed, we recommend Landlord to move ahead with the repairs to the conference room as needed. This work shall include replacing/reattaching wall covering, replacing ceiling tiles, replacing any sheet rock that has been removed and generally bringing the area back to Raymond James standard. Although we want this resolved as much as Raymond James does, the conference room can currently be used.

**Exterior building caulk and seal continues to deteriorate**

It has been challenging to determine if any infiltration is coming from the building envelope since the roof was definitely leaking prior to the reroofing project. We will closely monitor the building envelope and will recommend caulking and sealing, should we find conditions warrant same.

2. **HVAC**

The building mechanical systems (heating and cooling) are functioning as designed. The building has redundant capability with two chillers serving the property. Both chillers have been serviced and are operational. We recently overhauled one motor, cleaned the cooling tower, and are performing routine maintenance to help minimize downtime of the equipment. In addition, the AH, VAV boxes and other HVAC equipment are functioning properly. We checked Angus and there have been limited reports in which an HVAC issue has been raised that were due to equipment failure, the majority of the calls appear to be personal preference calls versus equipment failure. Although the Lease provides for a temperature range of between 68-76 F we have still continued to address personal preference calls and made adjustments, and will continue to do so.

3. **Pest Control.**

The building continues to have a weekly pest control service in place to treat the building for bugs and spiders. In addition, maintenance checks the glue traps weekly and Terminix fogs as requested by Raymond James. In 2017, we have had the 20th floor fogged twice (March and May). In addition, Terminix has the building setup for monthly fogging from April – August. We have continued to comply with the request for service even though Terminix and Raymond James Facilities **have not** reported any brown recluse spiders in 2017 (dead or alive).

4. **General building conditions.**

On 5/9/17, a Colliers management team completed a walkthrough of all restrooms on Raymond James floors. We observed the majority of restrooms with no issues whatsoever (see Exhibit D photos). Two restrooms exhibited minor wall covering coming loose (see Exhibit D), one where one piece of base tile was



missing, and a few where there were issues with a soap dispenser or water faucet not functioning properly. None of these issues were reported in Angus or to building management by Raymond James Tower tenants. All of the issues mentioned were minor and all were related to routine maintenance. Colliers will enter our findings in Angus, work orders will be dispatched to technicians and resolved in the next thirty (30) days. We did not find evidence of "significant wear and tear" nor did we find any restrooms that were unusable. It is our professional opinion that the restrooms meet Class A standards for Memphis.

**Stairwells are unsightly and potential trip hazards.**
We understand that upper floor stairwells were in their current condition at the time the Lease was signed, and is not a Landlord obligation. It is our understanding that Raymond James installed VCT and then removed it after years of service due to cracking. However, we also understand the importance of maintaining a solid relationship with Raymond James and are in process of having a contractor look at this issue and make recommendations. We should have more information on how to proceed within the next 30 days and will present our findings to the Landlord.

**Janitorial cleaning specifications and services provided are subpar and not consistent with maintaining Class A office building space.**
We have requested a walk through to address current cleaning issues with the Raymond James facilities team. Although the current vendor has made progress in the last few months, RJ is still not satisfied. Meanwhile, we have reached out to several cleaning vendors for pricing that have historically provided Class A office cleaning in Memphis and have provided them with the Raymond James cleaning specifications as part of the Request for Bid. Since RJ is still not satisfied we recommend that the Landlord replaces the current vendor.

**All building common area lobbies and hallways that are carpeted have visible stains and need a deep cleaning or replacement if cleaning is ineffective. Wallpaper and painted walls in these areas also need to be addressed.**
During the Colliers management tour of the property, very few stains were noted in common areas (see Exhibit E). We would be happy to meet with Raymond James facilities personnel to receive more direction in this regard. For the most part, the areas occupied by Raymond James are full floors with small common areas that appear to be in good condition.

**All elevator cab carpets and wall fabric panel finishes are worn and extremely dirty.**
Although we understand that building elevators were in their current condition at the time the Lease was signed and that this is not a Landlord obligation, we have still consulted with an interior designer (The Crump Firm) and are pricing an elevator refurbishment (walls, carpet, accent lighting). We recommend the Landlord move ahead with this project for the benefit of satisfying Raymond James and overall building appearance.

**Exterior windows are dirty and need to be cleaned.**



Pursuant to Exhibit B of the Lease, the windows should be cleaned "not more frequently than once every eighteen (18) months". Nevertheless we acknowledge the windows are in need of cleaning, and have obtained approval from Landlord to have this work completed in June.

**Exterior of the building needs a good pressure washing.**

As mentioned in item 1 above, there is a possibility that Landlord will be caulking and sealing the building envelope. Since the preferred time to get the pressure washing done would be in conjunction with this other building work, we would recommend pressure washing to be completed at the time of the caulk and seal in order to achieve the greatest results.

**Building generator fuel tank.**

The building generator is functioning properly. The display that was referenced as being non-operational has been abandoned and does not affect the operation of the building generator in any way. The building generator fuel sight glass is fully operational at this time with a reading of just shy of ¾ full (see Exhibit F). Raymond James' generator fuel tank is reading 18" that equates to roughly 200 gallons of fuel (see Exhibit F). Raymond James' fuel tank is filled by pumping fuel from the building tank to their tank via the Tramont machine which is fully operational. There is no current concern with the operation of the building generator or related equipment.

5. **Security.**

Although we have made progress with this vendor in the last few months, Raymond James is still not satisfied. Meanwhile, we have discussed and received pricing from a few vendors, including Raymond James' recommended security companies and are in review of same. We recommend that the Landlord replaces the current security vendor.

With regard to the cameras, we will investigate further and repair all non-operational cameras by June 30, 2017.

Locking the skybridge during normal working hours will cause problems for other tenants within the building. As a multi-tenant building, some occupants of the building have outside customers and visitors that require access via the skybridge so we feel that locking off an entry point to the building during normal working hours is not a viable option. The elevators serving Raymond James floors as well as the Raymond James leased premises are not accessible to the general public as they are limited by access control.

6. **Outdoor lighting.**

We are aware of only three lights on the exterior east side of the building under the canopy that were inoperable. They have since been repaired and are now fully operational.



**Aging Building Infrastructure.**
- **All building elevators (mechanical and interior cab conditions)**
  All elevators are functioning as designed and the interior cab conditions were addressed in item 4.

- **HVAC Systems.**
  All HVAC systems are functioning as designed and this was addressed in item 2.

- **Electrical Systems.**
  We are not aware of <u>any</u> electrical system failures and there are none reported in Angus. The electrical system is functioning as designed.

- **Generator and Fuel Tank.**

  Generator and fuel tank are functioning as designed. This was addressed specifically in item 5.
- **Exterior Caulk and Sealing of the building.**
  Exterior caulk and seal were addressed specifically in item 1.

Generally speaking we feel very comfortable in saying the Raymond James Tower is in good order and continues to operate in a manner consistent with downtown Class A office space in Memphis. We recognize that the major tenant in Raymond James tower appears to be more involved than most, we respect and value their input and want to provide them with a quality building and quality services for years to come. We also recognize and understand Landlord's frustration that most of these items have been ongoing for years under prior ownership, that Landlord has continuously substantially improved the building from where it was at the time of purchase, that Raymond James favorably renewed their Lease, and such Lease is silent of any capital investments or increase in services to be provided. We still believe that our attention to their needs is exceptionally important, and we therefore urge ownership to follow our recommendations and make the changes and improvements we have suggested. We strongly feel that this would make Raymond James a satisfied tenant.

In summary, we have made great progress over the past six months as evidenced above, and this letter seems to be coming in on the heels of that effort. Based on our recent building inspection, Angus reports, and several meetings with Raymond James staff, we are pleased with the positive momentum we have achieved. While there is room for improvement in areas such as communication with Raymond James, we have heard their requests and have started to implement weekly email updates and hold regular monthly meetings with their facility staff. We will continue to work toward resolution of the above items and continue to operate the building in accordance with the lease requirements. Rest assured, Colliers will continue to work with Raymond James to help resolve any issues timely, and work to improve the current relationship. We will seek continual



feedback from Raymond James during our monthly meetings and communicate our findings with ownership.

Please let me know if you have any questions or need further clarification.

# EXHIBIT A

additional cost for providing maintenance or services to the Premises, and Landlord shall be permitted and shall have the means to access all areas of the Premises in the event of emergency.

(e) Interruption of Essential Service. Landlord shall not be liable for any damages directly or indirectly resulting from, nor shall any Rent be abated (except as otherwise provided below) by reason of, the installation, use or interruption of use of any equipment in connection with furnishing any of the foregoing services, or failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord. The failure to furnish any such services shall not be construed as an eviction of Tenant or relieve Tenant from any of its obligations under this Lease. If Landlord shall fail to provide any Essential Service, defined below, to Tenant, or perform any maintenance to or repair of the Common Areas or Premises, that Landlord is expressly required to provide or perform under the terms of this Lease, and such failure shall continue for a period of five (5) consecutive business days after Landlord's receipt of written notice from Tenant of the existence of such failure, and such failure is not due to a Force Majeure Event (provided [and to the extent] that Landlord doesn't actually receive proceeds from any applicable insurance for rental loss the cost of which is included in Operating Expenses), and as a result of such failure, the Premises or a portion thereof shall be substantially unusable by Tenant, then, commencing with the expiration of such five (5) consecutive business day period, Tenant's Base Rent and Additional Rent shall abate in the proportion that the rentable square footage of the portion of the Premises rendered substantially unusable by such failure bears to the total Rentable Area of the Premises then leased hereunder for the period of time that such portion is substantially unusable. The term "Essential Service" shall mean HVAC service (exclusive of HVAC provided by any Supplemental HVAC Equipment), electrical service, water and sewer service, and at least one (1) passenger or freight elevator providing access to the floors of the Building on which the Premises are located.

(f) Critical Failure. If (i) Landlord shall fail to provide any service or perform any maintenance or repair to the Building or Building Systems that Landlord is expressly required to provide or perform under the terms of this Lease other than a repair involving any structural portion of the Building (repairs to structural portions of the Building being expressly excluded from the provisions of this paragraph) (ii) Landlord fails to commence to restore such service or perform such maintenance or repair within two (2) business days after the effective date of written notice from Tenant of the existence of such failure, forwarded to Landlord in accordance with the notices provision of this Lease (as such two (2) business day period is extended to the extent Landlord is unable to commence due to a Force Majeure Event), and thereafter diligently pursues such cure ("commence" to restore a service or to perform maintenance or a repair means performance of the first step towards such restoration or performance of such maintenance or repair as is reasonable under the circumstances, such as inspecting the area where the problem is located, assessing the nature of the problem, and which could include, for example, contacting experts to assess the nature of the problem and suggest necessary action, and contacting contractors after Landlord has determined the nature of the problem and the appropriate contractors to be contacted); (iv) as a result of such failure, Tenant's use of a material portion of the Premises is materially and adversely impaired (such failure deemed a "Critical Failure"); (v) Tenant at its election may provide Landlord with written notice pursuant to the notices provision of this Lease (the "Critical Failure Notice") that Tenant intends to cure such Critical Failure (a "Critical Repair"), and seek reimbursement from Landlord for the actual reasonable cost of effecting such Critical Repair in accordance with the terms of this paragraph; and (vi) Landlord fails to commence (as defined above) to cure such Critical Failure within four (4) consecutive calendar days after the effective date of the Critical Failure Notice, then Tenant may proceed to perform the Critical Repair and recover reimbursement from Landlord for the actual reasonable cost thereof in accordance with the terms of this paragraph. Landlord shall endeavor to address any Critical Failure as quickly as possible, and in any event, within the time frames set forth above. Landlord shall promptly and in good faith respond to inquiries by Tenant's Representative, defined below, regarding Landlord's plan for assessing the Critical Failure and the anticipated timing for curing such Critical Failure, provided such communication does not materially interfere with or compromise Landlord's cure efforts; impose unreasonable timeframes on Landlord's time for response; or otherwise impose unreasonable demands upon Landlord; such communication shall be limited to information Tenant needs to know for Tenant's legitimate business reasons; and in no event shall Landlord be required to include any proprietary or confidential information of Landlord or any third party.

If Tenant elects to make a Critical Repair in accordance with the terms of this paragraph, (a) Tenant shall use a contractor that is approved by Landlord for making comparable repairs in the Building and such contractor shall provide Landlord with a certificate of insurance that complies with the terms of this Lease regarding work to be performed by any contractor engaged by Tenant to perform work in the Premises; (b) such Critical Repair shall be made substantially in accordance with the Project Rules then in effect for the Building, to the extent practical under the circumstances; (c) such Critical Repair shall be made in a good and workmanlike manner; (d) Tenant shall be responsible for all damage to the Building, including any Building System, caused by or resulting from such Critical Repair; (e) Tenant shall be responsible for the timely payment of all costs of such Critical Repair (the preceding not to be construed as a forfeiture of Tenant's rights to be reimbursed for such costs, as provided herein) and for ensuring that no lien is filed against the Project or any portion thereof as a result of the making of such Critical Repair, and for removing any such lien that is filed against the Project or any portion thereof; (f) such Critical Repair shall be made in accordance with all applicable Laws and building codes; (g) Tenant shall not, with respect to any Critical Repair within the Premises, interfere with the use and occupancy of any other portion of the Project by any other tenant or occupant of the Project; and (h) with respect to any



## 11. Services

(a) Services provided by Landlord. Tenant shall have access to the Building and the Premises twenty-four (24) hours per day, seven (7) days per week, subject to any interruptions in access provided for in this Lease. Landlord shall furnish Tenant during Tenant's occupancy of the Premises the following services, all of which will be provided in no less than the Current Standard: (i) Cleaning and Janitorial Services (defined in Exhibit B); (ii) domestic water at those points of supply provided for general office use of tenants in the Building; (iii) electricity for normal Building Standard office uses subject to Section 12; (iv) elevator service at the times and frequency reasonably required for normal business use of the Premises; (v) lamp and ballast replacement for Building Standard light fixtures; (vi) HVAC service within the ranges stated below between 7:00 o'clock a.m. and 6:00 o'clock p.m. on Monday through Friday, and between 8:00 o'clock a.m. and noon on Saturday ("Building Standard Hours"), except on New Year's Day, Memorial Day, July 4, Labor Day, Thanksgiving Day, Christmas Day and other holidays observed by a majority of the tenants of the Building ("Holidays"); and security services for the Building, as provided below. Landlord shall not be responsible for cleaning or maintaining any Above Standard improvements or Above Standard fixtures in the Premises; Tenant shall, at Tenant's expense, be responsible for cleaning and maintaining any Above Standard improvements or Above Standard fixtures, including Above Standard Tenant Work, defined below, and the Premises. In the summer, with sustained occupancy of the Premises by no more than one person per one hundred (100) square feet of floor area, and in the absence of computer and other electronic equipment in the Premises that is in excess of computer and other electronic equipment generally installed by tenants of the Building and by tenants in Comparable Buildings for general office purposes which could affect the temperature that would otherwise be maintained in the Premises, the HVAC system for the Building will maintain average room temperatures not in excess of 76 degrees Fahrenheit dry bulb and fifty percent (50%) relative humidity when the outside conditions do not exceed 94 degrees Fahrenheit dry bulb or 77 degrees Fahrenheit wet bulb. In the winter, the HVAC system will maintain average room temperatures of not less than 68 degrees Fahrenheit dry bulb when the outside temperature is not less than 10 degrees Fahrenheit dry bulb. In the summer, in the event that the outside temperature exceeds 94 degrees, but it is not in excess of 105 degrees, Fahrenheit dry bulb, the HVAC system for the Building will maintain average room temperatures not ~~in excess of 80 degrees Fahrenheit dry bulb and in the winter, in the event that the outside temperature is below 10 degrees, but not~~ below zero degrees, Fahrenheit dry bulb, the HVAC system for the Building will maintain average room temperatures not below 64 degrees Fahrenheit dry bulb. Notwithstanding the foregoing, in the event that the outside temperature in the summer exceeds 94 degrees Fahrenheit dry bulb. Landlord shall use commercially reasonable efforts to maintain average room temperatures in the Premises not in excess of 76 degrees Fahrenheit dry bulb, and in the event that the outside temperature in the winter is below 10 degrees Fahrenheit dry bulb, Landlord shall use commercially reasonable efforts to maintain average room temperatures in the Premises of not less than 68 degrees Fahrenheit dry bulb. Landlord acknowledges that such commercially reasonable effort may include operating the HVAC system in the Building outside of Building Standard Hours in order to achieve the temperature ranges stated in this provision.

(b) Overtime HVAC Services. Tenant may request, and Landlord shall furnish HVAC service on days and at times other than those referred to above, provided Tenant requests such service in accordance with the Project Rules, defined below, then in effect, and agrees to reimburse Landlord for this service at the rate of Fifty Dollars ($50.00) per hour per floor of the Building (the "Overtime HVAC Rate"), subject to increase as provided in this paragraph. The Overtime HVAC Rate will only be increased to the extent that the Actual Cost, defined below, of providing overtime HVAC services to the Premises increases. The term "Actual Cost" shall mean the cost of the applicable utilities, plus a reasonable allocation of maintenance and depreciation costs attributable to the equipment utilized to provide such services, and an administrative fee of five percent (5%) of all such costs to reimburse Landlord for its reasonable expenses in providing such services. If Tenant utilizes services provided by Landlord hereunder in either quantity and/or quality exceeding the quantity and/or quality customarily utilized by normal office uses of comparable premises in the Building, then Landlord may separately meter or otherwise monitor Tenant's use of such services, and charge Tenant a reasonable amount for such excess usage; such amount shall constitute additional Rent due hereunder within fifteen (15) days of Tenant's receipt of Landlord's statement for such excess.

(c) Required Security Services. Throughout the Term of this Lease, Landlord shall continue to provide the Existing Security Services, defined below, and such other security services that are comparable to security services provided for Comparable Buildings at the time a comparison between the Building and Comparable Buildings is made hereunder (collectively, the "Required Security Services"). The following security services are provided to the Building as of the Effective Date of this Lease: on-site security services provided by a professional security services firm, consisting of at least one (1) guard twenty-four (24) hours per day, seven (7) days per week, and at least two (2) guards Mondays through Fridays (exclusive of Holidays) during the hours of 7:00 a.m. until 5:00 p.m. (collectively, the "Existing Security Services"). The cost of providing the Required Security Services shall be included in Operating Expenses. To the extent Tenant requests security services beyond the Required Security Services, Tenant shall reimburse Landlord for the entire cost of providing such excess security services as Additional Rent due under this Lease. As part of such additional security services, Landlord shall exert commercially reasonable efforts to limit access to the elevator bank of the Building serving the Twelfth (12th) and above Floors of the Building to tenants occupying such

10

RAYMOND JAMES 

by Tenant, and who is not employed by or otherwise affiliated with Tenant; (h) Tenant's Audit shall be conducted at Landlord's office where the records of the year in question are maintained by Landlord, during Landlord's normal business hours; (i) Tenant's Audit shall be completed within sixty (60) days after the date after Landlord provides to Tenant access of Landlord's books and records that Tenant begins such audit, and a complete copy of the results thereof shall be delivered to Landlord within sixty (60) days after Tenant completes such audit; and (j) Tenant's Audit shall be conducted at Tenant's sole cost and expense. If Tenant's Audit is completed and submitted to Landlord in accordance with the requirements of this Section and such audit establishes that Landlord has overstated the Operating Expenses or Taxes for the year audited, then Landlord shall reimburse Tenant for any overpayment, and if such Operating Expenses or Taxes (in the aggregate) have been overstated by more than five percent (5%), then Landlord shall also reimburse Tenant for Tenant's actual, reasonable cost incurred in conducting Tenant's Audit (not to exceed $17,500.00), together with interest at the Default Rate calculated from the date such reimbursement is owed, with such reimbursement(s) to be made within thirty (30) days after the amount of such overpayment has been established.

(ii) Confidentiality. Tenant hereby agrees to keep the results of Tenant's Audit confidential and to require the auditor conducting Tenant's Audit, including its employees and each of their respective attorneys and advisors, to keep the results of Tenant's Audit in strictest confidence. In particular, but without limitation, Tenant agrees that: (a) Tenant shall not disclose the results of Tenant's Audit to any past, current or prospective tenant of the Building; and (b) Tenant shall require that its auditors, attorneys and anyone associated with such parties shall not disclose the results of Tenant's Audit to any past, current or prospective tenant of the Building; provided, however, that Landlord hereby agrees that nothing in items (a) or (b) of this subparagraph shall preclude Tenant from disclosing the results of Tenant's Audit in any judicial or quasi-judicial proceeding, or pursuant to court order or discovery request, or to any current or prospective assignee or subtenant of Tenant, or to any agent, representative or employee of Landlord who or which request the same. If Tenant intends to disclose the results of Tenant's Audit in any judicial or quasi-judicial proceeding, or if Tenant receives notice that it may be required in any such proceeding by either the order of any judicial, regulatory or other governmental entity presiding over such proceeding, or by a discovery request made in such proceeding, to disclose the results of Tenant's Audit, then Tenant shall (i) promptly provide Landlord with sufficient prior written notice of Tenant's intent to make such disclosure, or such order or request for such disclosure, in order to permit Landlord to contest such intended disclosure, order or request; and (ii) cooperate with Landlord, at Landlord's expense, with Landlord's efforts to seek a protective order or other remedy to limit the disclosure of such results to the extent reasonably required to adjudicate the matters at issue in such proceeding. If required by Landlord, Tenant shall execute and require Tenant's auditor to execute a reasonable confidentiality agreement reflecting the terms of this Section as a condition precedent to Tenant's right to conduct Tenant's Audit.

8. Security Deposit. [Text intentionally deleted]

9. Initial Improvements. All Initial Improvements to the Premises shall be installed by Tenant, at Tenant's sole expense, in accordance with the terms and conditions of this Lease and the terms set forth in the Work Letter attached hereto as Exhibit D and incorporated herein by this reference, and Landlord shall have no obligation to improve or otherwise modify the Premises for Tenant's occupancy.

10. Maintenance and Repair. Landlord shall maintain and operate the Building: (i) in at least the form, manner and quality as exists at the Building on the Effective Date (the "Current Standard") as it relates to Building maintenance and operation; and (ii) substantially in accordance with the manner and quality of the maintenance and operation of Comparable Buildings at the time a comparison between the Building and Comparable Buildings is made hereunder. Landlord shall make such improvements, repairs or replacements as may be necessary to maintain the Building Systems serving the Premises, the exterior and the structural portions of the Building (including structural portions of the Building within the Premises) and the Common Areas in accordance with Current Standards and the standards applicable for maintaining such items in Comparable Buildings. Subject to the terms of Section 7, the maintenance and repairs to be performed by Landlord hereunder shall be at Landlord's expense, unless the need for such maintenance or repairs was caused by the negligence or willful misconduct of Tenant, its employees, agents, contractors or invitees, in which event Tenant shall reimburse Landlord for the cost of such maintenance or repairs, plus a construction oversight fee as is described in Section 16 for the cost and expense of such maintenance or repairs. Except to the extent that Landlord is obligated to restore and repair the Premises pursuant to Section 23, Tenant, at its sole cost, shall maintain and repair the Premises and otherwise keep the Premises in good order and repair. Any repair or maintenance performed on behalf of Tenant by third-party contractors shall be undertaken in accordance with the provisions and requirements of Section 16. Landlord is not responsible for replacing and/or repairing Tenant's Above Standard fixtures or any Above Standard improvements. Except as expressly provided in this Lease, Tenant shall accept the Premises including any existing appliances and Above Standard fixtures in their "AS IS, WHERE IS" condition as of the Effective Date. For purposes of this Lease, all Above Standard improvements and Above Standard fixtures existing in the Premises as of the Effective Date shall be deemed to be Tenant's property until the expiration or earlier termination of this Lease or Tenant's right to possession of the Premises under this Lease, at which time such Above Standard improvements and Above Standard fixtures shall become the property of Landlord and shall be surrendered to Landlord with the Premises.



# EXHIBIT B





**EXHIBIT C**








**Wallpaper Loose**





























**EXHIBIT (5 of 5)**






# EXHIBIT F



