IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

RAYMOND JAMES & ASSOCIATES, INC.,

       Plaintiff,

v.                                           CASE NO. 2:18-cv-02104-JTF-tmp

50 NORTH FRONT ST. TN, LLC,

       Defendant.

## MEMORANDUM IN SUPORT OF MOTION TO DISMISS COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES

COMES NOW Defendant 50 North Front St. TN, LLC ("Landlord"), by and through its attorneys, and submits its memorandum in support of its motion to dismiss with prejudice all claims in the Complaint for Injunctive Relief, Declaratory Relief, Breach of Lease, and Negligence (the "Complaint" at ECF 1-1) brought by Plaintiff Raymond James & Associates, Inc. ("Raymond James").

## INTRODUCTION

Landlord leases to Raymond James approximately 185,656 square feet of the building located at 50 North Front Street in Memphis, Tennessee. (ECF 1-1, ¶¶ 2, 3 & 5; and *see* Commercial Lease (the "Lease") at ECF 1-1, p. 23). The tenancy is governed by a June 26, 2014 Commercial Lease. (ECF 1-1, ¶¶ 2, 3 & 5; and ECF 1-1, p. 18-45). The 10-year Lease was bargained for and agreed to by both parties. Raymond James now seeks to change the terms, demanding that Landlord "immediately" provide new modernized elevators, without respect to the Lease and without regard to financial realities. All of Raymond James' claims are based on a

misreading of the Lease.  The Court should, therefore, dismiss the Complaint as a matter of law.

The gravamen of this litigation is the parties' divergent expectations under the Lease. Raymond James believes (and repeatedly alleges) that a complete modernization of the elevator systems is a Lease requirement; and Landlord believes that it's not a Lease requirement.  By its terms, the Lease shows that Raymond James expressly bargained for substantial benefits when the current Lease was negotiated, including a rent abatement of more than 8.8 million dollars – or 33-months of free rent.  (Lease ¶ 1(j) at ECF 1-1, p. 21).  Raymond James, however, did not bargain for a new modernized elevator system. The elevator modernization Raymond James demands in this lawsuit was not factored in that negotiated deal (either by Landlord or by Raymond James) and is, therefore, nowhere mentioned within the Lease.  (*See generally* ECF 1-1, p. 18-45).  Raymond James has no right to expect more than the Lease provides.[1]

In its Prayer for Relief, Raymond James demands a declaration that "the Lease requires the immediate replacement or complete overhaul of the elevator system by Landlord and at Landlord's sole expense."   The Lease has no such requirement.  Further, contrary to the targeted exculpatory clause in the Lease, Raymond James demands an award of damages "flowing from

---

[1]     Had modernization of the elevators been contemplated by the parties, such an expensive and time consuming process would have been detailed in specific terms in the Lease.  Despite that the Lease does not require to undertake modernization, any reasonable Landlord would still consider such modernization in order to have its anchor-tenant satisfied.  However, since modernization is a very costly and multi-year project, it does not make sense for either party to undergo such a project without knowing the tenant's intentions in terms of their Lease Termination option – for the following reasons: a) the hassle and elevator disruptions that are inevitable with such project, why put the Tenant through such inconvenience if the tenant might potentially vacate the building by the time the project is complete? b) why would Landlord undergo such a costly project if the tenant its looking to satisfy might not be in the building by the time the project is completed? c) as there is no immediate need for modernization since the elevators continue to function as designed, it would be financially logical to analyze and await what the market has to

Landlord's negligent operation and maintenance of the elevator systems and for Landlord's failure to provide the quality of space required in the Lease."[2]  (ECF 1-1, p. 16).

Because Landlord seeks to obey the Lease as drafted, the fundamental question before the Court is whether the Lease requires Landlord to modernize the elevator system, or not.  All of Raymond James' claims are founded in that question, upon a determination by the court that the lease does not require a new modernized elevator system, all claims falls like dominos, since Raymond James cannot claim damages when Landlord is in compliance of the Lease .  This Motion to Dismiss challenges, as a matter of law, Raymond James' claims in Count II seeking a Declaratory Judgment; Count III for Breach of Lease; and Count IV for Negligence.

## LAW AND ARGUMENT

### *Rule 12(b)(6) Standard*

"Rule 12(b)(6) authorizes the district courts to dismiss any complaint that fails 'to state a claim upon which relief can be granted.'"  *QQC, Inc. v. Hewlett-Packard Co.*, 258 F. Supp. 2d 718, 721 (E.D. Mich. 2003) (*citing* Fed. R. Civ. P. 12(b)(6)). "The purpose of Rule 12(b)(6) is to permit a defendant to test whether, as a matter of law, the plaintiff is entitled to relief even if everything alleged in the complaint is true." *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 750 (E.D. Tenn. 2009).  It tests "the plaintiff's cause of action as stated in the complaint;" it does not challenge the factual allegations of the complaint.[3] *Lambert v. Hartman*, 517 F.3d 433, 439 (6th

---

offer since the elevator industry is continuing to evolve and improve their systems.

2       On March 23, 2018, the Court entered its Order Denying Plaintiff's Request for a Preliminary Injunction.  (ECF 24).

3       "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  (Fed. R. Civ. P. 10(c)).

Cir. 2008).  In considering a Rule 12(b)(6) motion to dismiss, the Court must accept the well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *Lambert*, 517 F.3d at 439; and *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). The Court is not required to accept the truth of legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009).  A complaint setting forth allegations that constitute nothing more than "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice under Fed. R. Civ. P. 8. *Id.*  To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (U.S. 2007)).  The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully.  *Iqbal*, 556 U.S. at 662.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  If the factual allegations fail to "present 'enough facts to state a claim to relief that is plausible on its face,'" the Court should grant the motion to dismiss.

*Lease Interpretation*[4]

"The legal effect of the terms of a lease are governed by the general rules of contract construction."  *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889 (Tenn.

---

[4]      The Lease is to be interpreted under Tennessee Law.  The laws of the state where the Project is located control. (Lease, ¶ 42 at ECF 1-1, p. 25).  *Project* is defined as "the Building and the land." (Lease, ¶ 1(s) at ECF 1-1, p. 21).  The Building and the land are located in Memphis, Tennessee.  (Lease, ¶ 1(b) at ECF 1-1, p.21).

2002).  "The purpose of interpreting a written contract is to ascertain and to give effect to the

contracting parties' intentions." *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 681

(Tenn. Ct. App. 1999).  The "intention of the parties is generally treated as a question of law…."

*Planters Gin Co.*, 78 S.W.3d at 890.  Where the provisions of a contract are "clear and

unambiguous, their terms are to be taken and understood in their plain, ordinary and popular

sense." *Ballard v. North American Life & Cas. Co.*, 667 S.W.2d 79, 82 (Tenn. Ct. App. 1983).

"The Courts may not make a new contract for parties who have spoken for themselves and may

not relieve parties of the contractual obligations simply because these obligations later prove to

be burdensome or unwise." *Marshall*, 20 S.W.3d at 682 (citations omitted).

*Declaratory Judgment Actions*

The Complaint prominently includes a demand for Declaratory Judgment (ECF 1-1, ¶¶ 27

- 32).  The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction … any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not further
> relief is or could be sought.  Any such declaration shall have the force and effect of a
> final judgment or decree and shall be reviewable as such.

28 U.S.C.A. § 2201.  The United States Supreme Court has held that this Act "confer[s] on

federal courts unique and substantial discretion in deciding whether to declare the rights of

litigants." *Doe*, 687 F. Supp. 2d at 759 (*citing, Wilton v. Seven Falls Co.,* 515 U.S. 277, 286

(1995)).

"[T]he central purpose of the Declaratory Judgment Act ... is to provide the opportunity to clarify rights and legal relationships without waiting[5] for an adversary to file suit." *Severe Records, LLC v. Rich*, 658 F.3d 571, 580 (6th Cir. 2011). The Sixth Circuit applies "the following general principles in determining whether a declaratory ruling is appropriate:

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed.

*Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).

I.    **The Lease dictates Landlord's service requirements, including those requirements for the elevators, and addresses maintenance and interruptions of same.**

Landlord and Raymond James have entered into a repairs and maintenance lease; however, Raymond James seeks to force never-bargained-for capital improvements. This tactic, which pervades the Complaint, is improper under contract law. *See Marshall*, 20 S.W.3d at 682. The Court must look to the Lease language setting forth the services Landlord must provide to Raymond James and dismiss all claims that are inconsistent with the Lease requirements.

The Lease addresses the relevant *Services*:

> Services.   Services provided by Landlord.   Tenant shall have access to the building and the premises twenty-four (24) hours per day, seven (7) days per week, subject to any interruptions in access provided for in this lease. Landlord shall furnish tenant during tenants occupancy of the premises the following services, all of which will be provided in no less than the current standard; (i) Cleaning and Janitorial Services (Defined in exhibit B), (ii) domestic water at those points of supply provided for

---

[5]    "One commentator has observed that the declaratory judgment action recognizes that '[c]ourts should operate as preventive clinics as well as hospitals for the injured.'" *Colonial Pipeline Co.*, 263 S.W.3d at 836 (*citing* Henry R. Gibson, *Gibson's Suits in Chancery*, § 545 (6th ed.1982)).

general office use of tenants in the Building, (iii) electricity for normal, Building Standard office uses subject to section 12, **(iv) elevator service at the times and frequency reasonably required for normal business use of the premises,** (v) lamp and ballast replacement for Building Standard light fixtures, (vi) HVAC service within the ranges stated below between 7:00 o'clock a.m. and 6:00 o'clock p.m. on Monday through Friday, and between 8:00 o'clock a.m. and noon on Saturday ("Building Standard Hours"), except on New Year's Day, Memorial Day, July 4, Labor Day, Thanksgiving Day, Christmas Day and other Holidays observed by a majority of the tenants of the Building ("Holidays"); and security services for the Building, as provided below. Landlord shall not be responsible for cleaning and maintaining any Above Standard improvements or Above Standard fixtures in the Premises; Tenant shall, at Tenant's expense, be responsible for cleaning and maintaining any Above Standard improvements or Above Standard fixtures, including Above Standard Tenant Work, defined below, and Above Standard Initial Improvements, in the Premises. In the summer, with sustained occupancy of the Premises by no more than one person per one hundred (100) square feet of floor area, and in the absence of computer and other electronic equipment in the premises that is on excess of computer and other electronic equipment generally installed by tenants of the Building and by tenants in Comparable Building for general office purposes which could affect the temperature that would otherwise be maintained in the Premises, the HVAC system for the Building will maintain average room temperatures not in excess of 76 degrees Fahrenheit dry bulb and fifty percent (50%) relative humidity when the outside conditions do not exceed 94 degrees Fahrenheit dry bulb or 77 degrees Fahrenheit wet bulb. In the winter, the HVAC system will maintain average room temperatures of not less than 68 degrees Fahrenheit dry bulb when the outside temperature is not less than 10 degrees Fahrenheit dry bulb. In the summer, in the event that the outside temperature exceeds 94 degrees, but it is not in excess of 105 degrees, Fahrenheit dry bulb, the HVAC system for the Building will maintain average room temperatures not in excess of 80 degrees Fahrenheit dry bulb; and in the winter, in the event that the outside temperature is below 10 degrees, but nor below zero degrees, Fahrenheit dry bulb, the HVAC system for the Building will maintain average room temperatures not below 64 degrees Fahrenheit dry bulb. Notwithstanding the foregoing, in the event that the outside temperature in the summer exceeds 94 degrees Fahrenheit dry bulb, Landlord shall use commercially reasonable efforts to maintain average room temperature in the Premises not in excess of 76 degrees Fahrenheit dry bulb, Landlord shall use commercially reasonable efforts to maintain average room temperatures in the Premises of not less than 68 degrees Fahrenheit dry bulb. Landlord acknowledges that such commercially reasonable effort may include operating the HVAC system in the Building outside of Building Standard Hours in order to achieve the temperature ranges stated in this provision.

(Lease, ¶ 11(a)(iv) at ECF 1-1, p. 24) (Emphasis added).

7

In order to provide the required *Services*, the Lease sets out each party's rights and

expectations for the *maintenance* and *repair* of the elevator system:

> <u>Maintenance and Repair</u>.  Landlord shall maintain and operate the Building: (i) in at least the form, manner and quality as exists at the Building on the Effective Date (the "Current Standard")[6] as it relates to Building maintenance and operation, and (ii) substantially in accordance with the manner and quality of the maintenance and operation of Comparable Buildings[7] at the time a comparison between the Building and Comparable Buildings is made hereunder.  **Landlord shall make such improvements, repairs or replacements as may be necessary to <u>maintain</u> the Building Systems[8] serving the Premises[9],** the exterior and the structural portions of the Building (including structural portions of the Building within the Premises) and the Common Areas **in accordance with Current Standards and the standards applicable for <u>maintaining</u> such items in Comparable Buildings**.  Subject to the terms of Section 7, the maintenance and repairs to be performed by Landlord hereunder shall be at Landlord's expense, unless the need for such maintenance or repairs was caused by the negligence or willful misconduct of Tenant, its employees,

---

6      "[A] clause in the lease that the premises are in good order at the time of the execution of the lease is valid and binding on the tenant for all purposes."  *Boyce v. Shankman*, 292 S.W.2d 229, 232 (Tenn. 1953).

7      The Lease defines *Comparable Buildings* as:

 Commercial office buildings located in Memphis, Tennessee, managed by reputable professional management firms, that are of similar age, character, quality, height, size and location to, with similar permitted uses and tenants (both in nature and in number), and which have rental rates and amenities that are comparable to, the Building. … **The parties acknowledge that not all such criteria will likely be materially similar to other such buildings and certain criteria may need to be excluded** (such exclusion to be made as is reasonable appropriate for the purpose of such comparison), in effort to identify Comparable Buildings for the purposes described herein. (Lease, ¶ 1(w) at ECF 1-1, p. 22).

8      The Lease defines *Building Systems* as "The mechanical, electrical, plumbing, sanitary, sprinkler, heating, ventilation and air conditioning ('HVAC'), security, life-safety, **elevator** and other service systems or facilities of the Building…."  (Lease, ¶ 1(v) at ECF 1-1, p. 21). (Emphasis added).

9      The Lease defines *Premises* to include the space rented by Raymond James, but expressly excluding Building Systems, i.e., elevators.  (Lease, ¶ 1(b) & ¶ 2 at ECF 1-1, pp. 19 & 22).

agents, contractors or invitees, in which event Tenant shall reimburse Landlord for the cost of such maintenance or repairs, plus a construction oversight fee as is described in Section 16 for the cost and expense of such maintenance or repairs.

(Lease, ¶ 10 at ECF 1-1, p. 23) (Original emphasis omitted and replaced). Since maintaining the elevator system is very complex, Landlords typically engage the services of one of the international leaders in the field such as, Otis, ThyssenKrupp, Schindler and KONE to maintain and repair the Elevator systems under a <u>full maintenance agreement</u>.

In addition to dictating the elevator service requirements to be provided by Landlord, the Lease expressly restricts Landlord's liability for any damages resulting from *Interruption of Essential Services* that inevitably occur in maintaining and operating a large commercial building, and it allows Raymond James only to abate rent in the specific circumstance that NONE of the elevators are operational for a period of five consecutive days:

> <u>Interruption of Essential Services</u>.  **Landlord shall not be liable for any damages directly or indirectly resulting from, nor shall any Rent be abated (except as otherwise provided below) by reason of,** the installation, use or interruption of use of any equipment in connection with furnishing any of the foregoing services, **or failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord.  The failure to furnish any such services shall not be construed as an eviction of Tenant or relieve Tenant from any of its obligations under this Lease**.  If Landlord shall fail to provide any Essential Service, defined below, to Tenant, or perform any maintenance or to or repair of the Common Areas or Premises, that Landlord is expressly required to provide or perform under the terms of this Lease, **and such failure shall continue for a period of five (5) consecutive business days** after Landlord's receipt of written notice from Tenant of the existence of such failure, and such failure is not due to a Force Majeure Event (provided [and to the extent] that Landlord doesn't actually receive proceeds from any applicable insurance for rental loss the cost of which is included in Operating Expenses), and as a result of such failure, the Premises or a portion thereof shall be substantially unusable by Tenant, then, commencing with the expiration of such five (5) consecutive business day period, Tenant's Base Rent and Additional Rent shall abate in the proportion that the rentable square footage of the portion of the Premises rendered substantially unusable by such failure bears to the total Rentable Area of the

Premises then leased hereunder for the period of time that such portion is substantially unusable.  **The term "Essential Service:" shall mean** HVAC service (exclusive of HVAC provided by any Supplemental HVAC Equipment), electrical service, water and sewer service, and **at least one (1) passenger or freight elevator providing access to the floors of the Building on which the Premises are located.**

(Lease, ¶ 11(e) at ECF 1-1, p. 26) (Original emphasis omitted and replaced).

There is no allegation in the Complaint that fits *interruption of Essential Services* (meaning that NONE of the elevators were operational for a period of five consecutive days), by not having a claim of an *interruption of the Essential Services*, Raymond James, likewise, has no claim for damages, consequential damages, set-off, and rent abatement.

In addition the Lease defines and addresses *Critical Failures*:

Critical Failure.  If **(i) Landlord shall fail to provide any service or perform <u>any</u> maintenance or repair to the Building or Building Systems that Landlord is expressly required to provide or perform under the terms of this Lease,** other than a repair involving any structural portion of the Building (repairs to structural portions of the Building being expressly excluded from the provisions of this paragraph); **(ii) Landlord fails to commence to restore such service or perform such maintenance or repair** within two (2) business days after the effective date of written notice from Tenant of the existence of such failure, forwarded to Landlord in accordance with the notices provision of this Lease (as such two (2) business day period is extended to the extent Landlord is unable to commence due to a Force Majeure Event), and thereafter diligently pursues such cure ("commence" to restore a service or to perform maintenance or a repair means performance of the first step towards such restoration or performance of such maintenance or repair as is reasonable under the circumstances, such as inspecting the area where the problem is located, assessing the nature of the problem, and which could include, for example, contacting experts to assess the nature of the problem and suggest necessary action, and contacting contractors after Landlord has determined the nature of the problem and the appropriate contractors to be contacted); **(iv) as a result of such failure, Tenant's use of a material portion of the Premises is materially and adversely impaired (such failure deemed a "Critical Failure")**; (v) Tenant at its election may provide Landlord with written notice pursuant to the notices provision of this Lease (the "Critical Failure Notice") that Tenant intends to cure such Critical Failure (a "**Critical Repair**"), and seek reimbursement from Landlord for the actual reasonable cost of effecting such Critical Repair in accordance with the terms of this paragraph; and (vi) Landlord fails to commence (as defined above) to cure such Critical Failure within four (4) consecutive calendar days after the

effective date of the Critical Failure Notice, then Tenant may proceed to perform the Critical Repair and recover reimbursement from Landlord for the actual reasonable cost thereof in accordance with the terms of this paragraph. Landlord shall endeavor to address any Critical Failure as quickly as possible, and in any event, within the time frame set forth above. Landlord shall promptly and in good faith respond to inquiries by Tenant's Representative, defined below, regarding Landlord's plan for assessing the Critical Failure and the anticipated timing for curing such Critical Failure, provided such communication does not materially interfere with or compromise Landlord's cure efforts; impose unreasonable timeframes on Landlord's time for response; or otherwise impose unreasonable demands upon Landlord; such communication shall be limited to information Tenant needs to know for Tenant's legitimate business reasons; and in no event shall Landlord be required to include any proprietary or confidential information of Landlord or any third party.

(Lease ¶ 11(f) at ECF 1-1, p. 26) (Original emphasis omitted and replaced). There is no allegation in the Complaint that fits the three components which defines a *Critical Failure*, (meaning where the Landlord would cancel its <u>maintenance agreement,</u> fail to commence to restore it, and which will result in Tenant's use of a material portion of the Premises is materially and adversely impaired), (*See* Lease ¶ 11(f) at ECF 1-1, p. 26).

Having reviewed the foregoing sections, the legal requirements for contract interpretation, the general allegations of the Complaint and specific language of the Lease, it is appropriate to apply those concepts to each of the remaining Counts.

**II.     Count II for Declaratory Judgment does not fit the requirements for this Court to exercise declaratory jurisdiction. Furthermore the Lease does not require that the elevators be replaced, overhauled or modernized as alleged by Raymond James: and does not allow damage claims, abatement of rent or an off-set for such interruptions as alleged by Raymond James.**

**a.     The Complaint fails to satisfy declaratory judgment jurisdictional requirements.**

At the core of the Complaint, while clothing its claims in the context of a declaratory judgment action, Raymond James does not seek a *determination* or declaration by the Court of

the meaning of the Lease in the traditional sense of a declaratory judgment. Rather Raymond James already *determined* the meaning of the Lease on its own, that the Lease has been breached and is demanding judgment by the Court for Lease violations, breach of contract, and a finding it is entitled to damages arising out of such breach.

Raymond James' attempt to frame its case as one for declaratory judgment terms must fail as is obvious just by looking at the Complaint itself. Paragraph 32 states:

> Raymond James thus seeks a judgment declaring:
>
> a) Raymond James's right under the Lease for the elevator system to be immediately replaced or completely overhauled by the Landlord and at Landlord's sole expense; [and]
>
> b) That Landlord has violated the Lease by not maintaining the Building and Premises in the condition, to the standards and with the services required by the Lease, along with a declaration of the amount of Raymond James' resulting damages;….

(ECF 1-1, ¶ 32(a)-(d)). Sub-paragraph (a) is not seeking a declaration of rights, but rather is demanding a remedy for replacement and overhaul of the "elevator system." Sub-paragraph (b) likewise is not seeking a declaration of rights, but rather is alleging that a breach of the Lease has occurred seeking damages and remedies resulting from the breach. In this context, it is appropriate for the Court to engage in its "unique and substantial discretion" whether or not to exercise declaratory jurisdiction. *See Doe*, 687 F. Supp. 2d at 759 (trial court declined to exercise declaratory jurisdiction in primarily tort and breach of contract action). Just as in *Doe,* above, Landlord asserts that the Court has an ample basis for declining to exercise declaratory jurisdiction.

**The Lease language contradicts Raymond James' interpretation of it.**

As argued with more specificity below, it is the province of the Court, as a matter of law, to apply the general principles of contract interpretation to a lease agreement. "This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed…." *See Planters Gin Co.*, 78 S.W.3d at 890.

However, notwithstanding the terms of the Lease, Raymond James demands that Landlord "upgrade, overhaul or replace the elevator system in whole or in part" and demands that Landlord "start modernizing the elevators immediately." (Complaint, ECF 1-1, ¶¶ 10 & 14). Raymond James variously rephrases its ultimatum, demanding also that the elevators be "immediately overhauled or replaced" and that Landlord "replace or overhaul the elevator system immediately." (Complaint, ECF 1-1, ¶¶ 11 & 28). Raymond James steadfastly rejects the negotiated maintenance and repairs approach labelling it as nothing more than "maintain[ing] the current elevator system with ad hoc repairs." (Complaint, ECF 1-1, ¶ 12). It expresses its various demands in terms of claims in negligence, breach of lease, and declaratory judgment. (Complaint, ECF 1-1, p. 11). Regardless of the label placed on its claims, to the extent they are based on this errant reading of the Lease, they must be dismissed.

Raymond James negotiated a ten-year lease term fully aware that the elevators will only get older during the term without asking the Landlord to commit to modernization. The crux of the lawsuit is the interpretation of the contractual requirement that Landlord provide the services described in the Lease. To test this requirement, Raymond James' allegations must be weighed against the Lease requirements and not against its assertion of a modernization right because the elevators "were installed over thirty (30) years ago." Specifically, the Lease controls Landlord's

elevator maintenance obligations (Lease, 11(a) at ECF 1-1, p. 24) and does not call for a new modernized elevator system.

The Tennessee Supreme Court has described the relationship of parties to a lease as follows:

> Under the theory that the lease conveys the property for a term of years, the tenant is the owner of the leased property for the term and, therefore, the landlord need not concern himself with the property, but only with his damages under the lease ….
>
> > From the premise that a lease is a conveyance there were some consequences.  When a landlord conveyed - executed and delivered a lease to a tenant - he had done all he had to.  From then on the tenant was on his own.  Landlord need not repair.  Nor need he render any services to tenant.

*Cain P'ship Ltd. v. Pioneer Inv. Servs. Co.*, 914 S.W.2d 452, 456 (Tenn. 1996) (*citing* 1 Milton R. Friedman, *Friedman on Leases,* ¶ 1.1 (1990)).  This convey-and-forget default may be altered by contract.  "[O]rdinarily, as between the landlord and tenant the lessor has no obligation to make repairs upon leased premises.  His obligation to do so, in general, rests upon contract." *EVCO Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn. 1975).  Only the Lease can overcome the rule.

The language on the Maintenance and Repair obligations requires that: "Landlord shall make such improvements, repairs or replacements as may be necessary to **maintain** the Building Systems serving the Premises."  (Lease, ¶ 10 at ECF 1-1, p. 21) (Emphasis added).  The required end-result is for Landlord to **maintain the building systems.**  Black's Law Dictionary defines *maintain* as "[t]o continue (something). … [t]o care for (property) for purposes of operation productivity or appearance; to engage in general repair and upkeep. …"  *Black's Law Dictionary* (7th ed. 1999) at 965.  Webster's dictionary defines *maintain* as "to keep in an existing state (as of repair, efficiency, or validity)."  *Webster's Ninth New Collegiate Dictionary* at 718.

14

<u>The Lease requires Landlord to maintain the elevators operational in order to provide the Services required under the Lease</u>.  This is what Raymond James scornfully calls "maintain[ing] the current elevator system with ad hoc repairs."  (ECF 1-1, ¶ 12).  However, the Court will not find language in the Lease requiring Landlord to modernize[10], upgrade[11], overhaul[12], or replace[13] the elevators and none can be read into the Lease.  *See Marshall*, 20 S.W.3d at 682.  Raymond James cannot rely on the Lease to force the capital improvements it seeks through this litigation, therefore the declaratory judgment claims to that effect must be dismissed.

**b.**   **Raymond James has no right to offset its damages under the terms of the Lease.**

The central section of the Complaint contains Raymond James' request that the Court declare an entitlement to offset its damages.

c) That Raymond James has the right to offset its damages for all of Landlord's breaches of the Lease against any rent or other payments it might now or hereafter owe landlord, including any fees if Raymond James exercises its early termination of the Lease; and

d) That Raymond James is entitled to withhold from Landlord any rent, assessments, other payments or fees it now or in the future might owe and that such non-payment will in no way prevent Raymond James form exercising its option to terminate the Lease early.

(ECF 1-1, ¶ 32(c)-(d)).  This prayer for a contract damages remedy of offset is expressly barred by the exculpatory provision stated in the Lease.

---

10    "[T]o make modern in taste style or usage."  *Webster's 9th New Collegiate Dict.* at 763.

11    "[T]o raise or improve the grade of."  *Webster's 9th New Collegiate Dict.* at 1296.

12    "[T]o renovate, revise, or renew thoroughly."  *Webster's 9th New Collegiate Dict.* at 841.

13    [T]o put something new in place of …."  *Webster's 9th New Collegiate Dict.* at 999.

15

By law, Raymond James does not have a right to offset its perceived damages against any of its payment obligations.  *See Smith v. Wiley*, 60 Tenn. 418, 419 (Tenn. 1872) ("[L]eases are mutual and independent covenants …").  "It is well-settled in this jurisdiction that exculpatory clauses in commercial leases are enforceable."  *Miller v. Hembree*, No. 03A01-9712-CV-00537, 1998 WL 209016, *3 (Tenn. Ct. App. 1998).  "[A] landlord may, by stipulation in a commercial lease agreement, exempt himself from liability or any damage caused by defects in the leased premises."  *See Id.* (*citing Gilson v. Gillia*, 321 S.W.2d 855, 863 (Tenn. 1958).

In the Lease section on *Interruption of Essential Services*:

> Landlord shall not be liable for any damages directly or indirectly resulting from, nor shall any Rent be abated (except as otherwise provided below) by reason of, the installation, use or interruption of use of any equipment in connection with furnishing any of the foregoing services, or failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord."

(Set forth more fully above and at Lease, ¶ 11(e) at ECF 1-1, p. 26 (emphasis supplied

As a matter of law, Landlord is exempted under the Lease from liability for damages for "failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord" resulting in the *Interruption of Essential Services*.  There is no allegation in the Complaint that there has been any elevator failure that fits the definition of *interruption of the Essential Service*, nor can there be.  Pointedly, the term "*Essential Services*" is precisely defined in the Lease as long as there is "one (1) passenger or freight elevator providing access to the floors of the Building on which the Premises are located."

It necessarily follows that Landlord cannot be acting with willful misconduct or with gross negligence when it is in compliance with the Lease, since landlord has not failed to provide the

16

*Essential Services.* (*See generally* ECF 1-1, *and see* ECF 1-1, ¶ 9(c)). The damages and rent abatement claims fail as a matter of law and must be dismissed.

**III.     Count III for Breach of Lease must be dismissed.**

> **a.     Landlord's duty is to maintain, not to immediately replace or overhaul and is therefore not breaching the lease subsequently Raymond James is not entitled to consequential damages.**

Raymond James echoes much of its declaratory judgment claim (Count II) in its breach of lease claim (Count III). It uses different words, but the legal result must be the same. The heart of the breach of contract claim is the allegation that "Landlord is obligated … to replace or overhaul the elevator system immediately, yet has failed and refused to do so." (ECF 1-1, ¶ 34). As stated above (in Section II), the breach allegations are again based on Raymond James' rejection of the maintenance and repair provisions of the Lease denigrating them as to "maintain the current elevator system with ad hoc repairs." (ECF 1-1, ¶ 12). Plainly put, the Lease Raymond James accepted contains a maintenance obligation and does not contain an obligation to provide a new modernized elevator system. The Court should not redraft the Lease and should not relieve either Landlord or Raymond James of their "contractual obligations simply because these obligations later prove to be burdensome or unwise." *See Marshall*, 20 S.W.3d at 682. The Lease alone controls Landlord's obligations and does not call for an elevator modernization, upgrade, overhaul, or replacement. It requires only that "Landlord shall make such improvements, repairs or replacements **as may be necessary to maintain** the Building Systems serving the Premises." (Lease, ¶ 10 at ECF 1-1, p. 21, emphasis supplied). To the extent the breach of contract claims exceeds these requirements, they must be dismissed.

**b.      Raymond James has no constructive eviction claim.**

Raymond James goes even further to claim that this alleged failure amounts to a "constructive eviction." (ECF 1-1 ¶ 38). However Raymond James does not have a survivable claim for constructive eviction and that claim must be dismissed as a matter of law. Raymond James claims it "is entitled to all consequential damages, including the costs of future relocation, since such a move flows directly from Landlord's improper acts / constructive eviction." (ECF 1-1 ¶ 38). However, the Lease provides that: "The failure to furnish any such services shall not be construed as an eviction of Tenant or relieve Tenant from any of its obligations under this Lease." (Lease, ¶ 11(e) at ECF 1-1, p. 21).

Moreover, the Tennessee Supreme Court has ruled on the constructive eviction doctrine that "'[i]t is now well established that any disturbance of the tenant's possession by the landlord, or someone acting under his authority, which renders the premises unfit for occupancy for the purposes for which they were demised or which deprives the tenant of the beneficial enjoyment of the premises, causing him to abandon them, amounts to a constructive eviction, provided the tenant abandons the premises within a reasonable time.'" *Couch v. Hall*, 412 S.W.2d 635, 637 (Tenn. 1967) (citing 52 C.J.S., Landlord and Tenant, section 446, page 160). However Raymond James continues to occupy the rented space, all while enjoying free rent under the terms of the Lease.. Raymond James' allegations of elevator issues for over a year without vacating the premises cannot constitute a constructive eviction. That claim must be dismissed as a matter of law.

**IV.    The Lease's exculpatory clauses require dismissal of Count IV's Negligence claim.**

Finally, Raymond James has alleged in Count IV a negligence claim that "Landlord has breached [its] duty by failing to maintain the elevator in a safe, reliable and reasonable manner …." (Complaint, ECF 1-1, ¶ 43).  Raymond James couches this claim in negligence, asserting a duty in tort, breach and injury.  However, the parties have previously negotiated and stipulated to several exculpatory provisions contained in the Lease that defeat these negligence-based claims.

First, the section on *Interruption of Essential Services* provides very specifically that: "Landlord shall not be liable for <u>any damages</u> directly or indirectly resulting from … use or interruption of use of any equipment in connection with furnishing any of the foregoing services, or failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord."  (Lease, ¶ 11(e) at ECF 1-1, p. 26).

Second, Landlord is further exempted under the Lease from liability for damages to <u>person or property</u> caused by the elevators, absent willful misconduct or gross negligence.  The Lease recites as follows the Waiver of Claims for damage to person or property: "Except for the willful misconduct or gross negligence of Landlord, its employees, agents or contractors, Landlord shall not be liable to Tenant for damage to person or property caused by defects in the HVAC, electrical, plumbing, **elevator** or other apparatus or systems …."  (Lease, ¶ 25 at ECF 1-1, p. 30) (Emphasis added).

Taken separately or together, these clauses disallow the types of liability claims advanced by Raymond James for negligence.  "[P]arties may contract to absolve themselves from liability, and this rule is applicable, and has been applied to the field of landlord and tenant." *Chazen v.*

19

*Trailmobile*, Inc., 384 S.W.2d 1, 3 (Tenn. 1964). As a matter of law that "exculpatory clauses in commercial leases are enforceable." *See Miller*, 1998 WL 209016 at *3. "[A] landlord may, by stipulation in a commercial lease agreement, exempt himself from liability or any damage caused by defects in the leased premises." *See Id.* A "landlord may by stipulation exempt himself from liability for defects in portions of the property and appliances over which he by contract or by law reserves control …." *Robinson v. Tate*, 236 S.W.2d 445, 451 (Tenn. Ct. App. 1950).

As pointed out above the exculpatory clauses operate to bar negligence claims unless such claims are for willful misconduct or gross negligence resulting in the interruption of Essential Service as that term is defined by the Lease. Essential Service regarding the elevator system means "at least one (1) passenger or freight elevator providing access to the floors of the Building on which the Premises are located. " (Lease, ¶ 11(e) at ECF 1-1, p. 26). There is no allegation that there has been an interruption of Essential Service regarding the elevator system. Therefore, giving effect to the exculpation clauses, Raymond James' negligence claims for both simple and willful/gross negligence must be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court should give effect to the parties' intentions, refuse to form a new contract, and enforce the Lease as drafted. *See Marshall*, 20 S.W.3d at 681-682. The Court should, as a matter of law, dismiss Raymond James' claims in Count II seeking a declaratory judgment; Count III for breach of lease; and Count IV for negligence.

WHEREFORE, PREMISES CONSIDERED, Defendant 50 North Front St. TN, LLC submits that the Complaint for Injunctive Relief, Declaratory Relief, and Damages fails as a matter of law, and respectfully requests that this Honorable Court dismiss such claims with prejudice.

Respectfully submitted by,


s/ J. Lewis Wardlaw
David Wade (Tenn. Bar No. 4106)
J. Lewis Wardlaw (Tenn. Bar No. 23078)
Rebecca K. Hinds (Tenn. Bar No. 31368)
MARTIN, TATE, MORROW & MARSTON, P.C.
6410 Poplar Ave., Tower II, Suite 1000
Memphis, TN 38119-4839
(901) 522-9000
(901) 527-3746 (Fax)
*dwade@martintate.com*
*lwardlaw@martintate.com*
*Attorneys for Defendant*

### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon the below-listed counsel this 8th day of May, 2018, through the Court's ECF System:

Niel Prosser, Esq.
Rob Clapper, Esq.
Kyle Johnson, Esq.
The Prosser Law Firm, PLC
5865 Ridgeway Center Parkway, Suite 300
Memphis, Tennessee 38120

s/ J. Lewis Wardlaw
