IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| RAYMOND JAMES & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 18-cv-2104-JTF-tmp |
| | ) | |
| 50 NORTH FRONT ST. TN, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Before the court by order of reference is 50 North Front St. TN, LLC's ("50 North") Motion to Dismiss. (Mot. to Dismiss, ECF No. 54; Order of Reference, ECF No. 284.) For the following reasons, it is recommended that the motion be granted.

### I.   PROPOSED FINDINGS OF FACT

This is a breach of contract and tort case. Raymond James & Associates, Inc. ("Raymond James") is a Florida corporation. (Complaint, ECF No. 41-1 at 1 ¶ 1.) 50 North is a Delaware limited liability company headquartered in New York. (Id. at 1 ¶ 1.) 50 North has no members who are citizens of either Florida or Tennessee. (ECF No. 1 at 2 ¶ 7.) Because the amount in dispute between the parties is over $75,000, this court has diversity jurisdiction. (ECF No. 41-1 at 2 ¶ 5.) The following proposed

findings of fact are based on the well-pleaded allegations of the amended complaint and its attached exhibits.

Raymond James has offices in a building in Memphis owned by 50 North. (Id. at 1 ¶¶ 1-2.) The office building is 21 stories tall and has eight public elevators — four serving the lower floors and four serving the top floors. (Id. at 7 ¶ 27.) The office building is more than thirty years old. (Id. at 5 ¶ 27.)

Raymond James rents space in the office building. (Id. at 2 ¶ 6.) It entered into its current lease agreement in 2014 with a company that would later sell the property and its interest in the lease to 50 North. (Id.) The lease requires Raymond James to rent space in the building for about ten years, with an option to leave the lease early about seven years in for a substantial fee. (ECF No. 41-1 Exhibit A at 2, 4 §§ 1(f), 4.) The complaint alleges the lease was "advantageous" for Raymond James. (ECF No. 41-1 at 2 ¶ 6.) Raymond James was only required to pay a below market rent in general, and for a period of two- and three-quarter years in the middle of the lease term, did not have to pay any rent at all. (Id. at 2, 9 ¶¶ 6, 32.) Plus, the landlord agreed, in various provisions of the lease, to perform building maintenance and provide certain services to Raymond James. (Id. at 3-4 ¶¶ 9-12.)

Three of those commitments by the landlord are relevant here. First, the landlord agreed to "maintain and operate the Building" at both the "Current Standard" — a defined term referring to "the

form, manner and quality as exists at the Building" at the time the contract was signed — and at the same standard as other "Comparable Buildings".[1] (ECF No. 41-1 Exhibit A at 9 § 10.) Second, the landlord promised to "make such improvements, repairs or replacements as may be necessary to maintain the Building Systems serving the Premises, the exterior and the structural portions of the building . . . and the common areas in accordance with the Current Standards" and the "standards . . . for maintaining such items in Comparable Buildings." (Id.) Third, the landlord agreed to:

> furnish Tenant . . . the following services, all of which will be provided at no less than the Current Standard: (i) Cleaning and Janitorial Services (defined in Exhibit B) . . . (iv) elevator service at the times and frequency reasonably required for normal business use of the Premises, . . . and security services for the Building, as provided below.

(Id. at 10 § 11(a).) Exhibit B of the contract says that the landlord will "[c]lean [the] outside of all perimeter windows as needed, but not more frequently than once every eighteen (18) months." (Id. at Exhibit B.) Another paragraph in this provision defines the scope of "security services." (Id. at 10-11 § 11(c).)

---

[1]"Comparable Buildings" refers to "[c]ommercial office buildings in Memphis, Tennessee, managed by reputable professional management firms, that are of similar age, character, quality, height, size and location to, with similar permitted uses and tenants (both in nature and in number), and which have rental rates and amenities that are comparable to, the Building[.]" (ECF No. 41-1 Exhibit A at 4 § 1(w).)

It provides that "Landlord shall continue to provide the Existing Security Services"[2] and to provide "such other security services" as Comparable Buildings. (Id.) For ease of reference, the undersigned will refer to the first two provisions as the general building maintenance provisions and the third provision as the services provision.

The lease imposes limits on Raymond James's remedies in the event of a breach of these provisions. All three provisions are limited by a waiver of claims provision, which provides that "[e]xcept for the willful misconduct or gross negligence of the Landlord . . . Landlord shall not be liable to Tenant for damage to person or property caused by defects in the . . . elevator or other apparatus or systems[.]" (Id. at 18 § 25.) The waiver of claims provision also states that "[i]n no event shall Landlord or Tenant . . . be liable in any manner for incidental, consequential or punitive damages, loss of profits, or business interruption." (Id.) Another provision of the contract limiting the landlord's liability states that "[i]n no event shall Tenant's remedies for

---

[2]"Existing Security Services" refers to "[O]n-site security services provided by a professional security services firm, consisting of at least one (1) guard twenty-four (24) hours per day, seven (7) days per week, and at least two (2) guards Monday through Fridays (exclusive of Holidays) during the hours of 7:00 a.m. until 3:00 p.m." (ECF No. 41-1 Exhibit A at 10-11 § 11(c).)) "Holidays" refers to "New Year's Day, Memorial Day, July 4, Labor Day, Thanksgiving Day, Christmas Day and other holidays observed by a majority of the tenants of the building[.]" (Id. at 10 § 11(a).)

an alleged or actual failure of Landlord to perform its obligations under this Lease include termination of this Lease." (Id. at 20 § 30.) The services provision is further limited by its own terms:

> Landlord shall not be liable for any damages directly or indirectly resulting from, nor shall any rent be abated (except as otherwise provided below) by reason of, the installation, use or interruption of use of any equipment in connection with furnishing any of the foregoing services, or failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord. The failure to furnish any such services shall not be construed as an eviction of Tenant or relieve Tenant of any of its obligations under this Lease.

(Id. at 12 § 11(e).) The lease preserves two alternative remedies for Raymond James if the landlord breaches its obligations under the services provision. First, if the landlord fails to "provide any Essential Service" — defined in relevant part as "at least one . . . elevator" serving the floors where Raymond James has offices — "or perform any maintenance to or repair of the Common Area or Premises, that Landlord is expressly required to provide or perform under the terms of this lease" and the failure renders a portion of the premises "substantially unusable," then after five days' notice, Raymond James may abate rent by the proportion of the premises rendered unusable. (Id.) Second, if the landlord fails to "provide any service or perform any maintenance or repair to the Building or Building Systems that Landlord is expressly required to provide or perform under the terms of this lease" and the

failure rises to the level of a "Critical Failure," then Raymond James may hire contractors to fix the problem itself and be reimbursed by the landlord after the completion of repairs, subject to some terms and conditions not relevant here. (Id. at 12 § 11(f).) To count as a "Critical Failure," the failure must affect Raymond James's "use of a material portion of the premises" both "materially and adversely[.]" (Id.)

At the time Raymond James signed the lease, the elevators in the building worked reasonably well. (ECF No. 41-1 at 8 ¶ 28.) But the landlord knew, because of a report prepared by the Lerch Bates elevator company, that the elevator system in the building was soon going to "face significant issues with . . . the reliability of its operation" unless modernized. (Id. at 8 ¶ 29-30.) On information and belief, Raymond James alleges that 50 North learned this too when it did due diligence before it bought the building and assumed assignment of the lease from the original landlord. (Id.) Despite this, the complaint alleges neither the original landlord, nor 50 North when it took over, took any steps to modernize the elevators. (Id.)

Midway through 2017, the elevator system began to have significant problems. In March, June, July, August, October, and November of 2017, and in January and May of 2018, the elevator system trapped Raymond James employees, sometimes for so long that the Memphis Fire Department had to be called. (Id. at 5 ¶ 15.)

Over the same time period, there were 40 other serious elevator malfunctions. For example, in June 2017, the building had to be evacuated because the motor powering all eight public elevators smelled like it was burning. (Id. at 7 ¶ 23.) In July 2017, a Raymond James employee got on the elevator and pressed a button to take him to another floor. (Id. at 7 ¶ 24.) The elevator first took him to the wrong floor. (Id.) Then, it suddenly went down all the way to the first floor, colliding with the first-floor collision buffer with a bang. (Id.) In September 2017, an elevator cab bounced as an employee entered, causing her to fall face first on the floor and hurt her shoulder. (Id.) These incidents continued (at least) until the filing of the amended complaint.

Throughout this time, 50 North "attempted to meet its obligations by making ad hoc repairs." (Id. at 8 ¶ 28.) But these repairs failed to make a meaningful difference to the elevator system's reliability. (Id.) By the end of 2017, Raymond James was demanding that 50 North modernize the elevator system. (Id. at 9 ¶ 31.) 50 North expressed concern about the cost of modernization, but offered to do so in exchange for Raymond James electing not to exercise the early termination option in the lease. (Id.) Raymond James refused. (Id.)

Raymond James and 50 North's dispute soon expanded to other issues with the building. The windows, Raymond James alleges, had been allowed to become dirty and unsightly. (Id. at 11 ¶ 37.) The

caulking protecting the windows had deteriorated, causing water to come through the cracks during storms. (Id. at 11 ¶ 38.) A bridge between the building and a nearby parking garage was not appropriately patrolled by building security. (Id. at 12 ¶ 41.) Various features of the common areas had been allowed to fall into disrepair. (Id. at 11 ¶ 39.) And a portion of the spire on the top of the building blew off in the wind in early 2018 and was never replaced. (Id. at 12 ¶ 40.)

In February 2018, Raymond James sued 50 North in Tennessee state court. (ECF No. 1-1.) The complaint was removed to federal court, where Raymond James filed an amended complaint in May 2018. (ECF Nos. 1, 41.) The amended complaint brings breach of contract and tort claims against 50 North. Raymond James asks the court to award money damages, specific performance of the contract through an injunction compelling 50 North to modernize the elevators, and declaratory relief establishing that (1) 50 North is required to modernize the elevators to comply with the lease's maintenance obligations, (2) because of 50 North's breach of the lease, Raymond James may abate its rent, and (3) because of 50 North's breach, Raymond James may exercise its option to leave the lease early without paying the fee required by the contract. 50 North has moved to dismiss the complaint in its entirety.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Standard of Review

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court views plaintiffs' allegations in the light most favorable to them and accepts all well-pleaded factual allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010) (quoting Iqbal, 556 U.S. at 677). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)). To satisfy this requirement, plaintiffs must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." Id. (alteration omitted) (quoting Twombly, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

**B.    Timeliness**

Before the undersigned can address the merits of this motion, there is a procedural issue: Raymond James argues that 50 North's motion is untimely because it was filed on June 28, 2018, after the scheduling order's deadline for submitting such motions of June 18, 2018. (ECF Nos. 33, 54.)

Federal Rule of Civil Procedure 16 requires the district court to enter a scheduling order that "limit[s] the time to . . . file motions." Fed. R. Civ. P. 16(b)(3)(a). A scheduling order's deadlines control over deadlines set in other parts of the Federal Rules, including Rule 15. <u>Leary v. Daeschner</u>, 349 F.3d 888, 909 (6th Cir. 2003). A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Such a modification is appropriate 'only when a relevant deadline cannot reasonably be met despite the diligence of the party seeking the extension.'" <u>Preston v. Don Baskin Truck Sales, LLC</u>, No. 13-CV-2782-SHL-cgc, 2015 WL 12882804, at *1 (W.D. Tenn. Apr. 28, 2015) (quoting <u>EEOC v. U-Haul Intern., Inc.</u>, 286 F.R.D. 322, 325 (W.D. Tenn. 2012)). "An 'important consideration for a district court deciding whether Rule 16's good cause standard is met is whether the opposing party will suffer prejudice[.]'" <u>Marcilis v. Twp. of Redford</u>, 693 F.3d 589, 597 (6th Cir. 2012) (quoting <u>Leary</u>, 349 F.3d at 906). A dispositive motion filed outside of a deadline set by a scheduling order is treated as a

request to modify the scheduling order. <u>Andretti v. Borla Performance Indus., Inc.</u>, 426 F.3d 824, 830 (6th Cir. 2005).

The court only granted leave to file the amended complaint at issue here on June 15, 2018. (ECF No. 45.) To comply with the scheduling order, 50 North would have had to file a motion to dismiss only three days later. A diligent party could not reasonably meet this deadline. Furthermore, there is nothing to suggest Raymond James has suffered any prejudice by the late filing. It is recommended that the motion to dismiss not be denied due to timeliness.

## C.   Choice of Law

"A federal court sitting in diversity applies the choice of law provisions of the forum state." <u>Solo v. United Parcel Serv. Co.</u>, 819 F.3d 788, 794 (6th Cir. 2016). "Tennessee adheres to the rule of *lex loci contractus*, which presumes that a contract is 'to be governed by the law of the jurisdiction in which it was executed absent a contrary intent.'" <u>Porter v. AAR Aircraft Servs., Inc.</u>, No. 19-5059, 2019 WL 5446003, at *3 (6th Cir. Oct. 24, 2019) (quoting <u>Southeast Texas Inns, Inc. v. Prime Hosp. Corp.</u>, 462 F.3d 666, 672 n.8 (6th Cir. 2006)). For tort claims, Tennessee has adopted the Restatement (Second) of Conflict of Laws, which provides that the "law of the state where the injury occurred will be applied unless some other state has a more significant

relationship to the litigation." <u>Hataway v. McKinley</u>, 830 S.W.2d 53, 59 (Tenn. 1992).

Here, the parties to the lease agreed that the contract should be construed according to Tennessee law. (ECF No. 41-1 Exhibit A at 25 § 42.) In addition, the injuries allegedly suffered by Raymond James occurred in Tennessee. As a result, Tennessee law governs this suit.

**D.   Contract Interpretation**

Leases are contracts and should be interpreted based on the "general rules of contract construction." <u>Planters Gin Co. v. Fed. Compress & Warehouse Co.</u>, 78 S.W.3d 885, 889 (Tenn. 2002). "A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." <u>Allstate Ins. Co. v. Watson</u>, 195 S.W.3d 609, 611 (Tenn. 2006). The plain meaning of a contract's text is the best evidence of the parties' intent. <u>Id.</u> To determine a contract's plain meaning, its provisions "must be read together to give meaning to the document as a whole." <u>Maggart v. Almany Realtors, Inc.</u>, 259 S.W.3d 700, 705 (Tenn. 2008). "All provisions of the contract should be construed in harmony with each other to promote consistency and avoid repugnancy among the various contract provisions." <u>Adkins v. Bluegrass Estates, Inc.</u>, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011). An important application of this principle is that when a contract has "both general and special provisions relating to the same thing, the special

provisions control. Thus, where there is uncertainty between general and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions, although this is not universally or necessarily so." Cocke Cty. Bd. of Highway Comm'rs v. Newport Utilities Bd., 690 S.W.2d 231, 237 (Tenn. 1985); see also Advanced Concrete Tools, Inc. v. Beach, No. 3:10-CV-1139, 2014 WL 1385868, at *20 (M.D. Tenn. Apr. 9, 2014) ("When a contract contains both general and specific provisions relating to the same thing, the specific provisions control.") (internal quotations and citations omitted).

Under certain circumstances, Tennessee permits courts to consider evidence beyond the four corners of a contract, such as evidence about pre-contract negotiations or evidence about the parties' subsequent conduct, in determining the contract's meaning. See generally Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc., 566 S.W.3d 671 (Tenn. 2019). However, such evidence may only be appropriately considered "if ambiguity remains after reviewing the contract's plain language." Spec's Family Partners, Ltd. v. First Data Merch. Servs. LLC, 777 F. App'x 785, 789 (6th Cir. 2019) (quoting Planters Gin, 78 S.W.3d at 890). "A strained construction may not be placed on the language used to find ambiguity where none exists." Lammert v. Auto-Owners (Mut.) Ins. Co., 572 S.W.3d 170, 173 (Tenn. 2019)

(quoting Farmers-Peoples Bank v. Clemmer, 519 S.W.2d 801, 805 (Tenn. 1975)).

**E.   Contract Money Damage Claims**

50 North argues that, even if it has breached the contract, the contract's exculpatory clauses prohibit money damages as a remedy.

1.   Elevators

The first question is whether Raymond James is limited to the remedies identified in the services provision for 50 North's alleged maintenance failures. There are three provisions of the contract that reference 50 North's obligations regarding the elevators, the two general building maintenance provisions and the services provision. The services provision has the most specific language about what standard the elevators should be operated at and about Raymond James's remedies in the event the elevators fail to function as agreed. Furthermore, the other two provisions do not appear to articulate different standards than the one set by the services provision, but rather state the same principle in more general terms. To treat the more general building maintenance provisions as governing over the much more specific and comprehensive language of the services provision would render the services provision a nullity, which the Tennessee Supreme Court has instructed against. Maggart, 259 S.W.3d at 705. The services provision unambiguously establishes the scope of Raymond James's

-14-

rights and remedies for breach based on a failure to maintain the elevators.

Turning to the services provision, it provides two specific remedies for a failure to furnish elevator services. First, if there is a critical failure – meaning that there are no working elevators for five days – Raymond James can abate rent. Second, if there is a failure that falls short of a critical failure, Raymond James can fix the elevators itself and get reimbursed, after giving notice and an opportunity to cure. The services provision specifically forbids damages suits for a failure to furnish elevator services, except "when such failure or delay is caused by the gross negligence or willful misconduct of the landlord." (ECF No. 41-1 Exhibit A at 12 § 11(e).)

This gross negligence carveout has an obvious meaning. Tennessee, like most states, prohibits parties from contracting away tort liability for gross negligence and willful misconduct. Copeland v. Healthsouth/Methodist Rehab. Hosp., LP, 565 S.W.3d 260, 270 (Tenn. 2018). As a result, many contracts with exculpatory clauses carve out exceptions for gross negligence and willful misconduct. As explained by New York's highest court, these carveouts are intended to cover "tortious" conduct, not "intentional nonperformance . . . motivated by financial self-interest." Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 643 N.E.2d 504, 508 (N.Y. 1994).

Raymond James thinks otherwise. It argues that its breach of contract claims may go forward because of this exclusion. Raymond James posits that its complaint plausibly alleges gross negligence in elevator maintenance and that this disregard for its contract rights means 50 North's alleged conduct falls within the exclusion.

The court disagrees. Gross negligence and willful misconduct are tort concepts, not contract concepts. The parties' intent based on the plain reading of the contract was to exclude tort liability from the exculpatory clause, not contract liability. Hence, Raymond James is barred from bringing a breach of contract damages suit about elevator services and — given there is no allegation of a critical failure that would trigger rent abatement — is limited to the self-help remedy.

A contrary reading would be counter to elementary principles of contract law. "All contracts must be interpreted in a manner that is consistent with general legal principles." Individual Healthcare Specialists, 566 S.W.3d at 704. In contract law, it does not matter if a party's breach is intentional or inadvertent — "[i]f a contract is broken, the measure of damages generally is the same, whatever the cause of the breach." Globe Ref. Co. v. Landa Cotton Oil Co., 190 U.S. 540, 544 (1903) (Holmes, J.). This is, in part, because "'[p]arties engaged in a commercial transaction pursue their own self-interest and understand and expect that the parties with whom they are dealing are doing

-16-

likewise.'" <u>SecurAmerica Bus. Credit v. Schledwitz</u>, No. W2012-02605-COA-R3CV, 2014 WL 1266121, at *28 (Tenn. Ct. App. Mar. 28, 2014) (quoting <u>Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.</u>, 395 S.W.3d 653, 674 (Tenn. 2013) (Koch, J., concurring)). There is no logical reason for two sophisticated parties to treat intentional or grossly negligent breaches of contract differently than other breaches. Nor is it plausible that the parties would have expressed such a major deviation from ordinary contract principles in this roundabout fashion.

Furthermore, Raymond James's reading is wholly irreconcilable with the rest of the services provision. The contract's self-help remedy requires Raymond James to provide 50 North notice of a critical failure before attempting to fix the problem itself. Presumably, after providing such notice, if 50 North failed to cure the critical failure, Raymond James would have a strong argument that 50 North was intentionally, or grossly negligently, breaching the agreement. If Raymond James could then bring a breach of contract claim against 50 North for money damages, the self-help remedy would short circuit midway through and would be rendered meaningless. The parties would not have created a painstakingly detailed alternative to damages suits in the self-help remedy had they intended to allow damages suits to be so easily accessible.

A party cannot escape a contract's unambiguous meaning by advocating a "strained construction" of its language. <u>Lammert</u>, 519 S.W.2d at 173. Read in conjunction with background principles of contract law and the contract's other terms, the services provision unambiguously prohibits Raymond James from bringing suit for money damages based on 50 North's failure to provide elevator service and limits Raymond James to the rent abatement remedy (if applicable) or the self-help remedy.

2.   <u>Other Building Maintenance Issues</u>

The services provision explicitly governs window cleaning, building security, and repairs to the building's common areas. The services provision does not explicitly talk about window caulking, but in context, it makes sense to understand this type of quasi-janitorial issue as being covered by the services provision as well. Because all of these building maintenance issues are covered by the services provision Raymond James cannot bring a money damages contract claim based on them.

There is one exception. Raymond James alleges that a spire on top of the building was damaged in a windstorm and has not been repaired. (ECF No. 41-1 at 12 ¶ 40.) Structural maintenance to the building is expressly excluded from the scope of the services provision. (ECF No. 41-1 Exhibit A at 12 § 11(f)(i).) As a result, the exculpatory clause in the services provision does not apply. However, Raymond James acknowledges in its complaint that it never

provided 50 North with written notice and an opportunity to cure the damage to the spire before filing suit, as is required by the contract. (ECF No. 41 at 16 ¶ 54.) Raymond James purports to provide notice in the complaint itself, and promises that it will dismiss those portions of the complaint regarding damage to the spire in the event the damage is repaired within the cure period. But allowing a lawsuit to serve as pre-suit notice would defeat the point of pre-suit notice. It is recommended that the motion to dismiss Raymond James's money damages breach of contract claim be granted.

**F.   Specific Performance**

50 North also seeks to dismiss Raymond James's claim for specific performance of the contract through an injunction compelling 50 North to modernize the elevators. "Specific performance is an equitable remedy." Hillard v. Franklin, 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000) (quoting GRW Enterprises, Inc. v. Davis, 797 S.W.2d 606, 614 (Tenn. Ct. App. 1990)). As a result, "[s]pecific performance is not available when there is an adequate remedy at law." In re Estate of Mayfield, No. M201801977COAR3CV, 2019 WL 4409218, at *11 (Tenn. Ct. App. Sept. 9, 2019). Furthermore, a court will not remake a contract to grant specific performance.[3] King v. Mut. Life Ins. Co. of N.Y., 114 F. Supp. 700,

---

[3]A court may condition a grant of specific performance on modification of a contract when enforcing the contract as written

-19-

701 (E.D. Tenn. 1953); see also Individual Healthcare Specialists, 566 S.W.3d at 694 ("Tennessee has rejected firmly any notion that courts are a fallback mechanism for parties to use to 'make a new contract' if their written contract purportedly fails to serve their 'true' intentions.").

Granting specific performance here would have the effect of remaking the parties' contract in Raymond James's favor. The parties bargained for a specific set of remedies in the event of breach of the services provision. In doing so, they implicitly excluded the possibility of specific performance. If the contract is read to not exclude specific performance, Raymond James could evade the self-help clause's various limitations by bringing an action for specific performance after breach. The self-help remedy would be rendered superfluous. This cannot have been the parties' intent. It is recommended that the motion to dismiss Raymond James's claim for specific performance be granted.

## G.    Declaratory Judgment

50 North next argues that Raymond James's declaratory judgment claims should be dismissed. As noted earlier, Raymond James is seeking three declarations: (1) that 50 North is required to modernize the elevators to comply with the lease's maintenance

---

would be inequitable or impose an administrative burden on the court. Gilson v. Gillia, 45 Tenn. App. 193, 218, 321 S.W.2d 855, 866 (1958).

obligations, (2) that because of 50 North's breach of the lease, Raymond James may abate its rent, and (3) that because of 50 North's breach, Raymond James may exercise their option to leave the lease early without paying a fee.

The Declaratory Judgment Act, as codified in 28 U.S.C. § 2201(a), provides that:

> [i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

To be an actual controversy, a dispute between the parties must be "'real and substantial' and 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (internal alterations omitted) (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-241 (1937)). Applying this rule, the Sixth Circuit has held that when a party seeks a declaration of its rights under a contract, but a "chain of contingencies" would have to happen for one of the parties to be liable under the contract, the actual controversy requirement is not satisfied. Hemlock Semiconductor Corp. v. Kyocera Corp., 747 F. App'x 285, 292 (6th Cir. 2018). Furthermore, even if an actual controversy

exists, declaratory relief is a discretionary remedy.[4] United Specialty Ins. Co. v. Cole's Place, Inc., 936 F.3d 386, 396 (6th Cir. 2019).

The last two declarations Raymond James seeks constitute an actual controversy because they would have an immediate, non-hypothetical impact on the relations between the parties. However, Raymond James is not entitled to either based on the lease's text. Even assuming 50 North is in breach for failing to modernize the elevators, Raymond James cannot abate rent under the services provision absent an "Essential Service" failure lasting more than five days. (ECF No. 41-1 Exhibit A at 12 § 11(e).) "Essential Service" is defined by the contract as "at least one . . . elevator" serving the floors Raymond James has offices on. (Id.) The complaint is devoid of allegations that there have been no working elevators serving the floors where Raymond James has offices for a continuous period of five days. Raymond James is thus not entitled to a declaration that it has the right under the contract

_____

[4]In cases involving parallel state and federal litigation, the Sixth Circuit has outlined a non-exhaustive five-factor test (with three subfactors for factor four) to determine if a federal court should decline to exercise jurisdiction over the declaratory judgment action. United Specialty Ins. Co. v. Cole's Place, Inc., 936 F.3d 386, 396 (6th Cir. 2019); W. World Ins. Co. v. Hoey, 773 F.3d 755, 759 (6th Cir. 2014) (holding the five factors are non-exhaustive). It is somewhat unclear whether these factors are relevant in a case where there is no parallel state court proceeding. However, because declaratory relief is not appropriate here for reasons unrelated to this multifactor test, the undersigned need not wade into that dispute.

to abate rent. Similarly, Raymond James is not entitled to leave the contract early without paying the required fee. Allowing Raymond James to do so would effectively be an early termination of the lease. The contract is clear that "[i]n no event shall Tenant's remedies for [a breach by 50 North] include termination of this lease." (Id. at 20 § 30.) The court cannot declare the lease says something it plainly does not.

This leaves Raymond James's requested declaration that 50 North is required to modernize the elevators. Assuming 50 North has breached its obligations under the lease to maintain the elevators, Raymond James's only recourse is through the services provision's self-help remedy. This itself does not require judicial intervention; Raymond James can begin the self-help remedy on its own. A judicial declaration of 50 North's breach would only affect the relationship between the parties if Raymond James elected to go through with the self-help remedy, and then at the conclusion of the process, 50 North were to refuse to pay for the elevator modernization. Even then, the declaratory relief sought in the complaint would not resolve this future controversy — Raymond James may only self-help if 50 North's breach of the services provision affects Raymond James's "use of a material portion of the premises" both "materially and adversely[.]"[5] (Id.

---

[5]The result potentially might be different here if Raymond James sought a declaration that it had the right to use the self-help

at 12 § 11(f).) Raymond James is thus not seeking "specific relief through a decree of a conclusive character" but to "litigate a single issue in a dispute that must await another lawsuit for complete resolution." MedImmune, 549 U.S. at 127; Hemlock, 747 F. App'x at 293 (quoting Calderon v. Ashmus, 523 U.S. 740, 748, 118 (1998)). This is not an actual controversy within the meaning of the Declaratory Judgment Act. It is recommended that the motion to dismiss Raymond James's declaratory judgment claims be granted.

**H.   Gross Negligence**

50 North argues that Raymond James has not stated a gross negligence tort claim.[6] To state a claim for gross negligence, a plaintiff must allege an ordinary negligence claim, and that the defendant acted "'with utter unconcern for the safety of others,

---

remedy to modernize the elevators. A lessee need not "bet the farm" by building or destroying a structure before it can obtain a declaratory judgment that it has the right to do so under a lease. See MedImmune, 549 U.S. at 134. But Raymond James has not asked for such a declaration, or for that matter shown an interest in making use of the contract's self-help remedy.

[6]In its brief, 50 North specifically argues that (1) because Raymond James has not plead a separate ordinary negligence count, Raymond James has not properly plead gross negligence, (2) because 50 North is in compliance with the terms of the lease (as it understands them), it cannot have acted negligently, and (3) because 50 North has made ad hoc repairs to the elevators after breakdowns, it cannot have been grossly negligent. None of these arguments are persuasive. Although 50 North did not raise the issue of whether Raymond James had plead the existence of a duty (the issue discussed in this section) the undersigned believes that the lack of duty is plain and obvious and that the "just, speedy, and inexpensive determination" of this action is best achieved by addressing it here.

or . . . with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law.'" Lansky v. Prot. One Alarm Monitoring, Inc., No. 17-2883, 2019 WL 575390, at *3 (W.D. Tenn. Feb. 12, 2019) (quoting Leatherwood v. Wadley, 121 S.W.3d 682, 693-94 (Tenn. Ct. App. 2003)). To state an ordinary negligence claim, a plaintiff must plausibly allege "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." Cotten v. Wilson, 576 S.W.3d 626, 637 (Tenn. 2019).

There is no tort duty to refrain from breaching a contract. Hannan v. Alltel Publ'g Co., 270 S.W.3d 1, 10 n.11 (Tenn. 2008), overruled on other grounds by Rye v. Women's Care Ctr. of Memphis, MPLLC, 477 S.W.3d 235 (Tenn. 2015) ("[W]e have never recognized a tort of 'negligent breach of contract.'"); see also Morrison v. Allen, 338 S.W.3d 417, 451 n.12 (Tenn. 2011) (Koch, J., concurring in part and dissenting in part) ("Tennessee does not recognize a negligent breach of contract claim."). "[W]hen two parties enter into a contractual arrangement, their obligations to each other thereafter generally arise only out of the contract itself." Harris v. Nationwide Mut. Fire Ins. Co., 367 F. Supp. 3d 768, 774 (M.D. Tenn. 2019). "A tort exists only if a party breaches a duty which he owes to another independently of the contract." In

re Lingham Rawlings, LLC, No. 10-32769, 2013 WL 1352320, at *35 (Bankr. E.D. Tenn. Apr. 3, 2013) (quoting Calipari v. Powertel, Inc., 231 F. Supp. 2d 734, 736 (W.D. Tenn. 2002)). "[W]here a claim for negligence is based only on breach of contract obligations, and there are no alleged extra-contractual duties, 'the first element of the tort claim fails.'" Doe v. Belmont Univ., 367 F. Supp. 3d 732, 763 (M.D. Tenn. 2019).

Tennessee tort law does impose duties on certain professionals, such as doctors or lawyers, to conform their conduct to the standard of care expected of such professionals. See, e.g., Estate of French v. Stratford House, 333 S.W.3d 546, 554 (Tenn. 2011). But these duties have been imposed only on professions that have been traditionally held liable for malpractice. Courts applying Tennessee law have declined to impose such duties on professionals in areas that have not traditionally been held liable for malpractice. See Z.J. v. Vanderbilt Univ., 355 F. Supp. 3d 646, 705 (M.D. Tenn. 2018); Am.'s Collectibles Network, Inc. v. Sterling Commerce (Am.), Inc., No. 3:09-CV-143, 2016 WL 9132294, at *20 (E.D. Tenn. Sept. 7, 2016). Courts are "especially reluctant to create a free-standing duty where . . . the dispute is between two highly sophisticated parties operating under a tightly negotiated contract." Am.'s Collectibles Network, 2016 WL 9132294, at *20.

Raymond James alleges that 50 North has a duty "as the owner and operator of [the] commercial building" to:

> provide elevator service that is reasonably safe, reliable, free of entrapments and dangerous malfunctions and to maintain and operate the elevator system in a manner to reasonably ensure that it will be safe, reliable, free of entrapments and dangerous malfunctions, all in a manner consistent with industry standards for the operation and maintenance of commercial, high-rise office buildings.

(ECF No. 41 at 20 ¶ 73.) No such tort duty exists under Tennessee law. 50 North had no tort duty to refrain from breaching its contract with Raymond James. And Tennessee tort law does not impose an independent duty on the operators of elevators in "commercial, high-rise office buildings" to provide elevator service to corporate tenants that conforms to a certain standard of care. Raymond James has not shown it was owed a duty.

This is not to say that 50 North has no tort duty to anyone regarding its operation of the building elevators. Like any party, 50 North is obligated to take reasonable care to refrain from causing reasonably foreseeable physical harm or property damage to others. Giggers v. Memphis Hous. Auth., 277 S.W.3d 359, 364 (Tenn. 2009). The undersigned expresses no opinion about whether this duty would extend to individuals who might be physically injured or entrapped by elevator breakdowns caused by 50 North's alleged unwillingness to modernize the elevators. But the injuries Raymond James has allegedly suffered as a result of 50 North's supposedly

negligent elevator maintenance are simply not the kind of injuries negligence law is concerned with. "Tort law, including the law of negligence, is designed to protect all persons generally from the risk of physical or, in some cases, emotional harm to their persons or property." Thomas & Assocs., Inc. v. Metro. Gov't of Nashville, No. M2001-00757-COA-R3CV, 2003 WL 21302974, at *6 (Tenn. Ct. App. June 6, 2003). The law of negligence is not designed to protect "business plaintiffs who — having negotiated an elaborate contract or having signed a form when they wish they had not — claim to have a right in tort.'" Milan Supply Chain Sols. Inc. v. Navistar Inc., No. W201800084COAR3CV, 2019 WL 3812483, at *7 (Tenn. Ct. App. Aug. 14, 2019). It is recommended that the motion to dismiss be granted as to Raymond James's gross negligence claim.

### III.    RECOMMENDATION

For the reasons above, it is recommended that 50 North's motion to dismiss be granted.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

February 20, 2020
Date


### NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE**

SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND
RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S
OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A
COPY. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R.
72.1(g)(2). FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS
MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER
APPEAL.