IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| **RAYMOND JAMES & ASSOCIATES, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | No. 2:18-cv-02104-JTF-tmp |
| ) | |
| **50 NORTH FRONT ST. TN, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE
TO FILE A SECOND AMENDED COMPLAINT**

Plaintiff Raymond James & Associates, Inc. ("Raymond James"), pursuant to Rules 15 and 16 of the Federal Rules of Civil Procedure, submits this Brief in Support of Plaintiff's Motion for Leave to File a Second Amended Complaint ("Motion for Leave"). For the reasons explained below, the Motion for Leave should be granted.

**INTRODUCTION**

Raymond James initiated this lawsuit against Defendant 50 North Front St. TN, LLC ("50 North") in Shelby County Chancery Court on February 2, 2018. (*See* ECF 1-1 at PageID 4). 50 North removed the suit to this Court on February 16, 2018. (*See* ECF 1 at PageID 1). The original Scheduling Order—issued on April 26, 2018—fixed May 29, 2018 as the deadline for amending pleadings. (ECF 33 at PageID 312). On May 28, 2018, Raymond James filed its Motion for Leave to File First Amended Complaint (ECF 41), which the Court granted on June 15, 2018, thereby accepting as filed the First Amended Complaint ("FAC").[1] (ECF 45 at PageID 512-13).

---

[1] (*See generally* ECF 41-1).

50 North, on June 29, 2018, moved to dismiss the FAC. (ECF 54). On February 20, 2020, the Magistrate Judge issued a Report and Recommendation ("Report") recommending the dismissal of the FAC. (*See* ECF 301). Raymond James respectfully submits that the Report is erroneous in several respects and has accordingly filed its Objections to Report and Recommendation ("Objections") (ECF 310) and a Reply in Support of Plaintiff's Objections to Report and Recommendation ("Reply") (ECF 321).

Raymond James seeks leave from the Court to file the Second Amended Complaint ("SAC") attached as **Exhibit 1** to this brief. Although Raymond James believes that the FAC is well-pleaded in every relevant regard, the SAC does several important things, and the Court should permit Raymond James to file it for any or all of the following reasons:

- First, the SAC—unlike the FAC—contains a detailed account of the negotiating history between 50 North's predecessor, Parkway Properties, LP ("Parkway"), on the one hand, and Raymond James on the other over what ultimately became the operative Lease. This history demonstrates that negotiations came to impasse—with Raymond James ready to go forward with another suitor, Carlisle Corporation ("Carlisle") —and resumed only after Parkway agreed to incorporate into the Lease its commitment to spend whatever was necessary to maintain and operate the Raymond James Tower ("Tower") at the then-current level or higher. This negotiating history thus resolves any potential ambiguity regarding the language of the Lease in Raymond James's favor.

- Second, the SAC reflects highly relevant new facts—both ones that have occurred since the filing of the FAC nearly two years ago in May 2018 and ones that were uncovered in the course of the long, winding road that has been written discovery in this case.

      Neither of these sets of facts could have been asserted in the FAC, and Raymond James should be permitted to assert them now.

- Third, the SAC adds Jacob Sofer ("Mr. Sofer")[2] as a party Defendant based on what discovery has shown regarding his involvement in the tortious conduct directed at Raymond James.

- Fourth, the SAC further adds a discrete cause of action for fraud, clarifies certain existing causes of action asserted in the FAC, and—based on factual developments since the filing of the FAC—expands the damages being sought.

- Finally, the SAC streamlines the suit by dispensing with earlier requests for injunctive relief and specific performance.

All of the potentially pertinent legal factors—including good cause—point toward granting leave to amend. Leave to amend should typically be given freely, and these circumstances offer no reason to depart from the general rule. Raymond James has acted diligently at all relevant times; it has not been dilatory and is not acting in bad faith; the SAC is not futile in any respect; and 50 North would not be unduly prejudiced by the filing of the SAC. The Motion for Leave should therefore be granted.

## LEGAL STANDARD

Rule 15(a)(2) of the Federal Rules of Civil Procedure permits a party to amend its complaint with leave of the Court after a responsive pleading has been filed. *See id.* "Such leave [should] be freely granted when justice so requires." *Kennedy v. City of Zanesville*, 2005 WL 8161824, at *1 (S.D. Ohio Dec. 19, 2005) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (granting leave to file a *fourth* amended complaint). "If the underlying facts or circumstances

---

[2] 50 North and Mr. Sofer are sometimes referred to collectively in this brief as "Defendants."

3

relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.*

Additionally, "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive, on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.—the leave sought should be 'freely given.'" *Id.* And typically "delay alone . . . does not justify denial of leave to amend." *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (vacating a denial of a motion for leave to file a *second* amended complaint). When a scheduling order's deadline for the amendment of pleadings has passed, a showing of "good cause" under Rule 16(b) may also be required. *See Jones v. St. Jude Med. S.C., Inc.*, 2010 WL 145327, at *1 (S.D. Ohio Jan. 8, 2010) (granting a motion for leave to amend and noting that the Rule 16 inquiry operates in tandem with the Rule 15 inquiry). Although precise definitions of "good cause" vary among the federal courts, the standard has been typically been construed as requiring a movant to demonstrate that, despite its reasonable diligence, it could not meet the original deadline for amendments. *See Gray v. Javius*, 2015 WL 5031973, at *1 (W.D. Ky. Aug. 25, 2015).

## LAW AND ARGUMENT

A. **The SAC contains an extended discussion of the negotiating history between Parkway and Raymond James, and that negotiating history offers significant insight into the operative Lease.**

The Report, notwithstanding the Rule 12(b)(6) posture of the suit, opines on what Parkway and Raymond James *must have intended* when the operative Lease was executed in June 2014. (*See, e.g.*, ECF 301 at PageID 6253) ("The parties would not have created a painstakingly detailed

4

alternative to damages suits in the self-help remedy had they intended to allow damages suits to be so easily accessible."). Similarly, the Report subordinates Section 10 of the Lease on the basis that Section 10 contains merely "general building maintenance provisions." (*Id.* at PageID 6250). The pertinent negotiating history—as set forth in the SAC—demonstrates that the Report's assumptions in this regard are erroneous.

And, to the extent that the Lease is ambiguous in any relevant respect, the inclusion of the negotiating history in the SAC resolves any potential ambiguity in Raymond James's favor.[3] As the SAC explains, in 2013 and early 2014, Raymond James had negotiated in broad strokes the terms of a new ten-year lease with Parkway. (**Exhibit 1** at ¶ 16). By January 2014, Parkway and Raymond James had the makings of a deal, but the deal was contingent on the approval of both Parkway's and Raymond James's boards of directors. (*Id.*). Parkway's board of directors, in March 2014, unexpectedly rejected the proposed deal. (*Id.* at ¶ 18). Raymond James in response decided to look to Carlisle for a new lease; Carlisle hoped to secure Raymond James as the primary tenant to a new high-rise that Carlisle was planning to build. (*Id.*). And, given Parkway's lack of reliability—highlighted by its board's unexpected rejection of the proposed deal in March 2014—

---

[3] 50 North has recently taken the position in its pleadings that relevant language in the Lease is ambiguous. Its bizarre conspiracy theory—that the Lease's provisions regarding repair and maintenance contain so-called "code language with a hidden meaning . . . that no future buyer could ascertain from reviewing the Lease"—is merely another (albeit novel) way of saying that this language in the Lease is ambiguous. (*See* ECF 286 at PageID 4976) (internal quotation marks omitted). Such a position is itself fundamentally at odds with the notion that 50 North is entitled to dismissal. The "construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 689-90 (E.D. Mich. 2012) (internal quotation marks omitted). Because 50 North first raised its "code language" theory long after the briefing concluded on its Motion to Dismiss (*see* ECF 286, filed on December 19, 2019), the Magistrate Judge apparently overlooked this inconsistency in the Report.

Raymond James decided that it would be in its best interest to conduct negotiations with Carlisle and Parkway simultaneously. (*Id.*).

The resumed negotiations with Parkway initially progressed fairly quickly. (*Id.* at ¶ 19). Parkway and Raymond James, for example, agreed that Raymond James would forgo a multi-million-dollar tenant improvement allowance and would instead use its own funds (some $3.5 million) to make tenant improvements. (*Id.*). This was unusual because commercial landlords typically offer their tenants an improvement allowance. (*Id.*). Raymond James's agreement to fund millions of dollars' worth of tenant improvements was offset in part by Parkway's agreement to increase the period of free rent (i.e., abatement) that Raymond James would receive later in the life of the lease. (*Id.*).

Despite this progress between Parkway and Raymond James, however, the proposal from Carlisle remained attractive to Raymond James because Carlisle's proposal called for the construction of a brand-new skyscraper. (*Id.* at ¶ 21). The negotiations between Parkway and Raymond subsequently came to impasse in May 2014. (*Id.* at ¶ 22). And, indeed, the main point of contention was Parkway's unwillingness to commit to replacing the Tower's systems as needed to maintain the then-current level of maintenance and operation, let alone to keep up with similar buildings in the market. (*Id.*).

Parkway's refusal to so commit was a deal-breaker. (*Id.* at ¶ 22). Raymond James informed Parkway that it would "aggressively pursue all alternatives" because Raymond James could "only assume that the current service levels [at the Tower] will not be maintained, and any new building owner will have no requirements to maintain at least the current levels." (*Id)*. When Parkway saw that Raymond James was serious about pivoting to Carlisle's offering, Parkway changed course and committed to spend whatever capital was necessary to maintain and operate

6

the Tower in at least the then-current level and at a level similar to that of comparable buildings in the marketplace. (*Id.* at ¶ 23). Additionally, Parkway committed to make improvements, repairs, and replacements as necessary to do so, and to furnish services (including, but not limited to, elevator service) at no less than the then-current levels. (*Id.*). These commitments by Parkway—which were crucial to Raymond James—made it into Sections 10 and 11 of the Lease. (*Id.*). Raymond James should be permitted to assert this negotiating history because, among other things, it shows conclusively that Section 10 of the Lease was intended to contain—and in fact does contain—meaningful and enforceable obligations.

> **B.  Many of the new allegations contained in the SAC involve facts, conditions, and tortious conduct occurring *after* the filing of the FAC, and as such could not have been asserted in the FAC.**

The SAC reflects the unquestionable reality that the factual universe has changed substantially since May 2018, when the FAC was submitted to the Court. Raymond James could not have advanced these allegations before because the facts underlying them had not yet materialized when the FAC was filed. Examples of these subsequent facts, conditions, and conduct are discussed below.

> **1.  The safety and reliability of the elevator system—both of which were already quite poor as of May 2018—have declined dramatically since the FAC was filed.**

New developments as to the elevators include additional personal injuries to Raymond James' employees. Despite 50 North's previous statements to this Court that the elevators were

safe,[4] since the FAC was filed there have been two additional serious elevator-caused injuries, one involving a Raymond James employee who broke her elbow (in August 2018) and another Raymond James employee who broke a bone in her ankle (in March 2019). (*See* **Exhibit 1** at ¶ 41). These injuries were caused by the elevator's tendency to mis-level—a safety issue that, as explained below, was and remains well-known to 50 North and Mr. Sofer.

Additional new developments involve service outages. Although the elevators were certainly bad in May 2018, they have gotten markedly worse since then. As detailed in the SAC, having *three or more* elevators out at one time has become the norm at the Tower. (*See id*. at ¶ 47). All told, there have been nearly 200 business days when four of the Tower's elevators have been out of service, and there have been multiple instances where five or six elevators have been out of service at one time. (*Id.* at ¶ 48).

> **2. 50 North began deliberately depriving Raymond James of services after the FAC was filed, and ultimately 50 North and Mr. Sofer succeeded in their goal of driving Raymond James out of the Tower.**

50 North—after the filing of the FAC—discarded any pretense of good faith or veneer of compliance with its obligations under the Lease, and simply began shutting off elevators, thus deliberately depriving Raymond James of services. (*Id.* at ¶ 49). At times, at least four of the Tower's eight passenger elevators have been deliberately turned off and left off for a year or more. (*Id.*). This intentional conduct by 50 North, combined with the ever-worsening condition of the Tower's elevator system, the deterioration of the Tower in general under 50 North's ownership,

---

[4] (*See* ECF 19-4 at PageID 207) (filing at the preliminary injunction stage by 50 North consisting of an unsworn statement from a modernization salesman asserting that the elevators at the Tower were "safe for the riding public" and denying that any repairs were "due to safety issues").

and the pattern of duplicity and intransigence by 50 North and those associated with it—left Raymond James no choice but to decide to leave the Tower early. (*Id.* at ¶¶ 64-68). As explained in the SAC, Raymond James has secured space in two buildings (located roughly half a mile apart from each other) in East Memphis, and Raymond James will in the near future move its many hundreds of employees from the Tower to the East Memphis spaces. (*Id.* at ¶ 68).

### 3. 50 North and Mr. Sofer commenced and maintained a campaign of harassment against Raymond James after the filing of the FAC.

Since Raymond James's initiation of this suit in February 2018—and, most pointedly, *after* the FAC was submitted to the Court in May 2018—50 North and those associated with it (including Mr. Sofer) have undertaken a campaign of harassment towards Raymond James. These acts of harassment, as set forth in the SAC, include the following:

- <u>50 North's attempt to bill Raymond James for its legal fees</u>. In March 2019, 50 North sent Raymond James an invoice for $66,282 for purported "legal fees reimbursement." (*See id.* at ¶ 74). These invoices were, simply put, bogus. The invoices represented a frivolous (albeit bold) attempt by 50 North to collect its attorneys' fees after the Court permitted Raymond James to file the FAC in May 2018. (*Id.*). Raymond James refused to pay the invoices and demanded their withdrawal, to which 50 North had no response. (*Id.*).

- <u>50 North's attempt to bill Raymond James for "excess storage space" supposedly used over the last five years</u>. Worse, in late December 2019, 50 North ginned up and sent to Raymond James a retroactive invoice for nearly $600,000, founded on Raymond James's supposed use of "excess storage space" in the Tower. (*See id.* at ¶ 74).

9

- <u>Defendants' intentional defamation of Raymond James</u>. On or about February 20, 2020, Defendants sent an email blast to Memphis business leaders and real estate professionals promoting, among other things, the intentionally false narrative that their elevators are safe and reliable and that Raymond James contentions to the contrary are "deceitful."

### 4. 50 North has defrauded Raymond James in the course of this suit.

Since the submission of the FAC in May 2018, Raymond James has also learned that it has been defrauded by 50 North. This actual and attempted fraud, as detailed in the SAC, involves several components, including:

- Billing Raymond James some $20,000 in 50 North's own elevator-related expert witness fees, even though the Lease plainly prohibits passing on such fees to Raymond James. (*Id.* at ¶ 78).
- Billing Raymond James over $100,000 in capital expenses, in direct violation of the Lease's terms. (*Id.*).
- Failing to remit to Raymond James over $140,000 in credit Raymond James was rightfully due for reductions in property taxes enjoyed by 50 North in the 2017 and 2018 tax years. (*See id.* at ¶ 79).
- Refusing to cooperate in the Lease-required audit demanded by Raymond James. Suspecting that it had been cheated by 50 North, Raymond James in November 2019 invoked its audit rights under the Lease. (*Id.* at ¶ 80). 50 North—fearing that its fraudulent scheme would be uncovered by an ordinary-course audit of the operating expenses and property taxes for the Tower—denied Raymond James's attempted

exercise of its audit rights on the supposed basis that Raymond James's invocation of those rights was *received* in New York one day late. (*Id.*).

In sum, a significant amount of the factual matter contained in the SAC involves increasingly deplorable conditions at the Tower (particularly the elevators), ever-worsening intentional conduct by 50 North and Mr. Sofer (including harassment and fraud), and Raymond James's being forced out of the Tower early, all of which indisputably occurred after the filing of the FAC in May 2018. Raymond James should be given leave to plead these new facts, as it was impossible to assert them at the time the FAC was accepted by the Court.

### C. Discovery occurring since the filing of the FAC has supplied significant additional key context and facts, which are asserted in the SAC.

As the Court is well aware, written discovery in this case has been an arduous process. For example, to obtain documents that 50 North should have produced no later than mid-2018, Raymond James had to file, brief, and argue multiple motions to compel and other discovery-related motions. And when 50 North finally produced more than a relative handful of documents in the spring of 2019, it produced them in a fashion designed to stymie Raymond James—namely, by dumping over 700,000 pages' worth of un-reviewed (except for an automated privilege review) electronic documents on Raymond James.

#### 1. Discovery has shown that 50 North—which functions as Mr. Sofer's alter ego—and Mr. Sofer have long known of the need for substantial work at the Tower.

The items produced in discovery by 50 North ultimately paint a much darker picture of 50 North's and Mr. Sofer's conduct than appears in the FAC, which was filed before Raymond James

11

had the benefit of any documents from 50 North from numerous third-party subpoenas. This darkened picture is captured by additional factual allegations in the SAC. Written discovery, for example, has revealed the following:

- 50 North is, at best, a shell and as a practical matter functions as Mr. Sofer's alter ego. It was formed for the sole purpose of acquiring the Tower and, on information and belief, had no assets other than ones that Mr. Sofer had transferred from other entities that he owned, controlled and/or dominated. (*Id.* at ¶ 29). 50 North does not appear to have any will apart from that of Mr. Sofer, and the actions of 50 North—including its tortious conduct—have by all signs been directed by Mr. Sofer.

- Before the purchase of the Tower in January 2015 from Parkway, 50 North and Mr. Sofer received a "property condition assessment" ("PCA") that Parkway had commissioned EMG Corporation to perform. (*Id.* at ¶ 28). The PCA, which, to reiterate, was prepared at Parkway's (i.e., the seller's) request, reflected an aging Tower, including—no surprise—the elevator system, which the PCA candidly described as merely "fair" with just three years remaining until the entire system would be beyond its useful life. (*Id.*).

- 50 North and Mr. Sofer further agreed to confine their pre-purchase due diligence to a ten-day period, despite the fact that they were poised to buy a 21-story skyscraper that was built in 1985. (*Id.* at ¶ 32).

- This unusually circumscribed due diligence period was no accident; indeed; it appears to be part and parcel of 50 North's and Mr. Sofer's business model—as acknowledged in writing by Mr. Sofer's right-hand man, Joel Friedman ("Mr. Friedman"), to Parkway's agent in December 2014: namely, to "take unique or distressed assets" and

12

make them profitable (presumably by spending next to nothing on what might be required to comply with lease terms).  (*Id.* at ¶ 56).

- Discovery has shown that Parkway as seller—not 50 North as buyer—bore the entire $8 million cost of the abated rent under the Lease.  (*Id.* at ¶ 31).

In short, discovery has revealed that 50 North and Mr. Sofer bought the Tower knowing that it needed substantial work.  (*Id.* at ¶ 34).

> **2.** **Discovery has shown that 50 North and Mr. Sofer—since buying the Tower in January 2015—have repeatedly received and rebuffed warnings regarding the safety hazards and reliability problems posed by the elevator system.**

Discovery has further revealed that 50 North and Mr. Sofer received repeated warnings from multiple sources—including from at least two elevator service companies—about the dangerous and outmoded condition of the elevator system, and nevertheless proceeded to willfully ignore all of the warnings.  These warnings included:

- Shortly after buying the Tower in January 2015, 50 North and Mr. Sofer received a copy of a report (the "Lerch Bates Report") that had been prepared by an elevator consulting group at Parkway's behest.  (*Id.* at ¶ 24).  The Lerch Bates Report, among other key findings, concluded that the existing elevator system had inherent safety problems (mainly mis-leveling—the same issue that caused physical injuries to two Raymond James employees after the FAC was filed).  (*Id.*).  It also predicted that, because the underlying technology was obsolete, the system would likely soon experience serious reliability problems.  (*Id.*).  Finally, as relevant here, the Lerch Bates Report recommended that the elevators be modernized by the spring of 2015.  (*Id.*).

13

- In July 2016, Thyssenkrupp Elevator Company ("TKE"), an elevator manufacturer and service company that had been recently hired by 50 North, advised Mr. Friedman that the elevators needed to be modernized "in the near term (12-24 months)." (*Id.* at ¶ 51).

- TKE's assessment darkened soon thereafter. In December 2016, a TKE account manager told Mr. Friedman that the elevators had far outlived their useful life and that "continued prolonged shutdowns . . . should be expected by … management" absent modernization. (*Id.*).

- TKE continued to sound the alarm to 50 North and Mr. Sofer in late 2017, telling them that they "needed to modernize these elevators soon." (*Id.*). Privately, various persons associated with TKE expressed embarrassment regarding "shape this job [i.e., the elevator system] was in." (*Id.*).

- In July 2017, Mr. Friedman and Shellie Moses (an employee of Colliers, the local property management company) exchanged emails regarding the Tower's significant elevator problems. (*Id.* at ¶ 43). During that exchange, Mr. Friedman asked "[b]y leaving #6 operational isn't that putting us in a position where somebody can fall?" (*Id.*). And in another email exchange later that month, Mr. Friedman said (regarding the elevators): "Sounds like this is getting dangerous." (*Id.*).

Discovery has thus shown that 50 North and Mr. Sofer indisputably knew about the very real safety hazards and reliability issues posed by the Tower's elevator system, and yet insisted to Raymond James (and represented to the Court; *see* ECF 19-4 at PageID 207) that nothing was wrong with the elevators while trying to extort concessions from Raymond James.

### D.     All of the potentially relevant legal factors favor amendment.

The relevant factors under Rule 15 and Rule 16 plainly support amendment under the circumstances. First, the law has long favored affording a plaintiff the opportunity to test its claims on the merits. *See, e.g.*, *Kennedy*, 2005 WL 8161824, at *1 (citing *Foman*, 371 U.S. at 182) (granting leave to file a fourth amended complaint). As to the specific Rule 15 and Rule 16 factors, there has been no undue delay or dilatory motive by Raymond James. Raymond James has acted diligently throughout the case, and is moving to amend before the close of discovery.[5] *See Sierra v. Williamson*, 2012 WL 13000419, at *2-3 (W.D. Ky. Aug. 24, 2012) (granting leave to file a second amended complaint, finding "no indicia of intentional delay or neglect," and observing that the plaintiffs' request to amend was made before the close of discovery and before any summary judgment motion had been filed); *see also Emerman v. Fin. Commodity Invs.*, 2015 WL 367058, at *5 (N.D. Ohio Jan. 27, 2015) (granting leave to amend after the deadline for amendments in the scheduling order had expired and emphasizing in part that "neither the discovery or dispositive motions deadlines . . . have expired").

Further, good cause exists to permit Raymond James to file the SAC. As explained above, the bulk of the new factual allegations contained in the SAC either involve facts that occurred after the submission of the FAC and thus after the amendment deadline of May 29, 2018 or facts that were discovered in the course of voluminous discovery. The same is true of the fraud claim contained in the SAC; 50 North committed fraud *during the pendency of this suit*. Other additional factual allegations in the SAC set forth the negotiating history between Parkway and Raymond James; the negotiating history offers insight previously unavailable to the Court.

---

[5] Under the current (pre-COVID-19) scheduling order, discovery is set to close on May 28, 2020. (*See* ECF 282 at PageID 4964).

15

And the SAC helps to clarify and streamline the suit; one example is that the FAC's requests for injunctive relief and specific performance do not appear in the SAC. The SAC also contains an expressly denominated cause of action for nuisance against 50 North and Mr. Sofer. (*See* **Exhibit 1** at ¶¶ 116-121). A nuisance is defined as "anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable" and "extends to everything that . . . obstructs the reasonable and comfortable use of property." *Caldwell v. Knox Concrete Prods., Inc.*, 391 S.W.2d 5, 9 (Tenn. Ct. App. 1964) (applying Tennessee law). By virtue of the factual allegations contained in the FAC, a nuisance claim has already been pleaded. *See, e.g.*, *Quinn-Hunt v. Bennett Enters., Inc.*, 122 F. App'x 205, 207 (6th Cir. 2005) (explaining that "factual allegations alone are what matters"); *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (same principle).[6] The SAC makes clear that 50 North and Mr. Sofer are liable for nuisance.

District courts within the Sixth Circuit have repeatedly recognized that a litigant should be permitted to amend its pleadings—even after the expiration of a deadline for the amendment of pleadings—if (1) new facts material to the litigant's claims emerge during the course of a case or (2) facts (old or new) material to the litigant's claims emerge during the course of discovery. *See Sierra*, 2012 WL 13000419, at *2 ("Accordingly, where the Plaintiffs have filed new claims brought to their attention during the course of discovery, but after the deadline for amending pleadings has passed, the Court finds that the Plaintiffs have acted diligently in pursuing those claims."); *Emerman*, 2015 WL 367058, at *4 (concluding that leave to amend was warranted

---

[6] *Accord* Fed. R. Civ. P. 54(c) ("Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); Fed. R. Civ. P. 8(d)(1) ("No technical form is required."); Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

16

where the plaintiffs learned of information supporting additional causes of action during discovery); *Spruance v. Sunbelt Rentals*, 2014 WL 12654912, at *3 (S.D. Ohio Apr. 30, 2014) (granting leave to amend after the expiration of the amendments deadline where the "plaintiffs indicate[d] they first learned of certain facts . . . in discovery" and such information was "discovered after the deadline for amending pleadings had passed"); *Gray*, 2015 WL 5031973, at *2 (permitting amendment after the scheduling order deadline where the plaintiff discovered new facts in discovery); *Jones*, 2010 WL 145327, at *2-3 (granting leave to amend past the amendment deadline where the plaintiff obtained sufficient evidentiary support for certain claims only in the course of discovery). The reasoning of those district courts applies here; Raymond James—in addition to the factual allegations already contained in the FAC—should be permitted to assert factual matters that have occurred since the filing of the FAC and matters that it learned in the course of discovery.

50 North and Mr. Sofer would not suffer any undue prejudice if Raymond James is granted leave to file the SAC. Indeed, 50 North recently—in connection with its request to assert counterclaims and raise affirmative defenses out of time—took the position that Raymond James would not be unduly prejudiced if 50 North is permitted to assert its affirmative defenses and counterclaims late. (*See* ECF 297-26 at PageID 6193) (contending that "RJA will not be prejudiced if the Court amends the Scheduling Order deadline to permit Landlord to file an Answer to RJA's FAC with additional affirmative defenses and counter-claims."). Assuming only for the sake of argument that 50 North's no-undue-prejudice argument has merit, then the same logic would dictate that 50 North and Mr. Sofer would not be unduly prejudiced by Raymond James's filing of the SAC.

17

Other potential arguments in opposition to the filing of the SAC likewise fall flat. To the extent, for example, that 50 North may argue that it should not have to file another dismissal motion, the Sixth Circuit has rejected that line of argument. *See Morse*, 290 F.3d at 801 (rejecting the argument that "another round of motion practice" rises to the level of undue prejudice sufficient to block amendment). Similarly, even if delay existed (which it does not), "delay alone . . . does not justify denial of leave to amend." *Id.* at 800; *see also Sierra*, 2012 WL 13000419, at *3 (permitting amendment where the "case has been pending for more than two years"). Further factors supporting—rather than undercutting—amendment by Raymond James include the fact that discovery has not yet closed; no depositions have been taken, and no trial date has been set. *See Ragin v. Harry Macklowe Real Estate Co.*, 126 F.R.D. 475, 478 (S.D.N.Y. 1989) (permitting amendment where "plaintiff had not yet commenced depositions of defendants, and defendants had not yet completed depositions of all plaintiffs"); *accord Spruance*, 2014 WL 12654912, at *3 (granting leave to amend and observing in part that the "proposed amendment will not delay the scheduled trial date").

Nor is the SAC somehow futile. Raymond James (as it must) recognizes that the Magistrate Judge in the Report (ECF 301) recommended the dismissal of the FAC. That recommendation—in Raymond James's view—is erroneous in numerous respects, and Raymond James incorporates here by reference the contents of its Objections (ECF 310) and its Reply (ECF 321) regarding the reasons why the FAC's claims and requests for relief are valid and should be permitted to go forward. All of the causes of action and requests for relief contained in the SAC—new and old—are well-pleaded and Raymond James should be permitted to assert them.

## **CONCLUSION**

For the foregoing reasons, Raymond James respectfully submits that the Court should grant Plaintiff's Motion for Leave and permit Raymond James to file the SAC. A proposed Order granting the requested relief will be sent by email to the Court's CM/ECF inbox.

Respectfully submitted,

**BURCH, PORTER & JOHNSON, PLLC**

  /s/ Gary Scott Peeples
Jef Feibelman (BPR No. 7677)
Melissa A. Maravich (BPR No. 13876)
Gary Scott Peeples (BPR No. 32303)
130 North Court Avenue
Memphis, TN 38103
T: (901) 524-5000
F: (901) 524-5024
E: jfeibelman@bpjlaw.com
    mmaravich@bpjlaw.com
    gpeeples@bpjlaw.com

- and -

**THE PROSSER LAW FIRM**

  /s/ Niel Prosser
Niel Prosser (BPR No. 11647)
Rob Clapper (BPR No. 34180)
Kyle Johnson (BPR No. 36066)
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
T: (901) 820-4433
E: np@prosserlaw.com
    rclapper@prosserlaw.com
    kjohnson@prosserlaw.com

*Attorneys for Raymond James*

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a true and correct copy of the foregoing document was filed using the Court's CM/ECF system on May 15, 2020, which will automatically send an electronic copy of the filing to all counsel of record in this case.

                                                                              /s/ Gary Scott Peeples