# EXHIBIT 1 – PROPOSED SECOND AMENDED COMPLAINT

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **RAYMOND JAMES & ASSOCIATES, INC.,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:18-cv-02104-JTF-tmp** |
| | ) | |
| **50 NORTH FRONT ST. TN, LLC** | ) | |
| **and JACOB SOFER,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

**SECOND AMENDED COMPLAINT**

Plaintiff Raymond James & Associates, Inc. ("Raymond James") files this Second Amended Complaint against Defendants 50 North Front St. TN, LLC ("50 North") and Jacob Sofer ("Mr. Sofer") (collectively "Defendants") and states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.  Raymond James is a Florida corporation with its headquarters in St. Petersburg, Florida and offices in Memphis, Tennessee. In 2012, it acquired Morgan Keegan & Co. ("Morgan Keegan") and began operating out of Morgan Keegan's office space in Memphis.

2.  50 North is a Delaware limited liability company that is purportedly owned by two intermediate entities—Madison Holding Trust ("Madison") and Regal Holding Group, LLC ("Regal"). Madison is a trust governed by the laws of the state of New York. Regal is a single member limited liability company organized under the laws of New York and Mr. Sofer is its sole owner/member. Upon information and belief, Regal is nothing more than a shell entity. Mr. Sofer exercises complete dominion and control over 50 North, and it is his alter ego. Mr. Sofer likewise exercises dominion and control over the entities that own 50 North.

3. Mr. Sofer is a citizen of New York who resides in Monroe, New York.  Mr. Sofer has more than sufficient minimum contacts with Tennessee to support this Court's exercise of personal jurisdiction, including directly and indirectly managing the operations of the Tower, making personal visits to inspect the Tower, personally receiving "officers compensation" payments from revenues generated from the Tower's rents, and by committing the torts for himself and on behalf of 50 North, as alleged herein.

4. 50 North is the owner and operator of the 21-story office building located at 50 North Front Street, Memphis, Tennessee (the "Tower"). Raymond James rents over half of the Tower.

5. Defendants currently operate and manage the Tower through two agents. The first of these agents, the "asset manager," is Madison Realties, LLC ("Madison"). Madison is a limited liability company organized under the laws of Delaware. While Madison lists a business address in Montreal, Quebec, its president is also Mr. Sofer, who lists the same business address for both Madison and 50 North—i.e., 48 Bakertown Road, Suite 500, Monroe, New York. As Madison's president, Mr. Sofer also owns, controls, and/or dominates Madison. The public face of Madison is Joel Friedman ("Mr. Friedman"), who is a citizen of Canada. Mr. Friedman works directly or indirectly for Mr. Sofer and at all times was under his control. Madison has been the asset manager for, and/or otherwise involved with, the Tower since Defendants acquired it in January 2015. At all relevant times, Madison has either directly managed the Tower or has closely supervised the activities of a local management company. All significant decisions—and even many insignificant decisions, including the payment of modest and routine bills—regarding the Tower require the approval of Madison. Mr. Sofer makes all significant decisions for Madison, including decisions regarding the operation of and modernization of the Tower's elevator system.

2

6. The second agent, Colliers Management Services—Memphis, LLC (located in Memphis, Tennessee), has served as the local property manager for the Tower since approximately December 2016. Prior to that, the Tower was directly managed by Madison through Mr. Friedman.

7. Jurisdiction currently is proper in this Court under 28 U.S.C. § 1332 because, pursuant to Defendants' representation regarding the ownership structure of 50 North and Mr. Sofer's citizenship, complete diversity exists between the parties and more than $75,000 is in controversy.

8. Venue is proper because a substantial part of the events and/or omissions complained of herein occurred in the Western Division of the United States District Court for the Western District of Tennessee.

## **INTRODUCTION**

9. This case arises out of Raymond James's tenancy in the 35 year-old office building that bears its name in downtown Memphis. In June 2014, RJ entered a new ten-year Lease with Parkway, the Tower's then-owner, that imposed extensive requirements governing the maintenance, operation, and repair of the aging Tower—including its elevator system.  As part of the Lease, Parkway was obligated to keep the Tower operating at its then-existing level—or at the level of certain competing buildings—whichever was higher. These maintenance, operation, and service requirements were critical to Raymond James and, without them, it would have leased elsewhere.

10. Mr. Sofer, through 50 North—an entity he dominates—bought the Tower several months after the Lease was executed. Mr. Sofer did so, knowing that many of the Tower's systems—including its elevators—would need to be replaced and, further, that the Lease put this

replacement obligation squarely upon the landlord.  Mr. Sofer, however, did not care what the Lease required.  He and 50 North are not conventional commercial landlords. Rather, they are buyers of so-called "distressed assets" whose objective is to defer capital costs, such as elevator replacement, for as long as possible.  As Defendants saw it, they stood to make millions under the Lease—either as rent paid over the full term of the Lease, or in the form of a multi-million-dollar "Option Fee," if Raymond James left the Tower early.  From their perspective —i.e., that of an unscrupulous landlord—Defendants had little incentive to abide by the Lease since they made money whether or not Raymond James was a satisfied tenant.

11. Over the next several years, Defendants proceeded to run the Tower into the ground. The impact of their approach was especially pronounced as to the elevator system—one of the most critical systems in a 21-floor skyscraper.  At the time the Lease was signed, the elevator system operated with reasonable reliability. However, by 2017 and thereafter, the elevators were plagued by constant malfunctions, multiple extended outages, frightening entrapments and even serious injuries. Defendants were long on notice that the elevators were unsafe, that the elevators would become impossible to reliably maintain, and that the system needed to be modernized. Instead of doing so, Defendants lied about the system's condition to Raymond James and even used it as leverage to try to force concessions out of Raymond James. When that failed, Defendants intentionally made the situation worse—by, for example, turning certain elevators off rather than getting them repaired—in an effort to force Raymond James from the Tower and thereby collect the multi-million-dollar early termination Option Fee.

12. This campaign has been successful in forcing Raymond James to leave. Against the long backdrop of serious problems with the Tower—and following yet another elevator-caused injury to an employee—Raymond James made the decision to move. It has now secured

alternative office space and will be vacating the Tower once this space is built-out and ready for occupancy. Since this decision by Raymond James, Defendants have finally taken steps to modernize the elevators – something they have denied for years was even needed. They do this not to comply with the Lease, but rather to be able to immediately re-let the building once Raymond James is gone. Raymond James brings this action to recover its full damages for, inter alia, 50 North's numerous breaches of the Lease, for the fraud Raymond James has uncovered during the course of this suit in how 50 North overcharged it for operating expenses, and for both Defendants' tortious acts. The amount in damages sought by Raymond James totals in the many millions of dollars.

## **FACTUAL ALLEGATIONS**

13. **History of the Tower.**  Raymond James became a tenant in the Tower when it purchased Morgan Keegan in 2012. At that time, Morgan Keegan leased approximately 70% of the Tower and had occupied it since it was built in 1985. That lease expired in April 2016. The owner of the property at that time was Parkway Properties, LP ("Parkway"). The Tower represented the second-largest office location in the Raymond James system—only Raymond James's home office complex in Florida was larger.

14. **The Negotiation of the new Lease in 2013-2014.** In 2013, Raymond James and Parkway began negotiations about entering into a new ten-year lease. Given Morgan Keegan's historical relationship with the Tower—and the cost and disruption of moving—it was Raymond James's preference to remain in the Tower.

5

15. Parkway had owned the Tower since 1997. Both Parkway and Raymond James were aware of the Tower's age and the fact that many, if not all, of its major systems—including the elevator system—had not been modernized or replaced.[1]

16. Through much of 2013 and into 2014, Raymond James and Parkway negotiated the broad terms of a new ten-year lease. The negotiations were difficult and—because it appeared at times that they might end in impasse—Raymond James explored options with other potential landlords/developers. However, by January of 2014, the parties had reached an outline of a deal that—contingent on approval from both parties' boards of directors— would thereafter be developed into a new lease.

17. This proposed deal, among other things, included typical provisions that gave Raymond James free rent (for seven months) and an allowance for tenant improvements to be funded by Parkway (in the amount of $4.6 million).

18. Raymond James's board approved the proposal in February 2014. In March 2014, however, Parkway's board unexpectedly rejected it—forcing the parties to go back to the negotiating table. While Raymond James resumed negotiations with Parkway, given its lack of reliability, Raymond James also re-engaged with other potential landlords that had courted it earlier. This included Carlisle Corporation ("Carlisle"), which wanted to secure Raymond James as the flagship tenant for its new downtown high-rise—One Beale Street. As is standard practice, Raymond James conducted negotiations with Carlisle and Parkway simultaneously.

---

[1] The then-existing lease recognized that many of the Tower's systems were dated and even included an aspirational list of potential capital improvements that included modernization of the service elevator by 2011 and the passenger elevators by 2016. These improvements, however, were not required; rather, the lease expressly described this list as "fluid and flexible depending on the circumstances."

19. In its negotiations with Parkway, Raymond James came to terms on several principal financial points fairly quickly. For example, Raymond James gave up from the first proposal what tenants typically receive in a lease renewal—e.g., its $4.6 million tenant improvement allowance and, instead, agreed to make $3.5 million in tenant improvements with its own funds. This unusual concession—totaling some $8.1 million—was offset, in turn, by Parkway increasing the period of free rent (i.e. "abatement") to 33 months, which in total equaled a value of some $8.8 million.

20. Other serious points of disagreement, however, soon arose. These included Parkway's refusal to commit to upgrade or replace the Tower's aging infrastructure *as needed* in order to keep it operating at its current level *and* to keep it competitive with other equivalent buildings in downtown Memphis. A series of problems at the Tower during the fall of 2013 and early winter of 2014 had highlighted the need for such a commitment by Parkway—namely, several elevator problems (including a mass entrapment of employees in February 2014), a roof leak that flooded part of Raymond James's space, and HVAC control issues. Given such problems, Raymond James insisted that the new lease contain strong language requiring the landlord to vigorously keep up the 30-year-old Tower.

21. The Carlisle plan avoided any operation and maintenance issues since it called for constructing a brand-new building. Rather, the primary issues with its plan were cost—which was projected to be higher than the cost of remaining at the Tower—and timing, given the tight construction timetable for the new building.

22. **Impasse with Parkway.** By May of 2014, the negotiations with Parkway had come to an impasse. While the deal Parkway offered was far less expensive, Parkway would not, among other things, commit to replacing the Tower's systems as needed in order to maintain the

current level of operation, let alone keep up with competitors. Raymond James saw this refusal to provide such standard lease commitments as ominous and considered this refusal to be a deal-breaker. Raymond James thus told Parkway that it would have to "aggressively pursue all alternatives" since "we can only assume that the current service levels will not be maintained, and any new building owner will have no requirements to maintain at least the current levels." (*See* Email from Todd Brandon (for Raymond James) to John Barton (for Parkway) dated May 19, 2014, attached as **Exhibit A**); (*see also* Board of Directors' presentation dated May 22, 2014 in which the Corporate Real Estate Department stated: "Financially we have negotiated a strong deal with Parkway, however the significant service level/amenities/quality concerns are now driving us to seek approval for a lease in the to-be-built Carlisle building (One Beale Street).", attached as **Exhibit B**).

23. **Parkway's Agreement to Commit the Resources Necessary to Operate and Maintain the Tower at its Current Level or Better.** Confronted with Raymond James's intention to pivot to Carlisle, Parkway had a significant change of heart. Abandoning its prior position, it committed to spend whatever capital was necessary to:

    a)  maintain and operate the building in at least its then-condition;

    b)  maintain and operate the building at least to the level similar to that of other comparable buildings in the downtown Memphis market;

    c)  make the improvements, repairs, or replacements as necessary to do so; and

    d)  furnish services—such as elevator service—at no less than current levels.

(The parties incorporated these commitments into paragraphs 10 and 11 of the Lease.) In reliance upon these and other commitments by Parkway, Raymond James forwent the

opportunity presented by Carlisle to occupy a new Downtown building and decided to stay in the Tower.

24. By this time, Parkway had taken steps to address the immediate maintenance problems that had erupted earlier during the lease negotiations. As for the elevators, this included at least two things:

   a) First, Parkway had the elevator system evaluated by an elevator expert—the Lerch Bates Group. Lerch Bates Group produced a detailed report (the "Lerch Bates Report" or the "Report") that, among other things, recommended that the system be thoroughly cleaned.[2] (Relevant excerpts of this Report are attached as **Exhibit C**.) The Lerch Bates Report also found that the elevator system had inherent safety problems (e.g., mis-leveling that could create a trip hazard) and, in addition, predicted that because of the ever-growing obsolescence of the technology, the elevators were likely to start having serious reliability problems. (*Id.*) The Report recommended that the system be modernized and suggested this work be started in approximately a year, i.e., in the spring of 2015. (*Id.*) Parkway did not provide the Lerch Bates Report to Raymond James.

   b) Second, Parkway had Otis Elevator Company ("Otis")—its elevator service provider—bring in a team of specialists who spent approximately two weeks thoroughly cleaning the system. Following this work, the system's operation improved dramatically.

---

[2] It found that the system's antiquated equipment was creating massive amounts of carbon dust which especially interfered with the system's primitive electronics, thereby causing malfunctions. (*Id.*).

25. **Lease's Execution in June 2014.** Following the breakthrough with Parkway, and after over a year of hard-fought negotiations, Raymond James and Parkway executed the new lease on June 26, 2014 (the "Lease"). (The 77-page Lease and its addenda are attached as **Exhibit D**.) Over its 10-year term, the Lease obligates Raymond James to pay upwards of $26 million in rent, even after taking into account $8.8 million in "free rent."

26. By the time the parties executed the Lease, the Tower's elevators were operating with reasonable reliability with only infrequent problems. Indeed, the elevator system had only one reported malfunction during the *entire month* of June 2014, the month the parties executed the Lease. Operational reports from Otis are also indicative of how the elevators were operating at Lease execution and thus help inform the "Current Standard" under the Lease. Those reports provide that the Tower's elevators were available over 99% of the time.

27. **50 North Buys the Tower at a Discount because of its Condition.** Within a few months of Lease execution, Parkway began marketing the Tower for sale. It had already sold all its other properties in Memphis and was trying to exit the Memphis market entirely. Parkway's initial asking price for the Tower, upon information and belief, was $21 million.

28. As part of its sales effort, Parkway commissioned EMG Corporation to perform "a property condition assessment" (the "PCA"). (Relevant excerpts of the PCA are attached as **Exhibit E**). The PCA—which was effectively part of the seller's sales literature—reflected an aging building. It showed that the Tower's systems, while largely functional at that moment, would need significant upgrades and replacements in the future. This included the elevator system, whose condition the PCA described as being only "fair" and, according to even the seller's

inspector, had only three years left until the system was beyond its remaining useful life. (*Id.*) Defendants received a copy of the PCA prior to 50 North's purchase of the Tower.[3]

29. While Parkway's offering only came to Mr. Sofer's attention in November of 2014, by January 15, 2015, Mr. Sofer effectively owned the Tower. He did so using "Raymond James Tower LLC", a newly formed limited liability company which had no assets other than ones that Mr. Sofer had transferred from other shell entities he owned, controlled, and dominated.[4]

30. Mr. Sofer bought the Tower with knowledge of its age and outdated systems. In fact, he bought it *because* of these conditions. While he had almost no experience owning a large office building, he saw the Tower as a so-called "distressed" asset that he could purchase at a significant discount. This fact is acknowledged in a contemporaneous email from Mr. Sofer's right-hand man (Mr. Friedman) who, about a month before closing, states,

> We have reviewed the PCA, and we understand that the building will need Capital Improvements going forward, *and it is considered in our price.*

(*See* Email from Mr. Friedman to J. Lamberson (selling agent for Parkway) dated December 5, 2014, attached as **Exhibit F** (emphasis added).) Mr. Sofer went on to purchase the Tower for only $9,910,110—some $11 million less than Parkway's original list price. During the Lease negotiations, Parkway had offered to sell the Tower to Raymond James for $21 million.

31. The closing statement for 50 North reflected a dollar-for-dollar credit against the purchase price for the $8.8 million in abated rent that Raymond James was entitled to under the Lease.

---

[3] Raymond James did not obtain a copy of the PCA until after this suit was filed.

[4] "Raymond James Tower LLC" later changed its name to 50 North Front St. TN, LLC.

The cost of the free rent was thus borne by Parkway—as part of the sale—not by 50 North thereafter. [5]

32. As further inducement, and in a highly unusual step for the purchase of a 21-story skyscraper, Mr. Sofer agreed to constrict pre-purchase due diligence to just a ten-day period. Other than a review of the PCA, other seller-provided materials, and a visit to the property, Mr. Sofer and his agents did no other due diligence. Notably, Mr. Sofer did not contact Raymond James to inquire about the condition of the Tower—even though Raymond James leased approximately 70% of the space at the time.[6] Upon information and belief, Mr. Sofer likewise did not interview the Tower's other tenants about its condition.

33. Instead, the only inquiry that Raymond James received was from the seller, Parkway—not Defendants. It requested Raymond James to complete an "estoppel certificate" that inquired as to whether *Parkway*—at that precise moment—was in breach of the Lease. After conducting an internal review that specifically considered the elevator system, Raymond James named a handful of non-elevator related issues, none of which it considered a breach of the Lease. Notably, at that point in time, the elevators still were functioning at a reasonable level—as they largely had since the mass clean-up some eight months prior. Indeed, the elevator system had no recorded malfunctions during the entire month of January 2015.

34. Defendants bought the Tower knowing that it needed substantial work. They also knew that 50 North was stepping into Parkway's shoes as lessor and, as such, had an obligation to maintain, operate, and repair the Tower and to provide services—including elevator service—

---

[5] 50 North has frequently complained about the impact of this free/abated rent and used it as an excuse, when in reality it was wholly insulated from this cost.

[6] Although it is industry standard for landlords to contact tenants prior to a commercial purchase of this size, Defendants did not reach out to Raymond James even after they acquired the Tower. Rather, Raymond James reached out to them several months after 50 North's purchase.

at the level that existed when the Lease was signed on June 26, 2014, i.e., the "Current

Standard." Moreover, because the Lease gives Raymond James the benefit of the higher of the

Current Standard or the "Comparable Buildings Standard," 50 North was contractually

required to operate and maintain the building "substantially in accordance with" other

comparable buildings in Memphis. Defendants, however, ignored these obligations (50 North

thus breaching the Lease), and instead tried to maximize 50 North's profits by deferring nearly

all substantial repairs and replacements. Upon information and belief, 50 North's financial

statements reflect that Defendants spent little on capital improvements during 2015 and 2016

while at the same time they paid back millions in advances to Mr. Sofer's other entities.[7]

35. **Defendants' Failure to Keep Up the Tower in General**. Under Defendants'

ownership/control, new problems developed. Minor issues festered and became worse. As a

result of Defendants' indifference, ineptitude and/or malevolence, the condition of the Tower

rapidly declined. Defendants usually dealt with maintenance-related problems using a "3-D"

approach, i.e., to delay, to deny or to dissemble. The ever-increasing problems with the

elevators thus occurred against a backdrop of numerous other maintenance issues – issues

which frequently took years and extraordinary steps by Raymond James (e.g., initiating this

litigation) before Defendants effectively addressed them. These problems included the

following:

- Window leaks and other water intrusion. Beginning as early as 2015, Raymond
  James asked 50 North to address leaks including those that turned out to be coming
  from the Tower's exterior windows and walls. Although internal documents show
  that Defendants knew of the imminent need for this work, they did not complete
  the work until three (3) years later, in the fall of 2018—after Raymond James filed
  this suit. The re-sealing of the Tower's exterior remains ongoing.

---

[7] This statement is "upon information and belief" because in discovery 50 North has produced
multiple, internally contradictory versions of its financial statements that show radically different
numbers for even net income.

4836-3523-7817, v. 1

- <u>Worn and dirty elevator cab interiors.</u> Beginning in mid-2015, Raymond James asked 50 North to address the unsightly condition of the elevator cab interiors— which appeared, at best, tired and somewhat dirty. While 50 North repeatedly promised corrective action—even claiming that they were in the process of selecting the final finishes—nothing happened for the next three (3) years. In the meantime, the cab carpet and walls became so filthy that they were a source of ongoing embarrassment to Raymond James. Although this was clearly 50 North's responsibility, Raymond James in August 2018 paid to replace the elevators' badly stained carpets. (It was only thereafter that Defendants rehabbed, albeit shoddily, the rest of the cab interiors.)

- <u>Dirty, unkept exterior appearance.</u> Beginning as early as August 2015, Raymond James brought to 50 North's attention a decline in the Tower's exterior appearance. This included dirty windows/building exterior and problems with the large awning covering the east-side entrance and patio. Despite repeated promises, it took Defendants over three (3) years—and this lawsuit—to begin effectively addressing these problems. The awning—which ultimately was being held on by bungie cords—has finally been replaced. The cleaning/polishing of the windows and exterior, while it started in the fall of 2018, is still not finished.

- <u>Dirty and unsightly common areas.</u> Beginning in approximately 2015, the appearance of the Tower's common areas also declined. This included 50 North's failure to provide adequate janitorial services—resulting in habitually dirty common areas and restrooms—and a failure to repair such public-facing fixtures as the revolving entrance doors. These issues also persisted for years despite 50 North's numerous representations that they would be—or had been—corrected.

- <u>Inadequate Security.</u> Entry to Raymond James's floors from the elevators is contractually required to be restricted via a key card activated "access control system." While it is 50 North's obligation to maintain this system, it has been continuously out of operation since approximately August 2018 due to, upon information and belief, worn out cabling. As a result of these and other issues, Raymond James's floors are not properly secure, especially from the attached parking garage. This is the same parking garage that Defendants, themselves, have alleged is unsafe.[8] Despite this acknowledgement, the access control system remains inoperable to this day.

36. **<u>Defendants' Failure to Keep the Elevators at the Levels Required by the Lease.</u>** The Tower has eight public elevators—four elevators for the lower bank of floors (floors 1-12) and four

---

[8] In a March 2017 lawsuit against the owner of the parking garage, Defendants described the parking garage as an "Unsafe and Unsecure Environment" that posed "serious risks" to its users i.e., Raymond James's employees. (*See* Case 2:17-cv-02211-JPM-dkv, DocID 1.)

elevators for the upper bank of floors (floors 12-21). In addition, there is one service elevator. The elevators were installed when the Tower was built in 1985—some 35 years ago.

37. From Lease execution through approximately 2015, the elevators operated with reasonable reliability and only had occasional breakdowns. The cabs worked almost all the time. When a cab was down, it was rare for it to be out of service for more than a day or so, and it was very unusual for more than one cab to be down at a time. Also, it was unheard of to have an extended outage in even one cab. At all relevant times herein, the elevators in Comparable Buildings operated in the same fashion—i.e., with reasonable reliability and with only occasional breakdowns. In short, from the execution of the Lease in the summer of 2014 through approximately 2015, the elevators were sufficiently similar to the condition and level of operation that existed at the time the Lease was entered (as well as to that of Comparable Buildings) so as not to rise to the level of a breach.

38. This did not mean that Raymond James had no concerns about the elevators. While they operated with reasonable reliability through 2015, there were still some problems with outages, malfunctions, entrapments and even one injury. These highlighted the system's age and the need for it to be replaced before things got worse, especially given how long—up to 2 years—such a project was likely to take. Therefore, even as early as 2015, Raymond James requested that 50 North establish a schedule for the elevators' modernization. Defendants never provided such a schedule. Further, discovery in this case has revealed that for at least its early years of ownership, Defendants had no capital plan at all.

39. Beginning in approximately 2016 and extending through the present, the elevator system's performance declined markedly. This significant decline, as outlined below, coupled with

Defendants' refusal to modernize the system, violated both Sections 10 and 11 of the Lease – e.g., the Current and Comparable Building Standards and the required minimum service levels.

40. As early as July 2016, the system's performance had declined to the point that Defendants fired the Tower's then elevator maintenance contractor (Otis) and hired another service company, Thyssenkrupp Elevator Company ("TKE").[9] This change proved wholly ineffective, and the elevators' operation and performance continued to decline dramatically.

41. **Injuries Caused by the Elevators.** Since 2017, at least three Raymond James employees have been physically harmed by the Tower's elevators:

- On September 6, 2017, an employee injured her shoulder when, as she exited the elevator, it inexplicably bounced, causing her to fall face-first to the floor;

- On August 3, 2018, an employee fractured her elbow after the elevator failed to properly level, causing her to fall; and

- On March 20, 2019, an employee broke a bone in her ankle after the elevator stopped inches above the floor, causing her to trip.

Each of these incidents resulted in the employees filing workers' compensation claim.

42. The elevator's failure to properly level or otherwise move as it stopped at a floor caused and/or contributed to each of these injuries.  This problem was a known danger for the type and the vintage of the Tower's elevator system, and this danger was well known to Defendants. Among

---

[9] Defendants hired TKE even though Otis manufactured the Tower's elevators and had maintained them since their installation in 1985. While elevator companies can service systems made by others, TKE's local office had less familiarity and resources than did Otis' when it came to the type of antiquated system at issue. Upon information and belief, 50 North found TKE's maintenance contract attractive because it was cheaper than Otis.' TKE, on the other hand, took the contract because it believed that it would quickly lead to an opportunity to modernize the system.

other things, the problem of mis-leveling was apparent from casual observation. Mis-leveling was also the subject of dozens of reports in the Tower's own maintenance records, as well as in the records of its elevator maintenance providers (Otis and then TKE). In addition, Defendants had been specifically warned of this danger by, among other things, the Lerch Bates Report which they received on or before March 31, 2015. This Report—which recommended that the modernization process start in the spring of 2015 – listed the first benefit of modernization as "Improved Safety," which the Report stated would result from the elimination of the elevators' antiquated "motor generator" drive system. (*See* **Exhibit C**.) Such drive systems, "*are often the reason of leveling problems* which can cause a *trip hazard* in addition to poor acceleration and deceleration of the elevator." (*Id.*)

43. Defendants also had first-hand knowledge of this danger, even from very early in 50 North's tenure as owner. For example, on April 16, 2015—shortly after 50 North's purchase of the Tower and Defendants' receipt of the Lerch Bates Report—a Raymond James employee was up-ended from his wheelchair when the elevator suddenly changed levels as he exited the cab. While not seriously hurt, this incident still resulted in a workers' compensation claim and put Defendants on notice of the problem in a way that was impossible to ignore. While 50 North would later tell this Court something entirely different,[10] Defendants have long known of the system's danger. This is even reflected in Defendants' internal correspondence, which shows at a minimum a willful disregard for the harm that the Tower's elevators could cause (and in fact has caused) to Raymond James's employees and/or to members of the public at large. For

---

[10] For example, in 50 North's response to Raymond James's Motion for a Preliminary Injunction, 50 North attached an unsworn statement from the modernization salesman at TKE stating the elevators at Tower were "safe for the riding public" and denying that any repairs were "due to safety issues." (*See* ECF 19-4 at PageID 207).

example, on July 6, 2017, Shellie Moses, the local property manager for Colliers, notified Mr. Friedman that

> #6 elevator is having *leveling problems*, possibly caused by the issues with the generator. They will need to take this elevator out of service to look further into the issues *but will wait* until the #5 elevator comes back on line.

In response, Mr. Friedman specifically noted the danger of this approach: "By leaving #6 operational isn't that putting us in a position where somebody can fall?" Despite this realization, Defendants left Cab #6 in operation. Later that month Cab #6 shifted as a Raymond James employee was getting off, tripping her. Mr. Friedman's reaction, captured in an internal email, was "[s]ounds like this is getting dangerous." Mr. Friedman was correct—the situation with the elevators was dangerous and was only getting worse over time. The three personal injuries noted in paragraph 38, above, all occurred *after* this exchange.

44. **Elevator Entrapments.** In addition to causing injuries, the elevator system has also been plagued by entrapments—where an elevator is stuck between floors with no way for its passengers to escape. From the summer of 2017 to year-end, there were at least nine (9) entrapments in the Tower's elevators. The following year there were another ten (10) entrapments.  As discussed below, this latter figure would likely have been much higher if Defendants had not simply begun switching off cabs that they were unwilling to repair or replace. By this maneuver, Defendants deliberately deprived Raymond James of proper elevator service. While the elevators had experienced entrapments in the past, this had never occurred against a backdrop of the system experiencing nearly constant, serious malfunctions. These included, for example, sudden drops, shuddering, bouncing, burning smells/smoke, dragging, loud noises, banging, stops above or below floor level, inoperable doors, lights flashing or going out, non-responsive controls and erratic stops at entirely the wrong floors.

Each ride now involved unknown risk, subjecting Raymond James's employees to a vertical version of Russian roulette.

45. Many of these entrapments were prolonged and traumatic. For example, on June 26, 2017, six employees were trapped for over an hour after the cab in which they were riding made a grinding sound and suddenly stopped. The Memphis Fire Department was just about to extract them by cutting through the shaft wall when the elevator suddenly returned to the first floor and opened. Thereafter, on May 15, 2018, a Raymond James employee was trapped in an elevator for approximately thirty minutes after the elevator in which he was riding slammed into the bottom of the elevator shaft, causing a tremendous boom. A final example occurred on October 12, 2017, when fifteen people were trapped, like sardines, in the ever-hotter cab. They remained confined for approximately twenty minutes before being extricated, one by one, through an opening created by prying apart the elevator cab doors. Several were visibly upset, and one employee suffered a panic attack from the claustrophobic conditions.[11] Ironically, the fourteen Raymond James employees involved were on their way to a special "Town Hall Meeting" with Raymond James's CEO, who was there to address the many issues employees had with working at the Tower and to try to improve morale.

46. **Constant Service Outages.** Starting at least by mid- 2017, if not before, the Tower's elevators began to suffer frequent—and then *constant*—service outages. Moreover, the severity of these outages became progressively worse with time—going from one elevator cab out of service, to frequently two, three or even more cabs *all out at the same time*. In 2018, there were over 600 such outages. This number increased to over 900 outages in 2019.  While the Tower has

---

[11] Following this entrapment, one of TKE's service personnel at the scene had an apt analogy for the futility of keeping the elevators running safely, describing it as "like polishing a turd."

eight passenger elevators, their coverage is split between the two halves of the building, with four elevators servicing floors 1-12 and the other four servicing floors 12-21. Each passenger elevator that goes down thus effectively reduces passenger service by 25%.

47. The Elevator Outage Calendar (the "Calendar") attached hereto as **Exhibit G** reflects the severity of the situation and the clear breaches of Sections 10 and 11 of the Lease. Beginning in January of 2018, Raymond James's security personnel began keeping a daily elevator log that recorded the days on which an elevator was out of service for part or all of a day. Exhibit G summarizes these outages from January 2018 through March 2020. It shows that from January of 2018 onward, there is rarely a day without at least one elevator out of service, and that by December 2018 onward, having three or more elevators out of service became *the norm*.

48. By way of example, excerpts for the Calendar from March of 2018 and December of 2018 are shown below. (The lightest shading represents the outage of one elevator; the darker shade represents two; and the darkest shade represents three or more elevators out.)

| March 2018 |||||||
|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa |
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

| December 2018 |||||||
|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa |
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |  |  |  |  |  |

While the service level in March 2018 was itself abominable—with one or more elevators out for a majority of the month—by December 2018, this had devolved to *three or more elevators out of service every day.* For these two months alone, the elevators had a total of 91 outages. With few exceptions, that pattern has persisted every month forward through March 2020. The Calendar, moreover, understates the extent of the problem since it combines outages involving

20

three or more cabs together. Since January of 2018, there have been nearly 200 business days when four of the elevators have been out, and multiple instances when five or even more elevators have been out of service. This all stands in stark contrast to what the Lease requires. Among other things, the Lease requires the elevators to operate as they did at the Lease execution on June 26, 2014. At that time, the elevators had infrequent outages—i.e. approximately *five* in the two-month span from June through July 2014. The calendar pages below represent this:

| June 2014 | | | | | | |
|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |
| | | | | | | |

| July 2014 | | | | | | |
|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |
| | | | | | | |

Comparing this to the two-month period in 2018 discussed above—when there were 91 outages—the Calendar excerpts graphically illustrate 50 North's breach of the Lease.

49. The outages for certain cabs have extended from several months to well *over a year*. For example, Cab #8 and Cab #2 were taken out of service in July and August of 2018, respectively, and remained out for nearly a year and a half. In addition, Cab #4 and Cab #5 were shut off in February and June of 2019, respectively, and remain out of service to this day. These and other extended outages are the result of Defendants' calculated decision to simply shut cabs off rather than immediately fix or replace them. This deprivation of services represents a further blatant and deliberate violation of the Lease since, upon Lease execution, all of the Tower's elevators were working and since no Comparable Building—such as the Tower at Peabody Place and Toyota Center—allowed its elevators to operate in such a condition. By so shutting down

21

elevators, Defendants demonstrated their manifest intention to harm Raymond James and further interfered with Raymond James's quiet enjoyment of its leasehold.

50. The condition of the elevators, including the constant outages, dangerous operation and numerous entrapments, has significantly impaired Raymond James use of the Tower, by among other things, unnerving employees and undermining their morale, sapping employee productivity, diverting management attention, diminishing the firm's reputation and making the Tower an unsuitable or questionable location for events.

51. **Defendants Acted Intentionally, Willfully or at Least with Conscious Indifference**. The elevator system's malfunctions—and the injuries and harm they caused—were entirely avoidable. They only happened because of 50 North's grossly negligent and/or intentional violation of the Lease, and Defendants' violation of the independent duties owed to Raymond James. Defendants long knew of the need to modernize the elevator system—and that modernization had to be done promptly because of the substantial time such a project takes. This notice came in numerous ways, including:

- The *seller's* PCA, which even before 50 North bought the Tower, described the condition of the elevators as only "fair" and indicated that they would be beyond their useful life by 2017. (*See* **Exhibit E**.)

- The Lerch Bates Report, which in addition to warning about the elevators' safety, suggested that the process for modernization should begin later that year, i.e., *in 2014*.  (*See* **Exhibit C**.)

- The prior lease between Parkway and Morgan Keegan, which had listed replacement of the service elevator and the passenger elevators as possible capital improvements to be made by 2011 and 2016, respectively.

22

- The repeated warnings of TKE—50 North's elevator current maintenance provider.

    o At the time TKE was hired in July 2016 to take over maintenance of the failing system, it told 50 North that the elevators' age and condition warranted a modernization "in the near term (12-24 months)." (*See* Email from Chip Morris to J. Friedman dated July 12, 2016, attached as **Exhibit H**.)

    o Just six months after taking over the job, however, TKE's assessment became even more dire. In an email dated December 15, 2016 dealing with TKE's futile attempts at returning Cab #4 to service (which had been inoperable since August), James Van Frank, TKE's Memphis Account Manager, told Mr. Friedman, as follows:

    > These elevators have far outreached their effective life and *continued prolonged shutdowns such as this should be expected* by yourself and management until a Modernization project is completed…. Keeping this vintage of cars running at optimal and expected conditions though *becomes considerably more difficult with every passing day and month.*

    *See* Email from J. Van Frank to J. Friedman dated December 15, 2016, attached as **Exhibit I** (emphases added).

    o By the end of 2017, TKE provided Defendants an even more immediate warning—telling Defendants that they "needed to modernize these elevators soon." (*See* Email from K. Wenzel (TKE Regional Vice President, South) to D. Whitmore (TKE Regional Director, Mod Operations) referencing such a recommendation, dated January 12, 2018, attached as **Exhibit J**.) This was the second time in a year and a half that TKE had

submitted modernization plans. If anything, TKE's warnings were too optimistic since, as its internal correspondence shows, the system's problems had clearly overwhelmed TKE.[12]

- The warnings from Otis during its December 2017 bid. In conjunction with a bid to modernize the elevators,[13] Otis also submitted a proposal for the maintenance of the system. While it had done the maintenance work just a year and a half before, the system's operation had declined so significantly that it conditioned its bid on Defendants first completing nearly *$300,000 in repairs*. In its proposal addressed

---

[12] This is apparent from the above-referenced email exchange attached as **Exhibit J**. In his originating email of January 11, 2018, Mr. Whitmire (the TKE Regional Director of Mod Operations), wrote as follows,

> We surveyed Raymond James Center today in Downtown Memphis for a Mod next year. This is a 21 story Class "A" building. <u>I was completely embarrassed at the shape this job was in</u>. From what I'm told, we have had this on Maintenance for 3 years and it looks like it has been that long since the Low and High rise Machine rooms have even been swept. The Service car looks like it has been 5 years. To top it off Kone [another elevator service company] was onsite before us doing the same survey.

(*See* **Exhibit J**) (emphasis added). In response, Mr. Wenzel (TKE Regional Vice President, South) explained how and why TKE got into this situation, as follows:

> We have had this contract for 16 months. last year we lost ($69,122). Since we got the contract in August of 2016, we have spent over $77,655 in labor alone with another $19,000 in material trying to keep the elevators running. We took the contract hoping the customer would be modernizing. We submitted them capital plans last year and then met with them at the end of 2017 letting them know they needed to modernize these elevators soon. There is a 30 day out for any reason by either party that we will exercise our right to cancel if nothing is done to upgrade these units.

(*Id.*)

[13] Defendants repeatedly dangled the possibility of modernization to Raymond James, including in December 2017/January 2018.

24

to Mr. Sofer, Otis also strongly emphasized the need for the elevators'

modernization, as follows,

> We surveyed the equipment this morning. *There were 5 elevators down,* as you had mentioned….
>
> I have attached a proposal for pre-maintenance repairs to maintain the elevators and escalators in their current condition without a modernization. *All elevators are in major need of blow out/clean down. Carbon dust has been rubbing off from the brushes and has spread all over the controllers, machines/motors, and generators.* I have taken pictures and will send them to you as well. Also, there are various other repairs, including replacing two generators.
>
> *We highly recommend to modernize the elevators.* If you wish to proceed with the modernization, we can charge the maintenance price that we sent with our modernization quote.

(*See* Email from S. Jones (of Otis) to Mr. Sofer dated December 28, 2017, attached

as **Exhibit K**) (emphases added)).[14] Taken individually or jointly, these limited

examples show that Defendants unquestionably knew in 2017, if not well before,

that the elevators needed to be modernized, yet they deliberately—or at least with

conscious disregard—refused to do so unless they could extort a significant

advantage from Raymond James.

52. Defendants did not tell Raymond James about the warnings or advice they received regarding

modernization/improvement of the elevators, including that from TKE, Otis, and the

companies that had provided detailed reports on the system. Instead, Defendants

misrepresented what experts told them—baldly maintaining that modernization was not

needed. They also worked to conceal the elevators' true condition from Raymond James by

refusing to provide a copy of the Lerch Bates Report after Raymond James learned of its

---

[14] As the Lerch Bates Report emphasized, the presence of excessive carbon dust can itself lead to equipment malfunctions. (*See* **Exhibit C**.)

4836-3523-7817, v. 1

existence around the end of 2017 and refusing Raymond James's repeated requests to conduct
its own inspection of the system.

53. **Defendants' attempts to extort Lease concessions from Raymond James.** During the
course of 2017, the long-predicted problems with the elevators began in earnest—malfunctions
and outages increased dramatically, the system physically injured one employee and subjected
numerous others to random entrapments. The elevator situation was having an increasingly
severe impact on Raymond James—including undermining the morale of its employees and
interfering with its operations in the Tower. The elevators, plus a litany of other maintenance
problems, led Raymond James to provide several formal notices of breach, including notices
on May 5, 2017 and on August 3, 2017.[15]

54. On or about October 11, 2017, Derek Recer ("Mr. Recer") and other Raymond James
representatives met with Shellie Moses and others with Colliers (50 North's local manager) to
address numerous issues with the Tower, including concerns about the safety of the elevators
and their need for modernization. (*See* Email from S. Moses to J. Friedman dated October 11,
2017, attached as **Exhibit L**). The next day saw the mass entrapment of the fourteen employees
en-route to the aforementioned "Town Hall Meeting" conducted by Raymond James's CEO.[16]

55. By this point it was painfully apparent to Raymond James that the modernization should have
already been done, and it began to press Defendants repeatedly to start right away. Seeing the
effect on Raymond James—and believing that this gave them leverage—Defendants took a

---

[15] In addition to the elevators, Raymond James also highlighted problems with water leaks,
insufficient HVAC, lack of proper pest control, inadequate security, missing exterior lighting,
aging building infrastructure as well as the overall building condition.

[16] *See* para. 45, supra.

very different (and tortious) approach. First, they brazenly asserted that the Tower's elevators were operating properly and claimed that modernization was therefore not necessary.[17] They then insisted that if Raymond James wanted immediate modernization anyway, Raymond James would have to give up critical rights under the Lease.

56. This position stood in stark contrast to what Defendants knew (or were grossly negligent in not knowing)—i.e. that the condition and operation of the elevators was both dangerous and violated 50 North's obligations under the Lease. They had not only been warned—but had seen through first-hand experience—that a bad situation was getting progressively worse. The words of TKE's Account Manager had indeed proven prescient.[18] Defendants, however, did not care about passenger safety, Raymond James's right to the quality space promised in the Lease or with otherwise complying with their Lease obligations. Defendants had acquired the building as a "bottom feeder."[19] Indeed, their business plan had been to avoid (or at least defer) repairs, replacements and other maintenance expenses for as long as possible, regardless of what the Lease might require. Here, however, Defendants had deferred modernization to the point in the Lease when Raymond James was in its "abatement period" and was enjoying free

---

[17] Staking out baseless positions – even ones that were patently absurd – was standard operating procedure for Defendants.

[18] James Van Frank, the TKE Account Manager, had warned Defendants in December of 2016 that "continued prolonged shutdowns ... should be expected by ... management until a Modernization project is completed." (*See* para. 51, supra.)

[19] During its pre-purchase negotiations with Parkway, Defendants stated that their "business model" was to "take unique or distressed assets" and make them profitable. (*See* Email from Mr. Friedman to J. Lamberson (selling agent for Parkway) dated December 10, 2014, attached as **Exhibit M**.)

rent.[20] The Tower was therefore generating almost no cash flow.[21] If modernization was to be done immediately, its substantial cost (estimated at approximately $3 million) would therefore have had to be borne, directly or indirectly, by Mr. Sofer—unless 50 North could foist the cost of this contractual obligations onto Raymond James.

57. Acting in bad faith—and using the very harm they were causing to Raymond James and its employees as leverage—Defendants refused to perform 50 North's obligation to modernize unless Raymond James agreed to significant changes in the Lease. This attempted shakedown focused, among other things: i) on eliminating or significantly imperiling Raymond James's Termination Option—its ability to terminate the Lease early[22]—and/or, ii) on forcing Raymond James to give up approximately $1.5 million dollars of free rent. Besides the obvious cost, giving in to these demands would remove the strongest check Raymond James had on preventing further bad behavior—its ability to leave early.

58. In several emails, Defendants threaten to withhold modernization unless Raymond James relinquished its Early Termination Option. The first of several examples is the November 14, 2017 email from Mr. Friedman to Mr. Recer (with Mr. Sofer copied), attached as **Exhibit N**. After noting that modernization is a "huge capital investment", Mr. Friedman contended that

---

[20] Defendants were not only fully aware of this free rent period—they even profited from it. In purchasing the Tower, 50 North received a credit of $8,888,827—representing a dollar for dollar discount for all of the abated rent Raymond James was to receive. (*See* para. 31, supra.)

[21] The Tower's occupancy was approximately 65%, with tenants other than Raymond James accounting for only 10% of the building.

[22] As part of the Lease, Raymond James had negotiated the right to terminate its tenancy early—i.e. as of June 30, 2021 (the "Early Termination Option")—rather than at natural termination, which was almost 3 years later on March 30, 2024. Given the Tower's multiple and on-going problems and Defendants' conscious indifference to and/or deliberate disregard for 50 North's obligations under the Lease, this provision had become very important to both parties.

modernization was not necessary because "we are of the opinion that we fulfill our Lease obligations and we might be able to continue that way until the time of the termination option, and in the event that RJA would exercise its Termination option, there won't be an imminent need for modernization." (*Id.*) After thus threatening to do nothing and allow Raymond James's ordeal to continue for the next three and a half years, he offered a solution: "modernization right now" in exchange for Raymond James giving up its Early Termination Option. (*Id.*) As he noted, otherwise, "it will be difficult to convince ownership to make these Capital Investments at this time, while having the Termination Right looming." (*Id.*) Defendants thus threatened to withhold performance of 50 North's existing obligation to modernize unless Raymond James gave up its right to leave the Tower early. No provision of the Lease allowed Defendants to so condition the performance of 50 North's obligations.

59. On December 29, 2017, Defendants made another proposal through Scott Anderson ("Mr. Anderson") who worked for Colliers, the local property manager. (*See* **Exhibit O**.) Mr. Anderson wrote to Mr. Recer—supposedly as an honest broker to the parties—claiming that he was coming forward on his own with an idea for a solution. However, documents produced by 50 North, show that in actuality Mr. Anderson and Friedman had collaborated on several drafts of Exhibit O and that the substance of the proposal was actually drafted by Mr. Friedman.[23] (*See* Email from Mr. Friedman to Mr. Anderson, with a copy to Mr. Sofer, dated December 26, 2017, attached as **Exhibit P**.) This proposal also conditioned modernization on Raymond James drastically altering its Early Termination Option, including among other

---

[23] In the final email to Mr. Recer, Mr. Anderson went so far with the deception as to say that "they [Mr. Sofer and Mr. Friedman] have not heard this proposal, but I am certain I can gain their attention if Raymond James is a willing participant as well." (*See* **Exhibit O**).

things, forfeiting six months' worth of abated rent—the equivalent of approximately $1.5 million—if it chose to terminate early.

60. On January 3, 2018, Defendants yet again attempted to condition modernization on Raymond James's abandonment of its Early Termination Option. This time, however, Defendants' justification changed. Whereas before they had argued that modernization was not *needed*, they now argued that 50 North did not have the money. After citing a flurry of statistics about income and expenses, Mr. Friedman summed up this new argument as follows: "[A]s much as Ownership appreciates having RJA as a tenant in the building, the numbers simply speak for themselves." (*See* Email from J. Friedman to D. Recer, with a copy to Mr. Sofer, dated January 3, 2018, attached as **Exhibit Q**.)

61. This argument—just like the prior one—was untrue. While the Tower at that point was experiencing minimal cash flow, discovery has shown that Mr. Sofer and his entities could easily have paid the cost of modernization out of pocket. Indeed, only months earlier Raymond James had raised the idea of loaning 50 North the money (at zero interest) to modernize the elevator system. This approach, however, was summarily rebuffed, with Mr. Friedman stating that "Ownership is not in need of a loan." (*See* Email from J. Friedman to D. Recer, with a blind copy to Mr. Sofer, dated October 25, 2017, attached as **Exhibit R**.) It thus was not a situation where Defendants did not *have* the money—they simply did not want to spend *their money*, especially if Defendants had no guarantee of a tenant for the full term, or if they could (improperly) shift all or part of this expense to Raymond James. These *contemporaneous* arguments against modernization are also notable for another reason. Since this suit was filed, Defendants have repeatedly justified their failure to modernize on the grounds that "capital expenditures" such as modernization are *not required by the Lease*. While this argument is

clearly contrary to any fair reading of the Lease, it is telling that Defendant invented this often-used excuse for 50 North's non-performance only later.

62. While Defendants were busy trying to take advantage of the situation, the elevators were only getting worse. Indeed, since the time of Mr. Friedman's November 14, 2017 email, there had been two additional entrapments and three or more elevators had been down each day for nearly the entire month of December 2017. Mr. Recer, therefore, responded to Mr. Friedman's January 3, 2018 email the next day as follows,

> Joel/Jacob,
>
> While I can appreciate the perspective and understand the calculations, *it does not alleviate the need to overhaul/replace the elevators immediately for everyone's safety and to comply with lease requirements.* Even today, I received a call from the head of our HR group saying today there were three more elevator malfunctions including an entrapment; yes the elevator company is responding to address the issues after the fact but they should not be happening at this pace; hence the need for immediate modernization.
>
> …
>
> At this point (to be clear), Raymond James is *not willing to vacate our termination option or re-negotiate lease terms* to have the elevators properly maintained through overhaul/replacement as well as addressing their disgusting cosmetic condition.

(*See* **Exhibit S**) (emphases added).

63. Defendants continued to persist in their refusal to modernize, and on February 2, 2018, Raymond James filed the current suit in Shelby County Chancery Court, which 50 North thereafter removed to this Court.

64. **Defendants' successful effort to force Raymond James out of the Tower.**  Following Raymond James's filing of this suit, Defendants' focus changed. They abandoned trying to condition modernization on changing the Lease, and instead decided to force Raymond James out of the Tower early in order to collect the huge early termination "Option Fee" that is due

for Raymond James to exercise its Early Termination Option. (*See* definition of this Fee at **Exhibit D**, Addendum of Special Stipulations to the Lease at pp. 9-10.) This Option Fee— which is approximately $6.2 million—is the equivalent of nearly *two years*' worth of rent.[24] Defendants made the cold calculation that they were better off with this six-plus million dollars than with Raymond James as a tenant.[25] They therefore deliberately and in bad faith allowed the Tower to decline to such a degree that would force Raymond James to leave as soon as it could under the Lease, thereby ostensibly triggering the Option Fee for early termination.

65. Knowing their impact on Raymond James, Defendants used the Tower's elevators, among other things, to accomplish this goal. Thus, they allowed elevator service to deteriorate even further in 2018. In doing so, Defendants began deploying a new tactic—shutting malfunctioning cabs off rather than getting them repaired, thereby deliberately depriving Raymond James of full service as required by the Lease. As noted earlier, this was done to at least four of the elevators: Cab #8 and #2—which were turned off in July/August of 2018 and remained out of service for a year and a half—and Cab #4 and #5—which were switched off in February and June 2019, respectively, and are still out today. (*See* para. 49, supra.) When they overlapped, these outages alone reduced elevator service by 50%. Moreover, Defendants did nothing to address the hazards of the system and the elevators remained fundamentally

---

[24] Not only is this their current goal, but upon information and belief, this was Defendants' hope and/or intention at the time they acquired the Tower and at various times thereafter. Indeed, their actions as owner—from their lack of pre-purchase due diligence, to their long neglect of the Tower, to their deliberate effort to disaffect their largest tenant—are fully consistent with this motive.

[25] Upon information and belief, Defendants also wanted Raymond James to move out in order to raise 50 North's rental rates for future tenants. Raymond James's rental rate was lower at the end of the Lease term in 2024 than the rate charged at its beginning in 2014—*ten years earlier*. Petty vindictiveness due to the filing of this suit was also a factor. All that said, Defendants' actions have frequently appeared irrational and/or ill-advised, and their motivation(s) here are likely mixed, fluid, inconsistent and may yet not all be known.

unsafe. On August 3, 2018, for example, a mis-leveling elevator caused another Raymond
James employee to fall and the employee fractured her elbow.

66. This newest injury—in combination with the increasing problems with the elevators, the
deterioration of the Tower, and Defendants' duplicity and intransigence—forced Raymond
James to decide, reluctantly, to move. It could no longer brook the un-ending danger to its
employees and visitors, the undermining of employee morale, the drain on management, the
unreliability of the facility and the interference with its operations, among other things.

67. Raymond James did not take this step lightly. Indeed, it had been management's strong
preference to stay in the Tower through at least the Lease's natural termination in 2024 and
beyond. The firm had deep historical ties to both the building and to Downtown Memphis and
it knew that a move would involve substantial costs, including: increased rent, build-out costs,
moving expenses, and lost time/productivity. While Raymond James, as a precaution, had
taken steps to identify alternatives as early as 2017 (around the time it gave its first notice of
breach), this work did not become serious until Fall 2018.[26] Moreover, moving an
infrastructure heavy, 600 plus person operation like Raymond James was akin to turning the
proverbial battleship—it takes considerable time and planning. Given such things as the dearth

---

[26] As part of its on-going planning, Raymond James's Corporate Real Estate Department (the
"Department") routinely conducts planning regarding existing leases and locations across its
footprint, looking for such things as ways to save on costs. In Memphis this included all three of
its local locations—i.e. at the Tower, 1100 Ridgeway Loop, and the Crescent Center. As a result
of negotiations that started as early April 2016, the termination dates for the leases for its other
two Memphis locations were aligned with the Tower's so that it had the flexibility to consolidate
one or more of these spaces if warranted in the future. Defendants have tried to make much of this
routine practice, claiming it to be proof positive of a long-standing intent by Raymond James to
leave the Tower at Early Termination. This contention is simply not true and the supposed "proof"
Defendants gleans from this alignment of these termination dates conveniently ignores that they
are aligned—not only for the Tower's date of Early Termination in 2021—but also for Natural
Termination in 2024.

of suitable sites offering the amount of space needed, the need to build (or build-out) the space selected and the looming date for early termination (June 30, 2021), by the fall of 2018, there was only a limited time left to act.

68. After considering various alternatives in both Downtown and East Memphis, Raymond James eventually reached a letter of intent with Boyle on February 22, 2019 for 180,000 square feet of office space. This replacement space, in spite of the forced circumstances under which it was obtained, is reasonably similar in quality to that promised in the Lease. The replacement space, however, is still less than ideal since, among other things, it is located in two buildings approximately a half mile apart in East Memphis. Both buildings, however, were on the market and available, and Raymond James had to move expeditiously to secure them as a package.[27] The space in both buildings will need substantial improvements prior to move-in and the rent at both is more expensive than at the Tower.

69. On February 26, 2019, following news reports that Raymond James was going to re-locate to East Memphis, Mr. Sofer sent Mr. Recer an email. (*See* Email from Mr. Sofer to D. Recer dated February 26, 2019, attached as **Exhibit T**.) Self-serving and disingenuous in the extreme, this email attempted to completely re-write the parties' history, with Mr. Sofer, for example, even congratulating himself for how "we have continuously invested the necessary Capital in the Tower since we took ownership." (*Id.*) As for modernization, he parrots Defendants' late-found interpretation that it is "not required by the Lease" and, incredibly, blames Defendants' failure to modernize *on Raymond James*—stating that "as you know, we were always prepared to modernize" but have been "significantly hindered" due to the

---

[27] The one building—1100 Ridgeway Loop—was already half occupied by Raymond James, as well as partially owned by a subsidiary. Raymond James would now occupy the entire building. Raymond James would also be the only tenant in the other building, 889 Ridge Lake Blvd.

Raymond James suit. (*Id.*) The main thrust of the letter, however, was to announce that 50 North's intention to modernize the elevators—now that Defendants knew that Raymond James had committed to leave. (*Id.*) He then proceeded to make a back-handed offer for Raymond James to stay, stating that "[I]f the reason for a potential move is in any way related to the modernization of the Elevators, we would like to make it very clear that we can still get this done." (*Id.*)

70. Responding two days later on February 28, 2019, Mr. Recer corrected some of the history Mr. Sofer distorted and stated how a modernization now simply came too late, as follows:

> As I write this, three of the Tower's nine elevators are *completely* out of service and several have been out of service for literally *months* on end. Sadly, this is actually an improvement on recent performance since we have had as many as six elevators out all at one time this month.
>
> It is thus heartening to hear that modernization is now "imminent." Of course, we have asked for years that the elevators be modernized and/or brought up to the level of proper functionality required by the lease. We even took the extraordinary step of offering to finance the cost – all without any effect. Indeed, contrary to your statement that you were "always prepared to modernize," this is the first time we have heard this without you imposing conditions, including, for example, requiring us to waive our lease Termination Option. In the meantime, our Associates have had to contend with elevator service that, at a minimum, is shoddy, frightening and even dangerous, in a building that you have allowed to become substandard.
>
> While we appreciate that you are purportedly in the final stages of awarding a contract, your commitment to finally modernize – even if it should turn out to be true – comes too late to change the company's decision to relocate. Finding suitable space for our business takes considerable lead time and cannot be delayed in hopes that you will finally do the right thing. This is precisely why we have requested for years that you do something about the elevators, but unfortunately we are now left with little choice. Simply put, you have blatantly ignored your obligations under the lease and those failures have forced us to take the

expensive and highly disruptive step of finding suitable space
elsewhere.  As I am sure you can appreciate, we have our Associates
and our business to protect.

Thanks

(*See* Email from D. Recer to J. Sofer dated February 28, 2019, attached as **Exhibit U**.).

71. In reality, Mr. Sofer's email was merely posturing. Indeed, before Mr. Recer even had a chance

to respond, Mr. Sofer incorporated parts of his self-serving email—verbatim—into a press

release that was picked up by the local press. (*See* Daily Memphian article dated February 28,

2019, attached as **Exhibit V**.) Mr. Sofer's half-hearted invitation to stay notwithstanding,

Defendants actually wanted Raymond James to leave. Indeed, from their prospective, the

timing was ideal, giving Defendants everything they could have desired. Raymond James's

forced departure would provide them with $6.2 million in cash, the modernization—that for

years they had denied was even needed—could be completed before Raymond James even

left, and they would have a newly refurbished building to rent at higher rates to new tenants.

72. 50 North signed a modernization contract with TKE on March 13, 2019 and after additional

months of delay, work actually began on two cabs in September of 2019.

73. Defendants' efforts to force Raymond James from the Tower will be complete sometime

between now and June 30, 2021, when Raymond James decamps for its new space. Unless the

Court intervenes, Raymond James may have to pay the approximately $6.2 million Option

Fee.[28] To the extent any such payment is made, it will be paid under protest and part of the

relief Raymond James seeks herein is the return and/ or cancellation of any such payment.

---

[28] The Option Fee is ostensibly due approximately nine months beforehand, i.e., in September of
2020. (*See* **Exhibit D,** Addendum of Special Stipulations to the Lease at pp. 9-10.) To the extent
it pays this amount, Raymond James is doing so in order to avoid any argument that its non-
payment somehow violates the Lease. Under paragraph 32 of the Lease, a "Monetary Default" by
Raymond James can have drastic consequences. (*See generally* **Exhibit D,** para. 35.)

74. **Defendants' repeated bad faith harassment.** Following Raymond James's initiation of this suit, Defendants, acting tortiously and in bad faith, have repeatedly taken steps to hinder and harass Raymond James in retribution for the filing of this suit, to further deprive it of its right to quiet enjoyment of the premises and in order to generally cause harm, including defamatory harm to its reputation. These acts have included the following:

- Defendants' March 27, 2019 invoices to Raymond James for $66,282 in "legal fees reimbursement." Defendants attempted to collect this amount, sua sponte, based on this Court's *grant* nearly a year earlier in June of 2018, of *Raymond James's* Motion to Amend. Describing Raymond James's original filing as the "failed Original Complaint," Defendants' invoice demanded reimbursement for 50 North's legal fees during the four-and-a-half-month period that the original complaint was extant. While the Lease has a prevailing party attorneys' fees provision, it clearly did not apply. In response, the next day—March 28, 2019, Raymond James refused to pay this invoice and demanded that Defendants withdraw it. (*See* Email from Niel Prosser (Counsel for Raymond James) to Michael McLaren (Counsel for 50 North) dated March 28, 2019, attached as **Exhibit W**.) Over a year has now passed and Defendants have not responded to this withdrawal demand.

- Defendants' December 19, 2019 *retroactive* invoice for nearly $600,000 due to Raymond James's alleged use of "excess storage space" beyond what the Lease requires Defendants provide to Raymond James for *free*. (*See* Email from Hershy Brown (of Madison) to Bary Eck (of Raymond James) dated December 19, 2019, attached as **Exhibit X**.) The invoice covered nearly the entire 5-year period that 50 North has owned the building. Remarkably, Defendants have acknowledged that

the Lease has no authority to assess this charge and they have refused to produce any evidence that Raymond James actually used the space as alleged. Further, Defendants have long been aware of—and acquiesced in—Raymond James's occasional use of a portion of this space, and only now, years later, are attempting to bill for it. (*See* letter from D. Recer to Hershy Brown (of Madison) dated January 16, 2020, attached as **Exhibit Y**.)

- Defendant's intentional defamation of Raymond James. On or about February 20, 2020, Defendants sent an email blast to Memphis business leaders and real estate professionals through Ron Riley, an employee of its local manager and agent, Colliers. (*See* Colliers' press release sent on February 28, 2020 attached as **Exhibit Z**.) In this press release, Defendants simply lie to the local media. Styling it in the form of a press release, Defendants use Magistrate Judge Pham's recent report and recommendation as an excuse for the communication.[29] The piece, however, quickly abandons this pretext and instead proclaims the intentionally false narrative that, among other things,

  - characterizes Raymond James's claims that the elevator system is "unsafe and unreliable" as "deceitful"; and

  - denies that the Tower's condition had anything to do with Raymond James's decision to leave.

Instead, the piece quotes M. Sofer himself explaining Raymond James's "real" motives as follows:

---

[29] The release is titled "Magistrate Judge Makes Recommendation in Favor of 50 North Front Street LLC in the Lawsuit Filed by Raymond James".

> I have been certain that the cause of Raymond James' highly
> publicized departure from this beautiful tower has nothing to do
> with alleged deterioration and everything to do with Raymond
> James' attempt to avoid paying millions of dollars as the fee for
> breaking the contractual agreements it negotiated with my
> predecessor," said 50 North owner Jacob Sofer. "This ruse is all
> the more offensive because Raymond James received $8.8
> million in free rent.

(*Id.*). These statements are false and intentionally put Raymond James in a false

light with the intent to damage Raymond James's reputation.

75. **50 North's fraudulent assessment of Operating Expenses.** During the course of this

litigation, Raymond James has also learned that 50 North has been cheating on operating

expenses. It has done so both by charging Raymond James for illegitimate expenses and by

fraudulently withholding credits that Raymond James should have received due to reductions

in the Tower's property tax assessment. Moreover, in an on-going attempt to conceal this and,

upon information and belief, other and further fraud, Defendants have also refused to allow

Raymond James to exercise its right to have a third-party accounting firm audit the Tower's

books.

76. In general, the Lease permits 50 North to charge Raymond James its pro rata share of any

increase in expenses that it incurs from operating the Tower in a given year—i.e. "Operating

Expenses." (*See generally* **Exhibit D**, Lease at para. 7(a)-(b)). While some costs can be passed

through, costs that are capital in nature generally cannot.[30] The Lease also allows 50 North to

pass through to Raymond James increases in property taxes and—conversely, to the extent

---

[30] *Id.* at p. 7(b)(vii).

property taxes go down—requires 50 North to credit Raymond James with its pro rata share of such savings.[31]

77. Once a year, 50 North is required to provide Raymond James an "Expense Statement"[32] that outlines its pro rata share of Operating Expenses and property taxes. (*Id.* at p. 7(f)). Raymond James received the Expense Statement for the 2018 calendar year on May 10, 2019, along with an invoice that purported to reflect Raymond James's pro rata share of the increase in the Tower's reimbursable operating expenses for 2018.

78. After examining this Expense Statement in conjunction with other documents—including internal documents 50 North had produced in discovery— it appeared that the Expense Statement deliberately included expenses that should not have been passed on to Raymond James, including:

   a) <u>Expenses of this litigation.</u> 50 North has included over $20,000 in elevator related expert witness fees, even though these are specifically prohibited as Operating Expenses;[33]

---

[31] Property taxes are defined as "Additional Rent" under paragraph 6 of the Lease. (*See* **Exhibit D**, Lease at para. 6). Raymond James pays 50 North a monthly amount for estimated taxes for the upcoming year. *Id.* To the extent that "Tenant paid more in estimated Additional Rent than the actual amount of Additional Rent owed by Tenant…Tenant shall receive a credit therefor." *Id.* at para. 7(f).

[32] While these statements are defined "Expense Statements" under the Lease, the statements sent to Raymond James by 50 North are called "Operating Expense Reconciliations."

[33] One of the dozens of "Exclusions from Operating Expenses" outlined in Paragraph 7(b) of the Lease provides as follows:

> Leasing commissions, attorney's fees, *costs* and disbursements and *other expenses* incurred in connection with negotiations or *disputes with tenants* or prospective tenants.

b) <u>Cost of capital improvements.</u> 50 North inappropriately charged Raymond James at least $100,000 in capital expenses, even though those types of expenses are explicitly excluded.[34] Some examples of these expenses include:

- $24,760 for improvements to the roof (including the spire and steel canopy) and a cooling tower deck;

- $15,692 for sheet metal improvements on the 18th floor balcony;

- $11,806 for new furniture, computers, and security cameras;

- $11,629 to update/replace the awning on the outside of the east entrance of the Tower; and

- $9,142 to replace the revolving door at the east entrance of the Tower.

79. In addition, the Expense Statement—for both 2017 and 2018—deliberately failed to credit Raymond James for reductions in property taxes. 50 North appealed the Tower's property tax assessments for 2017 which secured a reduction that translated into gross savings of some $270,000 between the two years. None of these savings were passed on to Raymond James as required by the Lease, but rather were secretly retained by 50 North. This is clearly apparent from a review of some of the internal documents 50 North produced in discovery. A *draft* of Raymond James's 2017 Expense Statement reflects a reduction in property taxes and shows

---

**Exhibit D**, Lease at para. 7(b)(ii) (emphasis added).

[34] 50 North is expressly excluded from passing on to Raymond James the costs of the following:

> except as expressly permitted to be included in Operating Expenses under clauses (i) or (ii) of Section 7(a) above, costs of a capital nature, including, but not limited to, *capital improvements, capital replacements, capital repairs, capital equipment and capital tools, and other capital items*, all in connection with generally accepted real estate accounting principles

**Exhibit D**, Lease at para. 7(b)(vii) (emphasis added).

Raymond James receiving its pro-rata share of $70,760. 50 North never sent Raymond James that draft. The final Expense Statement that 50 North sent to Raymond James makes *no mention* of property taxes at all. (*Compare* 50 North's draft Expense Statement *with* the Expense Statement actually billed to Raymond James, attached collectively as **Exhibit AA**.) Raymond James paid the Invoice for 2017 on time and as submitted, not knowing at the time that 50 North had inflated the Invoice. Raymond James timely paid the 2018 Invoice, as well, but under protest (so as not to precipitate a possible argument that a Monetary Default existed), but with concern that it might be fraudulent.

80. Raymond James thereafter timely invoked its right under the Lease to audit the Tower's books. (*See* **Exhibit D**, Lease at para. (7)(g)).  50 North, however, refused, falsely claiming that the audit request was *one day* late. (*See* correspondence between D. Recer and Hershy Brown (of 50 North) attached as **Exhibit BB** (attachments not included).) 50 North, moreover, had ample motivation to act improperly. It was already in litigation with Raymond James during 2018 for its deliberate breach of the Lease and by its own admission was experiencing greatly diminished cash flow.

81. **Damages.** 50 North's numerous breaches of the Lease and Defendants' tortious acts have damaged Raymond James. These damages include the devaluation of its leasehold, harm to employee morale, moving costs, increased rent, extra rent, build-out costs for the substitute locations, lost work and employee productivity, over-payment of operating expenses and taxes, damage to its reputation, inability to use the premises as needed, waste of management resources and mitigation-related expenses.

The following causes of action and demands for relief are pleaded in the alternative, as may be applicable, pursuant to Rule 8(a)(3), Rule 8(d)(2), and Rule 8(d)(3) of the Federal Rules of Civil Procedure:

## COUNT I - BREACH OF LEASE/RIGHT OF QUIET ENJOYMENT (50 North)

82. Raymond James incorporates herein by reference paragraphs 1 through 81 of the Second Amended Complaint as if fully set forth herein.

83. The Lease constitutes a valid and enforceable contract against 50 North.

84. Raymond James has fully performed its obligations under the Lease.

85. All of the breaches described herein have persisted following written notice and a cure period, if any, as may be applicable.

86. Despite Raymond James's full performance, 50 North—through the specific course of conduct described above—has breached the Lease in numerous respects, including in the following particulars.

87. 50 North—through the specific course of conduct described above—has breached Section 10 of the Lease by failing to maintain and operate the Building (which includes the elevators) in at least the form, manner and quality as existed at the Building when the Lease was executed (i.e., the Current Standard) as relates to Building maintenance and operation.

88. 50 North—through the specific course of conduct described above—has breached Section 10 of the Lease by failing to maintain and operate the Building (which includes the elevators) substantially in accordance with the manner and quality of the maintenance and operation of Comparable Buildings, including (but not necessarily limited to) the Tower at Peabody Place and the Toyota Center.

89. 50 North—through the specific course of conduct described above—has breached Section 10 of the Lease by failing to make all such improvements, repairs or replacements (including as to the elevators) as may be necessary to maintain the Building Systems (which includes the elevators) serving the Premises and the Common Areas (which includes the elevators) in accordance with the Current Standard and the standards applicable to Comparable Buildings.

90. 50 North—through the specific course of conduct described above—has breached Section 11(a) of the Lease by failing to furnish Raymond James with elevator service at the times and frequency reasonably required for normal business use of the Premises in at least the Current Standard.

91. 50 North—through the specific course of conduct described above—has breached Section 11(e) of the Lease by failing to perform maintenance to or repair of the Common Areas (which includes the elevators) that 50 North is expressly required to provide or perform under the Terms of the Lease, and that failure has continued for a period of five consecutive business days after written notice of such failure, is not because of a Force Majeure Event, and has rendered the Premises or a portion thereof substantially unusable by Raymond James.

92. 50 North—through the specific course of conduct described above—has breached Section 7 of the Lease by passing on costs to Raymond James, including litigation-related elevator expert fees and various capital expenses that plainly do not constitute Operating Expenses under the Lease.

93. 50 North—through the specific course of conduct described above—has breached Section 7 of the Lease by failing to pass along to Raymond James credits for the property tax reductions that it received with respect to the Tower, and instead billed Raymond James for factually incorrect and inflated amounts.

94. 50 North—through the specific course of conduct described above—has breached Section 7 of the Lease by refusing to permit Raymond James to exercise its audit rights under the Lease.

95. 50 North—through the specific course of conduct described above—has breached Section 28 of the Lease by interfering, intentionally or otherwise, with and disturbing Raymond James's right to quiet enjoyment and possession.

96. This interference by 50 North—through the specific course of conduct described above—has directly and proximately resulted in the material disturbance, impairment, and partial destruction of Raymond James's quiet and beneficial enjoyment, occupancy, and use of the leased property in question.

97. All of the above-described breaches by 50 North have been the result of its gross negligence and/or its willful misconduct/intentional conduct.

98. 50 North's breaches have been grossly negligent because, beyond breaching with mere negligence, 50 North—through the conduct described above—has acted with an utter unconcern for Raymond James's property interests and Raymond James's contractual rights under the Lease, has evinced a reckless disregard of such interests and rights, and/or has at all relevant times acted with a conscious indifference to the consequences of its actions.

99. Further, 50 North's breaches have been grossly negligent because, beyond breaching with mere negligence, 50 North—through the conduct described above—has acted with an utter unconcern for Raymond James's property interests, Raymond James's contractual rights under the Lease, and the safety of Raymond James's employees, guests, and business invitees, has evinced a reckless disregard of such interests, rights, and safety issues; and/or has acted with a conscious indifference to the consequences of its actions.

4836-3523-7817, v. 1

100.    50 North's acts and breaches constitute willful misconduct—and in fact amount to intentional conduct—because 50 North has deliberately and intentionally refused to comply fully with its obligations under Section 10 and Section 11 of the Lease and has even used its deliberate and intentional refusal to comply with various Lease terms as attempted (and improper) leverage against Raymond James to change the Lease and to force Raymond James out of the Tower early.

101.    50 North—through the conduct described above—has also breached the duty of good faith and fair dealing implied in every contract in Tennessee.

102.    Raymond James has suffered significant damages (well in excess of $75,000, exclusive of interest and costs) as a direct and proximate result of 50 North's above-described breaches in an amount to be proved at trial, and 50 North's breaches have in fact forced Raymond James out of the Tower early.

103.    Raymond James is further entitled to punitive damages because 50 North has acted intentionally, fraudulently, maliciously, and/or recklessly, and any limitation to the contrary in the Lease is not enforceable.


### COUNT II - FRAUD (50 North)

104.    Raymond James incorporates herein by reference paragraphs 1 through 103 of the Second Amended Complaint as if fully set forth herein.

105.    50 North—through the specific course of conduct described above—has defrauded Raymond James.

46

106.   For 2017 and 2018, 50 North enjoyed property tax savings of approximately $270,000 with respect to the Tower, a share of which should have been credited to Raymond James per the terms of the Lease.

107.   Despite its knowledge of this, 50 North nevertheless billed Raymond James an inflated amount for property taxes and deliberately failed to credit to Raymond James its pro rata share of the property tax savings that 50 North had petitioned for and received.

108.    Expense Statements that were so inflated were submitted by 50 North and timely paid by Raymond James.

109.   Further, the Expense Statement submitted by 50 North for the 2018 operating year included approximately $20,000 in litigation-related elevator expert fees and over $100,000 in capital expenses, all of which may not be passed on to Raymond James for payment of its pro rata share pursuant to the terms of the Lease.

110.   In so billing Raymond James, 50 North represented to Raymond James via the Expense Statement that the above-referenced expenses were accurate, valid, due, and owing.

111.   In making these representations to Raymond James, 50 North knew that the above-referenced expenses were not properly includible in the Expense Statements and further knew that it had not passed on its property tax savings to Raymond James, as required by the Lease.

112.   These representations by 50 North were materially false.

113.   50 North intended for Raymond James to rely on 50 North's materially false representations, and Raymond James in fact reasonably relied on 50 North's materially false representations in paying the Expense Statement for 2017. Raymond James paid the Expense Statement for 2018 under protest because, while it suspected that 50 North was trying to defraud it, Raymond James did not want to risk the severe penalties associated with a Monetary

47

Default under the Lease if its suspicions proved to be wrong. 50 North's second attempt to defraud Raymond James for the 2018 operating year shows a pattern of deliberate fraudulent conduct.

114.    Raymond James has suffered significant damages, in an amount to be proved at trial, as a direct and proximate result of 50 North's above-described fraud for 2017, and in any further fraudulent acts regarding operating expenses that may be uncovered in discovery.

115.    Raymond James is also entitled to punitive damages because 50 North has acted intentionally, fraudulently, maliciously, and/or recklessly, and any limitation to the contrary in the Lease is not enforceable.

## **COUNT III - NUISANCE (50 North and Mr. Sofer)**

116.    Raymond James incorporates herein by reference paragraphs 1 through 115 of the Second Amended Complaint as if fully set forth herein.

117.    Raymond James has a leasehold interest and concomitant property rights and privileges in the Tower.

118.    Defendants—through the specific course of conduct described above—have substantially and unreasonably disturbed and interfered with Raymond James's free and ordinary use, occupation, and enjoyment of its leasehold interest and concomitant property rights and privileges in the Tower.

119.    As to Mr. Sofer, he is individually liable for nuisance (a tort) because he has, among other things, directed and participated in the tortious acts of 50 North; those tortious acts have been aimed at harming Raymond James's leasehold interest and other interests involving the Tower in Memphis, Tennessee.

4836-3523-7817, v. 1

120.     As a direct and proximate result of the nuisance created by Defendants and maintained for a significant and unreasonable length of time by Defendants, Raymond James has suffered significant damages (well in excess of $75,000, exclusive of interest and costs) in an amount to be proved at trial, and Defendants' conduct has in fact forced Raymond James out of the Tower early.

121.     Raymond James is also entitled to punitive damages because Defendants have acted intentionally, fraudulently, maliciously, and/or recklessly, and any limitation to the contrary in the Lease is not enforceable.

## COUNT IV–GROSS NEGLIGENCE, WILLFUL AND INTENTIONAL CONDUCT/PRIMA FACIE TORT (50 North and Mr. Sofer)

122.     Raymond James incorporates herein by reference paragraphs 1 through 121 of the Second Amended Complaint as if fully set forth herein.

123.     Defendants have a duty not to intentionally harm Raymond James or its employees, guests, and business invitees.

124.     Defendants have a duty not to intentionally harm Raymond James's property and property interests, including its leasehold interest and concomitant economic interests, property rights, and privileges.

125.     Defendants, by virtue of their ownership of the Tower and control over the common areas in the Tower (including the elevators), have the substantially heightened duty of a common carrier (i.e., the highest duty of care under the law) to tenants of the Tower (including Raymond

James) and to such tenants' employees, with respect to the elevators, their repair, and their safety.

126.    Defendants—through the specific course of conduct described above—have breached the above-described duties.

127.    Defendants' breaches of duty have occurred with gross negligence—and, indeed, have been intentional and willful—because Defendants (in going beyond mere negligence) have acted with utter unconcern for the safety of others and with a reckless disregard for the rights of others, all of which evince a conscious indifference to the consequences of their actions.

128.    Defendants' breaches of duty have been intentional and/or willful because, among other things, Defendants have intentionally and/or willfully sought to harm Raymond James and its employees, guests, and business invitees without just cause or excuse by, among other things, refusing to timely modernize the elevator system despite warnings and knowledge of its current and/or future unsafe and unreliable condition and by intentionally reducing elevator service and deliberately depriving Raymond James of services.

129.    Mr. Sofer is individually liable for gross negligence, willful and intentional conduct, and/or prima facie tortious conduct because he has directed and participated in the tortious acts of 50 North; those tortious acts have been aimed at harming Raymond James's leasehold interest and other business interests.

130.    As a direct and proximate result of Defendants' gross negligence, willful and intentional conduct, and/or prima facie tortious conduct, Raymond James has suffered significant damages (well in excess of $75,000, exclusive of interest and costs) in an amount to be proved at trial, and Defendants' tortious conduct has in fact forced Raymond James out of the Tower early.

131.    Raymond James is also entitled to punitive damages because Defendants have acted intentionally, fraudulently, maliciously, and/or recklessly, and any limitation to the contrary in the Lease is not enforceable.

## COUNT V - DECLARATORY RELIEF (50 North)

132.    Raymond James incorporates herein by reference paragraphs 1 through 131 of the Second Amended Complaint as if fully set forth herein.

133.    Raymond James (directly) and 50 North (by way of assignment from Parkway) are each parties to the Lease.

134.    Raymond James seeks the following declarations from the Court to settle actual controversies between Raymond James and 50 North and to clarify certain duties, obligations, rights, and other relations between Raymond James and 50 North.

135.    As set forth above, 50 North has materially breached the Lease in several respects, and those breaches have been grossly negligent and/or the result of willful misconduct and intentional conduct by 50 North.

136.    Because 50 North has committed the first material breaches of the Lease, and because 50 North's conduct has forced Raymond James to vacate the Tower at its earliest opportunity, Raymond James seeks a declaration from the Court that 50 North cannot contractually compel Raymond James to pay, or if the Court decides the issue after Raymond James has already paid, that 50 North must return to Raymond James, the early termination Option Fee.

137.    Because 50 North has committed the first material breaches of the Lease, and because 50 North's conduct has forced Raymond James to vacate the Tower, Raymond James seeks a declaration from the Court that, under the circumstances of this suit, 50 North's receipt of the

early termination Option Fee would result in a forfeiture by Raymond James and/or constitute an unenforceable penalty against Raymond James.

138.     Because 50 North has materially breached the Lease in several respects, and those breaches have been grossly negligent and/or the result of willful misconduct and intentional conduct by 50 North, Raymond James seeks a declaration from the Court that Raymond James has the right under Section 11(e) to abate rent, including the early termination Option Fee, and to recover rent already paid following 50 North's grossly negligent, willful, and/or intentional breaches of the Lease.

139.     Because 50 North has materially breached the Lease by failing to perform maintenance to or repair of the Common Areas (which includes the elevators) that 50 North is expressly required to provide or perform under the Terms of the Lease, and that failure has continued for a period of five consecutive business days after notice of the failure was given, is not because of a Force Majeure Event, and has rendered the Premises or a portion thereof substantially unusable by Raymond James, Raymond James seeks a declaration from the Court that Raymond James has the right under Section 11(e) to abate rent, including the early termination Option Fee, and to recover rent already paid following 50 North's breaches of the Lease.

140.     Because Defendants have acted with gross negligence and willful misconduct, and have engaged in tortious conduct, Raymond James seeks a declaration from the Court that any purported limitations or restrictions on Raymond James's recovery under the Lease or similar putative exculpatory clauses (whether in Section 25, Section 40, or elsewhere) are unenforceable as a matter of public policy.

141.     Because of Defendants' above-described breaches and through Defendants' specific course of conduct as set forth above, Raymond James has been forced to vacate the Tower at its

earliest opportunity; consequently, Raymond James seeks a declaration from the Court that its

vacating of the Tower constitutes a reasonable effort, under the specific circumstances of this

case, to mitigate its damages.

## **DAMAGES**

142.    Raymond James incorporates herein by reference paragraphs 1 through 141 of the Second

Amended Complaint as if fully set forth herein.

143.    As a direct and proximate result of the conduct complained of above, Raymond James has

suffered—and will continue to suffer—significant damages.

144.    These damages include, but are not necessarily limited to, the following: (1) the destruction

of Raymond James's benefit of the bargain (including, but not necessarily limited to, the

diminution of Raymond James's leasehold interest and economic advantage under the Lease);

(2) damages to Raymond James's leasehold interest and concomitant economic interests,

property rights, and privileges; (3) moving-related costs that Raymond James will incur and

lost productivity it will sustain due to its move to the replacement space in East Memphis; (4)

additional rent that Raymond James will have to pay while renting at both the Tower and the

replacement space in East Memphis;  (5) additional rent above that called for in the Lease

through natural termination and any likely extensions of the Lease; (6) build-out-related costs

incurred in Raymond James's move to replacement space in East Memphis;  (7) amounts paid

by Raymond James to 50 North in connection with 50 North's improper and fraudulent

billings; (8) punitive damages; (9) the annoyance, inconvenience, lost productivity/downtime,

and impaired morale caused by Defendants' wrongful conduct; (10) the abated rent amounts

that Raymond James is entitled to recover and/or avoid under the Lease; (11) all amounts paid

by Raymond James in connection with its exercise of the early termination provisions of the

Lease; (12) the early termination Option Fee; (13) attorneys' fees, costs, and expenses incurred

by Raymond James; and (14) all mitigation-related costs and expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Raymond James respectfully prays for the

following relief:

A.  That 50 North and Mr. Sofer be required to answer this Second Amended Complaint;

B.  That Raymond James be awarded all of the damages, costs, and expenses set forth above

proximately caused by the breaches of contract, nuisance, and tortious conduct set forth

above, in an amount (or amounts) to be proved at trial;

C.  That Raymond James be awarded any and all other damages, costs, and expenses

proximately caused by the breaches of contract, nuisance, and tortious conduct set forth

above, in an amount (or amounts) to be proved at trial;

D.  That Raymond James be awarded any rent amounts already paid that Raymond James

was/is entitled to abate;

E.  That Raymond James be awarded the declaratory relief set forth above;

F.  That Raymond James be awarded punitive damages against 50 North and Mr. Sofer in an

amount to be proved at trial and not to exceed any applicable federal and/or state

constitutional and/or statutory limits;

G.  That Raymond James be awarded its reasonable attorneys' fees and all costs and expenses

incurred in this litigation pursuant to Section 50 of the Lease;

H.  That Raymond James be awarded Court costs, prejudgment interest, and post-judgment

interest; and

4836-3523-7817, v. 1

I.   Any and all such other and further relief, whether at law or in equity, as the Court deems appropriate.

Respectfully submitted,

**BURCH, PORTER & JOHNSON, PLLC**

  /s/ Gary Scott Peeples
Jef Feibelman (BPR No. 7677)
Melissa A. Maravich (BPR No. 13876)
Gary Scott Peeples (BPR No. 32303)
130 North Court Avenue
Memphis, TN 38103
T:  (901) 524-5000
F:  (901) 524-5024
E:  jfeibelman@bpjlaw.com
     mmaravich@bpjlaw.com
     gpeeples@bpjlaw.com

- and -

**THE PROSSER LAW FIRM**

  /s/ Niel Prosser
Niel Prosser (BPR No. 11647)
Rob Clapper (BPR No. 34180)
Kyle Johnson (BPR No. 36066)
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
T:  (901) 820-4433
E:  np@prosserlaw.com
     rclapper@prosserlaw.com
     kjohnson@prosserlaw.com

*Counsel for Raymond James*