**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **RAYMOND JAMES & ASSOCS., INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18-cv-02104-JTF-tmp** |
| | ) | |
| **50 NORTH FRONT ST. TN, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION AND GRANTING DEFENDANT'S MOTION TO DISMISS**

Plaintiff Raymond James & Associates, Inc. ("Plaintiff" or "RJA") filed a First Amended Complaint ("complaint") on May 29, 2018. (ECF No. 41.) Before the Court is Defendant 50 North Front St. TN, LLC's (hereinafter "Landlord") Motion to Dismiss RJA's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), which was filed on June 29, 2018. (ECF No. 54.) RJA filed a Response in Opposition to the Motion on July 26, 2018, (ECF No. 70), and Landlord filed its Reply on August 9, 2018 (ECF No. 76). The Court referred the Motion to the Magistrate Judge for report and recommendation, pursuant to 28 U.S.C. § 636. (ECF No. 284.) The Magistrate Judge entered a Report and Recommendation ("R. & R.") on February 20, 2020, recommending that the Court grant Landlord's Motion to Dismiss in its entirety. (ECF No. 301.) RJA timely filed objections to the R. & R. (ECF No. 310), Landlord filed a response to those objections (ECF No. 317), and RJA subsequently filed its reply (ECF No. 321).

For the following reasons, the Court finds that the R. & R. should be ADOPTED and Landlord's Motion to Dismiss GRANTED.

1

## FINDINGS OF FACT

In his R. & R., the Magistrate Judge provides, and this Court adopts and incorporates, proposed findings of fact in this case. (ECF No. 301, 1-8.)

## LEGAL STANDARD

Congress passed 28 U.S.C. § 636(b) "to relieve some of the burden on the federal courts by permitting the assignment of certain district court duties to magistrates." *United States v. Curtis*, 237 F.3d 598, 602 (6th Cir. 2001). Pursuant to the provision, magistrate judges may hear and determine any pretrial matter pending before the Court, except various dispositive motions. 28 U.S.C. § 636(b)(1)(A). Regarding those excepted dispositive motions, magistrate judges may still hear and submit to the district court proposed findings of fact and recommendations for disposition. 28 U.S.C. § 636(b)(1)(B). Upon hearing a pending matter, "the magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact." Fed. R. Civ. P. 72(b)(1); *see also Baker v. Peterson*, 67 F. App'x 308, 310 (6th Cir. 2003). Any party who disagrees with a magistrate judge's proposed findings and recommendation may file written objections to the report and recommendation. Fed. R. Civ. P. 72(b)(2).

The standard of review that is applied by the district court depends on the nature of the matter considered by the magistrate judge. *See Baker*, 67 F. App'x at 310 (citations omitted) ("A district court normally applies a 'clearly erroneous or contrary to law' standard of review for nondispositive preliminary measures. A district court must review dispositive motions under the *de novo* standard."). Upon review of the evidence, the district court may accept, reject, or modify the proposed findings or recommendations of the magistrate judge. *Brown v. Bd. of Educ.*, 47 F. Supp. 3d 665, 674 (W.D. Tenn. 2014); *see also* 28 U.S.C. § 636(b)(1). The court "may also receive further evidence or recommit the matter to the [m]agistrate [j]udge with instructions." *Moses v.*

2

*Gardner*, No. 2:14-cv-2706-SHL-dkv, 2015 U.S. Dist. LEXIS 29701, at *3 (W.D. Tenn. Mar. 11, 2015). A district judge should adopt the findings and rulings of the magistrate judge to which no specific objection is filed. *Brown*, 47 F. Supp. 3d at 674.

## ANALYSIS

This is a breach of contract and tort case. Before turning to the parties' contract (the "Lease") to assess the merits of the complaint, the R. & R. addressed RJA's argument that Landlord's Motion to Dismiss should be denied as untimely. (ECF Nos. 70, 5 & 301, 10-11.) The R. & R. found that although Landlord's Motion was filed late, it should be accepted by the Court because a diligent party could not have reasonably met the filing deadline under the same circumstances. (ECF No. 301, 11) (*citing E.E.O.C. v. U-Haul Int'l, Inc*., 286 F.R.D. 322, 325 (W.D. Tenn. 2012)). The Court agrees, and in the absence of any objection by RJA, the R. & R.'s finding is adopted, and Landlord's Motion is accepted as timely.

### I.   Breach of Contract Claim

The Parties agree that Tennessee law governs their dispute. (ECF No. 54-1 n.5) (citing ECF No. 41-1.) *See Solo v. United Parcel Serv. Co*., 819 F.3d 788, 794 (6th Cir. 2016) ("A federal court sitting in diversity applies the choice of law provisions of the forum state."). They also agree that Sections 10, 11(e), and 11(f) of the Lease are the central provisions at issue in this case and require the Court's interpretation. (ECF Nos. 41-1, 54, & 70.) The parties contest the R. & R.'s application, but not its summary of the general rules of contract construction, and they agree that the rules apply to the Court's interpretation of the Lease in this case. (ECF No. 301, 12-14.)

"The cardinal rule in the construction of contracts is to ascertain the intent of the parties." *Am. Senior Dev., L.L.C. v. Parkside of Collierville, L.L.C*., 102 Fed. Appx. 890, 893 (6th Cir. 2004). As the R. & R. notes, the best evidence of the parties' intent can be found by looking at the plain

3

meaning of the text. (ECF No. 301, 12) (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). Ascertaining a contract's plain meaning requires its provisions to be "read together to give meaning to the document as a whole" and construed in a way that promotes consistency among its parts. (*Id.*) (quoting *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 705 (Tenn. 2008)); *Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011).

The R. &. R. also highlights the established "specific-over-general" rule which states: "[W]here there are, in a contract, both general and special provisions relating to the same thing, the special provisions control. Thus, where there is uncertainty between general and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions, although this is not universally or necessarily so." *Cocke Cty. Bd. of Highway Comm'rs v. Newport Utilities Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). The R. & R. correctly relies on these principles of contract interpretation to garner an understanding of the Lease generally, and the interplay between Sections 10, 11(e), and 11(f) in particular.

## A. Interpreting the Operative Lease Provisions

The entire complaint can be traced to three broad obligations Landlord has under the Lease, which RJA claims Landlord failed to meet. For ease of reference, the R. & R. separates these commitments into two categories it titles the "general building maintenance provisions" and the "services provisions." First, under the maintenance provisions found in Section 10, which the Lease titles "Maintenance and Repair," Landlord agrees to "maintain and operate the Building" at both the "Current Standard" and the same standard of "Comparable Buildings." (ECF No. 301, 2-3) (quoting (ECF No. 41-1, 34); Lease § 10).[1] The second obligation, which is found in Section 10, is the Landlord's agreement to "make such improvements, repairs or replacements as may be

---

[1] Hereinafter, all references to the Lease will be cited directly from the contract itself, which was provided as an attachment to Plaintiff's Amended Complaint. (ECF No. 41-1.)

4

necessary to maintain the Building Systems serving the Premises" at the same "Current" and "Comparable" building standards. (Lease § 10). This includes the building's exterior and structural portions, as well as its "Common Areas" such as the lobby, restrooms, and elevators. (Lease §§ 10 & 1(t)). Landlord's third obligation relevant to RJA's complaint, which was dubbed the "services provision" by the R. & R., is to "furnish Tenant . . .  the following services . . . in no less than the Current Standard: . . . (iv) elevator service at the times and frequency reasonably required for normal business use of the Premises . . . and security services for the Building . . . ." (Lease § 11(a)). The Lease titles this Section, "Services provided by Landlord." (*Id.*)

### i.   *Section 10*

After describing Landlord's obligation to maintain and repair the building according to certain standards, Section 10 of the Lease indicates that those maintenance and repairs "shall be at Landlord's expense, unless the need for such maintenance or repairs was caused by the negligence or willful misconduct of Tenant . . . in which event Tenant shall reimburse Landlord for the cost of such maintenance or repairs . . . ." (Lease § 10). In other words, unless Tenant, through its own negligence or willful misconduct, creates a need for maintenance or repairs to the building, Landlord must bear the expense necessary to maintain and repair the building in a manner commensurate with the current and comparable building standards.[2] Despite Plaintiff's attempts to extract specific stand-alone remedies for itself from Section 10, arguments that will be discussed more fully in the paragraphs to follow, nothing in the text supports that assertion. Moreover, the Court's plain reading reveals that Section 10 places limits on *Tenant's* conduct—giving a remedy

---

[2] Section 11(a) explicitly imputes the cost of any above-standard maintenance or improvements to the Tenant, not the Landlord, stating: "Landlord shall not be responsible for cleaning or maintaining any Above Standard improvements or Above Standard fixtures in the Premises; Tenant shall, at Tenant's expense, be responsible for cleaning and maintaining any Above Standard improvements or Above Standard fixtures, including Above Standard Tenant Work, defined below, and Above Standard Initial Improvements, in the Premises." (Lease § 11(a)).

to Landlord in the event Tenant acts in violation of the agreement, i.e., causes the need for maintenance or repairs through negligence or willful misconduct. As the R. & R. concludes, the provisions in Section 10 speak to Landlord's maintenance and repair obligations generally, but do not provide specific remedies for RJA in the event Landlord fails to maintain or repair the building according to the requisite standards. (ECF No. 301, 14.)

### ii.    *Section 11*

In contrast, Section 11 is much more specific. It describes what standard of elevator operation the Parties agree to and gives RJA two remedies, or ways it can recover, in the event the elevators fail to function, and Landlord fails to perform as agreed. These remedies are rent abatement and self-help. The service provision quoted above, outlines Landlord's general obligation to provide elevator service "at the times and frequency reasonably required for normal business use of the [leased] Premises." (Lease § 11(a)). However, subsections (e) and (f) significantly curtail RJA's ability to recover against Landlord for loss of services or lack of maintenance. Section 11(e) of the Lease begins:

> Landlord shall not be liable for any damages directly or indirectly resulting from, nor shall any Rent be abated (except as otherwise provided below) by reason of, the installation, use or interruption of use of any equipment in connection with furnishing any of the foregoing services, or failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord. The failure to furnish any such services shall not be construed as an eviction of Tenant or relieve Tenant from any of its obligations under this Lease.

(Lease § 11(e)). Notwithstanding this broad protection for Landlord, the Lease still provides rent abatement and self-help as remedies RJA can use to recover against Landlord under certain circumstances. Section 11(e) goes on to explain that RJA may abate its rent if Landlord fails to provide any "Essential Service" or perform maintenance or repairs of the common areas or leased premises. (*Id.*) The Lease defines Essential Service to include, among other things, HVAC, water,

sewage, and a minimum of one freight or passenger elevator capable of providing access to RJA's leased premises. (*Id*.) A significant caveat here, affecting RJA's claim, is that rent abatement is only available if Landlord's failure to provide Essential Services, or to abide by its maintenance and repair obligations, renders the leased premises "substantially unusable" for a period of five consecutive business days after Landlord receives written notice from RJA of such failures. (*Id*.) As the R. & R. found, and RJA tacitly admits,[3] "the complaint is devoid of allegations" that there were no working elevators for a period of five consecutive business days capable of accessing RJA's leases floors. (ECF 301, 22.) Therefore, rent abatement for lack of elevator service is a remedy under the Lease, but it is not available to RJA because RJA did not allege failure of an Essential Service.

In subsection (f), the Lease also provides a self-help remedy in the event of a "Critical Failure," which occurs if Landlord "fail[s] to provide any service or perform any maintenance or repair" that is "expressly required . . . under the terms of this Lease" and as a result, "Tenant's use of a material portion of the [leased] Premises is materially and adversely impaired." (Lease § 11(f)). RJA may engage in self-help—i.e. cure the Critical Failure itself and seek reimbursement from Landlord for the reasonable cost of the cure—if Landlord "fails to commence to restore" a required service or to "perform such maintenance or repair" within two (2) business days after receiving written notice from RJA that the failure exists. (*Id*.) However, RJA does not claim that it engaged in self-help and thus, it cannot utilize this second remedy to recover against Landlord.

---

[3] Confronting this conclusion by the Magistrate Judge, RJA contends that its "entitlement to abatement [] does not hinge on whether there was such a failure of Essential Services," but rather stems from its allegations that Landlord acted with negligence or willful misconduct. (ECF No. 310, 19.) Plaintiff's allegation of Landlord's tort liability will be addressed below, but it is clear to the Court that RJA offers no objection to the R. & R.'s finding that the complaint does not allege a failure of Essential Services.

### iii.    The Interplay Between Sections 10 & 11

After comparing the relevant provisions side-by-side, as the Court has just done, the R. & R. found that Sections 10 and 11 articulate the same maintenance, repair, and service standards, but with differing levels of specificity as follows: Section 10 uses general terms to describe the standards, whereas Section 11 includes specific language to describe what remedies are available to RJA under different circumstances. (ECF No. 310, 14.) Employing the specific-over-general rule of contract interpretation, the R. & R. determined that "[t]he services provision[, in Section 11,] unambiguously establishes the scope of Raymond James['] rights and remedies for breach based on a failure to maintain the elevators." (*Id.*) As a result, the R. & R. concludes that the general maintenance provisions in Section 10, which do not provide RJA remedies for Landlord's breach, should not govern over the more specific language of Section 11. (*Id.*)  The Court agrees.

RJA objects to the R. & R.'s use of the specific-over-general rule for two reasons. First, RJA asserts that this canon of construction is "plainly inapplicable" because Section 10 is no less specific than Section 11. (ECF No. 310, 17.) Second, RJA contends that to the extent Sections 10 and 11 contain more general and more specific provisions, respectively, the language is not in conflict and thus, the specific-over-general rule should not be applied. (*Id.*) (citing *Mark VII Transp. Co. v. Responsive Trucking, Inc.*, 339 S.W.3d 643, 648 (Tenn. Ct. App. 2009) (declining to apply the doctrine where the "two provisions are not in conflict")). For support, RJA points to the fact that Section 10 "goes to great lengths to define" the Current and Comparable Building Standards, it imposes a dual maintenance and operational obligation on Landlord with respect to the building itself, and imposes an independent obligation on Landlord with respect to the building systems. (*Id.* at 16.) Further, RJA argues that Section 11, by contrast, "says nothing at all about [Landlord]'s dual maintenance and operation obligation," which the complaint specifically alleges

Landlord breached. (*Id*.) In RJA's view, the complaint puts both Sections 10 and 11 at issue but the R. & R. "ignores all of Section 10's terms as 'more general' and thus meaningless." (*Id*. at 16-17.)

The Court is unpersuaded by RJA's argument because it convolutes both the text of the Lease and the R. & R.'s conclusion. As detailed above, the R. & R. applied the specific-over-general rule to resolve the issue of remedies. Section 10 articulates general standards for the building and its systems that RJA can expect Landlord to provide. However, the text of Section 10 is silent on what remedies are available to RJA in the event Landlord fails to maintain or repair the building and its systems as promised—a claim that in one form or another, pervades RJA's complaint. If the Lease ended with Section 10, there might be a question of whether and to what extent RJA can hold Landlord liable for failing to abide by its maintenance and repair obligations. But Section 11 does not leave that question open when the Court follows its mandate and considers the Lease as a whole. *Maggart*, 259 S.W.3d at 705.

From this required whole-lease perspective, some conflict or uncertainty between the two provisions comes into view, as the R. & R. identified. Section 10 provides general maintenance standards Landlord must meet but makes no mention of remedies for RJA. Section 11 then adds service requirements to Landlord's list of obligations, and gives RJA two remedies it can use under specific circumstances—i.e., in the event Landlord fails to provide a service, or maintain and repair the building in a way that causes the loss of an Essential Service or results in a Critical Failure. (Lease § 11(a), (e) & (f)). Whether this difference between the provisions is described as a conflict, or merely an area of uncertainty, as Landlord argues (ECF No, 317, 16), it is clear that Tennessee law supports the application of the specific-over-general rule here, because the specific language

of Section 11 qualifies the meaning of the general language in Section 10. *Cocke Cty.*, 690 S.W.2d at 237.

Despite RJA's belief that this conclusion was "ill-considered" by the R. & R., and "defies logical reasoning" (ECF No. 310, 4), the Court disagrees and finds that the interpretation which follows, makes sense. The exculpatory clause in Section 11(e) limits what options for recovery are available to RJA, providing: "Landlord shall not be liable for any damages directly or indirectly resulting from, nor shall any Rent be abated (except as otherwise provided below) . . . except when [] a [maintenance or services] failure or delay is caused by the gross negligence or willful misconduct of Landlord." (Lease § 11(e)). Notwithstanding allegations of gross negligence or willful misconduct, a scenario that will be discussed in the following section, the Lease clearly limits RJA's recovery to rent abatement and self-help, after explicitly prohibiting Tenant from recovering against Landlord for damages directly or indirectly caused by Landlord's failure to provide required maintenance or services. Although RJA's ability to recover is limited, such limitation is a reasonable outcome of what RJA described as "hard-fought negotiations" between the parties, which resulted in "advantageous" terms for RJA. (ECF Nos. 310, 3l & 41:6). RJA's consternation at how the Lease terms severely limit its recovery, has no bearing on the Court's interpretation.  The Court will not rewrite contracts that may be ill advised in retrospect. *Wilson v. Scott*, 672 S.W.2d 782, 786 (Tenn. Ct. App. 1984).

Further, RJA alleges that Landlord is liable for failing to modernize the elevators and it critiques the R. & R. for glossing over the maintenance provisions in Section 10 and looking instead to Section 11 for what remedies are available to RJA. *See* (ECF Nos. 41:29 & e.g. 310, 4).[4]

---

[4] The complaint alleges, "the only way for Landlord to provide elevator service that is both reliable and safe – and which complies with the Lease – is to modernize, upgrade, overhaul and/or replace the elevator system in whole or part." (ECF No. 41:29.)

However, as Landlord points out, this argument ignores the fact that Landlord's obligations under Section 10, as they pertain to the elevators, exist to ensure that RJA receives elevator *service*, that is, transportation by elevator to its leased premises—not access to elevators that are necessarily modernized. (ECF No. 317, 15.) It makes sense then, that the remedies available to RJA, in the event Landlord fails to provide adequate elevator service, can be found in the service provision of Section 11. (*Id.*) In other words, it's a lack of maintenance or repair by Landlord under Section 10, that can lead to a loss of elevator service, for which RJA may recover under specific circumstances articulated in Section 11.

The Court adopts the R. & R.'s conclusion that the service provision in Section 11 clearly establishes the scope of RJA's available rights and remedies under the Lease. Having determined that RJA is not entitled to recover under either of the two remedies provided by the Lease, the Court now considers whether RJA can recover money damages under its claim for breach of contract.

### B.  Money Damages

Setting aside its failure to properly invoke either of the remedies provided by Section 11, RJA objects to the R. & R.'s finding that rent abatement and self-help are RJA's exclusive means of recovery. RJA argues that, beyond these two remedies, Section 11 also allows RJA to recover money damages for Landlord's "gross negligence or willful misconduct" under the Lease. (ECF No. 310, 10.)  Specifically, RJA claims that the language in Section 11(e) "*explicitly* allows [RJA] to recover money damages if Landlord has breached the services portion of the Lease in a *sufficiently culpable way*." (ECF No. 310, 5-6) (emphasis in original). This is the basis of RJA's claim for money damages. According to RJA, the complaint alleges *inter alia* that Landlord was grossly negligent or intentional in its failure to provide adequate elevator service, which satisfies

the requirements for an alternative path to recovery under the Lease, apart from the two explicit remedies of rent abatement and self-help. (ECF No. 310, 10.)

The R. & R. considered this alternative remedy theory but disagreed, finding instead, that the tort-based language in Section 11(e), prohibiting Landlord from engaging in grossly negligent or willful misconduct, is a standard liability carveout, meant to limit Landlord's impunity under the Lease's exculpatory clause. (ECF No. 301, 15.)  A common principle of public policy shared by most states, including Tennessee, is that parties are prohibited from contracting away liability for negligence, recklessness, or intentional wrongdoing. *Copeland v. Healthsouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 270 (Tenn. 2018) (citing Restatement (Second) of Contracts § 195 (1981)).  Thus, as the R. & R. explained, liability carveouts are used to limit *tortious* conduct, but do not govern a party's intentional nonperformance under a contract that is motivated by financial self-interest. (ECF No. 301, 15) (citing *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994)). Gross negligence and willful misconduct are tort concepts, which are generally unrelated to breach of contract. *See Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S. Ct. 754, 755 (1903) ("If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach."). The R. & R. concluded that "[t]here is no logical reason for two sophisticated parties to treat intentional or grossly negligent breaches of contract differently than other breaches." (ECF Nos. 301, 17.)

RJA objects to this interpretation, arguing that it gives Plaintiff "no right to recover money damages for Landlord's breach—no matter how culpable Landlord's conduct may be." (*Id.* at 5 & 7.) The Court finds, however, that RJA's repeated emphasis of its position on this point[5]

---

[5] *See e.g.* (*Id.* at 1) (describing the R. & R. as concluding that the Lease "provides no right to damages due to the appalling condition of the Tower's elevators"); (*Id.* at 3) ("The Report's construction of the Lease . . . leads to an absurd and plainly erroneous result, namely, that Raymond James has no remedy in damages for breach, irrespective

oversimplifies the R. & R.'s conclusion and pulls the Magistrate Judge's interpretation out of context, beyond the facts that were presented in the complaint.

i.    *RJA's Hybrid Interpretation*

RJA's claim for money damages through the alternative remedy theory discussed above, relies on what amounts to a hybrid interpretation of the traditional tort and breach of contract concepts identified by the R. & R.  In response to the Magistrate Judge's finding that no logical reason exists for sophisticated parties to agree to this type of culpability-based contract provision, RJA argues that sophisticated parties use heightened standards of culpability, such as gross negligence, to govern their contracts rather than relying solely on strict liability. (ECF No. 310, 9.) RJA claims, as one example, that these culpability standards are useful in long-term contracts involving performance obligations because they prevent either party from suing for inadvertent breaches. (*Id*.)

It is unclear to what extent the R. & R. denies the existence of this hybrid method generally, because the concept was not fully presented until RJA filed its objections. The Court finds that whether the Magistrate Judge acknowledged the existence of this hybrid model has no bearing on the Motion now under consideration because RJA has not shown that it exists or has otherwise been recognized in Tennessee. For support, RJA cites cases from Missouri, California, and New York but offers only one from Tennessee, which states that under principles of agency law, an agent is not entitled to earn prior commission if it is found that he willfully breached the purchase contract. (ECF No. 310, 9); *Williams v. JE&T, Inc*., 1991 WL 149732, at *1 (Tenn. Ct. App. Aug. 9, 1991) (citing Restatement of Agency 2nd § 456). None of these cases assist the Court with the

---

of the level of culpability of Landlord's conduct."); (*Id.* at 5) ("The Report, however, effectively reads the parties' culpability requirement out of the Lease—and with it, Raymond James's corresponding right to money damages.").

interpretation issue at hand. In addition to its apparent lack of existence in Tennessee, both the R. & R. and Landlord provide other persuasive reasons, to be discussed below, for why RJA's hybrid interpretation should not be followed in this instance. Simply put, the Court does not find evidence that culpability standards for breach are enforceable in Tennessee, and even if they are enforceable, the Court does not find, based on its plain reading of the Lease, that the parties in this case intended to be bound by such an agreement.

In *Copeland*, the case relied on by the R. &. R. for its application of the carveout principle, the Tennessee Supreme Court held that parties may contract away their tort liability but in order to do so, the exculpatory language must be "clear, unambiguous, and unmistakable," i.e., "so clear and understandable that an ordinary and knowledgeable person will know what he or she is contracting away." *Copeland*, 565 S.W.3d at 273-74. As part of its objection, RJA criticizes the R. &. R for "read[ing] the parties' culpability requirement out of the Lease." (ECF No. 310, 6.) Far from ignoring the parties' culpability requirements, the R. & R. recognized that blending the general legal principles of tort liability and breach of contract into the hybrid model, as advocated by RJA, would be such a "major deviation from ordinary contract principles" that it is implausible the parties would have expressed it "in this roundabout fashion." (ECF No. 301, 16.) The Court agrees, particularly in light of *Copeland*, which held that a contract must be unambiguous in its language if the parties wish to stray from general principles and public policies of tort liability. *Copeland*, 565 S.W.3d at 273-74.

Section 11(e) protects Landlord from liability for direct or indirect damages to Tenant caused by Landlord's "failure to furnish or delay in furnishing" any required service "except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord." (Lease § 11(e)). As will be discussed below, this provision does not provide language absolving Landlord

of all liability for gross negligence or willful misconduct. Such an interpretation is unwarranted. Despite RJA's argument to the contrary, this is clearly not what the R. & R. concluded, nor how the Court interprets the Lease.

### ii.   *Interpreting the Negligence Clause as a Liability Carveout*

Declining to follow RJA's hybrid interpretation of the negligence clause, the Court now considers how the R. & R.'s liability carveout interpretation is able to withstand RJA's contention that the R. & R.'s interpretation of the Lease gives RJA "no remedy in damages for breach, irrespective of the level of culpability of Landlord's conduct." (ECF No. 310, 3.) The Court disagrees with this characterization of the Magistrate Judge's findings. More accurately, the R. & R. recognizes that the Lease prevents Landlord from committing intentional torts with impunity, while still considering the "painstakingly detailed" remedies that are provided by the Lease and available to RJA. (ECF No. 301, 17.)

The implications of the Court's reliance on the specific-over-general rule in its interpretation of the Lease, now come into full force. RJA may only recover against Landlord for its failure to provide maintenance or services under Sections 10 and 11, by using either of the two remedies found in Sections 11(e) and 11(f). Specifically, RJA must show a loss of Essential Service or a Critical Failure caused by Landlord's acts or omissions in order to receive rent abatement or self-help reimbursement. There is no alternative path RJA can use to recover money damages for Landlord's breach of the contract. However, this does not mean that the negligence clause is meaningless, or that Landlord can escape liability for its gross negligence or willful misconduct. On the contrary, a plain reading of the provision shows that, despite its language exculpating Landlord from liability for damages caused by certain maintenance and service failures, the

negligence clause explicitly protects RJA from Landlord's tortious conduct, serving its purpose as a liability carveout.

The R. & R. explains this further by providing a hypothetical scenario to demonstrate why interpreting the negligence clause as anything other than a liability carveout—such as a culpability standard to regulate conduct under the Lease, as argued by RJA—is inconsistent with the specific remedies and associated notice requirements enumerated in Section 11. The R. & R. explains as follows:

> The contract's self-help remedy requires Raymond James to provide 50 North notice of a critical failure before attempting to fix the problem itself. Presumably, [according to RJA's interpretation,] after providing such notice, if 50 North failed to cure the critical failure, Raymond James would have a strong argument that 50 North was intentionally, or grossly negligently [sic], breaching the agreement. If Raymond James could then bring a breach of contract claim against 50 North for money damages, the self-help remedy would short circuit midway through and would be rendered meaningless.

(ECF No. 301, 17.) As this example shows, the rent abatement and self-help remedies in Section 11, which clearly limit RJA's recovery, would be entirely avoidable and thus, meaningless, if RJA was permitted to obtain money damages by showing that Landlord either willfully or negligently failed to provide agreed-to maintenance and services. Recognizing this third path to recovery would create inconsistent results, enabling RJA to recover money damages for conduct the Lease explicitly states can only be remedied through rent abatement or self-help after showing a loss of Essential Services or a Critical failure. These are detailed thresholds, which, as the R. & R. found, plainly demonstrate the parties' intent to make damages less accessible. (ECF No. 301, 17.) RJA argues for an interpretation that usurps these requirements. The Court declines to reach such a conclusion.

Instead, the Court finds that the interpretation provided by the R. & R. harmonizes the requirements and protections placed on both parties by Section 11; Landlord's general impunity is

16

limited both by the two remedies available to RJA, and by the prohibition against Landlord's gross negligence and willful misconduct. *See Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011) ("All provisions of [a] contract should be construed in harmony with each other to promote consistency and avoid repugnancy among the various contract provisions."). In other words, Landlord is immune from liability for maintenance or service failures unless RJA shows that it suffered loss of an Essential Service or Critical Failure and is thus, entitled to damages through the two available remedies of rent abatement and self-help.

The Lease also provides RJA the ability to recover money damages in tort if Landlord's gross negligence or willful misconduct causes a loss or delay of promised services. (Lease § 11(e)). In this way only, the Lease technically provides an additional path to recover damages against Landlord apart from rent abatement and self-help.[6] Although this means of recovery, protecting against Landlords' intentional torts, is not the remedy RJA imagines in its pleadings, the Court finds that it is necessary to directly acknowledge here in order to answer RJA's objections that, under the R. & R.'s interpretation, Landlord is immune from all liability regardless of conduct. As explained above, the negligence clause is not meaningless, but it does not give RJA an avenue to recover money damages for Landlord's 'sufficiently culpable' breach of contract.

RJA objects to this analysis with a hypothetical of its own. What happens, RJA posits, when Landlord is providing Essential Services—i.e., at least one elevator is working—and there has not been a Critical Failure, that is, RJA's use of its leased premises has not be materially or adversely impaired for over two business days? (ECF No. 310, 12.) RJA argues that under those circumstances, according to the Magistrate Judge's reading of the Lease, Landlord could let the

---

[6] The R. & R. did not explicitly identify damages caused by Landlord's intentional torts as an available means of recovery under the lease, but the Court finds that this conclusion logically follows from the Magistrate Judge's recognition of the negligence clause as a liability carveout. (ECF No. 301, 15-16.)

building deteriorate below the agreed-to standards and RJA would be left with no recourse. (*Id.* at 13.) The Court disagrees, however, because the maintenance and service provisions are much broader than RJA admits. In this example, RJA is concerned that the building could fall into disrepair, but Landlord would not be liable as long as a single elevator is kept operational. This overlooks the numerous other maintenance and service requirements the Lease places on Landlord to, among other things, "make improvements, repairs or replacements as may be necessary to maintain the Building Systems[,] . . . the exterior and structural portions of the Building[,] . . . and the Common Areas" (Lease § 10), as well as "furnish Tenant" services including, but not limited to the following: cleaning and janitorial service, water, electricity, elevator service, light and ballast replacements, HVAC service, and security services. (Lease § 11(a)). Just as Landlord's failure to provide, or its delay in providing elevator service can be cause for RJA's recovery, so too can Landlord's failure to maintain the building or provide these "foregoing services" as required by the Lease. (Lease § 11(e)). Therefore, if RJA were facing such circumstances, it could recover against Landlord through the same two remedies, rent abatement and self-help, that are now available to address its current allegations of inadequate elevator service. The R. & R.'s interpretation should not be discarded on this basis.

Two final objections by RJA need to be addressed.  First, RJA contends that self-help is a remedy "fraught with risk" and thus, the Court should interpret the Lease as giving Tenant the *option* to pursue self-help but should not construe the self-help remedy as a "meaningful alternative in response to a major breach." (ECF No. 310, 12). As discussed in the preceding paragraph, the Lease terms encompass more than RJA acknowledges. In the event of Landlord's breach, the Lease gives RJA two optional remedies of rent abatement and self-help, through which it can pursue

recovery. Whether RJA now considers these options unappealing is irrelevant. *Wilson v. Scott*, 672 S.W.2d at 786. The Court declines to factor RJA's risk tolerance into its interpretation of the Lease.

Second, RJA argues that Section 25 of the Lease contains an exculpatory clause and a liability carveout that renders the carveout identified by the R. &. R in Section 11(e) redundant. (ECF No. 310, 8.) Section 25 states in relevant part:

> <u>Waiver of Claims</u>. Except for the willful misconduct or gross negligence of Landlord, its employees, agents or contractors, Landlord shall not be liable to Tenant for damages to person or property caused by defects in the HVAC, electric, plumbing, elevator or other apparatus or systems, or by water discharge from sprinkler systems …

(Lease § 25). As RJA points out, the Court should not interpret the Lease "in a way that renders a provision superfluous." *Lovett v. Cole*, 584 S.W.3d 840, 861 (Tenn. Ct. App. 2019) (citing *Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC*, 610 F. App'x 464, 468 (6th Cir. 2015)). However, the Court does not find that the R. & R.'s interpretation of Section 11(e) does that to Section 25 of the Lease. The primary reason is that the two Sections provide an exculpatory clause and liability carveout for two different things. Namely, the carveout in Section 11(e) pertains to disruptions in service caused by Landlord's gross negligence or willful misconduct, whereas Section 25 applies to tort liability arising from "defects" in the elevator system, HVAC system, electrical system, etc. (Lease § 25). Thus, the R. & R.'s interpretation of Section 11(e) does not render Section 25 unnecessary or superfluous.

In summary, the Court adopts the R. & R.'s interpretation and conclusion that RJA cannot prevail in its claim for damages against Landlord for lack of maintenance and service to the elevators, nor in its claims for damages caused by other building issues such as building security and upkeep of the building's common areas. The R. & R. found, and RJA did not object, that these

19

other alleged building issues, except for the broken spire,[7] are governed by the Lease's service provisions and thus, RJA cannot bring a claim for damages based on them. (ECF No. 301, 18.) The Court does not find that this interpretation renders the culpability standards placed on Landlord meaningless, as RJA suggests, nor, in other words, does it bar RJA from recovering damages caused by Landlord's gross negligence or willful misconduct, under different facts. However, under the circumstances described in the complaint, RJA is not entitled to recover damages for Landlord's breach of contract because it did not claim a loss of Essential Services or a Critical Failure. These are threshold standards, clearly articulated in Section 11, that must be met for RJA to receive damages in the form of rent abatement or self-help—the only two remedies available to RJA based on its complaint. Recovering money damages beyond rent abatement and self-help for Landlord's gross negligence or willful misconduct, is only possible if RJA had shown that Landlord's tortious conduct caused damage not otherwise covered by Sections 10 and 11 of the Lease. For reasons that will be discussed in Section III below, the Court does not find that RJA properly alleged that Landlord committed any intentional torts, which forecloses RJA's claim for money damages on that basis. The Court, therefore, adopts the R. & R.'s conclusion that RJA is not entitled to damages for breach of contract, or money damages caused by Landlord's allegedly culpable conduct.

## II.    Declaratory Judgment Claims

RJA seeks three declarations from this Court: 1) a declaration that Landlord is required to modernize its elevators; 2) a declaration that RJA may abate rent under the Lease without penalty;

---

[7] RJA did not object to the R. & R.'s conclusion that, although the service provision and the exculpatory clause in Section 11 do not govern RJA's claim against Landlord for its failure to repair a spire on the building's exterior, the claim should still be dismissed because RJA admits that it did not provide Landlord written notice and an opportunity to fix the damaged spire before filing suit, as required by the Lease. (ECF No. 301, 18-19). The Court agrees and, in the absence of any objection, adopts the recommendation to dismiss this claim as well.

and 3) a declaration that RJA may exercise its early termination option under the Lease without paying the Option Fee to Landlord. (ECF No. 41:60-70.) The R. & R. concludes that RJA is not entitled to the second two declarations based strictly on the Magistrate Judge's reading of the Lease. (ECF No. 301, 22.)

The Court first considers the Magistrate Judge's recommendation to dismiss RJA's request for a declaration that RJA is entitled to abate rent without penalty. RJA objects by reiterating its previous argument that the Lease, particularly Section 11(e), provides a "menu of potential remedies for Landlord's failure to deliver promised services." (ECF No 310, 20.) Notably, RJA highlights the following language in the first sentence of Section 11(e): "nor shall any Rent be abated . . . except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord." (*Id.*) (quoting Lease § 11(e)). To RJA, this sentence provides an alternative way to abate rent under the Lease, in addition to the rent abatement remedy available through a failure of Essential Services. (*Id.*) As pointed out by Landlord however, this argument relies on an omission of the parenthetical phrase found in the first sentence of Section 11(e) (ECF No. 317, 19), which, once more in relevant part reads: "Landlord shall not be liable for any damage directly or indirectly resulting from, nor shall any Rent be abated (*except as otherwise provided below*) . . . except when such service or delay is caused by the gross negligence or willfulness conduct of Landlord." (Lease § 11(e)) (emphasis added). In context, the phrase "except as otherwise provided below" clearly signals that any entitlement to rent abatement is governed by subsequent sentences in Section 11, which the Court determined above contains a detailed explanation for when rent abatement is permitted and how it is to be calculated. Having already found that RJA is not entitled to rent abatement through the explicit remedy in § 11(e) or entitled

to money damages through its alternative theory of Landlord's culpability, the Court adopts the R. & R.'s recommendation to deny this request for declaratory judgment.

Next, the R. & R. concludes that RJA is not entitled to exercise its early termination option under the Lease without paying the required fee. (ECF No. 301, 23.) RJA objects by arguing that the "Option Fee," imposed on Tenant for leaving the Lease early, is considered "Rent" under Section 11(c). (ECF No. 310, 22.) By that logic, RJA contents that because it is entitled to abate rent and because rent includes the Option Fee, the Court should declare RJA exempt from paying the Option Fee. (*Id*.) The Court finds, however, that the "Option Fee" falling under the Lease's definition of rent, and thus being included with rent abatement, does not change the fact that RJA is not entitled to rent abatement in the first place.

RJA also asserts that it offends notions of fair play and justice to allow Landlord to obtain the substantial Options Fee after "forc[ing] [RJA] out." (*Id*.) However, the Court is unpersuaded because RJA has not alleged facts to support that Landlord forced it out of the building early, thus triggering the Option Fee. RJA's primary allegation to that effect is that Landlord "made it clear that the modernization of the elevators will only occur if [RJA] is willing to renegotiate the Lease." (ECF No. 41-1:32). While RJA may dislike this method of negotiating, there is nothing unduly forceful about it, particularly considering the Court's finding that RJA has not stated a claim against Landlord that it is entitled to elevator modernization under the Lease. Further, the Lease clearly states, "In no event shall Tenant's remedies for an alleged or actual failure of Landlord to perform its obligations under this Lease include the termination of this Lease." (Lease § 30). The Court cannot declare that RJA is entitled to rights the Lease does not provide, such as the right to terminate the Lease and escape liability for the Option Fee. The Court adopts the Magistrate Judge's recommendation to deny this request.

Lastly, the R. & R. considers RJA's request for a declaration that Landlord must modernize the building. (ECF No. 301, 23.) Even if Landlord breached its obligation under the Lease to maintain the elevators, the R. & R. concluded that RJA's only recourse is through the self-help remedy, which does not require judicial intervention. (*Id*.) The Court finds that such a declaration would be premature in this instance because RJA has not sought the self-help remedy. Therefore, the Court adopts the R. & R.'s recommendation to deny this request.

## III.    Tort Claim

In Count III of its complaint, RJA alleges that Landlord owed it a duty to provide adequate elevator service and breached this duty by being grossly negligent in its failure to provide such service. (ECF No. 41:71-76.) As a result, RJA claims that it incurred damages for which Landlord is liable in tort. (*Id*.) The R. & R. declined to follow Landlord's specific arguments for why RJA's tort claim should be dismissed, but, for a different reason, ultimately agreed with Landlord's position that RJA has not stated a gross negligence tort claim. (ECF No. 301, 24 n.6.) To reach this conclusion, the Magistrate Judge considered whether RJA had pled the existence of duty—the first element of RJA's gross negligence claim. (*Id*.) Having found, under Tennessee law, that there is no duty to refrain from breaching a contract, the R. & R. recommends dismissing RJA's claim. (*Id*. at 28.) *See Hannan v. Alltel Publ'g Co.,* 270 S.W.3d 1, 10 n.11 (Tenn. 2008) ("[W]e have never recognized a tort of 'negligent breach of contract.'"), *overruled on other grounds by Rye v. Women's Care Ctr. of Memphis, MPLLC,* 477 S.W.3d 235 (Tenn. 2015).

RJA urges the Court to reject the Magistrate Judge's conclusion because it was reached *sua sponte*. (ECF No. 310, 18-20.) However, the R. & R. reached this conclusion after determining, as discussed at length above, that RJA is not entitled to money damages under Section 11(e) for its claim of gross negligence and willful misconduct. The R. & R. found, and now this Court finds,

that the negligence provision is a liability carveout, permitting RJA to recover damages for Landlord's intentional torts, but not for breaching the Lease in a "sufficiently culpable" way.  Here again, in Count III, that is precisely what RJA is claiming—that Landlord breached the Lease in a grossly negligent manner. By conducting an analysis of Landlord's duty to RJA, the R. & R. provided additional rationale to support a conclusion it had already reached, and which has already been adopted by the Court based on Landlord's earlier arguments that, under these circumstances, RJA's ability to recover is limited to the two remedies provided by the Lease. *See* (ECF No. 317, 11) (Landlord arguing that the Magistrate Judge's analysis of whether RJA claimed its opponent had a tort duty not to breach the contract was "part and parcel" of the argument already advanced by Landlord that RJA has not stated a claim for damages and is limited to recover through the two available remedies).

Nonetheless, RJA's *sua sponte* objection is specifically aimed at the "duty issue" contemplated by the R. & R. (ECF No. 310, 19.) Prior to this objection, the Magistrate Judge acknowledged that "[a]lthough [Landlord] did not raise the issue of whether [RJA] had ple[d] the existence of a duty[,] . . . the lack of duty is plain and obvious and [] the 'just, speedy, and inexpensive determination' of this action is best achieved by addressing it here." (ECF No. 301, 24 n.6.)  Although the Court finds that this conclusion could have been reached, and RJA's tort claim dismissed, through its interpretation and application of Section 11(e), RJA's pointed critique of the R. & R.'s *sua sponte* analysis of the "duty issue" warrants the Court's consideration.

RJA cites *Guinn Bros., LLC v. Jones Bros., Inc. of Tenn.*, 287 F. App'x 298, 301 (5th Cir. 2008) for the principle that a district court should "generally" refrain from granting summary judgment on *sua sponte* grounds. (ECF No. 310, 18.) "Before dismissing a complaint *sua sponte*, even if the dismissal is without prejudice, the court must give notice to the plaintiff." *Chase Bank*

*USA, N.A. v. City of Cleveland*, 695 F.3d 548, 558 (6th Cir. 2012) (reversing the district court's *sua sponte* dismissal of a claim for injunctive relief, the sufficiency of which had not been brief by either party, because no motion to dismiss had been filed). One way the court can provide notice of its intent to perform a *sua sponte* dismissal is to give the party a chance to amend its complaint. *Patton v. Scruggs*, 765 F.2d 146 (6th Cir. 1985). There are, however, times when *sua sponte* dismissals are appropriate without providing notice. *See e.g., Leal v. United States*, 805 F.2d 1035 (6th Cir. 1986) (affirming the adoption of a magistrate judge's *sua sponte* recommendation to dismiss a claim because it was "so lacking in merit as to not require further argument"); *Marksberry v. Transportation Cabinet & Dep't of Highways of Kentucky, Sec'y*, 181 F.3d 102 (6th Cir. 1999) (upholding the dismissal of a complaint for failure to state a claim based on a *sua sponte* recommendation by the magistrate judge); *Hoover v. Holston Valley Cmty. Hosp.*, 545 F. Supp. 8, 13 (E.D. Tenn. 1981) (adopting the magistrate judge's recommendation to dismiss plaintiff's claim *sua sponte* for his failure to state a claim upon which relief can be granted*); Suarez Corp. v. CBS, Inc.*, No. 1:92CV0045, 1995 WL 907586, at *6 (N.D. Ohio July 18, 1995), aff'd, 100 F.3d 957 (6th Cir. 1996) (finding it within the court's "responsibility and obligation to dismiss the amended complaint *sua sponte*") (quoting *Caruth v. Pinkney*, 683 F.2d 1044 (7th Cir. 1982) ("The proper administration of justice requires that a trial judge have substantial control over the proceedings before him.")).

Here, as noted, there is no duty in Tennessee to refrain from breaching a contract. *Hannan*, 270 S.W.3d 1, at n.11. "A contract may be negligently or fraudulently breached and the cause of action remain in contract rather than in tort." *Mid-South Milling Co. v. Loret Farms, Inc*., 521 S.W.2d 586, 588 (Tenn. 1975). "Courts should be particularly skeptical of business plaintiffs who—having negotiated an elaborate contract or having signed a form when they wish they had not—claim to

have a right in tort whether the tort theory is negligent misrepresentation, strict tort, or negligence." *Trinity Indus. v. McKinnon Bridge Co.*, 77 S.W.3d 159, 172 (Tenn. Ct. App. 2001). Whether or not a culpability standard can exist within the terms of a contract (an issue not decided by this Court), the Lease makes clear that nothing like that exists here. Although *sua sponte* dismissals are generally disfavored, the Court finds that RJA's gross negligence claim is so lacking in merit that such a dismissal is appropriate. *Leal* 805 F.2d 103. The Court notes that RJA was on notice of the Magistrate Judge's *sua sponte* determination of this duty issue and had an opportunity to argue against it by filing objections to the R. & R. before the Court ruled on Landlord's dispositive motion. Even if the Court gave RJA more explicit notice of its intended dismissal of this claim, by providing opportunity for RJA to amend its complaint, RJA's claim of gross negligence against Landlord would still be dismissed because RJA has not alleged that it is entitled to recover beyond what the Lease's remedies provide.

To the extent RJA insists that its intentional tort claim stands apart from its allegations of contract breach, and should thus withstand dismissal (ECF No. 310, 19-20), the Court is unpersuaded. The complaint exclusively alleges that Landlord failed to fulfill its duty "to provide elevator service" and "to maintain and operate the elevator system" in a safe and reliable manner, and that RJA suffered damages as a result. (ECF No. 41-1:72-75.) The tortious conduct RJA alleges here and throughout the complaint, describes violations of the Lease, not intentional torts committed by Landlord. In other words, RJA has not properly asserted a claim that Landlord violated a duty that it had to RJA apart from what obligations already existed under the Lease. Landlord, of course, remains obligated to take reasonable care to protect others from reasonably foreseeable physical harm and property damage. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). But like the R. & R. found, RJA's alleged injuries are simply not the kind

that negligence law is designed to prevent. *See Thomas & Assocs., Inc. v. Metro. Gov't of Nashville*, No. M2001-00757-COA-R3CV, 2003 WL 21302974, at *6 (Tenn. Ct. App. June 6, 2003) ("Tort law, including the law of negligence, is designed to protect all persons generally from the risk of physical or, in some cases, emotional harm to their persons or property."). In its objections, RJA asserts that Landlord "engaged in intentional conduct designed to injure [RJA]" but cites paragraphs in the complaint which describe how Landlord intentionally breached the Lease by not making necessary improvements and doing so to save money. (ECF 310, 19) (citing ECF No. 41-1:44 & 55.) RJA's complaint describes the ramifications of a business decision governed by a formal agreement, not a landlord willfully forcing a tenant out of its building. There are no allegations that Landlord, for example, intentionally disrupted elevator service, or did anything to overlook a reasonably foreseeable risk to RJA, its employees, or guests.  Instead, everything RJA described are Lease violations, not intentional torts.

Notwithstanding the R. & R.'s *sua sponte* finding and recommendation on the issue of Landlord's duty, "this Court is not 'constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely . . . .'" *Jimmerson v. Wilson & Assocs., PLLC*, No. 15-1020, 2015 WL 1888636, at *3 (W.D. Tenn. Apr. 24, 2015) (quoting *In re Livent, Inc. Noteholders Secs. Litig.,* 151 F.Supp.2d 371, 405 (S.D.N.Y. 2001)).  "[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Creelgroup, Inc. v. NGS Am., Inc.,* 518 F. App'x 343, 347 (6th Cir. 2013).  Here, the Lease contradicts and therefore, trumps RJA's allegation that it is entitled to damages caused by Landlord's gross negligence. After having the opportunity to object and correct these contradictions identified by the R. & R., RJA merely points to the conduct surrounding the breach

of contract claim and asserts that Landlord should be held liable in tort. "[W]here a claim for negligence is based only on breach of contract obligations, and there are no alleged extra-contractual duties, the first element of the tort claim fails." *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 763 (M.D. Tenn. 2019) (internal quotations and citation omitted). Thus, RJA has failed to state a cognizable claim for gross negligence. The R. & R.'s conclusion should be adopted and Count III of the complaint dismissed.

## IV.    Injunctive Relief Claims

The R. & R. also recommends dismissing RJA's claim for specific performance under the Lease, seeking to enjoin Landlord to modernize the elevators. (ECF No. 301, 19.) Specific performance, however, is not available when there is an adequate remedy at law. *See Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979) (holding that plaintiffs must be limited to damages under the contract and cannot receive specific performance unless they show a lack of an adequate remedy at law). As the R. & R. concluded, and the Court agrees, granting RJA's request for specific performance would effectively rewrite the contract, which is an adequate remedy at law. (ECF No. 301, 19-20.) For this reason, and in the absence of any meaningful objection from RJA on this conclusion, the Magistrate Judge's recommendation should be adopted.

## CONCLUSION

Upon *de novo* review and based on the unambiguous language of the Lease, the Court hereby **ADOPTS** the Magistrate Judge's Report and Recommendation and **GRANTS** the Defendant Landlord's Motion to Dismiss Plaintiff's complaint in its entirety. The Court will

consider RJA's Motion for Leave to File a Second Amended Complaint (ECF No. 324) in a separate order.[8]

      **IT IS SO ORDERED** this 30th day of July 2020.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
United States District Judge

---

[8] Despite RJA's objection (ECF No. 310, 24), the Court does not find that the R. & R. provided a formal recommendation to deny RJA's request to amend its complaint. RJA did not seek leave to amend its complaint for a second time until May 15, 2020 (ECF No. 324), almost three months after the Magistrate Judge entered the R. & R.