**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **RAYMOND JAMES & ASSOCIATES, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:18-cv-02104-JTF-tmp** |
| | ) | |
| **50 NORTH FRONT ST. TN, LLC,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

**RAYMOND JAMES' OBJECTIONS TO THE MAGISTRATE'S
REPORT AND RECOMMENDATION**

Plaintiff Raymond James & Associates, Inc. ("Raymond James"), pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure and Local Rule 72.1(g)(2), respectfully submits the following objections to the Magistrate Judge's July 30, 2021 Report and Recommendation (the "R&R") (ECF 375).  As explained herein[1], the Court should reject most of the R&R's conclusions and fully grant Raymond James' Motion For Leave To File A Second Amended Complaint (the proposed Second Amended Complaint hereinafter the "SAC") (ECF 324-2). Raymond James respectfully requests a hearing on its Objections pursuant to Local Rule 7.2(d).

---

[1] For the sake of brevity, Raymond James will not reiterate each additional argument it has previously made regarding the sufficiency of the current SAC and of its prior First Amended Complaint, and instead incorporates these arguments herein by reference and for purposes of any future appeal. *See* ECFs 301, 310 and 321. Further, none of the positions Raymond James' raises below should be construed as a waiver of any prior arguments.

## LEGAL STANDARD

Rule 15(a)(2) of the Federal Rules of Civil Procedure permits a party to amend its complaint with leave of the Court after a responsive pleading has been filed.  *See* Fed. R. Civ. P. 15(a). "Such leave [should] be freely granted when justice so requires."  *Kennedy v. City of Zanesville*, 2005 WL 8161824, at *1 (S.D. Ohio Dec. 19, 2005) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (granting leave to file a fourth amended complaint).  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Id.*

While the R&R reviewed the several grounds that could warrant denial of a motion to amend, the only basis the R&R found here to justify its recommended partial denial of Raymond James' Motion was "futility". *See* ECF 375 at PageID 7236, 7250-51 and 7259. Raymond James respectfully states that none of its proposed causes of action are futile, and that the SAC should therefore be allowed in its entirety.

## ARGUMENT

### 1.  THE COURT FUNDAMENTALLY MISINTERPRETED THE LEASE.

#### A. The Negotiating History Raymond James included in the Proposed SAC Does not Constitute Inadmissible Parol Evidence.

The proposed SAC provides details regarding the negotiations that resulted in the Lease in question between Raymond James and its then landlord, Parkway. (*See* ECF 324-2, at PageID 6-11.) This negotiation history shows, among other things, that Raymond James would not have renewed its lease if Parkway had not agreed to maintain and operate the building—including its elevators—pursuant to the standards set forth therein. (*Id.* at PageID 8-9.) The Magistrate rejected

any use of the parties' negotiating history as inadmissible parol evidence. (*See* ECF 375, at PageID 7239.) However, even when a contract is both integrated and unambiguous, parol evidence is admissible to provide a court with information regarding the *context* that led to the contract. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 698 (Tenn. 2019) (holding that "in interpreting a fully integrated contract, extrinsic evidence may be used to put the written terms of the contract into context"). Further, parol evidence is also admissible to determine if an ambiguity exists in the first place. *See URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018) (cited by *Individual Healthcare Specialists, Inc* and stating "whether a court is considering if an ambiguity exists or construing the terms of an unambiguous contract, surrounding facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else."). Such evidence here does not directly contradict or supplement the Lease as written and the parol evidence contained in the proposed SAC should thus be considered for this reason alone.

Moreover, parol evidence is also obviously admissible when the contract is ambiguous.[2] While the Court has previously found no ambiguity, the following discussion makes it clear that the Lease provision upon which the Court's analysis turns—Section 11(e)—is subject to a wholly different interpretation, one that allows Raymond James to recover damages. A contract provision which is subject to two or more interpretations is by definition ambiguous. *See Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (stating that contractual language is ambiguous "when it is of uncertain meaning and may fairly be understood in more ways than one."); *see also*

---

[2] Even when a contract is fully integrated, parol evidence can be evaluated to resolve an ambiguity. *Mapco Express, Inc. v. Interstate Entertainment, Inc*., 2011 WL 13253866, at *3 (M.D. Tenn. 2011) (stating a "merger clause does not preclude parol evidence when a contract provision is ambiguous and parol evidence is available to aid in resolving the ambiguity.").

*Campora v. Ford*, 124 S.W.3d 624, 628 (Tenn. Ct. App. 2003) (stating "an ambiguity occurs where a word or phrase is capable of more than one meaning when viewed in the context of the entire agreement by an objective and reasonable person").

Thus, to the extent that the Court does not revise its view to accept the interpretation that recognizes a right to damages (as discussed below), Raymond James respectfully submits that the Court should, at a minimum, acknowledge the presence of two reasonable interpretations that are in direct conflict, and the resulting need for the Court to have a fully developed record before this ambiguity can properly be resolved. Indeed, the law is clear that a motion to dismiss is not appropriate when the operative language is ambiguous and thus susceptible to an interpretation where dismissal would not be warranted. *Ross v. Kirkpatrick*, 2021 WL 533753, at \*5 (M.D. Tenn. 2021) (stating that "the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim" and that any contractual ambiguities should be construed in favor of the non-moving party).

Given this ambiguity, Raymond James' claims for breach of the Lease in Count One of the SAC should, at a minimum, be permitted to go forward.

B. **A fresh analysis of the Lease demonstrates that Section 11(e) was not intended to function as an exculpatory clause, but instead gave Raymond James a limited right to damages for breach.**

There are compelling reasons why the Court should revisit—and alter—its view as to what the Lease allows regarding damages.[3] This question is directly before the Court because this

---

[3]  The Court may "reconsider, rescind, or modify an interlocutory order before entry of a final judgment" in order "to correct a clear error or prevent manifest injustice." *Tyler v. Taco Bell Corp.*, 2016 WL 3162145, at \*1 (W.D. Tenn. June 3, 2016).

mistaken interpretation undergirds the R&R and leads to its conclusion that amendment would be futile.

The Court has concluded that damages are unavailable as a remedy for breach—a conclusion that turns largely upon the Court's interpretation of Section 11(e) of the Lease. For the reasons discussed below, this interpretation cannot be squared with a proper reading of the Lease. Section 11(a) of the Lease requires Landlord to provide certain listed "services", which includes elevator services.[4] Section 11(e), in turn, addresses Raymond James' monetary remedies for Landlord's breach of Section 11(a).[5] It ostensibly lists *two monetary (2)* remedies for such a breach. Significantly, the first remedy so listed is "damages", which is found in the first sentence of Section 11(e).[6] While prohibiting damages *otherwise*, the plain language of this sentence permits damages for service failures/delays "caused by the gross negligence or willful misconduct of Landlord." The R&R—and this Court through its prior Order—however, have effectively

---

[4] Section 11(a) requires Landlord to provide "elevator service at the times and frequency reasonably required for normal business use of the Premises" and at "no less than the Current Standard." *See* Lease at Section 11, ECF 41-1, at PageID 384.

[5] The Court has previously concluded that the remedies set forth in Section 11 also apply to Landlord's breaches of its operation, maintenance, improvement, repair and replacement obligations found in Section 10. Raymond James still objects to this interpretation and specifically incorporates its prior briefing on this issue by reference, (*see e.g.* ECF 310 at PageID 3-13), but will not separately address this issue here.

[6] The first sentence of Section 11(e) of the Lease reads:

> Landlord shall not be liable for any damages directly or indirectly resulting from, nor shall any Rent be abated (except as otherwise provided below) by reason of, the installation, use or interruption of use of any equipment in connection with furnishing any of the foregoing services, or failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord.

*See* Lease at § 11, ECF 41-1, at PageID 384.

interpreted this apparent remedy out of the Lease based upon the conclusion that this language is intended to exculpate Landlord for tort liability. Specifically, the Court previously held that the "tort-based language" in Section 11(e) "is a standard liability carveout, meant to limit Landlord's impunity under the Lease's exculpatory clause." (ECF 339 at PageID 6841). This conclusion, however, is erroneous for each of the following reasons:

> **i.** **The conclusion that the first sentence of Section 11(e) is intended to exculpate Landlord from tort liability (rather than provide a limited remedy for damages) ignores the fact that exculpation would be unnecessary given there is no generalized duty—and thus no liability in tort—to provide elevator services.**

In reaching the conclusion that the first sentence of Section 11(e) is an exculpatory clause, the R&R failed to ask two critical questions:

> 1) Why is such a clause necessary? and,

> 2) If Landlord has little or no exposure in tort, is an exculpatory clause actually what the parties intended the language to mean?

Section 11 involves Landlord's obligation to provide six different services, including elevator services, at specified levels. As the prior R&R found, there is no generalized duty to provide such services to the public and, as such, Landlord's failure to do so would not create tort liability for negligence. (*See* ECF 301, at PageID 6263.) *There is thus no need for an exculpatory clause that waives claims for negligence.* The courts should not assume that a nullity was the intention of the parties. Indeed, in analyzing a contract, courts should not accept non-sensical interpretations. *See e.g. FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 284-285 (7th Cir. 2002) (citing to *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527, (1989) (Scalia, J., concurring). ("people are

unlikely to make contracts …that they believe will have absurd consequences.").[7] A finding that the tort-based language at issue is part of a standard liability carveout is thus not supported by an analysis of the actual exposures involved. The Court's ruling that damages are not available under the Lease should thus be revised.

ii.     **The conclusion that the first sentence of Section 11(e) is intended to exculpate Landlord from tort liability (rather than provide a limited remedy for damages) ignores the fact that the language in question extends to remedies not available in tort.**

While the R&R has interpreted the first sentence of Section 11(e) as exculpating Landlord from liability in tort, one of the remedies this sentence lists not even available in tort—i.e. abatement of rent. The sentence in pertinent part states as follows,

> Landlord shall not be liable for any damages directly or indirectly resulting from, ***nor shall any Rent be abated*** (except as otherwise provided below) by reason of …failure to furnish or delay in furnishing any such service except when such failure or delay is caused by the gross negligence or willful misconduct of Landlord.

*See* ECF 41-1 at § 11(e), ECF 41-1, at PageID 386. The provision thus limits exposure for damages *and* for rent abatement. A tort litigant, however, cannot demand rent abatement as a remedy. The fact that this Section addresses a remedy that can exist only in a claim for *breach of contract* also compels the conclusion that the language at issue was not intended by the parties to exculpate Landlord for liability in tort. The Court's ruling that damages are not available under the Lease should thus be revised.

---

[7] Stated slightly differently, "interpretations which render the contract fair and reasonable are preferred to those which render the contract harsh or unreasonable to one party." Williston on Contracts § 32:11 (4th ed.)

     **iii.**    **In light of the fact that there is no liability in negligence for a failure to provide elevator *services*, the Court's interpretation of Section 11(e) does in fact make the Lease's explicit exculpation clause contained in Section 25 redundant.**

The Lease contains an explicit exculpatory clause that purports to limit Landlord's tort liability for the systems listed therein, including the elevator system. Found in Section 25 of the Lease, it provides in pertinent part as follows:

> 25. **<u>Waiver of Claims</u>**. Except for the willful misconduct or gross negligence of Landlord … Landlord shall not liable to Tenant for damage to person or property caused by defects in the HVAC, electrical, plumbing, elevator or other apparatus or systems …

(ECF 41-1 at § 25, PageID 392) Addressing this provision in its Order Granting Defendant's Motion to Dismiss, the Court turned aside the argument that treatment of Section 11(e) as an exculpatory clause has the effect of making Section 25 redundant. Specifically, the Court stated as follows,

> However, the Court does not find that the R. & R.'s interpretation of Section 11(e) does that to Section 25 of the Lease. The primary reason is that the two Sections provide an exculpatory clause and liability carveout for two different things. Namely, the carveout in Section 11(e) **pertains to disruptions in service** caused by Landlord's gross negligence or willful misconduct, whereas Section 25 applies to tort liability arising from "defects" in the elevator system, HVAC system, electrical system, etc. (Lease § 25). Thus, the R. & R.'s interpretation of Section 11(e) does not render Section 25 unnecessary or superfluous.

ECF 339 at PageID 6848 (emphasis added). Given the lack of any duty outside the Lease to provide the specified elevator services—which lack of duty in turn excludes the possibility of liability for simple negligence[8]—there is no reason to have two parallel exculpation clauses. The Court's

---

[8] *See* ECF 301, at PageID 6263.

interpretation—which leaves the parties with two provisions that unnecessarily address the same issue—thus does violate Tennessee's bedrock principle that contracts should be interpreted to avoid rendering any provision superfluous. *See e.g. Champion Hills Realty Holdings, LLC v. Wilmington Trust, N.A.*, 2017 WL 8727477, at *4 (W.D. Tenn. Oct. 18, 2017) (discussing this principle). This unnecessary creation of parallel exculpatory clauses is yet another indication that the Court's prior interpretation was incorrect and that the plain wording of Section 11(e) should instead be read to provide Raymond James with a limited remedy in damages. The Court's ruling that damages are not available under the Lease should thus be revised.

iv.   **The way in which the Lease allocates liability for breach in Section 11(e) is both legal and rational and, given that the parties' freedom to contract is well recognized in Tennessee, there is no basis for the parties' explicit agreement to be ignored.**

Finally, interpreting Section 11(e) to exculpate Landlord from tort liability—rather than to create liability for damages when the Landlord has acted intentionally or with gross negligence—overlooks the fact that in Tennessee, parties "have broad powers to order their own affairs by making legally enforceable promises." *Baugh v. Novak*, 340 S.W.3d 372, 382 (Tenn. 2011) (citing Restatement (Second) of Contracts 8 Intro. Note (1981) and stating that "[t]his form of private autonomy, 'premised on the ability of individuals to order their own affairs, and the desirability of allowing them to do so,' stands at the foundation of contract law."). This right of "freedom of contract" should be disturbed only when public policy demands, such as to "discourage undesirable conduct or if "enforcement of the promise may be an inappropriate use of the judicial process in carrying out an unsavory transaction." Restatement (Second) of Contracts 8 Intro. Note (1981). Neither of these grounds exist here. The fact that the parties to a commercial lease wanted to create liability for a breach of the Lease due to gross negligence or willful

misconduct is hardly the type of provision that violates public policy and therefore should not be disturbed. That Landlord may now want to disown this obligation is of no moment—"parties who have failed to prudently construct their business transactions" or otherwise properly order their affairs should not be "bailed out" by the court. *See* Williston on Contracts § 70:209 (4th ed.) cited by *Ellis v. Pauline S. Sprouse Residuary Trust*, 280 S.W.3d 806, 814 (Tenn. 2009).

Here, a plain reading of Section 11(e) shows that it preserves a right to damages when the stated breach was "caused by" Landlord's gross negligence or willful misconduct. There is no public policy reason why this provision should not be enforced. The Court's ruling that damages are not available under the Lease should thus be revised.

Given the four reasons cited above, Raymond James respectfully asks that the Court reverse its prior ruling, and either recognize that Raymond James has a right to damages under the Lease or, alternatively, that Section 11(e) is ambiguous in this regard, and that Raymond James must therefore be allowed to proceed with Count I of the SAC.

**2.   THE R&R'S CONCLUSION THAT RAYMOND JAMES' PROPOSED TORT CLAIMS ARE "FUTILE" IS INCORRECT SINCE IT BOTH OVERLOOKS THE COURT'S PRIOR GUIDANCE AND THE GENERAL DUTY RECOGNIZED IN TENNESSEE NOT TO INFLICT HARM WILLFULLY AND INTENTIONALLY UPON OTHERS.**

In finding that Raymond James failed to state a claim in tort, the R&R failed to take at least two things into account. First, the R&R overlooked the extended discussion of Landlord's potential tort liability found in this Court's Order Granting Motion to Dismiss. (*See generally* ECF 339). There, the Court specified some of the types of intentional conduct that *would* state a claim in tort, as follows,

> In its objections, RJA asserts that Landlord "engaged in intentional conduct designed to injure [RJA]" but cites paragraphs in the complaint which describe how Landlord intentionally breached the Lease by not making necessary improvements and doing so to save money. (ECF 310, 19) (citing ECF No. 41-1:44 & 55.) RJA's complaint describes the ramifications of a business decision governed by a formal agreement, **not a landlord willfully forcing a tenant out of its building**. **There are no allegations that Landlord,** for example, **intentionally disrupted elevator service, or did anything to overlook a reasonably foreseeable risk to RJA, its employees, or guests.** Instead, everything RJA described are Lease violations, not intentional torts.

*Id.* at PageID 6856 (emphasis added). While Raymond James filed its proposed SAC some 2.5 months before the Court issued this Order, it is striking how closely the Court's language mirrors what Raymond James pleaded. For example, Raymond James' proposed SAC alleges that Landlord did disrupt elevator service in order to force Raymond James from the Building, as follows:

- **Defendants intentionally made the situation** worse—by, for example, **turning certain elevators off rather** than getting them repaired—**in an effort to force Raymond James from the Tower and thereby collect the multi-million-dollar early termination Option Fee.** *See* SAC, ECF 324-2 at PageID 6447 (emphasis added).

- This newest injury—in combination with the increasing problems with the elevators, the deterioration of the Tower, and Defendants' duplicity and intransigence—**forced Raymond James to decide, reluctantly, to move.** It could no longer brook the un-ending danger to its employees and visitors, the undermining of employee morale, the drain on management, the unreliability of the facility and the interference with its operations, among other things. *See* SAC, ECF 324-2 at PageID 6476 (emphasis added).

- Mr. Sofer's half-hearted invitation to stay notwithstanding, **Defendants actually wanted Raymond James to leave.** Indeed, from their prospective, the timing was ideal, giving Defendants everything they could have desired. **Raymond James's forced departure would provide them with $6.2 million in cash,** the modernization—that for years they had denied was even needed—could be completed before Raymond James even left, and they would have a newly refurbished building to rent at higher rates to new tenants. *See* SAC, ECF 324-2 at PageID 6479 (emphasis added).

Raymond James also specifically alleged that Landlord intentionally/recklessly disregarded the "reasonably foreseeable risk" the malfunctioning elevators posed "**to RJA, its employees, or guests**."[9] Order on Motion to Dismiss, ECF 339 at PageID 6856.  None of these allegations are addressed in the R&R. Rather, it overlooks both the Court's prior instruction as to the types of conduct that would rightly state a claim, as well as the facts pled by Raymond James that comport with those very instructions. Raymond James thus respectfully submits that this was error, and that its proposed claims based upon defendants' intentional torts as set forth in its proposed Second Amended Complaint should be permitted to proceed.

The R&R also appears to have overlooked Raymond James' arguments regarding the new claim it seeks to assert for prima facie tort. As Raymond James highlighted in its Reply in Support of its Motion for Leave to Amend (ECF 356), it has properly pled a new claim for prima facie tort. Stemming from the principle that "[a]t common law there was a cause of action whenever one person did damage to another willfully and intentionally, and without just cause or excuse", *Large v. Dick*, 343 S.W.2d 693, 667 (Tenn. 1960), Tennessee has long recognized this cause of action, whether by name or simply in practice. *See Hutton v. Waters*, 179 S.W. 134, 135 (Tenn. 1915) ("In short, if an act be hurtful to another, intentional, and without legal justification, it is malicious in the true legal sense . . . [and] therefore unlawful, and is actionable."); *accord Schmitz v.*

---

[9] *See generally* the SAC, ECF 324-2 at ¶¶ 41-73. Some specific allegations of Landlord's knowledge of the foreseeable risk the elevators posed to the safety of Raymond James' employees and its ability to do conduct its business include: Landlord's receipt of dozens of reports about the elevators persistent problems with "mis-leveling" which causes a tripping hazard (*Id.*, at PageID 6459-60); ongoing employee injuries from such mis-leveling (*Id.*); Landlord's acknowledgement in an internal email that the elevator situation is getting "dangerous" (*Id.*, at 6461); Landlord's receipt of a warning in late 2016 from its elevator maintenance contractor that prolonged shutdowns should be expected because [t]hese **elevators have far outreached their effective life"** (*Id.*, 6466); Landlord's receipt of a warning in late 2017 from its elevator maintenance contractor that Landlord **"needed to modernize these elevators soon."** (*Id.* at PageID 6466); ever more serious elevator outages following these warnings (*Id.*, at PageID 6462-64).

*Smentowski*, 785 P.2d 726, 734 (N.M. 1990) (noting that prima facie tort "provides a remedy for plaintiffs who have been harmed by a defendant's intentional and malicious acts that fall outside of the rigid . . . tort categories"). Although each of these cases was cited in Raymond James' Reply, none were addressed in the R&R. S*ee* ECF 356 at PageID 7049-50.

The R&R also largely overlooked the intentional tort related allegations in Raymond James' proposed SAC, including that: a) Defendants had a duty not to intentionally harm Raymond James itself or its property (including its leasehold interest), *see* SAC, at ¶ 123-124; b) Defendants breached this duty by, inter alia, "intentionally reducing elevator service", *id.* at ¶ 128-129; and c) "Defendants' tortious conduct has in fact forced Raymond James out of the Tower early." *Id.*, at ¶ 130.[10]

Rather than focusing on Defendants' intentionally tortious conduct, the R&R instead focused largely on cases involving negligence, especially the heightened duty of care Landlord owed as a common carrier. (R&R, ECF 375 at PageID 7239-40). *See also Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646 (M.D. Tenn. 2018) (which dealt with allegations of negligent and grossly negligent conduct, not intentional conduct); *see also Thomas & Assocs. v. Metro Gov't of Nashville & Davidson Cty., No. M2001-00757-COA-R3-CV*, 2003 WL 21302974 (Tenn. Ct. App. June 6, 2003) (which dealt with allegations of negligence and notably, where the Court acknowledged there could be tort liability if the defendant's conduct implicated "wider principles of social responsibility"); *see also Calipari v. Powertel, Inc.*, 231 F. Supp. 2d 734 (W.D. Tenn. 2002)

---

[10] The proposed SAC contains additional examples of Defendants acting maliciously, in bad faith and with the very intention of harming Raymond James in its business or property, including Landlord attempting to extort favorable changes to the Lease in exchange for modernizing the elevator systems (SAC at ¶ 53-73); sending bogus bills to Raymond James for attorney's fees (SAC at ¶ 74); and sending bogus bills for the alleged excess use of storage space years after the fact and using Raymond James' refusal to pay as a basis for declaring a Monetary Default and thereby demand millions of dollars in bogus penalties. (*Id.*).

(where while the case involved a claim for prima facie tort, the plaintiff had not even identified "exactly what tort theory is applicable to this allegation"); *see also Mid–South Milling Co., Inc. v. Loret Farms, Inc.*, 521 S.W.2d 586 (Tenn. 1975) (noting the potential existence of claims *in tort* due to the negligent performance *of the contract)*.

Having plead the facts necessary for a claim of prima facie tort as to the Defendants, Raymond James respectfully requests that its claim as set forth in Count Four of the SAC be allowed to proceed.

### 3. THE R&R'S CONCLUSION THAT RAYMOND JAMES' PROPOSED CLAIMS FOR DECLARATORY RELIEF ARE "FUTILE" IS INCORRECT SINCE IT ASSUMES RAYMOND JAMES HAS NO VALID CLAIM FOR BREACH OF LEASE.

The R&R concluded that Raymond James' requests for declaratory relief were futile based primarily on its finding that the claims Raymond James had asserted were not viable. (R&R, ECF 375 at PageID 7245). As discussed at length above, this conclusion was based upon a misinterpretation of the Lease and/or because the R&R overlooked facts pled in support of Raymond James' claims in tort. An Order from the Court allowing these claims to move forward would thus also eliminate any lack of actual controversy. The R&R's alternate holding—that the declarations sought would require the Lease to be rewritten—is also incorrect. Rather, Raymond James seeks a declaration as to how the facts as plead impact the parties' obligations both under the Lease, as well as in tort—e.g. the legal impact of Landlord's first breach (SAC, ECF 342-2, ¶ 136 and 137); whether under the facts plead, the Early Termination Fee is payable and/or whether it constitutes a forfeiture or penalty (*Id.*, ¶ 138); whether at any time all or part of the premises were made "substantially unusable" for the requisite period so as to allow an abatement of rent (*Id.*, ¶ 139); and whether purported restrictions and limitations in the Lease beyond those

specifically relating to damages are unenforceable in light of Landlord's intentional, reckless and/or grossly negligent tortious conduct (*Id.*, ¶ 140).

In short, the Court should allow the filing of Raymond James' SAC in its entirety including the request for declaratory relief.

**4.   THE R&R'S CONCLUSION THAT RAYMOND JAMES' PROPOSED CLAIMS FOR NUISANCE ARE "FUTILE" IS INCORRECT.**

In finding that Raymond James failed to state a claim for nuisance, the R&R provided two different reasons: 1) that because Raymond James had a contract with Landlord, any claim in tort was necessarily precluded; and 2) that any claim for nuisance was precluded by a disclaimer of liability for third-party interference found in Section 25 of the Lease. As the following discussion will show, neither of these conclusions is well-founded and Raymond James' SAC should be permitted to go forward in its entirety.

First, the R&R found Raymond James was limited to an action in contract based upon the assumption that the only duties at issue must have arisen from the contractual relationship itself. *See* R&R, ECF 375, PageID 7249, quoting *Williams v. SunTrust Mort., Inc. Williams v. SunTrust Mortg., Inc.,* No. 3:12-CV-477, 2013 WL 1209623 (E.D. Tenn. Mar. 25, 2013) ("when two parties enter into a contractual agreement, their obligations to each other arise out of the contract itself, so that a violation of that contractual duty supports an action in contract rather than in tort."). Notably, the *Williams* case does not involve a claim for nuisance, and the R&R does not address the broad duties that nuisance vindicates. Numerous courts, however, have allowed a tenant to bring a nuisance action against their landlords. *See Stoiber v. Honeychuck*, 101 Cal. App. 3d 903 (Cal. Ct. App. 1980) (reversing trial court and holding that lessee's nuisance claim against landlord could

15

proceed—stating "[n]uisance liability is not precluded by the existence of a contractual relationship between the tenant and landlord.  It is hornbook law that an act that constitutes breach of contract may also be tortious."); *see Bell v. Friedman*, 201 N.W. 614 (Minn. 1925) (reversing judgment on the pleadings where tenant sued landlord under nuisance theory); *see also Kent v. Humphries*, 281 S.E.2d 43 (N.C. 1981) (holding that commercial month-to-month tenant had sufficient property interest to maintain nuisance claim against landlord). Moreover, as the R&R itself recognized, the duties recognized by the tort of nuisance are very broad:

> Under Tennessee law, nuisance is "anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable." Pate v. City of Martin, 614 S.W.2d 46, 47 (Tenn. 1981). The law of nuisance covers "everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of the property." Shore v. Maple Lane Farms, LLC, 411 S.W.3d 405, 415 (Tenn. 2013) (citing Pate, 614 S.W.2d at 47 and Caldwell v. Knox Concrete Prods., Inc., 391 S.W.2d 5, 9 (1964)). A defendant is liable for private nuisance where he or she uses his or her property in a manner that unreasonably interferes with the plaintiff's use or enjoyment of his or her own property. Sadler v. State, 56 S.W.3d 508, 511 (Tenn. Ct. App. 2001) (quoting Metro. Gov't of Nashville & Davidson Cty. v. Counts, 541 S.W.2d 133, 138 (Tenn. 1976)).

R&R, ECF 375 at PageId 7248-49. The fact that a lease may be involved is thus not at all determinative. Similar to the cases cited above, Raymond James has appropriately pled a cause of action for nuisance against Defendants (including Mr. Sofer) and the SAC should be permitted to go forward.

Next, the R&R finds: a) that Landlord is insulated from liability because of Section 25 of the Lease; and b) that the language in Section 28 does not create any enforceable right for Raymond James because any applicable rights were waived via Section 25. (*See* R&R, ECF 375, PageID

16

7248-7251. This premise, however, breaks down because Section 25 is not as broad as the R&R believed. It does not exclude liability for direct interference by Landlord and therefore has no application to Raymond James' nuisance claims. The relevant part of Section 25 states:

> Landlord agrees to make commercially reasonable efforts to protect Tenant from interference or disturbance by **third persons**, including other tenants; however, Landlord shall not be liable for any **such interference,** disturbance or breach….

*See* Lease at § 25, ECF 41-1 at PageID 32. (emphasis added). A close reading of Section 25 reflects that it is only a limitation on liability for interference from *third parties*—whether caused by third parties directly or because Landlord enabled such a third party (e.g. by Landlord's enabling the disturbance such as by permitting a loud band access to the building) *See* Lease at § 28, ECF 41-1, at PageID 392.  Stated differently, Section 25 does nothing to disclaim Landlord's liability here which is for *its own* interference/disturbance i.e. a nuisance. With that understanding, the R&R's reliance upon the clause "subject to the provisions of this Lease" contained within Section 28 makes no difference since Landlord's liability for its own acts of interference remains unaffected. Thus, the conclusion in the R&R that "the lease itself also defeats Raymond James's nuisance claim" is simply a misreading of Sections 25 and 28. (R&R, ECF 375 at PageID 7250).

Because Landlord has a general duty not to disturb or interfere with Raymond James' enjoyment of its leasehold and because this duty has not been disclaimed, the Court should decline to follow the R&R and instead allow the nuisance claims found in Count III to proceed.

**5.  JACOB SOFER IS AN APPROPRIATE PARTY TO THIS SUIT AND THERE IS NO BASIS TO SHIELD HIM FROM LIABILITY FOR TORTS HE COMMITTED ON BEHALF OF LANDLORD.**

The SAC sought to name Jacob Sofer ("Mr. Sofer") as a party defendant as to both its claims for intentional/prima facie tort and nuisance since he personally participated in the acts underlying both claims. The R&R, however, held that Mr. Sofer should not be made a defendant because: a) it found neither of the tort claims alleged to be viable; b) it found that tort liability against Mr. Sofer had been excluded by the terms of the Lease; and c) it found that Raymond James had failed to plead liability based upon piercing the corporate veil with the requisite specificity.

The R&R acknowledges that Mr. Sofer can be liable if he commits or participates in the commission of a tort to third parties regardless of the liability of a corporation. (R&R, ECF 375, PageID 7254.) For the reasons stated above, Raymond James has, in fact, pleaded colorable claims for both intentional/prima facie tort and for nuisance. Given this predicate, its claims against Mr. Sofer should therefore proceed.

Next, the R&R focuses on the Section 40 of the Lease which purports to limit *Landlord's liability* to its interest in the building. It does not purport to limit or extinguish the direct liability of others such as Mr. Sofer. (R&R, ECF 375, PageID 7255). Moreover, even if it did, a provision that purports to waive liability for gross negligence and/or intentional torts is not enforceable under Tennessee law. *See Lansky v. Prot. One Alarm Monitoring, Inc.,* No. 17-CV-2883-SHM-DKV, 2018 WL 6588566, at *2 (W.D. Tenn. July 18, 2018) ("Waivers seeking to limit damages from 'liability for intentional conduct, recklessness, or gross negligence, ... [are] unenforceable as against public policy.'" *citing Corso Enterprises, Inc. v. Shop at Home Network, Inc.,* No. 3:04-

0260, 2005 WL 2346986, at *8 (M.D. Tenn. Sept. 26, 2005)). Section 40 of the Lease should thus be stricken and treated as a nullity.

Finally, the R&R concludes that Raymond James failed to state a claim because it has not alleged sufficient facts to support a claim for piercing the corporate veil. Raymond James submits that the facts it has pleaded should be sufficient. *See* SAC at PageID 6444-47. However, even if it is deemed insufficient at this time, the SAC clearly alleges tortious acts personally committed and/or directed Mr. Sofer and the tort claims asserted against Mr. Sofer personally in Counts III and IV should be allowed to go forward.

**6. THE R&R's RECOMMENDATION THAT RAYMOND JAMES' CLAIM FOR FRAUD SHOULD PROCEED IS CORRECT AND SHOULD BE ADOPTED BY THE COURT.**

The R&R concluded that Raymond James' claims for fraud stated a claim and that its SAC should be allowed to proceed as to Count II. Raymond James agrees with this finding and asks that this portion of the R&R be adopted by the Court.

**CONCLUSION**

For each of the reasons mentioned above, Raymond James asks that the recommendations in the R&R (with the exception of the fraud claim) be declined and that the Court grant Raymond James' Motion to Amend, allowing the SAC to be Raymond James' operative complaint moving forward.

19

Respectfully submitted this 13th day of August, 2021

**THE PROSSER LAW FIRM**

 /s/ Niel Prosser

Niel Prosser (BPR No. 11647)
Rob Clapper (BPR No. 34180)
Kyle Johnson (BPR No. 36066)
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
T:  (901) 820-4433
E:  np@prosserlaw.com
       rclapper@prosserlaw.com
       kjohnson@prosserlaw.com

          - and –

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**

 /s/ John Branson

John Branson (BPR No. 10913)
Clinton Simpson (BPR No. 20284)
165 Madison Avenue, Suite 2000
Memphis, TN 38103
T: (901) 577-2323
E: jbranson@bakerdonelson.com
      csimpson@bakerdonelson.com

*Attorneys for Raymond James*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed using the Court's CM/ECF system on August 13, 2021, which will automatically send an electronic copy of the filing to all counsel of record in this case.


 /s/ Kyle Johnson_____