IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| **RAYMOND JAMES & ASSOCIATES, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 18-cv-2104-JTF-tmp |
| ) | |
| **50 NORTH FRONT ST. TN, LLC,** ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

Before the court by order of reference is 50 North Front St. TN, LLC's ("50 North") Motion to Dismiss, or in the Alternative, Motion to Strike Allegations and Attached Exhibits from Plaintiff's Second Amended Complaint. (ECF Nos. 396, 439.) For the following reasons, it is recommended that the motion be granted.

**I.   PROPOSED FINDINGS OF FACT**

**A.   Procedural History**

On February 2, 2018, Raymond James & Associates, Inc. ("Raymond James") commenced a civil action against 50 North in the Chancery Court for Shelby County, Tennessee. (ECF No. 1 at PageID 1.) On February 16, 2018, 50 North filed a Notice of Removal in the United States District Court for the Western District of Tennessee. (Id.) 50 North filed its first Motion to Dismiss for failure to state a claim on May 8, 2018. (ECF No. 36.) While that

motion was pending, Raymond James filed a Motion for Leave to File a First Amended Complaint ("FAC") on May 29, 2018, which this court granted on June 18, 2018. (ECF Nos. 41, 45.) In 50 North's answer to the FAC, filed on December 19, 2019, it asserted several counterclaims against Raymond James. (ECF No. 286.) Raymond James filed a Motion to Dismiss the counterclaims on January 9, 2020. (ECF No. 290.) Based on the undersigned's recommendation, District Judge John T. Fowlkes, Jr. denied Raymond James's Motion to Dismiss on November 13, 2020. (ECF Nos. 329, 360.)

On June 29, 2018, 50 North filed a Motion to Dismiss the First Amended Complaint. (ECF No. 54.) The motion was referred to the undersigned on November 22, 2019. (ECF No. 284.) On February 20, 2020, the undersigned entered a Report and Recommendation on the Motion to Dismiss, recommending that the court grant the motion in its entirety. (ECF No. 301.) On May 15, 2020, Raymond James filed a Motion for Leave to File a Second Amended Complaint ("SAC"). (ECF No. 324.) Attached to that motion was a proposed SAC.

On July 30, 2020, Judge Fowlkes adopted the Report and Recommendation and granted the Motion to Dismiss in its entirety. (ECF No. 339.) However, the Order stated that the Motion for Leave to File a SAC would be considered in a separate order. (Id. at PageID 6858.) On November 13, 2020, the Motion for Leave to File a SAC was referred to the undersigned. (ECF No. 361.) On July 30, 2021, the undersigned entered a Report and Recommendation on the

motion, recommending that the motion be granted to the extent the SAC alleged a claim for fraud, but denied as to the remainder of the claims in the SAC. (ECF No. 375 at PageID 7259.) On January 28, 2022, Judge Fowlkes entered an order adopting the undersigned's Report and Recommendation in full. (ECF No. 391.)

On February 10, 2022, Raymond James filed the SAC. (ECF No. 393.) The pleading is largely identical to the proposed SAC attached to the Motion for Leave to File an SAC except that the claims that were previously dismissed are omitted. However, the factual allegations in the complaint span almost thirty-seven pages and are not limited to the facts underlying the fraud claim. (Id. at PageID 7414-51.) Also attached to the SAC are twenty-eight exhibits, the majority of which are not relevant to the surviving fraud claim.

On March 7, 2022, 50 North filed the present motion. (ECF No. 396.) On April 11, 2022, Raymond James filed a response and on April 29, 2022, 50 North filed a reply. (ECF Nos. 406, 412.) Raymond James sought leave to file a sur-reply, which was granted on May 5, 2022. (ECF Nos. 414, 416.) The sur-reply was filed on May 19, 2022. (ECF No. 422.) On April 19, 2023, this motion was referred to the undersigned for Report and Recommendation. (ECF No. 439.)

B.  **Relevant Facts**

Because only the fraud claim survives, the undersigned only summarizes the factual allegations as to that claim. Raymond James rented office space in a building in Memphis owned by 50 North. (ECF No. 393 at PageID 7411.) Raymond James claims that 50 North had been fraudulently assessing operating expenses by "charging Raymond James for illegitimate expenses and by withholding credits that Raymond James could have received due to reductions in the Tower's property tax assessment." (Id. at PageID 7448.) Additionally, 50 North has refused to allow Raymond James to bring in a third-party accounting firm to audit the Tower's books. (Id.) Raymond James sets forth the following factual allegations:

> In general, the Lease permits 50 North to charge Raymond James its pro rata share of any increase in expenses that it incurs from operating the Tower in a given year—i.e. "Operating Expenses." While some costs can be passed through, costs that are capital in nature generally cannot. The Lease also allows 50 North to pass through to Raymond James increases in property taxes and — conversely, to the extent property taxes go down — requires 50 North to credit Raymond James with its pro rata share of such savings.
>
> Once a year, 50 North is required to provide Raymond James an "Expense Statement" that outlines its pro rata share of Operating Expenses and property taxes. Raymond James received the Expense Statement for the 2018 calendar year on May 10, 2019, along with an invoice that purported to reflect Raymond James's pro rata share of the increase in the Tower's reimbursable operating expenses for 2018.
>
> After examining this Expense Statement in conjunction with other documents — including internal documents 50 North had produced in discovery — it appeared that the Expense Statement deliberately included expenses that

should not have been passed on to Raymond James, including:

a) Expenses of this litigation. 50 North has included over $20,000 in elevator related expert witness fees, even though these are specifically prohibited as Operating Expenses;

b) Cost of capital improvements. 50 North inappropriately charged Raymond James at least $100,000 in capital expenses, even though those types of expenses are explicitly excluded. Some examples of these expenses include:

• $24,760 for improvements to the roof (including the spire and steel canopy) and a cooling tower deck;

• $15,692 for sheet metal improvements on the 18th floor balcony;

• $11,806 for new furniture, computers, and security cameras;

• $11,629 to update/replace the awning on the outside of the east entrance of the Tower; and

• $9,142 to replace the revolving door at the east entrance of the Tower.

In addition, the Expense Statement — for both 2017 and 2018 — deliberately failed to credit Raymond James for reductions in property taxes. 50 North appealed the Tower's property tax assessments for 2017 which secured a reduction that translated into gross savings of some $270,000 between the two years. None of these savings were passed on to Raymond James as required by the Lease, but rather were secretly retained by 50 North. This is clearly apparent from a review of some of the internal documents 50 North produced in discovery. A draft of Raymond James's 2017 Expense Statement reflects a reduction in property taxes and shows Raymond James receiving its pro-rata share of $70,760. 50 North never sent Raymond James that draft. The final Expense Statement that 50 North sent to Raymond James makes no mention of property taxes at all. Raymond James paid the Invoice for 2017 on time and as submitted, not knowing

>    at the time that 50 North had inflated the Invoice.
>    Raymond James timely paid the 2018 Invoice, as well, but
>    under protest (so as not to precipitate a possible
>    argument that a Monetary Default existed), but with
>    concern that it might be fraudulent.
>
>    Raymond James thereafter timely invoked its right under
>    the Lease to audit the Tower's books. 50 North, however,
>    refused, falsely claiming that the audit request was one
>    day late. 50 North, moreover, had ample motivation to
>    act improperly. It was already in litigation with
>    Raymond James during 2018 for its deliberate breach of
>    the Lease and by its own admission was experiencing
>    greatly diminished cash flow.

(Id. at PageID 7448-51) (internal citations and footnotes omitted).

## II.   PROPOSED CONCLUSIONS OF LAW

### A. Standard of Review

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court views the plaintiff's allegations in the light most favorable to it and accepts all well-pleaded factual allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010) (quoting Iqbal, 556

U.S. at 677). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)). To satisfy this requirement, the plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." Id. (alteration omitted) (quoting Twombly, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

**B.   Choice of Law**

"A federal court sitting in diversity applies the choice of law provisions of the forum state." Solo v. United Parcel Serv. Co., 819 F.3d 788, 794 (6th Cir. 2016). "Tennessee adheres to the rule of *lex loci contractus*, which presumes that a contract is 'to be governed by the law of the jurisdiction in which it was executed absent a contrary intent.'" Porter v. AAR Aircraft Servs., Inc., No. 19-5059, 2019 WL 5446003, at *3 (6th Cir. Oct. 24, 2019) (quoting Southeast Texas Inns, Inc. v. Prime Hosp. Corp., 462 F.3d 666, 672 n.8 (6th Cir. 2006)). For tort claims, Tennessee has adopted the Restatement (Second) of Conflict of Laws, which provides that the "law of the state where the injury occurred will

be applied unless some other state has a more significant relationship to the litigation." Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992).

Here, the parties to the lease agreed that the contract should be construed according to Tennessee law. (ECF No. 41-1 Exhibit A at 25 § 42.) In addition, the injuries allegedly suffered by Raymond James occurred in Tennessee. As a result, Tennessee law governs this suit.

**C. Motion to Dismiss**

    1.   Whether Raymond James Misinterpreted the Lease

50 North argues that Raymond James's fraud claim should be dismissed because "the Lease does not entitle Raymond James to any credit relating to the property taxes and Landlord rightfully billed Operating Expenses to RJA pursuant to the Lease." (ECF No. 396-1 at PageID 7685.) Under Tennessee law, there are four elements to a *prima facie* fraud claim: "(1) intentional misrepresentation of a material fact; (2) knowledge that the representation was false — that the misrepresentation was made knowingly or recklessly or without belief or regard for its truth; (3) reasonable reliance on the misrepresentation by the plaintiff and resulting damages; (4) 'that the misrepresentation relates to an existing or past fact[.]'" Dog House Invs., LLC v. Teal Props., 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014) (quoting Stacks v. Saunders, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)). In addition to alleging the *prima facie*

elements for a fraud claim, in order to survive a motion to dismiss, a complaint must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which reads: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." In the Sixth Circuit, this requires "alleg[ing] the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Coffey v. Foamex L.P., 2 F.3d 157, 161–62 (6th Cir. 1993) (quoting Ballan v. Upjohn Co., 814 F. Supp. 1375, 1385 (W.D. Mich. 1992)).

The SAC alleges that, during the pendency of this lawsuit, 50 North "charg[ed] Raymond James for illegitimate expenses and . . . fraudulently with[eld] credits that Raymond James should have received due to reductions in the Tower's property tax assessment." (ECF No. 393 at 7448.) According to the SAC, Raymond James discovered the alleged fraud when, on May 10, 2019, it was provided an Expense Statement for 2018 and "an invoice that purported to reflect Raymond James's pro rata share of the increase in the Tower's reimbursable operating expenses for 2018." (Id. at PageID 7449.) Raymond James asserts that "the Expense Statement deliberately included expenses that should not have been passed on to Raymond James," including expenses from this litigation and

-9-

costs of capital improvements. (Id. at PageID 7449-50.) Additionally, the SAC alleges that 50 North "deliberately failed to credit Raymond James for reductions in property taxes." (Id. at PageID 7450.)

The undersigned submits that, under the heightened pleading standard, the SAC plausibly alleges a claim for fraud. Taking all facts in the SAC as true, Raymond James identifies two expense statements that 50 North intentionally and artificially inflated with hidden charges and omitted deductions. Raymond James alleges that 50 North intentionally misrepresented certain expenses and allegedly hid tax credits from Raymond James, and that Raymond James was monetarily harmed by paying the allegedly fraudulent invoices. See ZMCC Props., L.L.C. v. Primeone Ins. Co., No. 19-12428, 2019 WL 11648517, at *5 (E.D. Mich. Dec. 19, 2019) (finding that the Rule 9 standard was met for an affirmative defense where the defendant alleged "the time, place, and content of the misrepresentation," as this was enough to "provide notice to [plaintiff] and the court of a fraudulent scheme"). 50 North's argument that Raymond James's fraud claims are based on misinterpretations of the lease fails because it goes to the underlying merits of the fraud claim and not to whether the claims are plausible. See Bell v. Kokosing Indus., Inc., No. 19-53-DLB-CJS, 2020 WL 4210701, at *16 (E.D. Ky. July 22, 2020) ("The purpose of the particularity requirement is to give the defendant

sufficient notice of the alleged misrepresentation to allow them to adequately respond to the plaintiff's claim; it should be interpreted liberally.") (citing Coffey, 2 F.3d at 162).

    2.   Whether Raymond James Can Bring a Fraud Claim

50 North also argues that under Tennessee law, a tort cannot be predicated on a breach of contract, and thus Raymond James's claim for fraud fails as a matter of law. (ECF No. 396-1 at PageID 7692.) Raymond James argues that this argument has been waived because 50 North did not raise it in opposition to Raymond James's Motion to File the SAC, nor did it object to the undersigned's Report and Recommendation, which found the fraud claim to not be futile. (ECF No. 406 at PageID 7759.) Raymond James also contends that 50 North had a duty independent of the contract not to commit fraud. (Id.)

As to the waiver argument, the undersigned's ruling allowing Raymond James to file the SAC did not preclude 50 North from filing a new motion to dismiss and raising new arguments. Smith v. Gallia Cty. Sherriff, No. 2:10-cv-1184, 2011 WL 2970931, at *3 (S.D. Ohio July 20, 2011) ("At least where the claim is arguably sufficient, it is usually a sound exercise of discretion to permit the claim to be pleaded and allow the merits of the claim to be tested before the District Judge by way of a motion to dismiss."). Therefore, the undersigned does not deem the argument waived and will address the merits.

The question of whether Raymond James can recover in tort, rather than solely under the contract, implicates two separate but closely related doctrines: the independent duty rule and the economic loss doctrine. The independent duty rule provides that "[a] tort action only arises when the act constituting the contract breach also constitutes a breach of a common law duty *independent* of the contractual relationship." E Sols. for Bldgs., LLC v. Knestrick Contractor, Inc., No. M2018-02028-COA-R3-CV, 2019 WL 5607473, at *9 (Tenn. Ct. App. Oct. 30, 2019) (quoting Yinghong Mach. Int'l Ltd. v. Wholesale Equip., Co., No. 2:13-cv-02671-JTF-cgc, 2014 WL 12887673, at *4 (W.D. Tenn. Oct. 17, 2014) (internal citation omitted)); see also 21 Tenn. Prac. Contract Law and Practice § 1:4 (citing Weese v. Wyndham Vacation Resorts, No. 3:07-CV-433, 2009 WL 1884058 (E.D. Tenn. 2009) ("Only where the act constituting a breach of contract also constitutes a breach of a legal duty independent of the contract does an action arise in tort and not in contract.")). Raymond James argues that "The law . . . recognizes a duty independent of any contract not to commit fraud." (ECF No. 406 at PageID 7759.) However, the only citation for this proposition is a 1969 Arkansas Supreme Court case. The court is unaware of any case in which a Tennessee court has recognized an independent duty not to commit fraud.

The economic loss doctrine is a "judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." Milan Supply Chain Sols., Inc. v. Navistar, Inc., 627 S.W.3d 125, 142 (Tenn. 2021). "A majority of jurisdictions have now adopted the economic loss doctrine," although "[d]espite its wide acceptance . . . the economic loss doctrine has been aptly described as 'one of the most confusing doctrines in tort law.'" Id. at 144 (quoting R. Joseph Barton, Note, Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims, 41 Wm. & Mary L. Rev. 1789, 1789 (2000)). "This confusion is largely attributable to the fact that there are 'a number of permutations,' which has made the doctrine 'difficult to define.'" Milan, 627 S.W.3d at 144 (citations omitted).

"Tennessee courts have not yet plunged deeply into the economic loss doctrine sea." Milan, 627 S.W.3d at 151. In Milan, the Tennessee Supreme Court - after providing a thorough discussion of the history of the economic loss doctrine, the current status of the doctrine, and how courts in Tennessee and elsewhere have applied the doctrine specifically to claims of fraud - "decline[d] to announce a broad rule either extending the economic loss rule to all fraud claims or exempting all fraud claims from the economic loss rule." Id. at 153 (citing HealthBanc Int'l, LLC v. Synergy

-13-

Worldwide, Inc., 435 P.3d 193, 194 (Utah 2018)). Instead, the Court held that in cases "involving a contract between sophisticated commercial business entities and a fraudulent inducement claim seeking recovery of economic losses only, the economic loss doctrine applies if 'the only misrepresentation[s] by the dishonest party concern[] the quality or character of the goods sold.'" Id. at 153-54. The Court emphasized that "like the Utah Supreme Court [in HealthBanc International], we expressly stop short 'of resolving the broad question of whether there may ever be a fraudulent inducement exception to the economic loss rule' in Tennessee and defer 'that question to a future case in which the facts may warrant it.'" Id. at 155.

The Tennessee Court of Appeals subsequently extended the doctrine to apply in non-products liability cases where the parties were sophisticated commercial entities. Commercial Painting Co., Inc. v. Weitz Co. LLC, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at *24 (Tenn. Ct. App. Mar. 11, 2022). In reaching that conclusion, the Court of Appeals noted that the Tennessee Supreme Court in Milan relied heavily on HealthBanc International, which was not a products liability case. The Court of Appeals observed that the Milan Court included the following quote from HealthBanc International (twice) in its opinion:

> Contract law seems sufficient to make wronged parties whole. When the contract terms contain the grounds for the tort claim, we see no reason to conclude that

>    recovery under contract law is insufficient — "when a
>    party is merely suing to recover the benefit of its
>    contractual bargain, there is no inherent unfairness in
>    limiting that party to a breach-of-contract claim."
>    Wronged parties will still have access to traditional
>    contract damages for breach, including expectation
>    damages. And such parties will also have access to
>    exceptional contract remedies — liquidated damages,
>    rescission, etc. — where applicable. The possibility of
>    liquidated damages seems particularly salient. If the
>    parties to a contract with express warranties are
>    concerned about the insufficiency of expectation
>    damages[,] they can bargain for liquidated damages. And
>    where they fail to do so it seems problematic for a court
>    to make a better contract for them than the one they
>    negotiated — by importing tort remedies into the deal.

Id. at *21 (quoting Milan, 627 S.W.3d at 155 and HealthBanc Int'l, 435 P.3d at 197-98). The Court of Appeals explained that the concerns articulated in HealthBanc International "apply with equal force in the products liability context as in other commercial transactions between sophisticated parties." Id. The court also adopted the Milan court's approach to applying the doctrine to fraud in the inducement claims. Id. at *24. The appeal of this decision is currently pending before the Tennessee Supreme Court. Commercial Painting Co., Inc. v. Weitz Co. LLC, No. W2019-02089-COA-R3-CV, 2022 WL 3149615 (Tenn. Aug. 4, 2022).

The undersigned notes that in a recent case in this district, this court declined to follow Commercial Painting. TNIJACI01 Good 961 Lower Brownsville Road LLC v. FC Cox Constr., LLC, No. 1: 22-cv-01015-STA-jay, 2023 WL 4504596, at *4 (W.D. Tenn. Feb. 14, 2023). This court found that the Tennessee Supreme Court had only

expressly applied the doctrine in products liability cases, and thus held that the economic loss doctrine does not apply in cases outside that context. Id.

To the extent FC Cox Construction conflicts with Commercial Painting on the concept of whether the economic loss doctrine can apply beyond products liability cases under Tennessee law, the undersigned agrees with the Tennessee Court of Appeals for the reasons set forth in its Commercial Painting opinion. However, as to the separate issue of whether the doctrine applies to fraudulent inducement claims (and if so, under what circumstances), the undersigned submits that this issue need not be reached because the present case involves only claims of fraud in the performance of a contract. The tort at issue in Milan and Commercial Painting was fraudulent inducement, which is where much of the debate exists among the courts as to the applicability of the economic loss doctrine. But to the extent Milan and Commercial Painting recognize that fraudulent inducement claims, under certain circumstances, are barred by the doctrine, then logically fraud in the performance claims would be barred as well. It is sufficient for the purpose of deciding the instant Motion to Dismiss for the court to conclude that the economic loss doctrine applies in cases involving fraud in the performance of the contract, at least where the parties are sophisticated commercial entities.

The undersigned submits that Raymond James's fraud claim is barred by the economic loss doctrine. The alleged misrepresentations underlying the fraud claim are related to 50 North's duties under the contract and Raymond James is exclusively seeking economic damages. Commercial Painting, 2022 WL 737468 at *24. Further, both parties are sophisticated commercial entities with the ability to draft complex, detailed agreements that allocate risks and assign remedies. It is therefore recommended that the Motion to Dismiss Raymond James's fraud claim be granted.[1] 50 North also seeks attorney's fees and expenses in connection with the motion. The undersigned submits that an award of attorney's fees and costs is not warranted. 50 North has not cited to any authority and the undersigned finds no basis to award attorney's fees or costs.

### III.  RECOMMENDATION

For the reasons above, it is recommended that 50 North's Motion to Dismiss be granted.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

July 24, 2023

---

[1] In the alternative, 50 North seeks to strike the allegations in the SAC that pertain to the previously dismissed claims. Because the undersigned is recommending that the Motion to Dismiss be granted, this issue is moot.

Date

NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R. 72.1(g)(2). FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**