IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION

| | | |
|---|---|---|
| RAYMOND JAMES & ASSOCIATES, INC | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-02104 and |
| | ) | No. 2:21-cv-02433 |
| | ) | |
| 50 NORTH FRONT ST. TN, LLC, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**RAYMOND JAMES' OBJECTIONS TO THE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Plaintiff Raymond James & Associates, Inc. ("Raymond James"), pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure and Local Rule 72.1(g)(2), respectfully submits the following Objections to the Magistrate Judge's July 24, 2023 Report and Recommendation (the "R&R"). *See* ECF 455. For the reasons explained below, the R&R's conclusion that Raymond James' fraud claim should be dismissed is incorrect and the Motion to Dismiss (ECF 396) of Defendant, 50 North Front St. TN, LLC ("Landlord"), should be denied in its entirety.

## I.    PROCEDURAL BACKGROUND

1. On February 10, 2022, Raymond James filed its Second Amended Complaint ("SAC") which brought a fraud claim related to Landlord's assessment of tenant Operating Expenses. *See* SAC, ECF 393 at PageIDs #7448-51. As the SAC explained in significant detail, the lease at issue allows Landlord to charge Raymond James its pro rata share of any increases in expenses it incurs over a given year—i.e. "Operating Expenses"—in return for Landlord providing

1

certain services for Raymond James and the other tenants in the building. *Id.* at PageIDs #7448-9; *see also* Lease, ECF 393-4 at PageIDs #7485-7. The lease goes on to explain that certain costs are not allowed to be passed through to Raymond James—such as costs that are capital in nature. *Id.* Further, Raymond James is entitled to a credit if Landlord enjoys any reduction in property taxes. *See* SAC, ECF 393 at PageIDs #7448-9. It was up to the Landlord to manage and operate the building, engage and pay the vendors/service providers for the building, keep and maintain the building's books, calculate the pass-through operating expenses, and present them to Raymond James for payment. *Id.* at PageIDs #7448-51, *see also* Lease, ECF 393-4 at PageIDs #7485-8. Importantly, Raymond James had to take Landlord at its word that the operating expenses on the Expense Statements were legitimate as it had no means to dispute the Expense Statement before the required payment date—just fifteen days after receipt. *See* Lease, ECF 393-4 at PageIDs #7488.

From discovery in this case, Raymond James first learned that Landlord was improperly passing through expenses (like the cost of its elevator expert in this litigation) and failing to provide credit for significant reductions in property taxes it was enjoying. *See* SAC, ECF 393 at PageIDs #7449-51. In both 2017 and 2018, Raymond James received Landlord's Expense Statements and paid the amount listed by Landlord—never knowing it was being defrauded. In discovery, Raymond James obtained the draft 2017 Expense Statement that correctly reflected a reduction in property taxes and showed that Raymond James was entitled to a $70,760 *credit* rather than a *charge* of $63,754 that Landlord had billed Raymond James and that Raymond James had long since paid. *Compare* both Expenses Statements titled "Raymond James Tower Operating Expense Reconciliation," ECF 393-27 at PageIDs #7661-63. Moreover, from a review of certain ledger documents produced in discovery, it was

apparent that Landlord was passing through a number of other improper expenses. For example, Raymond James was charged over $20,000 for *Landlord's* elevator expert in this litigation via these fraudulent Operating Expenses. *See* SAC, ECF 393 at PageID #7452

2. On March 7, 2022, Landlord filed a Motion to Dismiss Raymond James' SAC. *See* ECF 396.

3. In its 20-page memorandum that supported its Motion, Landlord dedicated two sentences to the argument that Raymond James could not assert a claim for fraud in tort because its claim was predicated upon a breach of contract.[1] Landlord cited only one case in support—*Mid-S. Milling Co., Inc. v. Loret Farms, Inc.*, 521 S.W.2d 586 (Tenn. 1975)—a warranty case involving a sale of goods (chicken feed), which ironically specifically recognized that cases not involving a sale of goods, such as ones involving the construction of a house,[2] could sound in either contract or tort. *See* ECF 396-1 at PageID #7692. Landlord never even used the term

---

[1] In its entirety, Landlord argued:

> In addition, it is well settled under Tennessee law that a tort cannot be predicated on a breach of contract. See Mid-South Milling Co. v. Loret Farms. Inc., 521 S.W. 2d 586 (Tenn. 1975) (a contract may be negligently or fraudulently breached and the cause of action remains in contract rather than in tort). Therefore, RJA's tort claim for fraud fails as a matter of law and should be dismissed.

*See* Landlord's Motion to Dismiss, ECF 396-1 at PageID #7692.

[2] The *Midsouth Milling Court* found:

> We conclude, however, that since the adoption of the Uniform Commercial Code, there is a vast difference between a cause of action based upon negligent breach of warranty of sale of chicken feed, as distinguished, for example, from a cause of action based upon negligent performance of a contract to construct a building; the first is governed by the Code, the **latter may be brought in tort**.

*Mid-S. Milling Co. v. Loret Farms, Inc.*, 521 S.W.2d 586, 588 (Tenn. 1975) (**bolding** added).

"economic loss doctrine" in its Motion to Dismiss nor in its Reply. *See generally* ECFs 396 and 412.

4. On July 24, 2023, the Magistrate Judge entered the R&R at issue. Although he found that Raymond James' SAC both pled fraud with particularity and met the *Twombly* standard, he nonetheless recommended dismissal because he found the fraud claim to ultimately be barred by the judicially-created economic loss doctrine. This finding by the Magistrate Judge was error and is the heart of Raymond James' objections herein.

## II.    STANDARD OF REVIEW

In the context of a dispositive motion, a "district judge must determine de novo any part of a Magistrate Judge's disposition that has been properly objected to." *Brown v. Bd. of Educ. of Shelby Cnty. Sch.*, 47 F. Supp. 3d 665, 674 (W.D. Tenn. 2014). At the Rule 12(b)(6) stage, the Court "must view the complaint in the light most favorable to the plaintiff and determine if the facts in the complaint set out a claim to which relief may be granted." *Memphis Light, Gas & Water Div. v. Comcast*, 2016 WL 8376738 at \*8 (W.D. Tenn. Mar. 30, 2016). The evaluation of a Rule 12(b)(6) motion *does not* involve a merits inquiry but "merely tests whether a cognizable claim has been pleaded in the complaint." *Id.* at \*7. All that is required is that a plaintiff "raise a right to relief above the speculative level." *Wesley v. Campbell*, 779 F.3d 421, 427 (6th Cir. 2015) (internal quotation marks omitted). The R&R already determined that the SAC met the particularity and plausibility tests, (R&R, ECF 455 at PageID #8271), to which there is no objection. The only question for this Court is thus whether Raymond James can bring a claim for fraud given the economic loss doctrine and Independent Duty Rule.

### III.   INTRODUCTION

The R&R's conclusion that the economic loss doctrine—alone or in conjunction with the independent duty rule—bars Raymond James' fraud claim is erroneous and should be rejected for at least the following reasons:

a.  As to the Independent Duty Rule, the Magistrate Judge's conclusion that there is no "independent duty not to commit fraud" in Tennessee is mistaken and overlooks the elements of the claim and the recent pronouncements of the Tennessee Supreme Court regarding Tennessee's pervasive public policy against fraud. No one is permitted to perpetrate—or even exculpate himself from—fraud in Tennessee, and Raymond James thus has a basis—independent of its contract—for asserting its fraud claims against Landlord. The Independent Duty Rule is thus fully satisfied.

b.  As for the economic loss doctrine, it is simply not applicable. Tennessee has moved conservatively in its embrace of the doctrine. Indeed, as the Tennessee Supreme Court acknowledged in 2021, it *has never recognized* the doctrine outside of the context of the sale of goods. *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 153-4 (Tenn. 2021). Moreover, given its description in *Milan* of the doctrine's origins, rationale and recent repudiations by jurisdictions which have come to regret the overbreadth of their approach, Tennessee is unlikely to expand the reach of the economic loss doctrine outside the sale of goods and particularly to contracts for services—like the provision of services here by a landlord to its tenant. In addition, even if it were to expand the scope of the economic loss doctrine beyond the sale of goods, Tennessee would also have to expand how the doctrine applies to claims of fraud—something the Tennessee Supreme Court has shown great reluctance to do. To date, Tennessee has only applied the doctrine (in the sale

of goods) when the alleged fraud was *in the inducement*—and then only when the misstatements by the dishonest party "concerned the *quality or character of the goods sold*." (*Milan*, 627 S.W.3d at 153-54). The Tennessee Supreme Court has said nowhere that the economic loss doctrine precludes claims for fraud in the performance of a contract, especially for services ancillary to a lease of office space.

c.   The R&R should also be rejected because it unnecessarily attempts to "read the tea leaves" regarding the upcoming decision of the Tennessee Supreme Court in *Commercial Painting Co. Inc. v. Weitz Co. LLC*, 2022 WL 3149615 (Tenn. Aug. 4, 2022). In so doing, the Magistrate Judge extends the economic loss doctrine outside of the context of the sale of goods, which directly conflicts with Tennessee law and the Tennessee Supreme Court's decision in *Milan*. In so doing, the Magistrate Judge adopts a position most disruptive to the efficient administration of this case—something Judge Anderson in *TNIJACI01 Good 961 Lower Brownsville Rd. LLC v. FC Cox Constr., LLC*, 2023 WL 4504596 (W.D. Tenn. Feb. 14, 2023) was unwilling to do in a similar context earlier this year.

For each of the above reasons and as expanded upon more below, Raymond James respectfully asks that the District Court reject the challenged recommendations of Magistrate Judge's R&R and deny Landlord's Motion to Dismiss in its entirety.

## IV.   ARGUMENT

## A.   The independent duty rule does not preclude Raymond James from bringing a fraud claim.

The R&R found that although Raymond James had otherwise pled a claim for fraud, its claim failed to meet the Independent Duty Rule since "no Tennessee court has recognized an

6

independent duty not to commit fraud." *See* R&R, ECF 455 at PageID #8273. While it is unclear whether this finding formed the basis of the Magistrate Judge's recommendation for dismissal— the R&R is silent on this point—Raymond James nevertheless disputes this finding for the following reasons. First, no particularized duty is required to establish fraud. Unlike negligence— which requires that the defendant owe a duty of care to the plaintiff—fraud is universally prohibited. This is apparent even from a review of the elements of fraud itself, which are recited in the R&R, as follows:

> Under Tennessee law, there are four elements to a prima facie fraud claim: "(1) intentional misrepresentation of a material fact; (2) knowledge that the representation was false — that the misrepresentation was made knowingly or recklessly or without belief or regard for its truth; (3) reasonable reliance on the misrepresentation by the plaintiff and resulting damages; (4) 'that the misrepresentation relates to an existing or past fact[.]'"

*See* R&R, ECF 455 at PageID #8269 (citing *Dog House Invs., LLC v. Teal Props.*, 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014). As an intentional tort, fraud is present any time its elements are met.

Second, the duty not to commit fraud flows from Tennessee's strong public policy against fraud, as recently stated by the Tennessee Supreme Court in *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 154 (Tenn. 2021). In deciding to limit the Economic Loss doctrine's ability to bar all fraud claims in the limited situation where it was even applicable (i.e., a sale of goods), the Court had to balance "two concepts crucial to Tennessee law—freedom of contract and abhorrence of fraud." *Id*. After noting the importance of freedom to contract, Tennessee's Supreme Court elaborated as follows:

> On the other hand, Tennessee law takes a dim view of fraud. This Court has described it as vitiating and voiding "all human transactions, from the solemn judgment of a court to a private contract." *Knox-Tenn Rental Co. v. Jenkins*, 755 S.W.2d 33, 40

> (Tenn. 1988) (quoting *New York Life Ins. Co. v. Nashville Trust Co.*, 200 Tenn. 513, 292 S.W.2d 749, 754 (1956)). Statutes also reflect that Tennessee public policy disfavors fraud. Furthermore, in Tennessee, "[a] party may not, for public policy reasons, exempt itself from liability for gross negligence, reckless conduct, or intentional wrongdoing." *Copeland v. Healthsouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 270 (Tenn. 2018).

*Id.* This abhorrence of fraud, as described by the Tennessee Supreme Court, reflects a broad-based duty not to commit fraud in Tennessee.

Stated differently, the obligation to refrain from defrauding someone is not created by contract and cannot be abrogated by a contract. Landlord thus had an obligation totally independent of the parties' contract not to commit fraud and the Independent Duty Rule is therefore satisfied.

## B. **The R&R incorrectly found that the economic loss doctrine bars Raymond James' fraud claim.**

As formulated in Tennessee, the economic loss doctrine only applies to the sale of goods. The Tennessee Supreme Court re-confirmed this position less than two years ago in its scholarly and exhaustive treatment of the subject in *Milan.* In so doing, it specifically noted that it had "never applied the economic loss doctrine outside the products liability context, in which it originated." *Milan* at 153.  It is this context that informs the need for the doctrine—i.e. the proper allocation of risk between the buyer and seller *of goods* when there is no injury to person or property.[3] The

---

[3] This context was so instructive that the *Milan* Court extensively quoted the case from which the economic loss doctrine originated—the seminal California Supreme Court case of *Seely v White Motor Co.*—as follows:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the **nature of the responsibility a manufacturer must undertake in distributing his products**. He can appropriately be held liable for physical injuries caused by

current case does not involve a sale of goods, but rather fraudulent billing arising from Landlord's

operation of the office building housing Raymond James' offices. The economic loss doctrine thus

has no application to this case.

There is also no reason for Tennessee to expand the doctrine beyond the sale of goods. The

doctrine was created to apply in products liability cases and prevent the erosion of contract law in

that area. As *Milan* discussed:

> The economic loss doctrine is a judicially-created rule of relatively recent vintage. It was developed in response to modern products liability law from a concern that products liability and tort law would erode or consume contract law. It has been described as a "judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship."

*Id.* (internal citations omitted). The doctrine has not transplanted well to other areas of the law.

While a "majority of jurisdictions have now adopted the economic loss doctrine," as *Milan*

explained, the expansion by some jurisdictions of it beyond products liability has compounded the

---

> defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm**. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.** A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. **He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.** Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.

*Milan*, 627 S.W.3d at 142 (citing *Seely v. White Motor Co.*, 403 P.2d 145, 151 (Cal. 1965) (Emphasis added).  The economic loss doctrine was thus developed to fairly allocate the risk of loss arising out of the sale of goods. While tort liability was necessary for physical injuries, broad liability was not appropriate when the product merely did not perform as the purchaser expected—unless the manufacturer had so agreed.

confusion and issues the doctrine has raised. *Id.* at 144-5. By way of example, other jurisdictions have found:

- "Our experience with the economic loss rule over time, which led to the creation of the exceptions to the rule, now demonstrates that expansion of the rule beyond its origins [in products liability] was unwise and unworkable in practice." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 407 (Fla. 2013).

- "At the current pace, the economic loss doctrine may consume much of tort law if left unchecked." *Grams v. Milk Prods., Inc.*, 283 Wis.2d 511, 699 N.W.2d 167, 181 (2005) (Abrahamson, C.J., dissenting, comparing the doctrine to the all-consuming Blob, of horror movie fame).

- "Because strict products liability and negligence are torts, defendants seek to extend the economic loss inquiry to all torts, even those, like fraud, specifically designed for economic harm. This logical leap would basically eviscerate the tort of fraud, for the only damages one has in fraud are economic. The law cannot be so twisted." *KD & KD Enterprises, LLC v. Touch Automation, LLC*, 2006 WL 3808257 at *1 (D. Ariz. Dec. 27, 2006).

- "It does not appear that Ohio courts intended to extend the economic loss rule beyond negligence actions to bar intentional torts as well. Indeed, it is a rare case where fraud or fraud in the inducement results in non-economic damages (i.e. damages to person or property). SAP's all-encompassing construction of the economic loss rule would effectively eviscerate the viability of fraud and fraudulent inducement tort claims in Ohio." *Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, 2010 WL 6765522 at*11 (N.D. Ohio Sept. 2, 2010), report and recommendation adopted, 2011 WL 2174365 (N.D. Ohio June 2, 2011).

These cases highlight the dangers in expanding the scope of the doctrine into other areas of the law as recommended by the Magistrate Judge in the R&R.

As noted above, even if it were to expand the scope of the economic loss doctrine beyond the sale of goods, this case would not be affected unless Tennessee also expanded the economic loss doctrine to preempt fraud claims much more broadly. This would have to occur against the backdrop of Tennessee's strong policy of combatting fraud—something the *Milan* Court cited as

a twin concern with freedom of contract. *Milan*, 627 S.W.3d at 154. *Milan* only barred claims of fraud in the *inducement* of the contract (and then only if the "misrepresentations of the dishonest party concern the quality or character of the goods sold."). *Id.* (quoting *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 209 Mich. App. 365, 532 N.W.2d 541, 545 (1995)). This case, however, involves fraud in Landlord's *performance* of the contract—specifically its representations (and omissions) years after the contract was executed, regarding the expenses Raymond James was supposedly incurring to occupy the building.[4] Milan nowhere indicated that it would allow the economic loss doctrine to override claims for fraud in the performance of a contract, especially for services ancillary to a lease of office space.

Finally, the economic loss doctrine is poorly suited to perform its stated role here. At bottom, the doctrine is intended to allow parties to intelligently allocate the risk of a product's non-performance with contractual remedies, such as an offsetting warranty. That may be well and good with the negotiated sale of a product, but how does one effectively gauge the likely cost of fraud? The Tennessee Supreme Court highlighted this point by its quote of the California Supreme Court in *Robinson Helicopter Co. v. Dana Corp.,* as follows:

> "While parties, perhaps because of their technical expertise and sophistication, can be presumed to understand and allocate the risks relating to negligent product design or manufacture, those same parties cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction." Id., 22 Cal.Rptr.3d 352, 102 P.3d at 277 (quoting Tourek et al., supra, at 909); see also Ralph C. Anzivino, The Fraud in the Inducement Exception to the Economic Loss Doctrine, 90 Marq. L. Rev. 921, 940–41 (2007) (stating that the broad fraud exception prevents contracting parties from using

---

[4] As Raymond James explained in its SAC, this fraud is comprised of numerous overcharges and the failure of Landlord to pass on tens of thousands of dollars of property taxes reductions it secretly enjoyed and the false paperwork it submitted to Raymond James in further of the fraudulent scheme. *See* SAC, ECF 393 at PageIDs #7448-51; *see also* Raymond James Tower Operating Expenses Reconciliations, ECF 393-27 at PageIDs #7661-3.

11

> the economic loss doctrine to achieve what they have traditionally been unable to achieve by contract: limit their liability for fraud).

*Milan*, 627 S.W.3d at 147 (*quoting Robinson*, 102 P.3d 268, 276 (2004)). Claims for fraud—and the additional remedies they can provide—provide a deterrent to fraud, separate and distinct from a breach of contract. Treating actual fraud as merely a contractual issue will merely breed more fraud as prior infractions go unaddressed and sow mistrust since the law will expect a party to have to anticipate being cheated at every turn. Unfortunately, that is the logical outcome of the R&R if it stands and the public policy against fraud in this state would not be upheld.

**C.** **The R&R should be rejected because it unnecessarily attempts to predict how the Tennessee Supreme Court *may* rule.**

The R&R should also be rejected because it unnecessarily attempts to "read the tea leaves" regarding an upcoming decision of the Tennessee Supreme Court. As the R&R acknowledged, a case is currently pending before the Tennessee Supreme Court which, if its issues are addressed straight-on, will likely resolve at least the foundational question of whether Tennessee will expand its use of the economic loss doctrine beyond the sale of goods. *Commercial Painting Co. Inc. v. Weitz Co. LLC*, 2022 WL 3149615 (Tenn. Aug. 4, 2022). Other U.S. District Courts in this State and, more notably another District Judge in this District, have followed Tennessee law on the economic loss doctrine as it currently stands[5] and therefore have denied dispositive motions like

---

[5] Earlier this year Judge Anderson refused to anticipate a change in Tennessee's law in *TNIJACI01 Good 961 Lower Brownsville Rd. LLC v. FC Cox Constr., LLC*, 2023 WL 4504596 (W.D. Tenn. Feb. 14, 2023), stating that the Court "cannot ignore the fact that the express language of *Milan Supply Chain* applies only to the transactions involving goods." *Id*. at *4; *see also InterMed Res. TN, LLC v. Green Earth Techs., LLC*, 2022 WL 4486402 at *5 (M.D. Tenn. Sept. 27, 2022) (declining to make an "*Erie* guess" as to how the Tennessee Supreme Court will rule in determining whether the *Commercial Painting* Court erred in expanding the economic loss doctrine").

the one filed by Landlord. Aside from preventing the Court from taking an unprecedented step broadening the economic loss doctrine, rejection of Landlord's Motion to Dismiss would be less impactful on this case given that, among other things, outright dismissal—if ultimately found incorrect—will likely have precluded discovery on the issues and, thus for this reason alone, further complicate the administration of the case. On the other hand, if the Court sustains these objections to the R&R, the impact of the economic loss doctrine on Raymond James' claim grounds could always be revisited later if the Tennessee Supreme Court rules in a way favorable to Landlord.

Raymond James therefore respectfully asks this Court to deny Landlord's Motion to Dismiss based upon the current state of the law which, as even the R&R acknowledges, does not apply the economic loss doctrine outside of situations involving the sale of goods.

## V.    CONCLUSION

For the reasons addressed herein, Raymond James respectfully requests that the District Court reject the R&R's finding that Raymond James' fraud claim is barred by the economic loss doctrine and deny Landlord's Motion to Dismiss in its entirely.

Respectfully submitted,

**PROSSER, CLAPPER & JOHNSON, PLC**

/s/ Kyle Johnson

Niel Prosser (BPR No. 11647)
Rob Clapper (BPR No. 34180)
Kyle Johnson (BPR No. 36066)

13

5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
T:  (901) 820-4433
E:  np@prosserlaw.com
rclapper@prosserlaw.com
kjohnson@prosserlaw.com


– and –


**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**


/s/ John Branson

John Branson (BPR No. 10913)
165 Madison Avenue, Suite 2000
Memphis, TN 38103
T: (901) 577-2323
E: jbranson@bakerdonelson.com


*Attorneys for Raymond James*

14

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed using the Court's CM/ECF system on August 7 2023, which will automatically send an electronic copy of the filing to all counsel of record in this case.

   /s/ Kyle Johnson           
