**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION**

| | | |
|---|---|---|
| **RAYMOND JAMES & ASSOCIATES, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:18-cv-02104** |
| | ) | **No. 2:21-cv-02433** |
| | ) | |
| **50 NORTH FRONT ST. TN, LLC,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

**RAYMOND JAMES' NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff/Counter-Defendant, Raymond James & Associates, Inc. ("Raymond James"), respectfully submits this Notice of Supplemental Authority in support of its Objections to the Magistrate Judge's July 24, 2023 Report and Recommendation (ECF 457) ("Raymond James' R&R Objection"). As noted in Raymond James' R&R Objection, pending before the Tennessee Supreme Court was the issue of whether the economic loss doctrine applies to contracts outside of products liability, like the Lease at issue in this matter between Raymond James and Defendant, 50 North Front Street, LLC. *See e.g.* ECF, 457, PageID 8395-6.  The Tennessee Supreme Court decided that issue as of last week, holding that,

> the economic loss doctrine should only apply in products liability
> cases. We decline to extend the doctrine to services contracts.

*Commercial. Painting Co. Inc. v. Weitz Co. LLC*, No. 2023 WL 6304838, at *11 (Tenn. Sept. 28, 2023). The full opinion issued by the Tennessee Supreme Court is attached hereto. As such the economic loss doctrine is not applicable in this matter and Raymond James respectfully requests that the R&R be rejected and Defendant's Motion to Dismiss or to Strike be denied.

1

Respectfully submitted this 4th day of October, 2023.


**Raymond James & Associates, Inc.**

**PROSSER, CLAPPER & JOHNSON, PLLC**


  /s/ Kyle Johnson
Niel Prosser (BPR No. 11647)
Rob Clapper (BPR No. 34180)
Kyle Johnson (BPR No. 36066)
5865 Ridgeway Center Parkway, Suite 300
Memphis, TN 38120
T: (901) 820-4433
E:  np@prosserlaw.com
    rclapper@prosserlaw.com
    kjohnson@prosserlaw.com


      – and –


**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**


  /s/ John Branson


John Branson (BPR No. 10913)
165 Madison Avenue, Suite 2000
Memphis, TN 38103
T: (901) 577-2323
E: jbranson@bakerdonelson.com

*Attorneys for Raymond James*

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed using the Court's CM/ECF system on October 4, 2023, which will automatically send an electronic copy of the filing to all counsel of record in this case.

  /s/ Kyle Johnson

2023 WL 6304838
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED
FOR PUBLICATION IN THE PERMANENT
LAW REPORTS. UNTIL RELEASED, IT IS
SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Tennessee,
AT JACKSON.

COMMERCIAL PAINTING COMPANY INC.

v.

The WEITZ COMPANY LLC et al.

No. W2019-02089-SC-R11-CV
|
November 9, 2022 Session
|
FILED September 28, 2023

**Synopsis**
**Background:** Drywall subcontractor brought action against general contractor on a multi-building retirement community development project and its sureties for, inter alia, breach of contract, payment under the performance bond issued by general contractor's sureties, unjust enrichment, fraud, intentional and negligent misrepresentation, and rescission and reformation of the contract, after general contractor failed to pay subcontractor full amount for work performed. General contractor counterclaimed against subcontractor and its surety for "no event less than" $500,000 in damages for costs allegedly incurred on the project due to subcontractor's delay and defective workmanship. The Chancery Court, Shelby County, Kenny W. Armstrong, Chancellor, granted partial summary judgment in favor of general contractor on subcontractor's claims for intentional and negligent misrepresentation and fraud, rescission and reformation of the contract, and punitive damages. After a bench trial, the Chancery Court, Kenny W. Armstrong, Chancellor, awarded subcontractor damages for breach of contract but offset them to compensate general contractor for having to supplement subcontractor's work. Both parties appealed. The Court of Appeals, 2014 WL 6453799, vacated and remanded. The Supreme Court granted general contractor's application for permission to appeal for purpose of remanding case to Court of Appeals for reconsideration. On remand, the Court of Appeals, Andy D. Bennett, J., 2016 WL 3519015, vacated and remanded. Following jury trial on remand, the Chancery

Court, JoeDae L. Jenkins, Chancellor, entered judgment in favor of subcontractor on its claims for breach of contract, unjust enrichment, and intentional misrepresentation, as well as its claims under general contractor's payment bond, awarding compensatory and punitive damages and prejudgment interest. General contractor appealed. The Court of Appeals, J. Steven Stafford, P.J., 2022 WL 737468, applied the economic loss doctrine to preclude recovery of damages in tort, affirmed the award of compensatory damages for breach of contract, and reversed the award of punitive damages. Subcontractor's application for permission to appeal was granted

**Holdings:** The Supreme Court, Lee, J., held that:

[1] contract between the parties was for construction services;

[2] economic loss doctrine applies only in products liability cases and does not extend to services contracts; and

[3] economic loss doctrine did not bar subcontractor's claim of intentional misrepresentation.

Ordered accordingly.

Campbell, J., filed a dissenting opinion, in which Jeffrey S. Bivins, J., joined.

**Procedural Posture(s):** On Appeal; Judgment; Motion for Attorney's Fees.

West Headnotes (7)

**[1]** **Appeal and Error** 🔑

The question of whether the economic loss doctrine applies is a matter of law which the Supreme Court reviews de novo.

**[2]** **Torts** 🔑

The "economic loss doctrine" is a judicially-created rule that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship.

**[3] Torts** 👈

The purpose of the economic loss doctrine is to preserve the important distinction between contract and tort law and to prevent the tortification of contract law.

**[4] Contracts** 👈

Contract between general contractor on a multi-building retirement community development project and drywall subcontractor was a contract for construction services, not a contract for the sale of goods, although the cost of the materials was a significant portion of the price to be paid to subcontractor under the contract, where contract described subcontractor's work as including all labor, supervision, material, equipment, services, and other items required or reasonably inferable from the contract documents to properly and timely perform and complete subcontractor's work.

**[5] Torts** 👈

Economic loss doctrine applies only in products liability cases and does not extend to services contracts.

**[6] Contracts** 👈

Parties to contract, even sophisticated commercial parties, cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction.

**[7] Fraud** 👈

Economic loss doctrine did not apply to bar drywall subcontractor's claim of intentional misrepresentation against general contractor on a multi-building retirement community development project, alleging that general contractor deliberately made false representations about the timing and amount of work involved in the subcontract, in order to mislead subcontractor to obtain an undue advantage over it; contract between the parties was a contract for construction services, to which the economic loss doctrine did not apply, claim was not predicated solely on a breach of contract, but on an independent tort, and subcontractor could not have been expected to factor into its decision to enter the contract the possibility that general contractor was making false representations.

**Appeal by Permission from the Court of Appeals, Chancery Court for Shelby County, No. CH-06-1573, JoeDae L. Jenkins, Chancellor**

**Attorneys and Law Firms**

Scott A. Frick, Memphis, Tennessee, for the appellant, Commercial Painting Company, Inc.

Philip E. Beck, Atlanta, Georgia, John A. Templer, Jr., Des Moines, Iowa, and Jeffrey C. Smith, Germantown, Tennessee, for the appellees, The Weitz Company, LLC, Federal Insurance Company, and St. Paul Fire & Marine Insurance Company.

Gregory L. Cashion, Nashville, Tennessee, and Leah Pilconis, Arlington, Virginia, for the Amici Curiae Associated General Contractors of America and Associated General Contractors of Tennessee, Inc.

Sharon G. Lee, J., delivered the opinion of the Court, in which Roger A. Page, C.J., and Holly Kirby, J., joined. Sarah K. Campbell, J., filed a dissenting opinion, in which Jeffrey S. Bivins, J., joined.

## OPINION

Sharon G. Lee, J.

**\*1** The economic loss doctrine generally precludes a contracting party who suffers only economic losses from recovering damages in tort. In Tennessee, the application of this doctrine is limited to products liability cases. In this appeal, we consider whether the economic loss doctrine should be expanded to apply outside the products liability context. A jury awarded compensatory and punitive damages

to a drywall subcontractor in a suit against a general contractor under theories of breach of contract and tort. The Court of Appeals applied the economic loss doctrine to preclude the recovery of damages in tort in a suit between sophisticated commercial entities. The intermediate court, in part, affirmed the award of compensatory damages for breach of contract, dismissed the tort claim, and reversed the award for punitive damages. We hold the economic loss doctrine only applies in products liability cases and should not be extended to other claims.

## I.

This case stems from a contract dispute between a general contractor, The Weitz Company, LLC, and its drywall subcontractor, Commercial Painting Company, Inc. Weitz was the general contractor on a multi-building retirement community in Shelby County. In December 2004, the parties entered into a contract for Commercial Painting to perform drywall work on the project.[1] The contract included a schedule detailing the phases and timing of construction. Weitz agreed to pay Commercial Painting $3,222,400 for its work. Change orders later increased the amount to $3,315,189. The parties had various disputes as the project progressed.

By the end of the contract, Weitz had paid Commercial Painting twelve of its seventeen pay applications. Weitz refused to pay the remaining five applications, claiming they were submitted untimely and contained improper change order requests.

In August 2006, Commercial Painting sued Weitz[2] and its sureties, Federal Insurance Company and St. Paul Fire & Marine Insurance Company, and The Village at Germantown in the Shelby County Chancery Court seeking $1,929,428.74 in damages for breach of contract, including attorney's fees.[3] Commercial Painting alleged that Weitz failed to properly sequence, coordinate, monitor, and inspect the work of the various subcontractors on the project, which caused Commercial Painting extra work and forced it to work in a more inefficient and costly manner. The complaint also included claims for payment under the performance bond issued by Weitz's sureties, interest on retainage under section 66-11-144 of the Tennessee Code,[4] unjust enrichment, enforcement of Commercial Painting's

mechanic's and materialman's lien, and interest and attorney's fees under the Prompt Pay Act of 1991.[5]

**\*2** Weitz answered and counterclaimed against Commercial Painting and its surety for "no event less than" $500,000 in damages for costs allegedly incurred on the project due to Commercial Painting's delay and defective workmanship.

In a later amendment to its complaint, Commercial Painting asserted additional claims for fraud, intentional and negligent misrepresentation, rescission/reformation of the contract, and $10,000,000 in punitive damages. Commercial Painting alleged Weitz negotiated a six-month extension with the project owner before executing the contract with Commercial Painting, but the construction schedule attached to the contract did not reflect the extension. Commercial Painting also claimed Weitz signed the contract knowing the schedule was outdated by about eight months and that the actual length of the delay was eight to twelve months. Commercial Painting alleged that Weitz knew when it executed the contract that to make up for the delay, it would have to compress the construction schedule and hire extra workers to supplement the work of various subcontractors, including Commercial Painting's drywall work. Commercial Painting also asserted that after negotiating the six-month extension with the project owner, Weitz issued an amended construction schedule that was "fraudulent and unrealistic" in order to earn an early completion bonus.[6] According to Commercial Painting, Weitz continued to issue construction schedules that were unrealistic, and required the subcontractors to adhere to those schedules, never revealing the actual length of the extension until near the end of the project when it became clear that Weitz could not complete construction in time to earn the early completion bonus. Commercial Painting contended that Weitz improperly supplemented Commercial Painting's work by falsely claiming Commercial Painting was not completing its work according to a schedule that Weitz knew contained false information about the project completion date and that Weitz fraudulently charged Commercial Painting for the cost of the supplemental drywall work. Weitz generally denied the allegations in the amended complaint and reiterated the allegations in its counterclaim that Commercial Painting was in breach of the subcontract and did not perform its contractual duties in a timely and workmanlike manner.

The trial court granted partial summary judgment in favor of Weitz on Commercial Painting's claims for intentional/ negligent misrepresentation and fraud, rescission/reformation of the contract, and punitive damages. After a bench trial,

the trial court awarded Commercial Painting $450,464.26 for breach of contract, finding that Commercial Painting was entitled to $600,464.26 less a $150,000 offset to Weitz for having to supplement Commercial Painting's work.

The Court of Appeals vacated the trial court's award of partial summary judgment to Weitz, concluding that Commercial Painting established a genuine issue of material fact regarding the intentional and negligent misrepresentation claims. *Com. Painting Co. v. Weitz Co., LLC*, No. W2013-01989-COA-R3-CV, 2016 WL 3519015, at \*2 (Tenn. Ct. App. June 20, 2016).

 **\*3** After remand from the Court of Appeals, Commercial Painting filed a second amended complaint including additional alleged facts. The second amended complaint sought compensatory damages of $1,929,428.74, less a payment of $456,170 made by Weitz in June 2013, and increased the punitive damages claim to $200,000,000.

In September and October 2018, a jury heard the case. Commercial Painting presented evidence that Weitz misled it from the outset of the relationship by misrepresenting how far behind schedule the project was, bids submitted by other subcontractors, and the existence of the agreement for extension of time to complete the project. The jury also considered evidence that Weitz tried to compress the work schedule by improperly supplementing Commercial Painting's drywall work, and wrongfully refused to pay for extra work done by Commercial Painting's employees.

The jury awarded Commercial Painting $1,729,122.46 in compensatory damages on each of the claims— breach of contract, unjust enrichment, and intentional misrepresentation, as well as its claim under Weitz's payment bond.[7] The jury also awarded Commercial Painting $3,900,000 in punitive damages. The trial court reduced the compensatory damages by $456,170, the amount of Weitz's earlier payment. The trial court also awarded Commercial Painting $2,083.362.16 in pre-judgment interest and $1,103,549.27 for litigation costs and attorney's fees. The total judgment was $8,359,863.83.[8]

Weitz appealed, and the Court of Appeals held that the economic loss doctrine applied outside the products liability context when the contract was negotiated between sophisticated commercial entities. The intermediate appellate court affirmed the trial court's judgment for compensatory damages for breach of contract; dismissed the tort claim for intentional misrepresentation and reversed the punitive

damages award based on the economic loss doctrine; reversed the trial court's award of pre- and post-judgment interest after finding that interest was not an available remedy under the parties' contract; and vacated the trial court's award of attorney's fees in part after determining that Commercial Painting was entitled only to attorney's fees incurred in obtaining the compensatory damages award. *Com. Painting Co. v. Weitz Co., LLC*, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at \*1 (Tenn. Ct. App. Mar. 11, 2022). The Court of Appeals analyzed and attempted to apply the principles stated in *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125 (Tenn. 2021), concluding that "the reasoning employed by" *Milan* "hews most closely to the reasoning of those jurisdictions that have extended the economic loss rule beyond its origination." *Com. Painting*, 2022 WL 737468, at \*21.

 **\*4** We granted Commercial Painting's Rule 11 application for permission to appeal to consider two issues:

1. Whether the Court of Appeals erred in applying this Court's holding in *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125 (Tenn. 2021), and expanding the application of the economic loss doctrine to the circumstances of this case.

2. Whether the Court of Appeals erred in vacating the trial court's award of attorney's fees and in limiting the scope of recoverable fees on remand, and whether the Court of Appeals erred in denying Commercial Painting Company an award of costs and fees on appeal.

## II.

 **[1]** The question of whether the economic loss doctrine applies in this case is a matter of law which we review de novo. *Milan*, 627 S.W.3d at 141 (citing *Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 488 (Tenn. 2009)).

### *Economic Loss Doctrine*

 **[2]** **[3]** The economic loss doctrine is a judicially-created rule that "operates generally to preclude contracting parties from pursuing tort recovery for purely economic or

commercial losses associated with the contract relationship." *Milan*, 627 S.W.3d at 142 (quoting *Plourde Sand & Gravel v. JGI E., Inc.*, 154 N.H. 791, 917 A.2d 1250, 1253 (2007)). The purpose of the rule is to "preserve[ ] the important distinction between contract and tort law" and to "prevent the 'tortification' of contract law." Jeffrey L. Goodman, Daniel R. Peacock & Kevin J. Rutan, *A Guide to Understanding the Economic Loss Doctrine*, 67 Drake L. Rev. 1, 3–4 (2019).

In 2009, the economic loss doctrine was adopted when this Court answered the certified question of whether "Tennessee law recognize[s] an exception to the economic loss doctrine under which recovery in tort is possible for damage to the defective product itself when the defect renders the product unreasonably dangerous and causes the damage by means of a sudden, calamitous event." *Lincoln Gen.*, 293 S.W.3d at 488.

The Court in *Lincoln General* noted that the "economic loss doctrine is implicated in products liability cases when a defective product damages itself without causing personal injury or damage to other property." *Id.* at 489. *Lincoln General* for the first time examined "the proper application of the economic loss doctrine when only the defective product is damaged." *Id.* Relying on the United States Supreme Court's opinion in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Court concluded that "the owner of a defective product that creates a risk of injury and was damaged during a fire, a crash, or other similar occurrence is in the same position as the owner of a defective product that malfunctions and simply does not work." *Lincoln Gen.*, 293 S.W.3d at 491. Thus, "the remedies available to these similarly situated product owners should derive from the parties' agreements, not from the law of torts." *Id.*

This Court most recently examined the economic loss doctrine in *Milan*, a products liability case where the manufacturer and seller of allegedly defective trucks asserted the doctrine as a defense to a fraud claim brought by a commercial trucking company. *Milan*, 627 S.W.3d at 129, 140–41. The Court examined three different approaches of other states in applying the economic loss doctrine to fraud claims: (1) a strict approach in which "the economic loss doctrine bars all fraud claims," *id.* at 146; (2) a broad exception under which "fraudulent inducement claims seeking economic losses are excepted because the duty not to commit fraud exists independent of any contract," *id.* at 147; and (3) a narrow exception in which fraud claims are barred in certain situations involving contracts between sophisticated business entities. *Id.* at 148–51. We adopted the narrow exception to bar a purely economic loss claim in cases where "the alleged fraud concerns pre-contractual misrepresentations and nondisclosures about the quality, reliability, and character of *the goods that are the subject of a contract between sophisticated business entities.*" *Id.* at 154 (emphasis added).

**\*5** The *Milan* Court "expressly stop[ped] short of resolving the broad question of whether there may ever be a fraudulent inducement exception to the economic loss rule in Tennessee." *Id.* at 155 (internal quotation marks omitted). Importantly, *Milan* did not contemplate the application of the economic loss doctrine outside of the products liability context. In fact, this Court stated in *Milan* that the economic loss doctrine "has been aptly described as 'one of the most confusing doctrines in tort law,' " and "[t]he confusion is compounded because most states have not limited the doctrine to the products liability context, in which it originated." *Id.* at 144–45 (quoting R. Joseph Barton, Note, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L. Rev. 1789, 1789 (2000)).

Legal scholars generally agree that the inconsistent application of the economic loss doctrine and the wide array of exceptions applied by different states have resulted in a "confusing morass." Goodman et al., *supra*, at 56. This is in part because the results of the cases "vary depending on the fact pattern of the particular case and the variation of the doctrine utilized by the jurisdiction." *Id.* Consequently, "application of the doctrine now involves applying copious exceptions, numerous tests, and exhaustive mental gymnastics." *Id.* at 8. As one law professor put it, "[s]ome courts have suggested, in effect, that the 'economic loss rule' means there is no recovery in tort for pure economic loss, except when there is." Ward Farnsworth, *The Economic Loss Rule*, 50 Val. U. L. Rev. 545, 571 (2016).

*Commercial Painting Company Inc. v. Weitz Company LLC*, --- S.W.3d ---- (2023)

The widespread confusion and lack of clarity resulting from the unwarranted expansion of the economic loss doctrine is far from the only concern raised by such a decision. As further discussed below, applying the economic loss doctrine in cases beyond product liability actions would threaten contracting parties for services, who are not covered by the significant protections afforded by the Uniform Commercial Code. This is particularly true for less sophisticated individuals who enter into more informal, often unwritten, agreements for a variety of services. As numerous expert commentators have observed, the expansion of the doctrine also threatens to extinguish tort claims, long recognized as legitimate and viable, for people entering into such commonplace informal contracts for services.

*Application of Economic Loss Doctrine
Beyond Products Liability Cases*

**[4]** Here, we are not presented with claims of defective products or buildings. Instead, a provider of construction services on a project sued the general contractor, asserting various claims, including intentional misrepresentation. Although the cost of materials was a significant portion of the price to be paid to Commercial Painting under the contract, the description of the scope of Commercial Painting's work on the project clearly shows it is a contract for services.[9] The description of Commercial Painting's work makes it clear that, regardless of the price of materials, the contract was not for the sale of goods. The question thus presented is whether Tennessee should expand the application of the economic loss doctrine to contractual relationships outside the products liability context.

**\*6** Courts in some jurisdictions have applied the economic loss doctrine to services contracts but have carved out numerous and varying exceptions. These exceptions include claims arising out of contracts with providers of professional services, such as attorneys, accountants, and doctors, among others. *See, e.g.,* ⚑ *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 223 P.3d 664, 673 (2010) (holding the economic loss doctrine applied to construction contracts, but noting an exception for attorneys and fiduciaries); ⚑ *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000) (expressly adopting the economic loss doctrine and applying it to a services contract, but recognizing exceptions for "special

relationships" such as attorney-client, doctor-patient, or insurer-insured and situations where a duty *independent* of any contractual obligations exists, such as fraud or negligent misrepresentation); ⚑ *Taylor v. Taylor*, 163 Idaho 910, 422 P.3d 1116, 1125 (2018) (stating that economic loss doctrine applies in all negligence cases, including actions based on a services contract, unless there is a special relationship between the parties or "unique circumstances require a reallocation of the risk"); ⚑ *Congregation of the Passion v. Touche Ross & Co.*, 159 Ill.2d 137, 201 Ill.Dec. 71, 636 N.E.2d 503, 514–15 (1994) (holding that the economic loss doctrine does not apply to a contract that results in something intangible, such as the services of an accountant or an attorney, because "[w]hether the professional produces a legal brief or a financial statement, the value of the services rendered lies in the ideas behind the documents, not in the documents themselves," and noting the doctrine does not apply to a breach of duty that exists outside of the contract); ⚑ *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 742 (Ind. 2010) (holding that the economic loss doctrine generally applied to a contract for design and inspection services on a construction project, but stating that the rule "is a *general* rule that admits of exceptions for contracts for services in appropriate circumstances" such as, possibly, legal malpractice, breach of fiduciary duty, breach of an insurer's duty to settle a claim, or negligent misstatement); ⚑ *David v. Hett*, 293 Kan. 679, 270 P.3d 1102, 1114 (2011) (holding economic loss doctrine does not bar claims for economic damages "against a service contractor in the residential construction context"); ⚑ *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 125 Nev. 66, 206 P.3d 81, 87, 90 (2009) (holding that the economic loss doctrine applies to contracts for architectural and engineering services, but noting exceptions to the doctrine for "certain categories of cases, such as negligent misrepresentation and professional negligence actions against attorneys, accountants, real estate professionals, and insurance brokers"); ⚑ *Sapp v. Ford Motor Co.*, 386 S.C. 143, 687 S.E.2d 47, 49 (2009) (recognizing a "narrow exception to the economic loss rule to apply solely in the residential home context" because a home is usually the largest investment a person will make, it is different than any other manufactured good a person will buy, and the business transaction between a home builder and a home buyer "involves inherently unequal bargaining power"); ⚑ *LAN/STV v. Martin K. Eby Constr. Co.*, 435

S.W.3d 234, 243–46 (Tex. 2014) (noting that professional malpractice claims are not barred by the economic loss doctrine, regardless of the existence of a contract, and stating that "the application of the rule depends on an analysis of its rationales in a particular situation"). [10]

As these cases show, applying the economic loss doctrine outside the products liability context to services contracts necessitates finding and justifying "very numerous and confusing" exceptions. Farnsworth, *supra*, at 571. Consequently, "judges, lawyers, and legal scholars struggle to track the doctrine's meaning, application, and scope within their jurisdiction." Goodman et al., *supra*, at 1; *see also* Andrew Gray, Note, *Drowning in a Sea of Confusion: Applying the Economic Loss Doctrine to Component Parts, Service Contracts, and Fraud*, 84 Wash. U. L. Rev. 1513, 1513 (2006) (noting the "vast confusion over this area of the law" resulting in part from "the doctrine's wide-ranging impact"); *Milan*, 627 S.W.3d at 144–45 (discussing concerns of confusion and lack of clarity caused by doctrine's expansion).

The federal district court decisions attempting to apply Tennessee law to this issue are not in complete agreement. Weitz cites *Ladd Landing, LLC v. Tennessee Valley Authority*, 874 F. Supp. 2d 727, 729 (E.D. Tenn. 2012) for its rejection of the plaintiffs' argument "that the economic loss rule is inapplicable to their claims because under Tennessee law, that rule is limited to claims for products liability or claims involving the sale of goods." However, at least eight federal district court opinions have reached the contrary conclusion, holding, based in part on rulings of this Court and the Tennessee Court of Appeals, that the economic loss doctrine does not extend to services contracts. *See SPO Go Holdings, Inc. v. W & O Constr. Co.*, 187 F. Supp. 3d 887, 892–93 (M.D. Tenn. 2016) (noting that "many federal courts have concluded that the doctrine should not be extended beyond cases involving the sale of goods," and following cases "predicting Tennessee law [that] have held that the economic loss doctrine does not extend to contracts for the provision of services"); *Lick Branch Unit, LLC v. Reed*, No. 3:13-cv-203, 2014 WL 546696, at *16 (E.D. Tenn. Feb. 10, 2014) (same; stating that economic loss doctrine "typically applies in the products liability context"); *Tan v. Wilbur Smith Assoc., Inc.*, No. 2:09-cv-25, 2011 WL 3421320, at *7 (E.D. Tenn. Aug. 4, 2011) (footnote omitted) ("[a]fter reviewing the *Ham* case and its companion cases

and noting the lack of extensive Tennessee case law on this issue, the Court agrees that the economic loss rule is applicable to the sale of goods, but does not extend equally to contracts for the provision of services"); *Ham v. Swift Transp. Co.*, 694 F. Supp. 2d 915, 922–23 (W.D. Tenn. 2010); *Lott v. Swift Transp. Co.*, 694 F. Supp. 2d 923, 930–31 (W.D. Tenn. 2010); *Pascarella v. Swift Transp. Co.*, 694 F. Supp. 2d 933, 945–46 (W.D. Tenn. 2010); *Broadnax v. Swift Transp. Co.*, 694 F. Supp. 2d 947, 953–54 (W.D. Tenn. 2010); *Corso Enters., Inc. v. Shop at Home Network, Inc.*, No. 3:04-0260, 2005 WL 2346986, at *7 (M.D. Tenn. Sept. 26, 2005) (holding an agreement was for services, "not a contract for the sale of goods governed by the UCC" and thus the economic loss doctrine did not bar the plaintiffs' tort-based claims).

**\*7** In the *Ham*, *Lott*, *Pascarella*, and *Broadnax* related quartet of cases, the court carefully analyzed then-existing Tennessee caselaw on the issue of the potential application of the economic loss doctrine outside of cases involving the sale of goods and stated:

> Application of the economic loss doctrine to cases involving defective products is not surprising ... because the Uniform Commercial Code ("UCC") sets forth the full series of rights and remedies available to an aggrieved purchaser who suffers only economic losses.... If the existence of UCC remedies provides the justification for not allowing the plaintiff to sue in tort, the absence of UCC remedies should counsel in favor of allowing tort recovery. Thus, the Court believes that, like the Wisconsin Supreme Court, the Tennessee Supreme Court would rely on the fact that the economic loss doctrine has its origins in the UCC to preclude application of the doctrine to suits not involving UCC remedies, specifically those concerning the provision of services.

*E.g.,* 🚩*Ham*, 694 F. Supp. 2d at 922–23 (citing 🚩*Ins. Co. of N. Am. v. Cease Elec. Inc.*, 276 Wis.2d 361, 688 N.W.2d 462, 467–68 (2004)).

The Supreme Courts of Wisconsin, Florida, and Minnesota, and the Michigan Court of Appeals, have all held that the economic loss doctrine does not apply to services contracts.

In 🚩*Insurance Co. of North America v. Cease Electric Inc.*, 276 Wis.2d 361, 688 N.W.2d 462 (2004), the Wisconsin Supreme Court held that the economic loss doctrine did not bar a tort claim brought by a barn owner arising out of losses incurred due to the failure of a ventilation system in the barn. 🚩*Id.* at 464. After determining that the contract for installation of the ventilation system was for services and not for a product, the court examined the applicability of the economic loss doctrine. 🚩*Id.* at 466–67. The 🚩*Cease* court rejected the defendant's argument that "contract law is better suited than tort law for dealing with purely economic loss in the context of service agreements" because "the built-in warranty provisions that the U.C.C. may provide in a contract for the sale of products or goods would not apply to a contract for services." 🚩*Id.* at 469. The court reasoned that, under the UCC, when a product does not operate as it should, the purchaser has the option of filing a claim for breach of warranty or revoking acceptance and suing for breach of contract. 🚩*Id.* at 468. The manufacturer is also protected by its ability to disclaim warranties or limit remedies in its contract with the purchaser. 🚩*Id.* But the UCC does not apply to services contracts, and therefore the 🚩*Cease* court determined that the economic loss doctrine did not apply. 🚩*Id.* at 469.

The Minnesota Supreme Court employed similar reasoning in 🚩⚠️*McCarthy Well Co. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312 (Minn. 1987). There, the court held that because the UCC does not apply to a services contract, the economic loss doctrine did not bar the plaintiff from recovering purely economic losses under a negligence theory. 🚩⚠️*Id.* at 315.

The Michigan Court of Appeals in 2002 noted that Michigan courts had only applied the economic loss doctrine in cases involving a transaction for goods and had "declined to apply the economic loss doctrine where the claim emanates from a contract for services." 🚩*Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 254 Mich.App. 372, 656 N.W.2d 858, 862–63 (2002). *See also White Acres, LLC v. Shur-Green Farms, LLC*, No. 354175, 2022 WL 4283105, at *4 (Mich. Ct. App. Sept. 15, 2022), *perm. app. denied*, 984 N.W.2d 196 (Mich. Jan. 31, 2023) (quoting 🚩*Quest Diagnostics*, 656 N.W.2d at 863) (reiterating that "the economic loss doctrine does not apply when 'the claim emanates from a contract for services' " but applying the doctrine because the contract involved the sale of goods rather than services).

**\*8** The evolution of the Florida Supreme Court's jurisprudence on this issue is particularly instructive. That court eventually recognized that its "unprincipled expansion" of the economic loss doctrine outside the realm of products liability had resulted in confusion. 🚩*Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So.3d 399, 407 (Fla. 2013). The court ruled that in Florida, the application of the economic loss doctrine should return to the rule's origin and original purpose and be limited to products liability cases. 🚩*Id.*

Nine years earlier, the Florida Supreme Court "recognized the danger in an 'unprincipled extension of the [economic loss] rule' " in 🚩*Indemnity Insurance Co. of North America v. American Aviation, Inc.*, 891 So.2d 532, 542 (Fla. 2004) (citing 🚩*Moransais v. Heathman*, 744 So.2d 973, 981 (Fla. 1999)). The court in 🚩*American Aviation* "expressly limited" the economic loss rule to "cases involving either privity of contract or products liability." 🚩*Id.* at 542–43. The court stated that the "other exceptions" to the rule—professional malpractice, fraudulent inducement, negligent misrepresentation, and freestanding statutory causes of action—would still apply. 🚩*Id.* at 543. The court also noted that "[i]ntentional tort claims such as fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent" remained viable claims even in the context of products liability or privity of contract. 🚩*Id.* at 543, n.3. The express limitation on the economic loss rule in 🚩*American Aviation* was necessary because, as the concurring justice stated, "[t]he economic loss rule ha[d] become a confusing morass." 🚩*Id.* at 544 (Cantero, J., concurring). Concurring Justice Cantero summarized the holding as follows: "[T]he economic loss rule does not apply

in the services context unless a contract exists and none of the established exceptions to the rule apply." *Id.*

In *Tiara Condominium Association*, the Florida Supreme Court again lamented the "unprincipled expansion" of the economic loss doctrine beyond products liability, "recede[d] from [its] prior rulings to the extent that they have applied the economic loss rule to cases other than products liability," and "return[ed] the economic loss rule to its origin in products liability." *Tiara Condo. Ass'n*, 110 So.3d at 407. The court concluded: "Our experience with the economic loss rule over time, which led to the creation of the exceptions to the rule, now demonstrates that expansion of the rule beyond its origins was unwise and unworkable in practice." *Id.*

Professor Farnsworth summed up the problem recognized and addressed by the Florida high court as follows:

> Stating a broad rule against recovery for pure economic loss in tort has an additional worrisome consequence beyond the confusion it has caused. It creates a presumption against liability in cases that don't fit into one of the well-defined exceptions. This can cause legitimate claims to be snuffed out inadvertently by the sweep of the rule in the background. Trouble predictably results when a rule is recited and extended without attention to its rationale; sure enough, some states have found themselves in difficult and embarrassing positions when they stated aggressive versions of the economic loss rule and then discovered that the "rule" they had stated had implications they did not intend or came to regret.

Farnsworth, *supra*, at 550 (citing *Tiara Condo. Ass'n*, 110 So.3d at 404).

**\*9** **[5]** We conclude that it would be unwise for this Court to travel down the same path the Florida Supreme Court ultimately found to be an untenable "confusing morass."

*See American Aviation*, 891 So.2d at 544 (Cantero, J., concurring). As expressly stated in *Milan*, the widely recognized confusion about the economic loss doctrine has been compounded "because most states have not limited the doctrine to the products liability context, in which it originated." *Milan*, 627 S.W.3d at 145. In sum, there is no compelling reason to extend the economic loss doctrine to services contracts.

Weitz argues that the Court of Appeals' application of *Milan* to the facts in this case does not constitute a modification of or deviation from *Milan*. But it does. *Milan* was a products liability case. We indicated no interest in expanding the economic loss doctrine beyond the products liability context. The application of the doctrine to a contract for construction services is a modification by expansion of *Milan*. The amici curiae contend that reversing the Court of Appeals' decision "will materially change Tennessee law." But just the opposite is true. Our decision today does not change the current state of Tennessee law regarding the application of the economic loss rule. Weitz and the amici are seeking a material change in Tennessee law by extending the economic loss doctrine to services contracts.

Weitz asserts that this Court has never held the economic loss doctrine is limited to products liability cases, pointing out that *Milan* adopted the reasoning of *Healthbanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193 (Utah 2018), which was not a products liability action. *See Milan*, 627 S.W.3d at 153 (citing *Healthbanc*, 435 P.3d at 194). However, in *Milan*, we followed the reasoning of *Healthbanc* in addressing fraud claims in products liability cases. We concluded that in cases "involving a contract between sophisticated commercial business entities and a fraudulent inducement claim seeking recovery of economic losses only, the economic loss doctrine applies if 'the only misrepresentation[s] by the dishonest party concern[ ] the quality or character of the *goods sold*' " because "[u]nder such circumstances, 'the other party is still free to negotiate warranty and other terms to account for possible defects *in the goods.*' " *Id.* at 153–54 (emphasis added).

In *Milan*, this Court expressed no interest in expanding the doctrine to services contracts and noted that such an

expansion in other states had caused confusion about the doctrine. 🚩*Id.* at 145. On this point, 🚩*Milan* is clear and unambiguous: "[T]his Court has never applied the economic loss doctrine outside the products liability context, in which it originated." 🚩*Id.* at 153. The sole issue decided in 🚩*Milan* was whether to adopt a fraud exception to the economic loss doctrine in a case involving a contract between two sophisticated business entities for the sale of goods. 🚩*Id.* at 153–54.

Weitz and the amici express the concern that allowing a contracting party to recover tort damages would "frustrate[ ] the ability of contracting parties to reliably allocate risks and costs during their bargaining and to then build cost considerations into their contracts." This Court explained in 🚩*Milan* that courts adopting a broad fraud exception to the economic loss doctrine have stated that "the parties to a contract 'create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks.' " 🚩*Milan,* 627 S.W.3d at 147 (quoting 🚩*Robinson Helicopter Co. v. Dana Corp.,* 34 Cal.4th 979, 22 Cal.Rptr.3d 352, 102 P.3d 268, 275 (Cal. 2004)). In this scenario, it is the function of contract law "to enforce only such obligations as each party voluntarily assumed, and to give [each party] only such benefits as [that party] expected to receive." 🚩*Id.* (quoting 🚩*Robinson Helicopter,* 22 Cal.Rptr.3d 352, 102 P.3d at 275) (alterations in original). But "this universe of expectations does not merit protecting if one party commits fraud to induce the contract because '[a] party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to the contract.' " 🚩*Id.* (quoting 🚩*Robinson Helicopter,* 22 Cal.Rptr.3d 352, 102 P.3d at 275).

 **\*10**  **[6]**  One party need not have to consider another party's fraud among the potential risks and costs when negotiating a contract in good faith. Parties to a contract— even sophisticated commercial parties—"cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction." 🚩*Id.* (quoting 🚩*Robinson Helicopter,* 22 Cal.Rptr.3d 352, 102 P.3d at 277). To hold otherwise would increase the risk of fostering a legal system tending to place the risk of fraudulent behavior on the defrauded party rather than the perpetrator. Contracting parties in Tennessee, including those in the construction industry, should not have to factor into their decision to enter a contract the potential for fraud or another party's dishonesty.

Weitz and the amici also urge us to recognize that the economic loss doctrine draws "the line between warranty and contract on the one hand and the torts of strict liability, negligence, fraud, and misrepresentation on the other hand." In support, Weitz cites 🚩*Trinity Industries, Inc. v. McKinnon Bridge Co. Inc.,* 77 S.W.3d 159, 171–72 (Tenn. Ct. App. 2001), *abrogated on other grounds by* 🚩*Bowen ex rel. Doe v. Arnold,* 502 S.W.3d 102 (Tenn. 2016). But 🚩*Trinity Industries* was a case involving the sale of goods, and the economic loss doctrine applied because a claim based on a contract for the sale of goods is governed by the UCC. 🚩*Trinity Indus.,* 77 S.W.3d at 171–73. The amici make the same argument, relying on 🚩*Messer Griesheim Industries, Inc. v. Cryotech of Kingsport, Inc.,* 131 S.W.3d 457 (Tenn. Ct. App. 2003). Like 🚩*Trinity Industries,* however, 🚩*Messer Griesheim* involved the sale of goods. The economic loss doctrine was inapplicable because the product caused damage to other property. 🚩*Messer Griesheim,* 131 S.W.3d at 466.

Moreover, as observed by Professor Johnson,

> The boundary-line function of the economic loss rule is most clearly established in the field of products liability....
>
> The economic loss rule operates sensibly in the products liability field because the commercial nature of the underlying transaction means that a contract-law remedy is not only feasible, but routinely available. The sale that produces the distribution of the defective product allows the parties to determine how economic risks relating to the quality of the product should be allocated and supplies default rules relating to warranties that resolve disputes if the parties do not specify particular terms of recovery. In addition, the ubiquitous adoption of the Uniform Commercial Code (UCC) means that there is a carefully crafted statutory mechanism available for resolving economic loss claims.

Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule,* 66 Wash. & Lee L. Rev. 523, 549, 551 (2009).

The expansion of the economic loss doctrine has raised concerns that "it is traditional tort claims that are struggling to keep their heads above water." Daniel Rapaport, Kurt Olafsen, Sigmund D. Schutz & Jonathan Mermin, *Tort Killer: The Applicability of the Economic Loss Doctrine to Service Contracts*, 20 Me. B.J. 100, 103 (2005). "The extension of the economic loss doctrine to services threatens to engulf longstanding common law torts for the inadequate or incompetent performance of professional services." *Id.* In

*Milan*, we noted this concern by quoting Chief Justice Abrahamson's observation that, like the alien in the classic horror film *The Blob*, "[a]t the current pace, the economic loss doctrine may consume much of tort law if left unchecked."

*Milan*, 627 S.W.3d at 145 (quoting *Grams v. Milk Prods., Inc.*, 283 Wis.2d 511, 699 N.W.2d 167, 181 (2005) (Abrahamson, C.J., dissenting)).

 **[7]**   Weitz also cites other cases in which courts in Tennessee have held that a tort claim cannot be based on a breach of contract. However, Commercial Painting's claim of intentional misrepresentation was not predicated merely on a breach of the contract; it was predicated on the fact, as found by the jury, that Weitz deliberately made false representations about the timing and amount of work involved in the subcontract "in order to mislead Commercial Painting to obtain an undue advantage over it." [11] And, as stated above, Commercial Painting could not be expected to factor into its decision to enter the contract the possibility that Weitz was making false misrepresentations. *See Milan*, 627 S.W.3d at 147 (quoting *Robinson Helicopter*, 22 Cal.Rptr.3d 352, 102 P.3d at 275–76). [12]

 **\*11**   In sum, the economic loss doctrine should only apply in products liability cases. We decline to extend the doctrine to services contracts. Thus, the economic loss doctrine does not bar Commercial Painting's recovery of compensatory and punitive damages based on its tort claim of intentional misrepresentation against Weitz. The Court of Appeals reversed the punitive damages award based largely on its holding that the economic loss doctrine precluded Commercial Painting's tort claims and pretermitted all remaining issues related to the punitive damages award. *Com. Painting*, 2022 WL 737468, at \*28. We granted review on the narrow issue of the applicability of the economic loss doctrine. Thus, we remand to the Court of Appeals to review any pretermitted issues regarding the jury's award of punitive damages consistent with this opinion.

*Existing Safeguards against Disproportionate Liability*

We recognize the concerns of potential disproportionate or indeterminate liability for defendants who cause purely economic harm, which in part gave rise to the doctrine in the first place. But the common law of damages, contracts, and torts has developed to adequately equip courts to guard against and reject claims that involve overly speculative, excessive, or unforeseeable losses. As one legal scholar notes,

> general principles of damages and proximate causation already recognize these concepts, and rules are in place to guard against liability for speculative, excessive, or unforeseeable losses or losses outside the scope of risks that made the defendant's conduct negligent. Because that is true, these considerations offer dubious justification for erecting a general economic loss rule. Moreover, while there is a risk that liability for negligent conduct might have a chilling effect on non-negligent conduct, "because the line between negligent and non-negligent conduct is not a clear one," there is no reason to think that that problem is any greater in cases involving purely economic losses than in the great mass of cases in which liability for negligence (including economic loss damages) is routinely imposed.

Johnson, *supra*, at 543–44. It is reasonable to trust that Tennessee courts can apply well-established limiting concepts, such as foreseeability and proximate causation, to provide safeguards against disproportionate liability. As the Court of Appeals earlier observed in this case,

> Commercial Painting is entitled to just one recovery to the extent damages from more than one cause of action overlap, but it should not be precluded from proceeding on multiple theories of liability if it is able to make out a prima facie case under more than one cause of action.... "Whether the theory of recovery is breach of contract, intentional misrepresentation, or promissory fraud, if the damages claimed under each theory overlap, the Plaintiff is only entitled to one recovery." Commercial Painting is not required to choose between various causes of action just because the damages available may overlap. *See* *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 909 (Tenn. 1999) ("If a defendant has been found liable under more than one theory of recovery, no inequity results from allowing the plaintiff to choose one of the claims

upon which to realize its maximum recovery of enhanced damages.").

*Com. Painting*, 2016 WL 3519015, at *12 (quoting 🏳️ *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998)). The law thus already precludes double or excessive recovery for the same damages, which ultimately must be adequately proven to the satisfaction of the trier of fact under whichever theory of liability has been validly presented.

The dissent discusses the possibility that the independent duty doctrine might be used to counter some of the deleterious effects of expanding the economic loss rule. But this Court has not adopted the independent duty doctrine, so any future role of the doctrine in Tennessee remains theoretical.

**\*12** In short, there are adequate existing safeguards to protect against disproportionate liability, and the extension of the economic loss doctrine beyond products liability cases is not needed.

## CONCLUSION

We hold the economic loss doctrine only applies in products liability cases and should not be extended to other claims. Thus, the economic loss doctrine does not bar Commercial Painting's recovery of compensatory and punitive damages based on its tort claim of intentional misrepresentation against Weitz. We reverse the Court of Appeals' ruling as to the applicability of the economic loss doctrine. We remand to the Court of Appeals to review any pretermitted issues regarding the jury's award of punitive damages consistent with this opinion. Because this ruling makes Commercial Painting the only prevailing party, the second issue raised in this appeal about attorney's fees is pretermitted. We reverse the judgment of the Court of Appeals, affirm the judgment in part of the trial court, and remand to the Court of Appeals for review of any pretermitted punitive damage issues consistent with this opinion. The costs of this appeal are taxed to The Weitz Company, LLC, Federal Insurance Company, and St. Paul Fire & Marine Insurance Company, for which execution shall issue if necessary.

Sarah K. Campbell, J., filed a dissenting opinion, in which Jeffrey S. Bivins, J., joined.

Sarah K. Campbell, J., with whom Jeffrey S. Bivins, J., joins, dissenting.

The economic-loss doctrine bars recovery in tort for purely economic losses in certain situations. In this case, the Court is asked to apply that doctrine to bar tort claims brought by a subcontractor against a general contractor, where the relationship between the subcontractor and general contractor is governed by a contract. The majority opinion cabins the economic-loss doctrine to products liability cases and refuses to extend it to contracts for services for fear that doing so would require that we also create various exceptions. I respectfully disagree with that holding. The core rationale underlying the economic-loss doctrine—to create a boundary line between tort and contract law to ensure that parties can allocate risks and responsibilities as they see fit—applies equally to cases involving contracts for services. And to the extent that any exceptions to the rule would be needed, their creation would not be nearly as difficult or messy as the majority predicts. I would hold that the economic-loss doctrine applies here and precludes the subcontractor from recovering punitive damages and pre-judgment interest.

I.

This appeal arises from a decades-old dispute between a general contractor—The Weitz Company, LLC—and its drywall subcontractor—Commercial Painting Company, Inc. —during the construction of a retirement community in Shelby County. Weitz is a large commercial contractor that, at the time of the project, was the largest builder of continuing-care retirement communities in the country. Commercial Painting had a staff of thirty-five employees.

In 2004, Weitz and Commercial Painting executed a standard form subcontract agreement related to the Shelby County project. Commercial Painting's president reviewed the subcontract terms in detail, initialing each page, and requested a number of changes to certain parts of the subcontract, including the scope of work provisions. The agreement provided that Commercial Painting would be paid $3.22 million for proper performance.

**\*13** The subcontract incorporated the plans and specifications for the project and addressed in detail the scope of Commercial Painting's work, the project schedule, available remedies, attorney's fees, and myriad other items. Of particular relevance here, the subcontract provided that

**Commercial Painting Company Inc. v. Weitz Company LLC, --- S.W.3d ---- (2023)**

Commercial Painting "shall be entitled to an extension of the Subcontract Time and/or reimbursement for delay damages only to the extent that [Weitz] actually receives an extension of time and/or reimbursement for delay damages under the Prime Contract for events pertaining to [Commercial Painting's] Work." With the exception of those pass-through rights, Commercial Painting "waive[d] and release[d] [Weitz] from any and all [c]laims for such delay damages, including without limitation [c]laims attributable to breach of contract or tort."

In a provision titled "Contract Terms Control," the subcontract further stated that Weitz would "[i]n no event ... be obligated to pay [Commercial Painting] any anticipatory profit or indirect, special or consequential damages, however caused" and made clear that Commercial Painting was "waiv[ing] all such [c]laims." In the same provision, Commercial Painting "specifically agree[d] that it shall not be entitled to assert ... any [c]laims in quantum meruit, interest on late payments, or any other measure of damages other than as specifically provided" in certain other provisions of the subcontract.

The subcontract detailed whether and when Weitz and Commercial Painting could modify the scope of Commercial Painting's work or the amounts owed under the subcontract. For example, the subcontract expressly permitted Weitz to charge Commercial Painting for the cost of any "additional services ... required ... to assist [Commercial Painting] in performing its obligations" under the subcontract, including "supplemental manpower." And it entitled Commercial Painting to payment for additional work only as "properly authorized" by Weitz.

As for the schedule, the subcontract obligated Commercial Painting to "meet or better the durations established in [Weitz's] [s]chedule" but also provided that the schedule would be "updated periodically to reflect actual job progress." Commercial Painting was required to "provide sufficient crews, materials and equipment to maintain or improve upon [Weitz's] [s]chedule." Weitz, meanwhile, had "the right to suspend [Commercial Painting's] performance from time to time, or to reschedule or re-sequence [its] [w]ork."

Weitz was already more than eight months behind schedule when the subcontract was executed. Although Weitz was aware of the delay, it did not share that information with Commercial Painting before entering the subcontract and instead included an outdated construction schedule as an exhibit to the subcontract.

Trouble began soon after Commercial Painting started work on the project. Because of pre-existing delays and slow progress by other subcontractors, Commercial Painting struggled to comply with the performance schedule set by Weitz. Weitz hired additional workers to supplement Commercial Painting's work. Weitz also issued "notices to comply" to Commercial Painting, claiming that Commercial Painting was failing to perform a "Level 4" drywall finish even though the subcontract required only a "Level 3" finish. By the end of the project, Weitz had withheld more than half a million dollars in payments to Commercial Painting for "supplementation charges and supervision charges." And it refused Commercial Painting's requests for additional compensation related to extra work necessitated by the poor performance of other subcontractors. The project was not completed until February 2006.

Commercial Painting sued Weitz and various other defendants in late 2004.[1] The operative complaint for purposes of this appeal—Commercial Painting's second amended complaint—asserted breach of contract and tort claims, including negligent and intentional misrepresentation and unjust enrichment claims against Weitz.[2] Commercial Painting alleged that it had fully performed the subcontract and that Weitz had breached the agreement by failing to pay in full. It further alleged that Weitz had made material misrepresentations by failing to inform Commercial Painting that the project schedule would be compressed or that it would supplement Commercial Painting's drywall work with other subcontractors. Commercial Painting sought compensatory damages of nearly $2 million plus pre-judgment interest and attorney's fees, along with punitive damages of $200 million.

**\*14** Weitz counterclaimed and alleged that Commercial Painting had breached the subcontract by delaying the project and performing defective work. Weitz sought damages of $500,000, interest, and attorney's fees.

A jury trial was held in September and October 2018. As relevant here, the jury returned verdicts in favor of Commercial Painting on its breach of contract, intentional misrepresentation, and unjust enrichment claims against Weitz and further found that Commercial Painting was entitled to pre-judgment interest and punitive damages. The trial court approved the verdict and awarded Commercial Painting $1,729,122 in compensatory damages plus pre-

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

judgment interest, $3,900,000 in punitive damages, and $1,103,549 in attorney's fees. [3]

The Court of Appeals affirmed in part, reversed in part, and vacated in part. *See Com. Painting Co. v. Weitz Co., No. W2019-02089-COA-R3-CV, 2022 WL 737468, at \*1 (Tenn. Ct. App. Mar. 11, 2022).* The court affirmed the award of compensatory damages. *Id.* at \*29. But it reversed the punitive damages and pre-judgment interest awards. The court concluded that the economic-loss doctrine precluded Commercial Painting from recovering tort damages and that Commercial Painting was limited to remedies under the subcontract, which did not allow for punitive damages or pre-judgment interest. *Id.* at \*30. Finally, the court vacated the attorney's fees award and remanded the case to the trial court to determine the amount of attorney's fees incurred exclusively in obtaining the compensatory damages award. *Id.* at \*31. The court denied Commercial Painting's request for attorney's fees on appeal, reasoning that Weitz was the "prevailing party" on appeal because it had "obtain[ed] reversal of a significant portion of the damages awarded by the jury." *Id.*

We granted Commercial Painting's application for permission to appeal. We instructed the parties to address two issues: first, whether the Court of Appeals erred by expanding the application of the economic-loss doctrine to the circumstances of this case; and second, whether the Court of Appeals erred in vacating the trial court's award of attorney's fees and in limiting the scope of recoverable fees on remand, and whether the Court of Appeals erred in denying Commercial Painting costs and fees on appeal.

II.

The majority holds that the economic-loss doctrine does not apply outside the products liability context and upholds a jury verdict awarding Commercial Painting nearly $4 million in punitive damages. I would instead conclude that the economic-loss doctrine precludes Commercial Painting from recovering tort damages and affirm the Court of Appeals' judgment reversing the award of punitive damages and pre-judgment interest. I begin with an overview of the economic-loss doctrine. I then explain why the doctrine should apply in cases involving contracts for services. Finally, I address the

majority's contention that extending the doctrine would cause too much confusion.

A.

The term "economic-loss doctrine" or "economic-loss rule" is a bit of a misnomer because it suggests a single rule that is uniformly and consistently applied. *See* Dan B. Dobbs et al., *Dobbs' Law of Torts* § 607, Westlaw (database updated May 2023) ("[T]he implication of references to 'the' economic loss rule that there is but a single overarching economic loss rule is misleading."). In fact, the doctrine is a collection of " 'somewhat similar doctrines that tend to limit liability' but work in different ways in different contexts, for not necessarily identical reasons." *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 145 (Tenn. 2021) (quoting Oscar S. Gray, *Some Thoughts on "The Economic Loss Rule" and Apportionment*, 48 Ariz. L. Rev. 897, 898 (2006)); *see also* Jay M. Feinman, *The Economic Loss Rule and Private Ordering*, 48 Ariz. L. Rev. 813, 813 (2006) ("Because the rule applies to a diverse range of situations, there is not one economic loss rule, but several."). In its broadest form, the doctrine precludes recovery in tort for harm that is purely economic. *See* Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee. L. Rev. 523, 525 (2009). But most courts apply a narrower version of the rule that prohibits tort liability for purely economic losses only in certain circumstances. *See id.*

**\*15** What we now call the economic-loss doctrine originated in products liability cases in the 1960s. As one commentator has noted, "[t]he economic loss rule was not formally stated" before then, but "only because it was not needed." Feinman, *supra*, at 815; *see also Milan*, 627 S.W.3d at 142 n.15. "At the outset of the twentieth century, product defect claims were squarely within the province of contract law—one could only recover if in privity of contract with the product seller, and only in accordance with the specific provisions and limitations of contract." Catherine M. Sharkey, *The Remains of the Citadel (Economic Loss Rule in Products Cases)*, 100 Minn. L. Rev. 1845, 1845 (2016). By the 1960s, however, "an injured consumer not in privity with the manufacturer could often successfully sue using both a breach of contract (implied warranty) theory and a tort theory (either negligence or strict liability)." *Id.* at 1846.

The California Supreme Court was the first to apply a form of the economic-loss doctrine. *See* *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). In *Seely*, the court rejected the contention that strict liability should displace the law of warranty in cases involving economic losses. The court explained that "[t]he distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary" but rather "rests ... on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." *Id.*, 45 Cal.Rptr. 17, 403 P.2d at 151. On the one hand, a manufacturer "can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm." *Id.* On the other hand, he "cannot be held [liable] for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." *Id.* The court noted that applying "the rules of warranty" instead of strict liability helped prevent manufacturers from being held "liable for damages of unknown and unlimited scope." *Id.,* 45 Cal.Rptr. 17, 403 P.2d at 150–51.

Twenty years later, the United States Supreme Court adopted *Seely*'s approach and held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In the Court's view, the "reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* The Court explained that "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies ... because the parties may set the terms of their own agreements." *Id.* at 872–73, 106 S.Ct. 2295. The Court saw "no reason to intrude into the parties' allocation of the risk," and it echoed *Seely*'s concern that "[p]ermitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums." *Id.* at 874, 106 S.Ct. 2295. Allowing products liability to encroach too far on the law of warranty, the Court explained, would cause "contract law [to] drown in a sea of tort." *Id.* at 866, 106 S.Ct. 2295.

Our Court, too, originally adopted the economic-loss doctrine in products liability cases for reasons similar to those underlying the *Seely* and *East River* decisions. *See* *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 132–33 (Tenn. 1995) (implicitly applying doctrine to bar negligent-misrepresentation claim by farmers alleging that chemical product that was intended to protect crops from frost was defective); *Lincoln General Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 491–92 (Tenn. 2009) (expressly adopting the doctrine in products liability case against a bus manufacturer); *see also* *Milan*, 627 S.W.3d at 153 (applying doctrine in a products liability case and noting that "this Court has never applied" the doctrine outside that context).

**\*16** In *Lincoln General*, we explained that "the remedies available to" the owners of a defective product "should derive from the parties' agreements, not from the law of torts, lest we disrupt the parties' allocation of risk." 293 S.W.3d at 491. We reasoned that a contrary holding "would make it more difficult for parties to predict the consequences of their business transactions, the cost of which ultimately falls on consumers in the form of increased prices." *Id.* We ultimately adopted the *East River* approach because it "fairly balances the competing policy interests and clearly delineates between the law of contract and the law of tort." *Id.* at 492.

Our more recent decision in *Milan* likewise underscored the need to protect parties' freedom to contract and "preserv[e] the boundary line between tort and contract law." 627 S.W.3d at 155. We declined to adopt a broad fraud exception to the economic-loss doctrine because doing so would undermine the parties' contractual bargain "by importing tort remedies into the deal." *Id.* (quoting *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 197–98 (Utah 2018)).

Although the economic-loss doctrine originated in products liability cases, at least thirteen jurisdictions—Arizona, Colorado, Hawaii, Idaho, Illinois, Indiana, Nevada, Texas, Utah, Vermont, Virginia, Washington, and Wyoming—have extended it to cases involving other contractual relationships, including contracts for services. *See* *Flagstaff Affordable*

*Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 223 P.3d 664, 665 (2010) (applying doctrine to contract for architectural design services); *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 67–68 (Colo. 2004) (applying doctrine to contract for bridge design and construction); *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264–66 (Colo. 2000) (applying doctrine to contract for installation of a water system); *City Express, Inc. v. Express Partners*, 959 P.2d 836, 839–40 (Haw. 1998) (applying doctrine to contract for architectural services); *Brian & Christie, Inc. v. Leishman Elec., Inc.*, 150 Idaho 22, 244 P.3d 166, 170 (2010) ("The economic loss rule applies to negligence cases in general; its application is not restricted to products liability cases.") (quoting *Ramerth v. Hart*, 133 Idaho 194, 983 P.2d 848, 851 (1999)); *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill.2d 160, 223 Ill.Dec. 424, 679 N.E.2d 1197, 1200–01 (1997) (applying doctrine to contract for engineering services); *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246, 249 (1986) (applying doctrine to contract for electrical services); *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 742 (Ind. 2010) (applying doctrine to contracts for construction design and inspection services); *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153 (Ind. 2005) ("[D]amage from a defective product *or service* may be recoverable under a tort theory if the defect causes personal injury or damage to other property, but contract law governs damage to the product *or service* itself and purely economic loss arising from the failure of the product *or service* to perform as expected." (emphasis added)); *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 125 Nev. 66, 206 P.3d 81, 89 (2009) (applying doctrine to contracts for architectural and engineering services); *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 245–46 (Tex. 2014) (applying doctrine to contract for architectural services); *Hayes v. Intermountain GeoEnvironmental Servs., Inc.*, 498 P.3d 435, 439–43 (Utah 2021) (applying doctrine to contract for engineering services); *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 244, 249 (Utah 2009) (applying doctrine to construction contracts); *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 681–82 (Utah 2001) (applying doctrine to contract for architectural

services); *Springfield Hydroelectric Co. v. Copp*, 172 Vt. 311, 779 A.2d 67, 71 (2001) ("The economic loss rule clearly applies to commercial disputes outside the confines of product liability ...."); *Long Trail House Condo. Ass'n v. Engelberth Constr., Inc.*, 192 Vt. 322, 59 A.3d 752, 755–61 (2012) (applying doctrine to construction contract); *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (Va. 2004) (applying doctrine to contract to procure homeowners' insurance); *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wash.2d 816, 881 P.2d 986, 992 (1994) (applying doctrine to contract for architectural services); *Excel Constr., Inc. v. HKM Eng'g, Inc.*, 228 P.3d 40, 45–46 (Wyo. 2010) (applying doctrine to contracts for engineering and design services); *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1235 (Wyo. 1996) (applying doctrine to contract for engineering services).

**\*17** These courts have reasoned that applying the economic-loss doctrine to services contracts furthers the rationales underlying the doctrine by protecting parties' ability to allocate risks and responsibilities by contract. As the Illinois Supreme Court put it, "[t]he policy interest supporting the ability to comprehensively define a relationship in a service contract parallels the policy interest supporting the ability to comprehensively define a relationship in a contract for the sale of goods." *Congregation of the Passion v. Touche Ross & Co.*, 159 Ill.2d 137, 201 Ill.Dec. 71, 636 N.E.2d 503, 514 (1994); *see also Indianapolis-Marion Cnty. Pub. Libr.*, 929 N.E.2d at 742 ("[T]he policy justifications for the economic loss rule discussed throughout this opinion amply support applying the rule to products and services alike."). The Indiana Supreme Court acknowledged that the Uniform Commercial Code ("UCC") "does not apply to service contracts," but it found that distinction immaterial because "the common law of contracts has well developed rules of interpretation and doctrines to protect the reasonable expectations of the parties." *Indianapolis-Marion Cnty. Pub. Libr.*, 929 N.E.2d at 742.

Some of these courts have extended the doctrine to cases involving contracts for services in the construction context, without indicating whether they would apply the doctrine to contracts for other kinds of services. These courts have pointed out that the policy rationales for the doctrine apply

especially strongly in the construction context. *See, e.g.,* *Flagstaff Affordable Hous.*, 223 P.3d at 669 (reasoning that "[t]he contract law policy of upholding the expectations of the parties has as much, if not greater, force in construction defect cases as in product defect cases"); *Terracon Consultants*, 206 P.3d at 90 ("The work provided by construction contractors or the services rendered by design professionals in the commercial building process are both integral to the building process and impact the quality of building projects. Therefore, when the quality is deemed defective, resulting in economic loss, remedies are properly addressed through contract law."); *City Express*, 959 P.2d at 840 ("Construction projects are characterized by detailed and comprehensive contracts that form the foundation of the industry's operations. Contracting parties are free to adjust their respective obligations to satisfy their mutual expectations." (quoting *Am. Towers Owners Ass'n v. CCI Mech. Inc.*, 930 P.2d 1182, 1190 (Utah 1996))); *Davencourt at Pilgrims Landing*, 221 P.3d at 242 (stating that the economic-loss doctrine is "particularly applicable to claims of negligent construction based on the construction industry's use of detailed and comprehensive contracts that form obligations and expectations" (internal quotation marks omitted)); *Berschauer/Phillips Constr.*, 881 P.2d at 992 ("We hold parties to their contracts. If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. The construction industry in particular would suffer, for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract."); *Excel Constr.*, 228 P.3d at 45 ("The Court continues to believe that parties to a construction contract have the opportunity to allocate the economic risks associated with the work, and that they do not need the special protections of tort law to shield them from losses arising from risks ... which are inherent in performance of the contract.").

Supreme courts in only three jurisdictions—Minnesota, Wisconsin, and Florida—have declined to apply the economic-loss doctrine in cases involving services contracts. *See* *McCarthy Well Co., Inc. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312, 314–15 (Minn. 1987); *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 276 Wis.2d 361, 688 N.W.2d 462, 467–72 (2004); *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 406–07 (Fla. 2013).

*\*18* Both the Minnesota Supreme Court and the Wisconsin Supreme Court distinguished contracts for services on the ground that, unlike contracts for goods, such contracts are not governed by the UCC. In *McCarthy*, the Minnesota Supreme Court explained that the economic-loss doctrine is "premised on the existence of certain rights and remedies provided for in the [UCC]" and the notion that "allow[ing] tort liability in commercial transactions would totally emasculate [the warranty and liability] provisions of the [UCC]." 410 N.W.2d at 314 (second alteration in original) (internal quotation marks omitted). Similarly, in *Cease*, the Wisconsin Supreme Court noted that "the existence of [certain] rights and remedies" under the UCC is "one of the critical rationales underlying the economic loss doctrine." 688 N.W.2d at 469. "[I]f a commercial purchaser were allowed to sue in tort to recover solely economic loss," the court explained, the UCC "provisions designed to govern such disputes could be circumvented entirely," *id.*, and "contract law would drown in a sea of tort," *id.* (quoting *E. River*, 476 U.S. at 874, 106 S.Ct. 2295). *Cease* concluded that the same rationale does not apply to services contracts, because "[u]nlike contracts for products or goods, which enjoy the benefit of well-developed law under the [UCC], no such benefit exists for contracts for services." *Id.*

The *Cease* court also reasoned that extending the economic-loss doctrine to services contracts would do little to further the policy rationales underlying the doctrine. The court noted that contracts for services are often "simple and informal" and do not necessarily reflect the "fundamental premise" that "bargaining parties will allocate the risks and remedies." *Id.* at 470. The court also worried that extending the doctrine would put the court "on a slippery slope of having to decide whether an exception should be made for some or all professional groups" such as lawyers and accountants. *Id.* at 471.

The Florida Supreme Court initially applied the economic-loss doctrine to services contracts while carving out exceptions for professional services and tort claims that were independent of any breach of contract. *See* *AFM Corp. v. S. Bell Tel. & Tel. Co.*, 515 So. 2d 180, 181–82 (Fla. 1987)

(extending economic-loss doctrine to contract for advertising services); *Moransais v. Heathman*, 744 So. 2d 973, 983 (Fla. 1999) (declining to apply doctrine to contracts for professional services); *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 542–43 (Fla. 2004) (declining to apply economic-loss doctrine where parties were not in privity, but affirming other exceptions).

In *Tiara*, however, a deeply divided court reversed course, overruled earlier precedents, and limited the economic-loss doctrine to products liability cases. 110 So. 3d at 400. The majority concluded that applying the doctrine to contracts for services did not further its original purpose, which was "to protect manufacturers from liability for economic damages caused by a defective product beyond those damages provided by warranty law." *Id.* at 403. The majority's "experience with the economic loss rule over time, which led to the creation of the exceptions to the rule," had demonstrated "that expansion of the rule beyond its origins was unwise and unworkable in practice." *Id.* at 407. Other than pointing to the court's creation of various exceptions to the doctrine, however, the majority did not explain in what way extension of the doctrine had proved unworkable.

Justice Pariente, joined by two other Justices, concurred in the majority opinion but wrote separately to explain that the decision to limit the economic-loss doctrine to the products liability context "does not undermine Florida's contract law or provide for an expansion in viable tort claims." *Id.* at 408 (Pariente, J., concurring). That was because "[b]asic common law principles already restrict the remedies available to parties who have specifically negotiated for those remedies." *Id.* "[T]o bring a valid tort claim," for example, a party must satisfy "all of the required elements for the cause of action," including that "the tort is independent of any breach of contract claim." *Id.* The concurrence acknowledged that the economic-loss doctrine "has provided a simple way to dismiss tort claims interconnected with breach of contract claims" but found it "neither a necessary nor a principled mechanism for doing so" because "basic contractual principles" accomplish the same result. *Id.* at 409. In the concurrence's view, common-law contract principles already "properly delineate the general boundary between contract law and tort law." *Id.* And "[a]pplication of the economic loss rule to serve this function outside the products liability context simply allows for the possibility of confusion, overuse, and the restriction of well-established common law remedies." *Id.*

**\*19** Justice Polston dissented and accused the majority of "greatly expand[ing] the use of tort law at a cost to Florida's contract law." *Id.* at 410 (Polston, J., dissenting). Justice Canady dissented as well, likewise contending that the majority was expanding "tort law at the expense of contract law." *Id.* at 411 (Canady, J., dissenting). In his view, "[t]he goal of preventing contract law from drowning in a sea of tort is as compelling in the broader context of contract-based relationships as it is in the product liability context." *Id.* at 413. And "[t]he fact that the economic loss rule is subject to certain recognized exceptions—exceptions that are based on specific policy considerations—does not undermine the integrity of the general rule or obliterate the purpose on which it is based." *Id.*

B.

Unlike the majority, I would join those courts that have extended the economic-loss doctrine to contracts for services. I reach this conclusion for two primary reasons.

*First*, applying the economic-loss doctrine to contracts for services directly furthers its "central purpose of preserving the boundary line between tort and contract law." *Milan*, 627 S.W.3d at 155. Early cases adopting the economic-loss doctrine reflected several different policy rationales, including the need to prevent unbounded and unpredictable liability, the superiority of warranty law in addressing product defects, and the preference for private allocation of risk. *See, e.g.*, Johnson, *supra*, at 542–47. Today, however, it is widely accepted that the principal and strongest rationale for the economic-loss rule is its "critical boundary-line function, separating the law of torts from the law of contracts." *Id.* at 546; *see also* Feinman, *supra*, at 817 ("As expressed in the case law and the literature, the principal explanation for the rise of the economic loss rule ... is the preference for private ordering over public regulation."); Dobbs, *supra*, at § 614 ("Perhaps the strongest [rationale for the economic-loss doctrine] is to honor the contract by enforcing its express or implied allocations of responsibility."). By limiting parties to their remedies under the contract, the economic-loss doctrine respects and encourages private ordering, which does a better

job of furthering individual and societal interests than tort law. *See* Johnson, *supra*, at 548, 580 (explaining that the boundary-line function of the doctrine ensures that "the adjudication of tort remedies defers to private ordering"); Feinman*, supra*, at 817 (attributing the economic-loss rule to "a belief that there is a meaningful distinction between contract law and tort law, and that in cases of potential overlap, contract law is a superior system for regulating behavior and achieving socially optimal results").

Application of the economic-loss doctrine to contracts for services, no less than contracts for the purchase of goods, directly furthers this rationale. Contracts for services, like contracts for goods, allow parties to "allocate[ ] the risks and benefits of performance." Feinman, *supra*, at 814. As with contracts for goods, the court "upsets that allocation when it imposes liability ... outside the contract" and "undermines the process of contracting." *Id.*; *see also* Dobbs, *supra*, at § 614 ("[I]f the contract limits liability, the rule eliminating tort claims prevents the plaintiff from circumventing the contract's allocation of loss."). This is true even when a contract is "simple and informal." *Cease*, 688 N.W.2d at 470. And it is especially true in the construction industry, where "detailed and comprehensive contracts" are routinely used to establish obligations and expectations. *City Express*, 959 P.2d at 840 (quoting *Am. Towers*, 930 P.2d at 1190); *see also* *Davencourt at Pilgrims Landing*, 221 P.3d at 242–43 (same).

**\*20** The majority posits that "[o]ne party need not have to consider another party's fraud among the potential risks and costs when negotiating a contract in good faith." But the majority's decision to cabin the economic-loss doctrine is not limited to fraud claims. By altogether refusing to extend the economic-loss doctrine to contracts for services, the majority opinion opens the door to any and all tort claims, including those alleging nothing more than negligent performance of the contract. In any event, the Court already considered in *Milan* whether fraud justifies interfering with the freedom of contract. *627 S.W.3d at 154.* And it held that, "[w]hen the alleged fraud concerns pre-contractual misrepresentations and nondisclosures" about matters "that are the subject of a contract between sophisticated business entities, Tennessee's interest in freedom of contract prevails, and the economic loss doctrine applies." *Id.* Tennessee's interest in the freedom of contract should prevail here too.

The majority also suggests that the doctrine's boundary-line function is stronger in products liability cases than the services context because the UCC ensures that a contract-law remedy is readily available. It may be that the doctrine's "boundary-line function ... is most clearly established in the field of products liability." Johnson, *supra*, at 549. But that does not mean the function is absent in other contractual contexts. To the contrary, Professor Johnson acknowledges that the "purpose of the economic loss rule is ... to ensure respect for private ordering by relegating a plaintiff to contract remedies in cases where there is an agreement between the parties allocating economic risks." *Id.* at 555. That purpose is served when the economic-loss doctrine is applied to claims between parties to any contractual agreement, regardless of its subject matter.

This case does not require us to extend the economic-loss doctrine to claims between parties lacking contractual privity or other situations in which it could be said that the boundary-line function of the doctrine is less directly implicated. *See, e.g.*, Johnson, *supra*, at 553, 555 (noting that "[a] number of courts have rejected arguments that contract principles define the extent of a duty where the economic injurer and victim were not in privity" and arguing that "decisions holding that third-party claims are not foreclosed by the [economic-loss] rule make sense" in light of the rule's boundary-line function). Whether to extend the doctrine in those situations presents a more difficult question. This case merely asks us to treat contracts for services the same as contracts for goods. Because I see no good reason to distinguish between the two, I would hold that the economic-loss doctrine applies here.

*Second*, unlike the majority, I am not convinced that existing limiting principles in Tennessee's common law will provide sufficient "safeguards against disproportionate liability." The majority notes that the law "already precludes double or excessive recovery for the same damages." True enough. But "tort law frequently offers potential plaintiffs more generous terms of recovery" than contract remedies. Johnson, *supra, at 549.* As one example, "punitive damages and attorney fees are sometimes available in tort actions, but generally cannot be had in breach of contract claims." *Grams v. Milk Prods., Inc.*, 283 Wis.2d 511, 699 N.W.2d 167, 171, 171 n. 4 (2005) (noting that "[t]ort law generally offers a 'broader array' of damages than contract" (quoting *Cease*, 688 N.W.2d at 467)). That means that even if a plaintiff is precluded from recovering overlapping damages in both contract and tort, tort

damages often will far exceed contract damages. This case proves the point: Commercial Painting's tort claim resulted in a punitive damages award of nearly $4 million—damages that would have been unavailable had Commercial Painting been limited to its contract remedies. *See* [Com. Painting, 2022 WL 737468, at \*28](#).

 **\*21** The majority also trusts that "concepts[ ] such as foreseeability and proximate causation" will prove sufficient. Properly applied, principles governing foreseeability and proximate causation will likely provide some protection from excessive tort liability. But that protection will depend on the facts of each case and will not afford contracting parties nearly the same certainty or predictability as the economic-loss doctrine. *See* [Lincoln General, 293 S.W.3d at 489](#) (describing the economic-loss doctrine as a "bright-line rule").

The common-law principle that holds the most promise as a potential limiting force is one the majority fails to mention: the independent-duty rule. That rule "is closely related to the economic loss rule" and provides that "[a] tort action only arises when the act constituting the contract breach also constitutes a breach of a common law duty *independent* of the contractual relationship." [Com. Painting, 2022 WL 737468, at \*12](#) (quoting *E Sols. for Bldgs., LLC v. Knestrick Contractor, Inc.*, No. M2018-02028-COA-R3-CV, 2019 WL 5607473, at \*9 (Tenn. Ct. App. Oct. 30, 2019)); *see also* [Tiara, 110 So. 3d at 408](#) (Pariente, J., concurring) (pointing to the independent-duty rule in concluding that "common law principles [of contract] already restrict the remedies available to parties who have specifically negotiated for those remedies"). [4] But our Court has yet to expressly adopt the independent-duty rule. It therefore remains unclear whether that rule will adequately protect contracting parties.

In sum, I would extend the economic-loss doctrine to contracts for services because there is no principled basis to distinguish those contracts from contracts for the purchase of goods and because existing common-law principles are not an adequate substitute for application of the doctrine.

C.

The majority's strongest objection to extending the economic-loss doctrine to contracts for services is that doing so would "necessitate[ ] finding and justifying very numerous and confusing exceptions." To be sure, some exceptions may be necessary. But I do not find those exceptions as confusing as the majority, and certainly no more confusing than exceptions that exist in countless other areas of the law.

Most of the exceptions that exist in jurisdictions that have extended the economic-loss doctrine to contracts for services are simply the flipside of the independent-duty rule: When a claim is premised on a common-law duty that is independent of the contractual relationship, the economic-loss doctrine will not bar the claim. *See, e.g.*, [Hermansen v. Tasulis, 48 P.3d 235, 240 (Utah 2002)](#) ("[T]he initial inquiry in cases where the line between contract and tort blurs is whether a duty exists independent of any contractual obligations between the parties."); [Town of Alma, 10 P.3d at 1262](#) (explaining that a tort action premised on breach of a duty that arises independently of the parties' contractual duties remains viable); [Springfield Hydroelectric Co., 779 A.2d at 71](#) ("The underlying analysis turns on whether there is 'a duty of care *independent* of any contractual obligations.'" (quoting [Grynberg v. Agri Tech, Inc., 10 P.3d 1267, 1269 (Colo. 2000)](#))); [Congregation of the Passion, 201 Ill.Dec. 71, 636 N.E.2d at 514](#) (holding that the economic-loss doctrine does not prohibit tort recovery for breach of a duty arising outside the contract).

 **\*22** It is on this basis that courts have excepted from the economic-loss doctrine claims against certain professionals such as attorneys and physicians. *See, e.g.*, [Davencourt at Pilgrims Landing, 221 P.3d at 247](#) (citing the attorney-client relationship as an example of an independent duty of care); [S K Peightal Eng'rs, LTD v. Mid Valley Real Est. Sols. V, LLC, 342 P.3d 868, 875 (Colo. 2015)](#) (explaining that certain "special relationships" such as the attorney-client relationship and physician-patient relationship "automatically trigger independent duties of care" (quoting [Grynberg, 10 P.3d at 1271](#))). Courts' approaches to determining exactly which claims fall into this "independent duty" category have varied. But nothing prevents us from adopting the approach we deem best or developing an approach of our own.

The other notable category of exceptions includes claims alleging intentional torts and negligent misrepresentation. Again, courts' approaches to these exceptions have varied.

*See, e.g.,* *Milan,* 627 S.W.3d at 146 (explaining that "[a]t least three approaches have emerged" regarding application of the economic-loss doctrine to fraud claims). But we have already grappled with these exceptions in products liability cases, *see* *id.* at 153–54 (adopting middle-ground approach to fraud claims), and could apply the same approach in cases involving contracts for services.

Finally, the majority's decision to cabin the economic-loss doctrine to products liability cases is likely to create confusion of its own. In other jurisdictions that have declined to extend the economic-loss doctrine to contracts for services, courts soon faced questions about contracts for items that are neither clearly goods nor clearly services and hybrid contracts involving both goods and services. In *Linden v. Cascade Stone Co.*, for example, the Wisconsin Supreme Court adopted "the predominant purpose test to determine whether a mixed contract for products and services is predominately a sale of a product and therefore subject to the economic loss doctrine or predominately a contract for services and therefore not subject to the economic loss doctrine." 283 Wis.2d 606, 699 N.W.2d 189, 193 (2005) (citations omitted). Applying that test to a contract for the construction of a home, the court held that the economic-loss doctrine applied because the homeowners had "bargained for [a] finished product, a house; not its various components." *Id.* at 198. That decision has been subject to criticism,

however, because "a residential real estate transaction is not a contract for a product, and residential real estate transactions are protected by neither manufacturer warranties nor the U.C.C." *Below v. Norton*, 310 Wis.2d 713, 751 N.W.2d 351, 366 (2008) (Bradley, J., dissenting). Minnesota adopted a similar predominant-purpose test for hybrid contracts, but its application has yielded inconsistent answers. The Minnesota Supreme Court declined to apply the economic-loss doctrine to a contract for well-restoration services and installation of a new pump after determining that it was primarily a contract for services. *McCarthy*, 410 N.W.2d at 315. The following year, by contrast, the Minnesota Court of Appeals applied the economic-loss doctrine to a contract for the sale, assembly, and installation of a silo after determining that it was primarily a contract for goods. *Holstad v. Sw. Porcelain, Inc.*, 421 N.W.2d 371, 373–75 (Minn. Ct. App. 1988).

Given that some confusion is inevitable whichever path we take, I would choose the path that furthers the important interests underlying the economic-loss doctrine and join those jurisdictions that have extended the doctrine to contracts for services.

**All Citations**

--- S.W.3d ----, 2023 WL 6304838

## Footnotes

1      The work included installation of exterior ceiling insulation; exterior wall metal framing; exterior wall insulation; light gauge metal partitions; gypsum board walls, ceilings, and soffits; and suspended ceilings. The contract, with an effective date of September 28, 2004, was signed by the president of Commercial Painting on November 1, 2004, and by Weitz's representative on December 7, 2004.

2      The defendant named in the complaint's caption was The Weitz Company, Inc., but the first paragraph of the complaint referenced the defendant as The Weitz Company-National. These entities are referred to herein collectively as "Weitz."

3      Section 12.1 of the contract provides:

> In the event it shall become necessary for either party to institute legal proceedings against the other party for recovery of any amounts due and owing under the Agreement, it is expressly agreed that the prevailing party in any such action shall be entitled to recover from the non-prevailing party all costs,

including reasonable attorney's fees, of pre-suit collection attempts, suit, and post judgment or settlement collection including those incurred on appeal.

4 Transferred to section 66-34-104 of the Tennessee Code by 2008 Public Acts, chapter 804, section 2, effective July 1, 2008.

5 Tenn. Code Ann. §§ 66-34-101 to -704.

6 The extension agreement negotiated by Weitz and the project owner included a bonus to Weitz of $8,597 for each day, up to forty-five days, that the project was completed early.

7 The jury verdict form showed awards to Commercial Painting of $1,729,122.46 on its intentional misrepresentation claim; $1,729,122.46 on its breach of contract claim; and $1,729.122.46 on its unjust enrichment claim.

8 The judgment for compensatory damages and pre-judgment interest in the amount of $3,356,314.62 was entered against The Weitz Company, LLC, Federal Insurance Company, and St. Paul Fire & Marine Insurance Company, jointly and severally. Punitive damages were awarded solely against Weitz. There was no verdict against The Village at Germantown, Inc. The trial court dismissed Commercial Painting's claims against The Village at Germantown and The Weitz Company, Inc. with prejudice, and these entities are not parties to this appeal. The trial court also dismissed with prejudice Weitz's counterclaims against Commercial Painting and its surety. Commercial Painting withdrew its claim for rescission/reformation before trial.

9 Section 1.1 of Exhibit D to the contract, under the heading "Subcontractor's Work," states as follows: "Subcontractor's Work includes all labor; supervision; materials; equipment; services; supplies; tools; facilities; transportation; storage; receiving; licenses; inspections; certifications; overhead; profit; insurance; and other items required or reasonably inferable from the Subcontract Documents to properly and timely perform and complete the Subcontractor's Work."

10 Many of these cases are cited and relied upon by Weitz in support of its various arguments in favor of affirming the Court of Appeals' decision. Weitz has also cited other cases, including *New London Tobacco Market, Inc. v. Kentucky Fuel Corp.*, 44 F.4th 393 (6th Cir. 2022); *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282 (Colo. Ct. App. 2009); *United Textile Workers of America, AFL-CIO, CLC v. Lear Siegler Seating Corp.*, 825 S.W.2d 83 (Tenn. Ct. App. 1992); *Mechanical, Inc. v. Venture Electrical Contractors, Inc.*, 392 Wis.2d 319, 944 N.W.2d 1 (Wis. Ct. App. 2020). We have considered these and other cases cited by Weitz and the amici and find them inapplicable, distinguishable, or unpersuasive.

11 The amici assert there is no proof in the record of justifiable reliance on a misrepresentation or damages resulting proximately from such a misrepresentation. We disagree. There is proof in the record from which the jury found both.

12 Weitz contends that the implied duty of good faith and fair dealing that Tennessee law imposes on parties to a contract provides sufficient protection to justify applying the economic loss doctrine to services contracts, citing *Dick Broadcasting Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653 (Tenn. Ct. App. 2013) and *APAC-Atlantic, Inc., Harrison Constr. Div. v. State*, No. E2012-01536-COA-R3-CV, 2013 WL 5883697, at *1 (Tenn. Ct. App. Oct. 31, 2013). Neither of those cases, however, involved tort claims or the economic loss doctrine. They are inapplicable.

Weitz's sureties—Federal Insurance Company and St. Paul Fire & Marine Insurance Company—were among those defendants. They are also appellants in this case.

As explained in more detail by the majority opinion, this case has a lengthy procedural history that included two appeals before this one. Those appeals preceded the filing of Commercial Painting's second amended complaint in 2017. See *Com. Painting Co. v. Weitz Co.*, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at *1–4 (Tenn. Ct. App. Mar. 11, 2022).

The compensatory damages award was later reduced to $1,272,952.46 to account for an extrajudicial payment.

Weitz argued to the Court of Appeals that the independent-duty rule precluded Commercial Painting's tort claims, but the Court of Appeals held that Weitz had waived that argument by failing to preserve it in the trial court. See *Com. Painting*, 2022 WL 737468, at *12–13.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.