# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| **RAYMOND JAMES & ASSOCS., INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:18-cv-02104-JTF-tmp |
| ) | |
| **50 NORTH FRONT ST. TN, LLC,** ) | |
| ) | |
| Defendant. ) | |

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant, Counter-Plaintiff 50 North Front St. TN, LLC's ("50 North") Motion for Summary Judgment and Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, filed on November 6, 2023. (ECF Nos. 471 & 471-1.) Plaintiff, Counter-Defendant Raymond James & Associates ("Raymond James") responded and filed a counterstatement of undisputed material facts on December 4, 2023. (ECF Nos. 479-481.) 50 North replied and responded to Raymond James' counterstatement of material facts on December 18, 2023. (ECF Nos. 483 & 484.) For the reasons set forth below, the Motion is **DENIED**.

### I.    FACTUAL BACKGROUND[1]

When this litigation began, Raymond James was renting office space in a Memphis building that 50 North owns ("the Building"). (ECF No. 393, 2.) The dispute arises from facts that predates both parties' involvement with the Building.

---

[1] The Court only discusses the facts pertinent to 50 North's Motion. The facts are taken from the parties' filings. Any disputes of fact are noted.

**A. Dealings Between the Original Landlord and Tenant**

The Building was completed in 1985. (ECF No. 480, 1.) Parkway Properties, L.P. was the original owner, and Morgan Keegan and Co. ("Morgan Keegan") was the original anchor tenant. (*Id.*) On February 1, 2006, Morgan Keegan and Parkway agreed to a 10-year extension on the lease, running from April 1, 2006 to March 31, 2016, in a document referred to as the "Eighth Amendment." (*Id.* at 1-2.) The Eighth Amendment required Parkway to make certain improvements to the Building; an incorporated spreadsheet outlined major projects that Parkway would have to undertake to achieve the "Class 'A'" look and function for the Building. (ECF No. 471-3, 98.) That spreadsheet, internally referred to as "Exhibit E," "establishe[d] a minimum basis for mechanical and capital improvement to be performed by [Parkway] throughout the term of the lease." (*Id.*) It provides in relevant part that:

> Over the term of the lease, Parkway will continue to make capital improvements in order to maintain mechanical systems and building appearance in accordance with other class "A" buildings in downtown Memphis. This exhibit outlines major projects: anticipated by Parkway that will be necessary to achieve this level of commitment. While such list is fluid and flexible depending on circumstances, it shall serve as a guide or basis for the term of the lease.

(*Id.* at 100.) Exhibit E stated that modernization for the service elevator would be completed in the first 5 years of the lease, whereas modernization for the passenger elevator would be completed in the second 5 years. (*Id.*) Exhibit E also dictated that Parkway would "caulk exterior granite and precast" by 2008 and would perform "[w]aterproofing at the Balconies" immediately. (*Id.*) The parties dispute whether these instructions obligated Parkway to make the specified capital improvements, or whether they were merely guidelines for Parkway to follow to maintain the Building at a "Class A" standard. (ECF No. 480, 2-3.) Assuming the document's contents do amount to obligations, the parties also dispute whether the established deadlines were firm, or whether the dates were only provided as estimates. (*Id.*)

2

**B. Raymond James' Assumption of the Lease and the Building's Condition**

Raymond James acquired Morgan Keegan, assumed the lease to the Building by assignment, and began working there in 2012. (*Id*. at 3.) Raymond James occupied the 21st floor of Building. (*Id.* at 7.) Audrey Davis, the Building's Property Administrator from 2012 to 2014, recounted that the Building had several ongoing issues with its elevators and water infiltration at this time. (ECF No. 471-7, 2-4.) She also stated that Raymond James was aware of these issues. (*Id.*) Indeed, the "Infrastructure Audit of Raymond James Memphis Tower" that Raymond James commissioned in 2013 confirms that it knew of the elevators' condition.[2] (ECF No. 480, 3.) The Report's Executive Summary noted that "[t]he elevator control cabinets [were] building original and were observed to make an unsettling amount of noise, as well as continuing to level to a floor with the doors opening, making it a potential safety issue. The tenants in the building have come to expect this from the system and have become accustomed to the issues." (ECF No. 471-4, 2.) The Report was shared with several Raymond James executives. (ECF No. 480, 4.)

The Building's elevator and water infiltration issues during this time are well documented. A list of work orders for the 2013 calendar year reflects that 81 service calls were placed regarding the Building's elevators. (ECF No. 480, 5.) That list also indicates that there were 18 reported instances of mis-leveling in 2013 alone.[3] Further, between September 11, 2013 and September 17, 2014, there were 12 elevator entrapments. (*Id.* at 4.) As for the water infiltration issues, an email chain beginning in August of 2014 documents a number of leaks on the Building's 4th, 16th, and

---

[2] 50 North contends that Raymond James commissioned the Report while evaluating the potential purchase of the Building, but Raymond James disputes this. (Id.)

[3] The parties do not explain what "mis-leveling" is. For the purposes of this order, the Court understands mis-leveling to mean an event where "the floor of the elevator [is] not flush with the floor of the building." *Krueger v. Otis Elevator Co*., 925 F.2d 1464 (6th Cir. 1991).

3

18th floors. (ECF No. 471-4, 29-36.) The parties dispute whether these leaks were isolated incidents, or evidence of a systemic problem within the Building. (ECF No. 480, 6.)

To resolve the water infiltration issue, Parkway constructed a "series of tarps and garden hoses set up inside the ceiling of the 21st floor of the building to capture water infiltration from several areas of the building's roof." (*Id.*) The parties dispute whether Raymond James was aware of this remedial measure. (*Id.*)

### C. Raymond James' Negotiations and the 2014 Lease Extension

In February 2014, Raymond James elected to renew its lease at the Building. (ECF No. 471-9, 3.) Raymond James held an internal board meeting on May 22, 2014, where the board considered the terms of such a transaction. (*Id.* at 2-3.) A slide deck from that meeting reflects Raymond James' belief that although it had "negotiated a strong position [with Parkway], significant risk exist[ed] that service levels/quality [would] not meet reasonable expectations." (*Id.* at 3.) In a section covering the Building's issues at the time of these negotiations, Raymond James identified multiple elevator entrapments, window seal leaks, and water pipes bursting, among other issues. (*Id.* at 4.) The presentation also compared the price difference for extending the lease at the Building and pursuing a lease at the then-newly constructed Carlisle Building. (*Id.* at 8.) That comparison revealed that as things stood between Raymond James and the two buildings' landlords, a lease at the Carlisle Building would have cost $11 million more than extending the lease at the Building. (*Id.*)

Internal e-mails reflect that Raymond James prioritized elevator replacement and/or modernization when negotiating the lease extension with Parkway. (ECF No. 480, 8.) On June 26, 2014, Parkway and Raymond James agreed to a new 10-year commercial lease. (*Id.*) Parkway ultimately offered Raymond James 33 months of free rent, valued at $8.8 million, and agreed to

4

operate the Building at a level similar to that of other comparable buildings in the downtown Memphis market. (*Id.* at 9.) Under this new lease, Parkway was obligated to maintain and operate the Building according to two different standards: the "Current Standard" and the "Comparable Building Standard." (ECF No. 484, 3.) The parties dispute whether either standard anticipated less than perfection in the operation and performance of the Building and its systems. (*Id.* at 4.) Moreover, the parties dispute how these standards relate to this case's facts. (*Id.*)

### D. 50 North's Purchase of the Building

On November 21, 2014, 50 North submitted a Letter of Intent to purchase the Building. (*Id.* at 10.) 50 North and Parkway entered into a Purchase and Sale Agreement ("PSA") on December 18, 2014. (*Id.*) The PSA provided for a period where 50 North was to inspect the Building and review the tenant leases, among other things. (*Id.*) The parties dispute whether 50 North performed routine due diligence during the inspection period. (*Id.*) 50 North contends that it took care to look for obligations it would be assuming as the new owner, such as upcoming rent abatements, outstanding tenant improvements or capital improvements. (*Id.*)

50 North received a Property Condition Assessment ("PCA") from Parkway. (ECF No. 484, 9.) The PCA showed that although the Building's systems were functional, they would need significant upgrades and replacements in the future. (*Id.*) The Assessment included the elevator system, whose condition was described as "fair." (*Id.*) According to Parkway's inspector, the elevators had only three years left until they were beyond their remaining useful life and would require over $1 million in capital expenditures to modernize. (*Id.*) Joel Friedman, acting on behalf of 50 North, told Parkway's real estate agent that 50 North had received the PCA. (*Id.*) He also conveyed that 50 North understood that the Building would need capital improvements, and factored this into its purchase price. (*Id.*)

5

Also relevant here is one clause in the PSA that required Parkway to secure a document from each of the Building's tenants certifying that Parkway was not in default on the lease. (ECF No. 471-3, 24.) This document is referred to as the "Estoppel Certificate." (*Id.*) In more specific terms, the Estoppel Certificate required each tenant's certification that:

> Landlord is not in default under any of the provisions of the Lease, and no event has occurred and no circumstance exists which, with the passage of time or the giving of notice by Tenant, or both, would constitute such a default. . . All construction to be performed and the improvements to be installed by Landlord on the Premises as a condition to Tenant's acceptance of the Premises, if any, have been completed and fully accepted by Tenant.

(*Id.* at 54.) On December 24, 2014, Parkway requested that Raymond James provide an Estoppel Certificate. (ECF No. 480, 11.) Raymond James circulated news of the request internally via e-mail to seven individuals, including Sue Hometchko and Derek Recer. (*Id.*) In response to that e-mail, Recer stated that he did not believe that Raymond James had received credit from Parkway for the water damage earlier in the year or that the elevator issues had been addressed. (ECF No. 471-11, 2.) He also stated that he was unsure if the language on security was encompassing or whether Parkway had any other obligations because Raymond James was self-funding much of the work. (*Id.*)

Recer indicated that Raymond James did not list the elevators or water intrusions in the Estoppel Certificate because he and the others involved did not believe the performance of the elevators or roof constituted a breach of the performance standards set forth in the Lease at that point in time since some tolerance of performance issues was built into the Lease. (ECF No. 481-1, 3.) He explains that Raymond James' gloss on the Estoppel Certificate's requirement to disclose any event or circumstance that would constitute a default with the passage of time was due to his prior experience with estoppel certificates, and his belief that such an expansive reading would be unreasonable. (*Id.* at 3-4.)

6

Raymond James executed the Estoppel Certificate on January 13, 2015. (ECF No. 480, 11.) As relevant here, Raymond James' Estoppel Certificate reflected that:

> Landlord is not in default under any of the provisions of the Lease, and no event has occurred and no circumstance exists which, with the passage of time or the giving of notice by Tenant, or both, would constitute such a default. Notwithstanding the foregoing, Tenant is currently waiting for Landlord to satisfy Landlord's obligations as described in the following Lease terms: (a) Section 5, Addendum of Special Stipulations, Food Service; and (b) Section 11(d) (Access Control); and Tenant hereby reserves its rights available under the Lease as any performance or non-performance of the aforementioned obligations.

(ECF No. 471-3, 84.) Although it is undisputed that Raymond James provided this response based upon their knowledge, the parties dispute whether the Estoppel Certificate only required disclosure of current breaches and/or defaults under the lease's terms. (ECF No. 484, 1-2.) The parties also dispute Raymond James' reasons for not including anything about the elevators or water intrusions in the Estoppel Certificate. (*Id.* at 2.)

50 North proceeded to purchase the Building on January 15, 2015. (ECF No. 480, 12.) It is undisputed that 50 North explicitly disclaimed reliance upon any statements or information furnished by Parkway via the Purchase and Sale Agreement ("PSA"). The parties dispute whether 50 North purchased the Building in reliance on Raymond James' Estoppel Certificate, whether such reliance was appropriate under the PSA's terms, and whether 50 North pursued and/or received a downward price adjustment to account for elevator modernization and other capital expenditures. (*Id.* at 12-13.)

**E. Post-Acquisition Disputes Between 50 North and Raymond James**

Raymond James started complaining about issues with the Building soon after 50 North completed the purchase. (ECF No. 471-2, 4.) Raymond James requested a meeting on the matter. (*Id.*) That meeting took place on April 23, 2015, 3 months after 50 North completed its purchase. (*Id.*) The parties held another meeting on August 26, 2015 to address 50 North's progress on a

7

number of capital improvements related to the elevators and the Building's various water systems. (ECF No. 132-5, 1-2.) Later in 2015, Raymond James requested that 50 North establish a schedule for the elevators' modernization. (ECF No. 480, 15.) Around this time, Raymond James also requested that 50 North address the water leaks, including those that were coming from the Building's exterior windows and walls. (ECF No. 480, 14.) At some unspecified time, 50 North received additional water intrusion complaints pertaining to the 15th, 17th, and 19th floors. (*Id.*) 50 North then discovered that the entire deck and planter areas above those floors had failed. (*Id.*) At another unspecified time, 50 North replaced the entire main roof of the building, as well as the deck and planter areas on the 16th, 18th, and 20th floors. (*Id.*)

On May 5, 2017, Raymond James provided 50 North with a "Notice of Breach." (*Id.* at 14.) The Notice of Breach states that "[50 North's] breach includes, but is not limited to, the list of items attached hereto as Exhibit A. A number of such items constitute Critical Failures." (ECF No. 471-3, 87.) Exhibit A described 8 issues, which included water leaks, the Building's aging elevators, and general problems with the Building's condition. (*Id.* at 89-91.) Raymond James believed 50 North was obligated to modernize the elevators pursuant to the lease's terms. (ECF No. 480, 15.)

## II.   PROCEDURAL HISTORY AND SUMMARY OF CLAIMS

### A. Procedural History[4]

On February 2, 2018, Raymond James sued 50 North in Tennessee state court. (ECF No. 1, 1.) 50 North removed the action to federal court on February 16, 2018. (*Id.*) Raymond James filed their First Amended Complaint on May 29, 2018. (ECF No. 41-1.) 50 North filed their sealed Answer and Counter-Complaint on December 19, 2019. (ECF No. 286 (sealed).) The Court

---

[4] The Court provides only a brief sketch of this case's procedural history because a full recitation of the 497 docket entries spanning over 9000 pages would be unnecessary.

entered an Order adopting the Magistrate Judge's Report and Recommendation and granting 50 North's Motion to Dismiss Raymond James' First Amended Complaint on July 30, 2020. (ECF No. 339.) The Court adopted the Magistrate Judge's Report and Recommendation and denied Raymond James' Motion to Dismiss 50 North's Counter-Complaint on November 13, 2020. (ECF No. 360.) On January 28, 2022, the Court entered an Order adopting the Magistrate Judge's Report and Recommendation and granting in part Raymond James' Motion for Leave to File a Second Amended Complaint. (ECF No. 391.) On April 22, 2024, the Court entered an Order adopting in part the Magistrate Judge's Report and Recommendation and denying 50 North's Motion to Dismiss Raymond James' Second Amended Complaint and granting in part 50 North's Motion to Strike allegations in the Second Amended Complaint that were immaterial to Raymond James' fraud claim. (ECF No. 491.)

Consistent with the Court's Order striking certain allegations from their Second Amended Complaint, Raymond James filed their Revised Second Amended Complaint on May 16, 2024. (ECF No. 495.) 50 North filed their Answer and Affirmative Defenses to the Revised Second Amended Complaint on June 17, 2024. (ECF No. 496.)

50 North filed their Motion for Summary Judgment and Statement of Undisputed Material Facts in Support of Motion for Summary Judgment on November 6, 2023. (ECF Nos. 471 & 471-1.) Raymond James responded and filed their counterstatement of undisputed material facts on December 4, 2023. (ECF Nos. 479-481.) 50 North replied and responded to Raymond James' counterstatement of material facts on December 18, 2023. (ECF Nos. 483 & 484.)

### B. Summary of Claims, Counterclaims, and Arguments Presented

After the many rounds of Rule 12(b)(6) motions described above, Raymond James proceeds with just one claim: that 50 North had been fraudulently assessing operating expenses by

9

"charging Raymond James for illegitimate expenses and by withholding credits that Raymond James could have received due to reductions in the Tower's property tax assessment." (ECF No. 495, 5.)

50 North's counterclaims (1) that it is entitled to declaratory judgment establishing that Raymond James' claims are barred based on the estoppel certificate; (2) that Raymond James committed four different kinds of fraud related to the estoppel certificate; and (3) that Raymond James breached its contract with 50 North by suing after executing the estoppel certificate. (ECF No. 286, 75-80.)

50 North now moves for partial summary judgment, arguing that it is entitled to judgement as a matter of law on their claim that Raymond James is liable for breach of contract, and its declaratory judgment claim. (ECF No. 471, 20.) Raymond James contends that 50 North's Motion for Summary Judgment should be denied because (1) discovery on the counterclaims has not occurred; (2) whether Raymond James believed Parkway was in default at the time it completed the Estoppel Certificate is a disputed question of fact; (3) the Estoppel Certificate only addressed whether Parkway was in default at the moment of the Certificate's execution; and (4) there is a genuine dispute of material fact as to whether 50 North's reliance on the Estoppel Certificate was reasonable. (ECF No. 479, 4-18.)

### III.   LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the Court must view the facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The court's role is not to weigh evidence or assess the credibility of witnesses, but simply to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (citation omitted).

Once a properly supported motion for summary judgment has been filed, the party opposing summary judgment must show that there is a genuine dispute of material fact by pointing to evidence in the record or arguing that the moving party is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). "When confronted with a properly supported Motion for Summary Judgment, the party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact." *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). A genuine issue of fact for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party; thus, a plaintiff must produce probative evidence to create a material factual doubt. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 and 250 (1986).  *See also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) ("The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must present affirmative evidence in order to defeat a properly supported motion for summary judgment.") (internal quotation marks omitted). The opposing party "cannot rest solely on the allegations made in [his] pleadings." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) (quoting *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002)).

## IV.    ANALYSIS

As noted, 50 North moves for summary judgment on two of its counterclaims. The Court finds that 50 North is not entitled to summary judgment on its breach of contract counterclaim. Because 50 North's declaratory judgment counterclaim depends on the success of its breach of contract counterclaim, it is not entitled to summary judgment on this ground either.

Under Tennessee law, a "plaintiff alleging breach of contract must prove: (1) the existence of an enforceable contract, (2) the non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Franklin Am. Mort. Co. v. University Natl. Bank of Lawrence*, 910 F.3d 270, 281 (6th Cir. 2018) (quoting *Nw. Tenn. Motorsports Park, LLC v. Tenn. Asphalt Co.*, 410 S.W.3d 810, 816-817 (Tenn. Ct. App. 2011)).

50 North argues that it is entitled to judgment as a matter of law on its breach of contract claim because Raymond James was contractually obligated to disclose whether it had actual knowledge that Parkway was in default under any provision of the lease, or would be in default with the passage of time, but failed to do so. (ECF No. 471, 16-17.)

Raymond James advances four arguments in response. First, it argues that 50 North's Motion for Summary Judgment should be denied because it is premature given that the parties have not conducted discovery on the counterclaims. (ECF No. 479, 4.) Second, Raymond James contends that 50 North is not entitled to judgment as a matter of law because whether Raymond James actually believed Parkway was in default at the time it signed the Estoppel Certificate goes to its state of mind, which is a disputed question of fact. (*Id.* at 6.) Third, Raymond James urges that the Estoppel Certificate only required it to disclose whether Parkway was in default at the moment the Certificate was executed, not whether certain conditions could eventually result in a

12

default. (*Id.* at 9.) Fourth, it argues that there is a genuine dispute of material fact as to whether 50 North's reliance on the Estoppel Certificate was reasonable. (*Id.* at 15.)

The Court ultimately determines that the Motion should be denied in full due to the inapplicability of the judicial admissions doctrine, and the existence of a genuine dispute of material fact as to Raymond James' state of mind at the time it executed the Estoppel Certificate. Hence, the Court declines to address the parties' other arguments.

### A. Judicial Admissions

"Factual assertions in pleadings ..., *unless amended*, are considered judicial admissions conclusively binding on the party who made them." *Kay v. Minacs Grp. (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014) (internal quotation marks and citations omitted) (emphasis added). In its reply, 50 North argues that the Court need not wade through Raymond James' arguments about the elevators' deteriorating condition and its state of mind because treating Raymond James' previous statements about the Lease's requirements as binding judicial admissions is sufficient to establish that Raymond James' Estoppel Certificate breached the Lease. (ECF No. 483, 3-5.) In simpler terms, 50 North's argument is that:

(1) Throughout this litigation, Raymond James has claimed that the Lease required 50 North to modernize the elevators.
    a. Raymond James is bound by its prior statements that the Lease required elevator modernization.
(2) The elevators had not been modernized at the time that Raymond James executed the Estoppel Certificate.
(3) Because the Lease required modernization, and such modernization had not occurred at the time that Raymond James executed the Estoppel Certificate (*see* (2)), Parkway was breaching the Lease. [(1)(a) & (2) → (3)]
(4) Raymond James knew that modernization was required under the Lease.
(5) Raymond James also knew that the elevators had not been modernized at the time it executed the Estoppel Certificate.
(6) Raymond James knew that Parkway was breaching the Lease. [(4) & (5) → (6)]
(7) Raymond James knew about a breach of the Lease but did not disclose it in its Estoppel Certificate.

13

> (8) By bringing suit against 50 North for breaching the Lease despite effectively informing 50 North that such a breach did not exist, Raymond James breached the Lease.

(*See id.*)

In support of (1), 50 North points to three sections in Raymond James' First Amended Complaint where Raymond James said something similar. (ECF No. 483, 3-4 (quoting ECF No. 41-1, 17-18).) In the quoted passages, Raymond James sought a declaration from the Court that the Lease's requirement that "'Landlord shall make such improvements, repairs or replacements as may be necessary to the maintain the Building Systems serving the Premises… in accordance with Current Standards and the standards applicable for maintaining such items in Comparable Buildings', required Landlord to modernize, in whole or part, the current elevator system" among other things. (*See* ECF No. 41-1, 17-18.)

50 North asserts that it was Raymond James' position that elevator modernization was an explicit term of the Lease as it existed at the time the Estoppel Certificate was executed. However, that is a mischaracterization of Raymond James' statements. These passages instead reflect Raymond James' position that at the time it filed the First Amended Complaint in 2018, the Lease's requirement that the landlord maintain the building's systems, in turn, required the modernization of the elevator. The difference is subtle, but significant. If the Lease explicitly required modernization, then Parkway's failure to modernize was an outright breach of the Lease. If the Lease instead required that the Building's systems (here, the elevators) be maintained, then Parkway's failure to modernize would only be a breach if modernization was the only means of maintaining the Building's systems. 50 North refers to passages that undisputably evidence Raymond James belief in the latter formulation.

That said, a different passage in Raymond James' First Amended Complaint is problematic. In Paragraph 29, Raymond James alleged that:

14

> Upon information and belief, the only way for Landlord to provide elevator service that is both reliable and safe – and which complies with the Lease – is to modernize, upgrade, overhaul and/or replace the elevator system in whole or part. Landlord has known of the need for modernization for years (or has been grossly negligent in not so knowing), due to among other things, its pre-purchase due diligence, through the work/inspections of various elevator companies and others involved with the system, and through simple adherence to industry norms and standards.

(ECF No. 41-1, 8.)

This paragraph is consistent with the previously cited passages because it makes clear that Raymond James believed that Landlord's obligation to maintain the premises required it to modernize the elevators. (*See id.*) The difference is that here, Raymond James went further and stated that Landlord's obligations could only be satisfied via modernization *before 50 North became the Landlord*. (*See id.*) Thus, according to Raymond James, Parkway breached the Lease by failing to modernize. Given Raymond James' knowledge that the elevators had not been modernized at the time it executed the Estoppel Certificate, and its demonstrated belief that modernization was the only way Parkway could fulfill its obligations (*i.e.,* not breach the Lease), it would be required to disclose that information.

More importantly, with regard to summary judgment, this line of argument presumes that Raymond James' prior statements constitute judicial admissions. They do not. Relevant here is the fact that Raymond James' purported judicial admission—that it believed that Landlord was contractually obligated to modernize the elevators before it executed the Estoppel Certificate—was made in its First Amended Complaint. That Complaint was superseded by Raymond James' Second Amended Complaint, which was in turn superseded by its Revised Second Amended Complaint. (ECF Nos. 393 & 495.) Because Raymond James did not incorporate factual assertions from its First Amended Complaint or reassert the factual matter at issue, the purported judicial admission was effectively eliminated and nullified twice. Thus, the factual statements can no longer constitute judicial admissions. *See* 580 F. App'x at 331.

15

Although factual allegations from a superseded pleading cannot be considered judicial admissions, they may still be advanced at the summary judgment stage as evidence rebutting a subsequent contrary assertion. *See* W. *Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 172–73 (3d Cir. 2013) (collecting cases). As relevant here, 50 North cannot prevail on summary judgment in sole reliance on Raymond James' allegations from a complaint that has now been superseded twice over.

Problems also arise when treating Raymond James' allegations from its First Amended Complaint as evidence rebutting Raymond James' latest assertions. The next paragraph of Raymond James' First Amended Complaint suggests that Raymond James' belief that Landlord was required to modernize the elevators is based upon a 2014 report Landlord commissioned but did not provide to Raymond James until a third-party subpoena required it to. (ECF No. 41-1, 9.) This clarification makes it unclear if Raymond James believed at that time that Landlord was required to modernize the elevators, or if the assertion was made with the benefit of hindsight.

In sum, 50 North's reliance on "judicial admissions" is misplaced. The Court next considers whether there exists a genuine dispute of material fact as to Raymond James' state of mind at the time it executed the Estoppel Certificate.

### B. Raymond James' State of Mind at the Time it Executed the Estoppel Certificate

Raymond James urges that its state of mind at the time it executed the Estoppel Certificate constitutes a genuine dispute of material fact that warrants the denial of 50 North's Motion for Summary Judgment. (ECF No. 479, 6.) It contends that this is the case because 50 North's Motion "turns on its unsupported contention that this omission was *intentional* and that Raymond James in fact *believed* that the condition of the elevators and roof breached the Lease." (*Id.*) Thus, Raymond James insists that whether it believed Parkway was in default at the time it executed the

16

Certificate turns on its subjective belief about the condition of the elevators and roof on January 13, 2015. (*Id.* at 7.) In support, Raymond James points to Recer's remarks that at the time of the Estoppel Certificate's execution, he and the others involved did not believe the performance of the elevators or condition of the roof constituted a breach of the performance standards set forth in the Lease since some tolerance of performance issues was built into the Lease. (ECF No. 481-1, 3.) 50 North attempts to sidestep this via the judicial admissions argument that the Court considered in the prior section. (ECF No. 483, 3-5.) 50 North urges that the elevators' condition at the time Raymond James' executed the lease is irrelevant because of Raymond James' prior assertion that the contract required Landlord to modernize the elevators. (*Id.* at 5.) To reiterate, this argument is incorrect because (1) Raymond James' prior assertion that the Lease required modernization is not binding on the Court because it was raised in a superseded complaint; and (2) that assertion carries little persuasive force because it appears to be expressly conditioned on findings from a report commissioned by Landlord but only provided to Raymond James in the course of this litigation. *See supra* Part IV.A.

Raymond James has demonstrated the existence of a genuine dispute of material fact as to whether it believed that Parkway was in default at the time it executed the Estoppel Certificate. This factual dispute lies at the heart of 50 North's counterclaim for breach of contract. Summary judgment must therefore be **DENIED**.

### C. Miscellaneous Arguments

In their briefings, the parties argue over a handful of other matters that the Court declines to address here. These disputes pertain to whether (1) additional discovery is needed; (2) future events are within Estoppel Certificate's scope; (3) 50 North's reliance on the Estoppel Certificate was reasonable; and (4) Raymond James' reasons for not disclosing issues pertaining to the

17

elevators and water infiltration are relevant. The Court finds the previously identified factual dispute sufficient to deny the Motion for Summary Judgment in full. Also, the Court cautions the parties against treating any part of this Order as a ruling on any of these matters.

## V. CONCLUSION

In considering 50 North's Motion for Summary Judgment, the Court had the opportunity to review the parties many filings and numerous court rulings. Both the undersigned and the Chief Magistrate Judge have devoted significant judicial resources to this dispute. The lack of meaningful progress in this case demonstrates that those resources have essentially gone to waste. Following that review, the Court drew several obvious conclusions. First, this case presents little more than a straightforward contractual dispute that the parties have unnecessarily complicated. Second, after seven years, around 10,000 pages spanning nearly 500 docket entries and significant motion practice, this dispute is no closer to being resolved than it was when the case began in 2018. Third, it appears that the parties are not invested in resolving this dispute in a timely fashion. Thus, at the soon to be set status conference, the parties should be ready to discuss whether additional discovery is truly needed and appropriate, and to determinate a date for any additional dispositive motions and a date for trial.

Consistent with the foregoing, 50 North's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED,** this 12th day of March 2025.

                                             *s/John T. Fowlkes, Jr.*
                                             JOHN T. FOWLKES, JR.
                                             UNITED STATES DISTRICT JUDGE